IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PHARMACYCLICS LLC and          )
JANSSEN BIOTECH, INC.,         )
                               )
            Plaintiffs,        )
                               )
        v.                     )   C.A. No. 19-434 (CFC)
                               )
                               )   **REDACTED - PUBLIC**
                               )   **VERSION**
ALVOGEN PINE BROOK LLC and     )
NATCO PHARMA LTD.,             )
                               )
            Defendants.        )

## JOINT CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com
jlyons@mnat.com
    *Attorneys for Plaintiffs*

YOUNG CONAWAY STARGATT &
TAYLOR LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
    *Attorneys for Alvogen Pine Brook*
    *LLC and Natco Pharma Ltd.*

OF COUNSEL:

Christopher N. Sipes
Erica N. Andersen
Brianne Bharkhda
Chanson Chang
Nicholas L. Evoy
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000
    *Attorneys for Pharmacyclics LLC*

OF COUNSEL:

Siegmund Y. Gutman
David M. Hanna
Michelle M. Ovanesian*
Christopher D. Lynch
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA  90067-3010
(310) 557-2900

Irena Royzman
Marcus A. Colucci
Cristina Martinez
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Hannah Lee
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
(650) 752-1700

Kimberly Q. Li
One International Place
Boston, MA  02110-2600
(617) 526-9600

 *Attorneys for Janssen Biotech, Inc.*

Original Filing Date: December 12, 2019
Redacted Filing Date: December 27, 2019

# TABLE OF CONTENTS

Page

I.   INTRODUCTION AND TECHNOLOGY BACKGROUND ...................... 1

   A.   Plaintiffs' Introduction and Technology Background ........................ 1

      1.   Plaintiffs' Introduction.................................................................. 1

      2.   Plaintiffs' Technology Background............................................ 5

   B.   Defendants' Introduction and Technology Background...................... 9

      1.   Defendants' Introduction ........................................................... 9

      2.   Defendants' Technology Background ...................................... 9

II.   DISPUTED TERMS............................................................................ 16

   A.   Disputed Compound Terms ............................................................. 16

      1.   "compound" (the Honigberg Patents)...................................... 17

      2.   "compound" (the '857 and '507 Patents) ................................ 41

      3.   "the structure […] "................................................................. 45

      4.   "pharmaceutical[ly] acceptable [ . . . ] salt[s] thereof"............ 50

   B.   Disputed Ibrutinib Terms ................................................................. 58

      1.   "ibrutinib" ............................................................................... 59

      2.   "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one"................................................................................ 65

   C.   Disputed Crystalline Form Terms.................................................... 71

      1.   "crystalline form"................................................................... 71

      2.   "[X-ray powder diffraction (XRPD) pattern; Infrared (IR) Spectrum; DSC thermogram; or thermo-gravimetric

analysis (TGA) thermograph] as [shown/the one set forth] in [FIG. 1; 2; 3; or 4, respectively]" .............................. 79

D.  Disputed Tablet Formulation Terms .................................... 90

   1.  "solid tablet formulation" ........................................ 90

   2.  "mean $AUC_{0-\infty}$ of about 465 ng*h/ml +/-248 ng*h/ml" .......... 95

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009) ...................................................................38, 40

*Ansell Healthcare Prods. LLC v. Reckitt Benckiser LLC*,
   C.A. No. 15-915-RGA, 2018 WL 620968 (D. Del. Jan. 30, 2018)....................87

*AstraZeneca AB v. Dr. Reddy's Labs., Inc.*,
   No. 11-CV-2317 JAP, 2013 WL 1847639 (D.N.J. May 1, 2013)..............*passim*

*Augme Techs., Inc. v. Yahoo! Inc.*,
   755 F.3d 1326 (Fed. Cir. 2014) .........................................................................82

*BASF Agro B.V., Arnhem (NL), Wadenswil Branch v. Cheminova, Inc.*,
   No. 10-CV-274 WO, 2011 WL 3473352 (M.D.N.C. Aug. 9, 2011) .................18

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
   895 F.3d 1374 (Fed. Cir. 2018) .........................................................................40

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
   749 F.3d 1349 (Fed. Cir. 2014) ...................................................................51, 52

*Bristol-Myers Squibb Co. v. Apotex, Inc.*,
   C.A. No. 10–5810 (MLC), 2013 WL 1314733 (D.N.J. Mar. 28, 2013) ...................................................................................................35

*Cephalon Inc. v. Mylan Pharms. Inc.*,
   962 F. Supp. 2d 688 (D. Del. 2013)...................................................................90

*Cipla Ltd. v. Sunovion Pharms. Inc.*,
   CA No. 15-424 (LPS), 2017 WL 2778352 (D. Del. June 27, 2017)............72, 74

*Collabo Innovations, Inc. v. Omnivision Techs., Inc.*,
   C.A. No. 16-197-JFB-SRF, 2017 U.S. Dist. LEXIS 136711 (D. Del. Aug. 25, 2017) ...........................................................................................55

iii

*D&M Holdings, Inc. v. Sonos, Inc.*,
  C.A. No. 16-cv-141, 2017 U.S. Dist. LEXIS 122301 (D. Del. Aug.
  3, 2017) ...........................................................................................*passim*

*Digital Biometrics, Inc. v. Identix, Inc.*,
  149 F.3d 1335 (Fed. Cir. 1998) ........................................................26

*Digital-Vending Servs. Int'l., LLC v. Univ. of Phoenix, Inc.*,
  672 F.3d 1270 (Fed. Cir. 2012) ........................................................97

*Dow Chem. Co. v. Astro-Valcour, Inc.*,
  267 F.3d 1334 (Fed. Cir. 2001) ........................................................35

*Finjan v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) .......................................................*passim*

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014) ..................................................29, 38

*Glaxo, Inc. v. Novopharm, Ltd.*,
  110 F.3d 1562 (Fed. Cir. 1997) ........................................................35

*Glaxo Inc. v. Novopharm Ltd.*,
  52 F.3d 1043 (Fed. Cir. 1995) ..........................................................35

*H. Lundbeck A/S v. Apotex, Inc. et al.*,
  C.A. No. 18-88-LPS, 2019 WL 3206016 (D. Del. Jul. 16, 2019)......................88

*Hill-Rom Servs. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014) ...........................................20, 28, 59

*In re Rambus Inc.*,
  694 F.3d 42 (Fed. Cir. 2012) ............................................................78

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
  783 F.3d 1262 (Fed. Cir. 2015) ..........................................................3

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*,
  285 F.3d 1046 (Fed. Cir. 2002) (en banc) ........................................83

*Kinetic Concepts v. Blue Sky Med. Grp.*,
  554 F.3d 1010 (Fed. Cir. 2009) ........................................................38

iv

*Kowa Co., Ltd. v. Amneal Pharms., LLC*,
    No. 14-CV-2758 PAC, 2017 WL 10667089 (S.D.N.Y. Sept. 19,
    2017) .................................................................................................0, 5

*Markman v. Westview Instruments*,
    52 F.3d 967 (Fed. Cir. 1995) .......................................................*passim*

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ...........................................................51

*Meds. Co. v. Mylan, Inc.*,
    853 F.3d 1296 (Fed. Cir. 2017) ..................................................29, 38

*Merck & Co., Inc. v. Ranbaxy Inc.*,
    No. 07-CV-229 GMS, 2008 WL 5727540 (D. Del. Feb. 29, 2008)..................19

*Merck & Co. v. Teva Pharm. USA, Inc.*,
    347 F.3d 1367 (Fed. Cir. 2003) ...........................................................90

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)..................................................................28, 55

*Nystrom v. TREX Co.*,
    424 F.3d 1136 (Fed. Cir. 2005) ...........................................................38

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) .......................................................*passim*

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) .............................................21, 41, 65, 102

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*,
    386 F.3d 1133 (Fed. Cir. 2004) ............................................21, 27, 73, 74

*Paragon Solutions, LLC v. Timex Corp.*,
    566 F.3d 1075 (Fed. Cir. 2009) ...........................................................87

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................27, 37, 38, 79

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018) ...........................................................87

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*,
No. 11-CV-230 FSH, 2013 WL 5333033 (D.N.J. Sept. 23, 2013) ..............50, 55

*S.O.I.TEC Silicon on Insulator Techs., S.A. v. MEMC Elec. Materials, Inc.*,
745 F. Supp. 2d 489 (D. Del. 2010).............................................................24, 53

*Smith v. Nichols*,
88 U.S. 112 (1874)........................................................................................35

*SoftView LLC v. Apple Inc.*,
2013 WL 4758195 (D. Del. Sept. 4, 2013)........................................................37

*Stumbo v. Eastman Outdoors, Inc.*,
508 F.3d 1358 (Fed. Cir. 2007) ...............................................................91, 97

*Takeda Pharm. Co. v. Handa Pharms., LLC*,
No. 11-CV-00840 JCS, 2012 WL 1243109 (N.D. Cal. Apr. 11, 2012) ........................................................................................................72, 74

*Temco Elec. Motor Co. v. Apco Mfg. Co.*,
275 U.S. 319 (1928)......................................................................................35

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ...............................................................29, 38

*Trs. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) .......................................................................38

*Warner Chilcott Co., LLC v. Mylan Inc.*,
No. CIV.A. 11-6844 JAP, 2013 WL 3336872 (D.N.J. July 2, 2013) ...............90

*Zenith Labs. Inc. v. Bristol-Myers Squibb Co.*,
19 F.3d 1418 (Fed. Cir. 1994) .........................................................................35

**Statutes**

35 U.S.C. § 112 .............................................................................24, 33, 40

# LIST OF ABBREVIATIONS

- "**A___**" refers to material in the Exhibits to the Final Joint Claim Construction Chart, D.I. 59.

- **"Alvogen's Products"** refers to Alvogen's proposed generic ibrutinib tablet product.

- "**ANDA**" refers to Abbreviated New Drug Application.

- "**Capsule Action**" refers to Consolidated C.A. No. 18-192 (CFC).

- "**Capsule Defendants**" refers to the named defendants in Consolidated C.A. No. 18-192 (CFC).

- **"DSC"** refers to differential scanning calorimetry.

- **"IR"** refers to Infrared.

- "*Markman* **Tr.**" refers to Transcript for the *Markman* Hearing held on May 20, 2019 in Consolidated C.A. No. 18-192 (CFC), D.I. 169.

- "**Myerson Decl**." refers to the Declaration of Dr. Allan S. Myerson on Claim Construction, dated February 15, 2019, filed as an Exhibit to the Joint Claim Construction Appendix for Consolidated C.A. No. 18-192 (CFC), D.I. 145, B0106–B0163.

- "**Myerson Reply Decl.**" refers to the Reply Declaration of Dr. Allan S. Myerson on Claim Construction, filed as an Exhibit to the Joint Claim Construction Appendix for Consolidated C.A. No. 18-192 (CFC), D.I. 145, B0446–B0479.

- "**NDA**" refers to New Drug Application.

- "**POSA**" refers to a "Person of Ordinary Skill in the Art."

- "**Reider Decl.**" refers to the Declaration of Dr. Paul J. Reider on Claim Construction, dated February 7, 2019, filed as an Exhibit to the Joint Claim Construction Appendix for Consolidated C.A. No. 18-192 (CFC), D.I. 145, B0041–B0061.

- **"TGA"** refers to thermogravimetric analysis.

- **"The '645 Application"** refers to U.S. Patent Application No. 11/617,645 (B0752-61, B0762-77, B1256-71).

- **"The '949 Application"** refers to U.S. Patent Application No. 13/908,949. (B0778-803, B0871-946, B0947-59)

- **"The '386 Patent"** refers to U.S. Patent No. 10,213,386 (A1251–A1316).

- **"The '444 Patent"** refers to U.S. Patent No. 7,514,444 (A0132–A0205).

- **"The '455 Patent"** refers to U.S. Patent No. 9,725,455 (A0001–A0067).

- **"The '507 Patent"** refers to U.S. Patent No. 10,010,507 (A1183–A1250).

- **"The '753 Patent"** refers to U.S. Patent No. 9,296,753 (A0068–A0131).

- **"The '857 Patent"** refers to U.S. Patent No. 9,655,857 (A1113–A1182).

- "**The Buggy Patent**" or **"The '090 Patent"** refers to U.S. Patent No. 8,754,090 (A0856–A0977).

- "**The Crystalline Form Patents**" refers to U.S. Patent Nos. 9,725,455 (A0001–A0067); 9,296,753 (A0068–A0131); 10,106,548 (A0978–A1045); and 10,125,140 (A1046–A1112).

- "**The Honigberg Patents**" refers to U.S. Patent Nos. 7,514,444 (A0132–A0205); 8,008,309 (A0206–A0273); 8,476,284 (A0274–A0345); 8,497,277 (A0564–A0636); 8,697,711 (A0346–A0421); 8,735,403 (A0637–A0711); 8,754,091 (A0712–A0782); 8,952,015 (A0783–A0855); 8,957,079 (A0422–A0492); and 9,181,257 (A0493–A0563).

- "**The Tablet Formulation Patents**" refers to U.S. Patent Nos. 9,655,857 (A1113–A1182); 10,010,507 (A1183–A1250); and 10,213,386 (A1251–A1316).

- **"USPTO"** refers to U.S. Patent and Trademark Office.

- **"XRPD"** refers to X-Ray powder diffraction.

# I.    INTRODUCTION AND TECHNOLOGY BACKGROUND

## A.    Plaintiffs' Introduction and Technology Background

### 1.    Plaintiffs' Introduction

This case concerns Imbruvica® (ibrutinib), a ground-breaking drug developed by Pharmacyclics and Janssen (collectively, "Plaintiffs") to treat certain types of cancer, including mantle cell lymphoma, and chronic graft versus host disease. Ibrutinib covalently bonds to a protein called Bruton's tyrosine kinase ("BTK"), a key signaling molecule in a pathway that controls B-cell growth and maturation, thereby irreversibly inhibiting BTK's activity. Abnormalities in this pathway can cause cancers of the blood and bone marrow. Imbruvica is the first FDA-approved BTK inhibitor.

Imbruvica is available in the United States in both capsule (NDA No. 205552) and tablet (NDA No. 210563) dosage forms. Alvogen and Natco (collectively, "Tablet Defendants") seek FDA approval to sell generic ibrutinib tablets before the expiration of the asserted Orange Book patents protecting Imbruvica. Litigation against other generic drug manufacturers seeking approval for ibrutinib capsules, on many of the same patents and claims, began more than a year before the litigation against Tablet Defendants. Claim construction involving the Capsule Defendants has already occurred. *See* Capsule Action, D.I. 144, 145, 148, 169. Several of the terms identified for construction by Tablet Defendants—"compound," "crystalline form," and "an X-ray powder diffraction (XRPD) pattern as shown in FIG. 1"—were addressed by this

1

Court as part of the claim construction proceeding involving the Capsule Defendants. Plaintiffs submit that the constructions previously adopted by this Court for those terms should apply here.

There are four patent families at issue: (1) the Honigberg Patents are directed to BTK inhibitor compounds, including ibrutinib; (2) the Buggy Patent is directed to a method of treating mantle cell lymphoma using ibrutinib; (3) the Crystalline Form Patents are directed to novel crystalline forms of ibrutinib; and (4) the Tablet Formulation Patents are directed to ibrutinib tablet formulations.

Tablet Defendants have identified ten terms for construction. They fall into four groups. First, Tablet Defendants seek construction of several common terms ubiquitous to pharmaceutical patents: "compound," "the structure [followed by particular chemical structures]," and "pharmaceutical[ly] acceptable [...] salt[s] thereof." "Compound" is a basic chemistry term which has already been construed by this Court consistent with its plain meaning. *Markman* Tr. at 12:17–15:19. The terms that refer to particular chemical structures would be understood by a POSA on their face. The term "pharmaceutical[ly] acceptable [...] salt[s] thereof" has a well-understood meaning, and the express definition in the patents is consistent with the meaning.

Tablet Defendants disregard the Court's prior claim construction ruling. They do not actually offer constructions for the terms. Rather, they either argue that certain

claims using common pharmaceutical terms are indefinite or add unfounded negative limitations to the terms to avoid infringement. However, these terms are either basic chemistry terms or actual chemical compounds. Tablet Defendants' scientifically inaccurate negative limitations violate bedrock claim construction principles. That Tablet Defendants have proposed nearly identical exclusionary language for five different terms—(1) "compound"; (2) "the structure […]"; (3) "pharmaceutical[ly] acceptable […] salt[s] thereof"; (4) "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one"; and (5) "ibrutinib"—in 17 different patents in itself shows that this language is not based on the intrinsic evidence, which varies for each patent family, but rather on Tablet Defendants' litigation strategy.[1]

Second, Tablet Defendants seek construction of the terms "ibrutinib"—the compound at the heart of this case—and "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one"—the chemical name for ibrutinib. The meaning of these terms is clear; they both refer to the ibrutinib compound. No further construction is necessary. Tablet Defendants' exclusionary constructions are scientifically and legally wrong.

Third, the parties dispute the proper construction of several terms from the

---

[1] Tablet Defendants clearly understand the meaning of these terms. Indeed, they were able to copy Plaintiffs' product and patented inventions.

Crystalline Form Patents. Tablet Defendants seek a litigation-motivated construction of "crystalline form"—a term already construed by the Court to have its plain meaning. Tablet Defendants also seek construction of several terms relating to the identification of crystalline forms of ibrutinib through various scientific techniques. The Court already ruled on one of these terms, "an X-Ray powder diffraction (XRPD) pattern as shown in FIG. 1," rejecting the Capsule Defendants' disclaimer argument that this term requires "an X-Ray powder diffraction pattern identical to FIG. 1." *Markman* Tr. at 96:12–101:3; 113:2–3. As the Court recognized, the question of whether the results of a particular analytical technique are "as shown in" or "as set forth in" a figure in the patent is a question for the experts at the merit stage; it is not a question of claim construction. *Id.* at 115:17–118:5. Accordingly, these terms do not require further construction. Tablet Defendants' attempt to re-write these terms to require identical analytical results should be rejected.

Fourth, Tablet Defendants seek construction of two terms from the Tablet Formulation Patents: "solid tablet formulation" and "mean $AUC_{0-\infty}$ of about 465 ng*h/ml +/-248 ng*h/ml." These terms need no further construction. Indeed, Tablet Defendants' "constructions" simply repeat these claim terms verbatim and then add words plucked from other portions of the claims, which do not elucidate the meaning of the disputed terms. Importing such limitations into the disputed terms is unnecessary and contrary to the law of claim construction.

4

### 2. Plaintiffs' Technology Background

### a) Crystalline Forms and Salts

Crystalline solids or crystals are solid material in which the atoms or molecules are arranged in a repeating three-dimensional pattern. Myerson Decl. ¶ 27 (B0116). The structure of a crystalline solid (called the crystal lattice) is determined by the position of the molecules relative to each other in three dimensions, their packing arrangement, and their symmetry. *Id.* ¶¶ 28–31 (B0117–18). If a crystalline compound has solvent molecules in its structure, it is referred to as a solvate. Ex. 17, Harry G. Brittain, *Chapter 6: Methods for the Characterization of Polymorphs and Solvates*, *in* POLYMORPHISM IN PHARMACEUTICAL SOLIDS 227, 228 (1st ed. 1999) ("Brittain") (B0701). If the solvent is water, it is referred to as a hydrate. *See, e.g.*, '444 Patent, 60:13–14; '753 Patent, 29:38–39. Certain compounds can be crystallized into more than one distinct crystal structure. Different crystal forms of the same material are called "polymorphs." Myerson Decl. ¶ 32 (B0118).

Salts are electrically neutral compounds that consist of atoms or molecules held together via bonds that include some degree of ionic transfer between the acid and the base. The positive ion is known as the cation, and the negative ion is known as the anion. Salts of pharmaceutically active compounds are formed by reacting the parent or "free" form of the compound with either an acid or base, depending on the properties of the parent. *See* '444 Patent, 59:33–63; '857 Patent, 24:66–25:22.

5

Ibrutinib is not a salt; it is in the free form. Ex. 16, FDA Center for Drug Evaluation and Research, Product Quality Review for Imbruvica Tablet NDA (B0697) (ibrutinib is "free base, not a salt").

### b) Analytical Methods

The Crystalline Form Patents discuss several analytical techniques, including X-Ray powder diffraction ("XRPD"), Infrared spectroscopy ("IR"), thermogravimetric analysis ("TGA"), and differential scanning calorimetry ("DSC"). As with any measurement technique, these techniques are subject to experimental error and variation. Myerson Decl. ¶ 46 (B0124); Ex. 13, Joel Bernstein, *Analytical techniques for studying and characterizing polymorphs*, *in* POLYMORPHISM IN MOLECULAR CRYSTALS, 94, 106 (2002) ("Bernstein") (B0628); Ex. 14, *Spectrophotometry and Light-Scattering*, *in* THE UNITED STATES PHARMACOPEIA, 1992–97 (24th rev. 2000) (B0678–83); Ex. 15, Kishore et al., *Uncertainties in the Measurements in Differential Scanning Calorimeter and Thermomechanical Analyser*, 31 Def. Sci. J. 63–71 (1981) ("Kishore") (B0684–92).

### (1) X-Ray Powder Diffraction (XRPD)

XRPD can be used to characterize or identify the crystalline form of a given material. It works by exposing a sample to X-rays, which diffract as they pass through the sample. Because the position of atoms differs in each crystalline form of a substance, the X-rays will diffract in a unique way. Myerson Decl. ¶¶ 36–37 (B0119–

20). The diffracted X-rays are measured to determine the angle of diffraction, known as "Bragg angles" or "2-Theta" values. *Id.* ¶¶ 38–39 (B0120–22). A separate parameter measured in XRPD testing is "intensity," which represents the strength of diffraction at a particular angle. *Id.* ¶ 40 (B0122). "Relative intensity" refers to the relative size of a peak as compared to the intensity of the most pronounced peak in the diffractogram. *Id.* These measurements can be plotted in a graph with the 2-Theta values on the horizontal (x) axis and the intensities on the vertical (y) axis. *Id.* Figure 1 from the '753 Patent is an example of such a graph, known as a diffractogram. *Id.* ¶ 39 (B0121–22).

The number of peaks detected, their positions and intensities may depend on a number of factors, including sample preparation, sample size, the degree to which a sample was ground, and instrument variability, and experimental parameters, such as the scanning speed of the diffractometer. *Id.* ¶¶ 46–48 (B0124–25).

### (2)    Infrared (IR)

IR is an analytical technique based on the interaction of light (usually a laser) with the chemical compound under investigation. Ex. 13, Bernstein at 125 (B0651). Using this technique, one can generate an infrared spectrum for the compound or polymorph, which has a series of peaks. *Id.* at 125–28 (B0651–54). The IR spectrum can used to characterize and identify the compound. *Id.* Figure 2 from the '753 Patent is an example of an IR spectrum.

### (3)    Thermogravimetric Analysis (TGA) and Differential Scanning Calorimetry (DSC)

TGA and DSC are thermal techniques. TGA, which involves heating a sample and measuring the change in the mass of the sample as the temperature increases, can be used to analyze the water content of a material. Ex. 13, Bernstein at 105 (B0627). DSC is used to identify the melting point of a material (the transition point from a crystalline solid to a liquid) and the energy required to melt a particular material (referred to as the enthalpy of melting). *Id.* at 104–05 (B0626–27). Melting point and enthalpy of melting are used to identify materials or to distinguish between different forms of the same material, and can provide useful information about a sample, such as purity, form, and degree of crystallinity. *Id.* at 104 (B0626). Figure 3 from the '753 Patent is an example of a DSC. Figure 4 is an example of a TGA.

### c)    A Person of Ordinary Skill in the Art

Plaintiffs' proposed definitions of a person of ordinary skill in the art relevant to certain disputed terms are set forth in the declarations of Dr. Reider (Reider Decl. ¶¶ 10–11 (B0046–47)) and Dr. Myerson (Myerson Decl. ¶ 61 (B0131–32)). In addition, a person of ordinary skill in the art relevant to the disputed terms of the Tablet Formulation Patents would have a bachelors or masters-level degree in a science or engineering discipline relating to pharmaceutics with several years of experience in drug delivery, or a Ph.D. level degree in such a discipline with less experience.

8

### B.    Defendants' Introduction and Technology Background

#### 1.    Defendants' Introduction

Defendants' proposed constructions are based on the intrinsic evidence, including the claims, the specification, and the prosecution history. In contrast, for several claim terms, Plaintiffs offer no further construction at all and merely assert that each should be given its "plain and ordinary meaning," without saying what that "meaning" is. For other claim terms, Plaintiffs rely only on extrinsic evidence and fail to cite any intrinsic evidence, such as the prosecution history, which undermines Plaintiffs' proposed constructions. As a result, Plaintiffs' proposed constructions impermissibly attempt to broaden the scope of the claims. Furthermore, for claim terms such as "ibrutinib" and the chemical formula thereof, Plaintiffs' constructions fail to resolve the parties' dispute regarding whether the entities identified in Defendants' proposed construction should fall within the scope of the term. For these reasons, Plaintiffs' proposed "constructions" should be rejected and Defendants' proposed constructions, which are tied to the intrinsic evidence, should be adopted.

#### 2.    Defendants' Technology Background

##### a)    Crystalline Solids, Polymorphs, Solvates, and Salts

Crystalline solids are solid materials whose atoms, molecules, or ions are arranged in a highly ordered structure, forming a three-dimensional lattice that extends in all directions, *see* Figure 1.



Figure 1.  Visual representation of 3D lattice of molecules.

Ex. 43, Swift Decl. ¶ 42 (B1356). The structure of a crystalline solid is determined by the relative positions of the molecules, the arrangement of the molecules, and their symmetry. *Id.,* ¶ 43 (B1356). Different crystalline solids of the same group of atoms, molecules, or ions are referred to as "polymorphs" or "crystalline forms," which have distinct crystal structures and properties from other polymorphs of the same compound, as shown by the distinct crystal structures of Polymorphs A, B, and C in Figure 2. *Id.,* ¶¶ 44-46 (B1357).

A crystalline solid can be combined with a solvent to form a solvate. *Id.,* ¶¶ 44, 47 (B1357). Figure 2 shows the conceptual difference between three different ***polymorphs***, where the blue boxes are atoms, molecules, or ions that arranged in an orderly but different fashion between A, B, and C, and a ***solvate***, where the purple hexagons represent the atoms, molecules, or ions and the green stars indicate a solvent:

10



Figure 2.  Visual representation of three different polymorphs and a solvate. *Id.,* ¶ 48 (B1357-58).

Structural differences between polymorphs and solvates with respect to crystal packing and molecular conformation yield different respective properties, including lattice energy, entropy, enthalpy of melting, solubility, and dissolution rate. *Id.,* ¶ 49 (B1358).

Where the solvent is water, the solvate is termed a hydrate. *Id.,* ¶ 50 (B1358). The term "crystal forms" broadly refers to all crystalline solids sharing the same non-solvent component. *Id.,* ¶ 51 (B1359). The experimental conditions under which a specific crystalline form can be obtained are highly unpredictable. Conditions which yield one crystal form exclusively must be determined through experimentation. *Id.,* ¶ 52 (B1359).

11

Salts are solid compounds consisting of an ionic assembly of cations (positively charged ions) and anions (negatively charged ions) such that the resultant compound is electrically neutral. *Id.,* ¶ 53 (B1359).

### b)    Analytical Methods

The Crystalline Form Patents rely on the following analytical techniques for characterizing the claimed subject matter, crystalline Form A: XRPD, IR spectroscopy, TGA, and DSC. For each of these analytical methods, the results are unique to identifying the specific crystalline form. *Id.,* ¶ 54 (B1359).

### (1)    XRPD

XRPD is an analytical technique used to identify and characterize the "phase" of a crystalline material. Every phase of a crystalline substance produces an XRPD pattern that is distinct, so that XRPD patterns serve as "fingerprints" for the crystalline form. Because each crystalline form has a unique XRPD pattern, XRPD can be used to determine whether two crystalline forms are the same. *Id.,* ¶ 55 (B1359).

The XRPD pattern is presented as a graph, with the peak positions on the x-axis, reported in units of "degrees 2-Theta," and peak intensity on the y-axis, reported in units of "counts." In some instances, the y-axis represents relative peak intensity based on a ratio of the subject peak to the most intense (highest) peak. *Id.,* ¶ 56 (B1360).

For any two samples of the same test material, the resultant XRPD patterns show little variance, if any, regarding peak positions, though peak intensities may vary. By examining the peak positions produced in the XRPD pattern, one can determine the crystalline form because the peak positions of XRPD patterns of the same crystalline form are the same. *Id.*, ¶¶ 57-58 (B1360).

### (2)    IR Spectroscopy

IR spectroscopy is an analytical technique based on the interaction of infrared light interacting with a particular compound. An IR spectrum presents as a graph, with frequency or wavelength on the x-axis, reported in units of "reciprocal centimeters," and absorbance on the y-axis. Any given compound is characterized by a particular IR spectrum. *Id.*, ¶ 59 (B1361).

### (3)    TGA

TGA is a thermoanalytical technique in which the mass of a sample is continuously measured while the temperature of the sample changes over time. Base measurements typically include mass, temperature, and time. This data is presented as a curve, referred to as a "TGA curve," on a graph, with temperature or time on the x-axis, and the mass or percentage of initial mass on the y-axis. The TGA curve is used to characterize materials based on their characteristic decomposition patterns and thermal stability. *Id.*, ¶ 60 (B1361).

### (4)    DSC

DSC is a thermoanalytical technique used to detect phase transitions by measuring the amount of heat required to increase the temperature of a sample, and a reference as a function of temperature. When a sample undergoes a phase transition, the amount of heat needed to flow to or from the sample, as compared to the reference, differs in order to maintain both the sample and the reference at the same temperature. Data from DSC is presented in the form of a DSC curve, which shows the heat flux on the y-axis against temperature or time on the x-axis. DSC can be used to determine the melting point and enthalpy of melting of a material, both of which are characteristics that help distinguish different forms of a compound. DSC, by similar means, is used to determine the purity and degree of crystallinity of a compound. *Id.,* ¶ 61 (B1361-62).

### c)    Ibrutinib

The current action relates to the purported infringement of Alvogen's Products of Imbruvica. ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Plaintiffs unsurprisingly, by way of example with respect to the claim term "ibrutinib," attempt to broaden the scope of "ibrutinib" under its "plain meaning" to cover both a compound and a particular polymorph of the compound. *Infra* at 59; Myerson Decl. ¶ 54 (B0128). This is

precisely why this Court should reject Plaintiffs' proposed "constructions" (or lack thereof) and squarely address the issue of whether certain entities fall within the scope of the disputed claim terms.

### d)    Person of Ordinary Skill in the Art

Defendants generally agree with Plaintiffs regarding the role of a POSA in the claim construction process. However, Defendants note that determining how a POSA would have understood the claim also requires consideration of the disclosures in the specification and the prosecution history. *Markman v. Westview Instruments*, 52 F.3d 967, 979 (Fed. Cir. 1995).

For the Honigberg Patents, a POSA would have a Ph.D. in chemistry, organic chemistry, or a related field. For the methods of treatment claims of the Honigberg Patents, a POSA would comprise one or more individuals that have the aforementioned education; and/or a M.D., and several years of experience in treating cancer. For the formulation claims of the Honigberg Patents, a POSA would have the aforementioned education and also have several years of experience in drug delivery and/or drug formulation.

For the Crystalline Form Patents, a POSA would have a Ph.D. in chemistry, organic chemistry, or a related field, with some knowledge of solid state or analytical chemistry.

For the Buggy Patent, a POSA would comprise one or more individuals that have: 1) a Ph.D. in chemistry, organic chemistry, or a related field; and/or 2) a M.D., and several years of experience in treating cancer.

For the Tablet Formulation Patents, a POSA would have a Ph.D. in chemistry, organic chemistry, or a related field, with several years of experience in drug delivery and/or drug formulation.

## II.    DISPUTED TERMS

### A.    Disputed Compound Terms

| CLAIM TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|
| "compound" (the Honigberg Patents) | "a substance formed when two or more elements are chemically bonded together. These elements cannot be separated by physical means." (C.A. No. 18-192, D.I. 169, Transcript of May 20, 2019 Hearing) | *The term is indefinite* If the Court chooses to construe the term, it means "molecule (that is not a composition, formulation, derivative, salt, metabolite, solvate, prodrug, ester, acid, crystalline form ("also known as polymorph[]"), or N-oxide of the recited molecule)" |
| "compound" (the Tablet Formulation Patents) | "a substance formed when two or more elements are chemically bonded together. These elements cannot be separated by physical means." (C.A. No. 18-192, D.I. 169, Transcript of May 20, 2019 Hearing) | "molecule (that is not a composition, formulation, derivative, salt, metabolite, solvate, prodrug, [ester], [acid], crystalline form, ["also known as polymorph[]"], or N-oxide of the recited molecule)" |

| "the structure […]" | No construction necessary/plain and ordinary meaning. | "the structure shown (that is not a composition, formulation, derivative, salt, metabolite, solvate, prodrug, [ester], [acid], crystalline form, ["also known as polymorph[]"], or N-oxide of the recited molecule)" |
|---|---|---|
| "pharmaceutical[ly] acceptable […] salt[s] thereof" | No construction necessary/plain and ordinary meaning.<br><br>In the alternative, Plaintiffs propose construing this term to mean: "salt[s] that has/[have] no persistent detrimental effect on the general health of the subject being treated or does/[do] not abrogate the biological activity or properties of the compound, and is/[are] relatively nontoxic | *The term is indefinite*<br><br>If the Court chooses to construe the term, it means "a salt[s] 'having no persistent detrimental effect on the general health of the subject being treated, or does not / do not abrogate the biological activity or properties of the compound, and is relatively nontoxic' (excluding compositions, formulations, derivatives, metabolites, solvates, prodrugs, esters, acids, crystalline forms ("also known as polymorphs"), and N-oxides of the molecule recited in the respective claim)" |

## 1.    "compound" (the Honigberg Patents)

### a)    Plaintiffs' Opening Position[2]

"Compound" appears in asserted claims of the Honigberg Patents and two

Tablet Formulation Patents (the '857 and '507 Patents). During the claim construction

---

[2] For convenience, Plaintiffs cite to the written description of the '444 Patent for the Honigberg Patents, which share a common written description, and to the written description of the '857 Patent for the Tablet Formulation Patents, which share a common specification.

proceeding in the Capsule Action, the Court construed the term "compound" in the Honigberg Patents and the Buggy Patent to have its plain and ordinary meaning in the art: "A substance formed when two or more elements are chemically bonded together and these elements cannot be separated by physical means." *Markman* Tr. at 12:17–15:19.

The Court's construction is correct and should apply here. The Court's construction is supported by the intrinsic and extrinsic evidence. The written descriptions of the patents use the term "compound" hundreds of times without giving it a special definition. Rather, the written descriptions of the patents explicitly instruct that technical terms like "compound," which are not otherwise defined, "have the same meaning as is commonly understood by one of skill in the art." '444 Patent, 11:18–21; '857 Patent, 25:65–26:2; *see also* '444 Patent, 11:48–49 (definitions of "standard chemistry terms may be found in reference works"). References such as chemistry dictionaries and textbooks define the term as the Court and Plaintiffs do. Reider Decl. ¶¶ 13–15, 19 (B0047–48, 50) (citing, e.g., Ex. 1, Steven S. Zumdahl, INTRODUCTORY CHEMISTRY: A FOUNDATION 69 (2d ed. 1993) (B0004) (defining "compound" as "a substance composed of a given combination of elements that can be broken down into those elements by chemical methods.")).

The Court's construction is the term's ordinary meaning. *See, e.g., BASF Agro B.V., Arnhem (NL), Wadenswil Branch v. Cheminova, Inc.*, No. 10-CV-274 WO, 2011

WL 3473352, at *7 (M.D.N.C. Aug. 9, 2011) (construing "compound" as "[a] substance whose molecules consist of atoms of different elements. The elements cannot be separated by physical means."); *see also Merck & Co., Inc. v. Ranbaxy Inc.*, No. 07-CV-229 GMS, 2008 WL 5727540, at *1 (D. Del. Feb. 29, 2008) ("'A compound' is construed to have its plain and ordinary meaning.").

Despite the Court's prior claim construction ruling, Tablet Defendants argue that this term is somehow indefinite when used in the Honigberg Patents (but not indefinite when used in the Tablet Formulation Patents). There is no merit to this argument. This is a basic chemistry term with an ordinary, well-established meaning—already adopted by the Court.

The construction for compound that Tablet Defendants have offered is equally flawed. It is over inclusive, under inclusive, and wrong as a matter of science and law. It starts by describing a "compound" as a "molecule." However, a POSA would understand that a molecule is not the same as a "compound." A "compound" must include two or more different elements. Reider Decl. ¶ 18 (B0049). But, a molecule need not. For example, oxygen gas ($O_2$) is a molecule, but it is not a "compound." Thus, the Tablet Defendants' construction includes substances that are not "compounds."

Tablet Defendants also ask the Court to rule as a matter of claim construction that a compound is not "a composition, formulation, derivative, salt, metabolite,

19

solvate, prodrug, ester, acid, crystalline form ('also known as polymorph[]'), or N-oxide of the recited molecule." This "construction" is not a definition of the term "compound." Rather, it is a list of unconnected exclusions that is not based in science or the intrinsic evidence. For example, a compound is not a formulation, but may be included in a formulation. By contrast, crystalline forms and polymorphs describe physical forms (the arrangement of the material in space) in which a compound may exist. Reider Decl. ¶ 17 (B0049); Myerson Decl. ¶ 32 (B0118).

Whether a substance is a "compound" depends on its chemical composition at an atomic level, and is an inquiry answered by examination of the substance's constituent atoms and their bonding. Reider Decl. ¶ 17 (B0049). A "compound" is neither defined nor limited by reference to any particular physical state, *Id*. ¶¶ 17–20 (B0049–51), nor whether it is incorporated into a composition, formulation, or prodrug. There is no dispute that ibrutinib is a "compound" within the scope of the claims, regardless of its physical form or whether it is incorporated into a drug product.

Tablet Defendants' construction is also at odds with claim construction principles. Courts may "depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Neither applies here. There is no indication that the inventors intended to depart from the term's

ordinary meaning. Indeed, "compound" is used over four hundred times in the Honinberg Patents and dozens of times in the Tablet Formulation Patents, without any redefinition of the term or disavowal of its plain and ordinary meaning. *Id.*

Tablet Defendants' negative limitation would also improperly exclude embodiments of the claimed compounds, such as crystalline forms/polymorphs, that the written description expressly states are included:

> Compounds described [in the patents] may be in various forms, including but not limited to, amorphous forms, milled forms and nano-particulate forms. In addition, ***compounds described herein include crystalline forms, also known as polymorphs***.

'444 Patent, 60:38–42 (emphasis added); *see also id.* at 57:25–61:9; '857 Patent, 10:48–57, 10:65–11:4. "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) (internal quotation marks omitted).

Tablet Defendants' point to the prosecution histories of various patents, but those do not support their construction. There were no "clear and unmistakable" "actions or statements made during prosecution" disavowing the plain meaning of "compound"—let alone redefining "compound" in the way Tablet Defendants propose. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003). That Tablet Defendants' construction is not driven by the intrinsic evidence is

21

clear from the fact that they have proposed nearly identical exclusionary language for five different terms.

**b)    Defendants' Answering Position**

"Compound" is present in certain asserted claims of the Honigberg Patents. Defendants' proposed construction is consistent with the Court's prior construction for "compound" in the Capsule Action. However, Defendants' proposed construction identifies certain entities that, according to the intrinsic evidence, do not fall within the scope of "compound"—an issue that was not previously before the Court.

The intrinsic record supports Defendants' construction that certain entities do not fall within the scope of "compound." For example, in the specification of the '444 Patent,[3] the patentee distinguished "compound" from "composition," "formulation," "derivative," "salt," "metabolite," "solvate," "prodrug," "crystalline form ('also known as polymorph[]')," and "N-oxide." *See, e.g.*, '444 patent, 4:20- 23 ("*Pharmaceutical compositions* formulated for administration by an appropriate route and means containing effective concentrations of one or more of the *compounds* provided herein, or pharmaceutically effective *derivatives* thereof . . . .") (emphases added), 4:55-57 ("In other embodiments, *compounds* provided herein are used for the *formulation* of a medicament for the inhibition of tyrosine kinase activity.")

---

[3] For convenience, Defendants cite to the written description of the '444 Patent for the Honigberg Patents, which all share a common written description.

(emphases added), 62:34-42 ("The *pharmaceutical compositions* will include at least one *compound* described herein . . . . In addition, the methods and *pharmaceutical compositions* described herein include the use of N-oxides, *crystalline forms (also known as polymorphs)* . . . .") (emphases added), 83:32-38 (". . . involves administration of *pharmaceutical compositions* containing at least one *compound* of any one of Formula (A), Formula (B), Formula (C), or Formula (D), described herein, or a pharmaceutically acceptable *salt*, pharmaceutically acceptable *N-oxide*, pharmaceutically active *metabolite*, pharmaceutically acceptable *prodrug*, or pharmaceutically acceptable *solvate* thereof, in therapeutically effective amounts to said subject.") (emphases added). This Court should construe "compound" to exclude these entities[4] since the patentee acted as its own lexicographer and differentiated "compound" from these entities.[5] *D&M Holdings, Inc. v. Sonos, Inc.*, C.A. No. 16-cv-141, 2017 U.S. Dist. LEXIS 122301, at *17-18 (D. Del. Aug. 3, 2017) ("adopt[ing] Defendants' proposed construction, including the negative limitation" when "there is substantial evidence in the patent itself that the patentee considered [the subject of the negative limitation] to be distinct from the [disputed claim term]").

The prosecution history of the '444 Patent also supports the exclusion of compositions, metabolites, solvates, and prodrugs from what is a "compound." In its

---

[4] To the extent an "acid" or "ester" is one of these excluded classes (*i.e.*, "prodrug"), this Court should also exclude these classes.

[5] Plaintiffs concede that "a compound is not a formulation."

01/24/08 Office Action, the Examiner rejected the pending claims of U.S. Patent Application No. 11/617,645 ("the '645 Application"), the application that issued as the '444 Patent, for lack of enablement under 35 U.S.C. § 112, explaining that the specification enabled compounds, compositions (distinct from compounds), and salts (distinct from compounds), but not metabolites, solvates, or prodrugs. Ex. 18 ('645 Application, 01/24/08 Office Action), ¶ 6 (B0755) ("[T]he specification, while being enabling for a *compound*, *composition* or pharmaceutically acceptable *salt*, does not reasonably provide enablement for the pharmaceutically active *metabolites*, pharmaceutically acceptable *solvates* or pharmaceutically acceptable *prodrugs*.") (emphases added). In response, the patentee deleted metabolites, solvates, and prodrugs from the pending claims. Ex. 19 ('645 Application, 02/06/08), 2-3 (B0763-64). Plaintiffs are not permitted to recapture, through claim construction, subject matter that it clearly surrendered when it deleted subject matter in response to the USPTO's enablement rejection. *S.O.I.TEC Silicon on Insulator Techs., S.A. v. MEMC Elec. Materials, Inc.*, 745 F. Supp. 2d 489, 499 n.11 (D. Del. 2010) ("Narrowing a claim in response to a § 112 rejection results in a surrender of the broader subject matter.") (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Ltd.*, 535 U.S. 722, 736-37 (2002)).

The prosecution history of the '753 Patent also supports the exclusion of polymorphs from what is a "compound." During prosecution of U.S. Appl. No.

13/908,949 ("the '949 Application") (the application that issued as the '753 Patent, which is purportedly directed to polymorphs), the PTO rejected certain pending claims under double patenting grounds in view of several Honigberg Patents, including the '444 Patent. In response, the patentee argued against the rejection and explained that the '444 Patent did not enable polymorphs, arguing that "choosing an appropriate polymorph and establishing reaction conditions to reproducibly prepare the same polymorph is a difficult task" and

> [T]here is no predictable way of selecting polymorph preparation to develop further with a reasonable amount of success for achieving an appropriate polymorph with the desired combination of properties but without undesirably affecting physiochemical and biological properties or modifying its chemical structure or diminishing yield rate, let alone adversely affecting properties such as hygroscopicity, stability, solubility, processability, pharmacokinetics and toxicology.

Ex. 20 ('949 Application Prosecution, 08/24/15 Amendment and Remarks), 10-13 (B0787-90). For these reasons, the Tablet Formulation Patents do not enable polymorphs. The fact that the Honigberg Patents do not enable polymorphs is consistent with recent discovery confirming that polymorphs of the compounds described in the Honigberg Patents were not made or synthesized until after September 22, 2006 (the earliest possible priority date of the Honigberg Patents). Ex. 21 (Plaintiffs' Objections to Defendants' Deposition Notice to Plaintiffs Pursuant to Fed. R. Civ. P. 30(b)(6)), 52 (B0855) ("Plaintiffs further state that Plaintiffs are not aware of any instance in which crystalline Forms A-F of ibrutinib

were made or synthesized by Pharmacyclics LLC, Pharmacyclics, Inc., or Janssen before September 22, 2006."); Ex. 22 (Goldman Dep. Tr., Oct. 25, 2019), 150:23-151:7 (B0860) ███████████████████████████████████████████

███████████████████████████████████████ The Applicant's remarks and Plaintiffs' recent admissions during discovery are consistent with a POSA's understanding of the disclosure in the Honigberg Patents and the Tablet Patents—namely, that they do not enable polymorphs. Ex. 43, Swift Decl. ¶¶ 71-76, 82-88 (B1365-66, B1369-71). "Compound" may not be construed to include polymorphs (*i.e.*, crystalline forms) when there is no enablement for polymorphs in the specification of the Honigberg Patents or the Tablet Patents. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998) ("[I]f the claim is susceptible to a broader and a narrower meaning, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of enablement under § 112, ¶ 1, we will adopt the narrower of the two").

Furthermore, a POSA would understand that "compound" excludes prodrugs, solvates, metabolites, and N-oxides because the '444 Patent does not enable prodrugs, solvates, metabolites, and N-oxides (Ex. 42, Lepore Decl. ¶¶ 57-74 (B1327-34)).

Defendants' construction does not result in "compound" improperly covering substances that have a single element. Claim terms are construed in the context of

the rest of the claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). Here, none of the claims recites entities with less than one element. A POSA would understand that Defendants' proposed construction in the context of the claims refers to entities with two or more different elements.

Plaintiffs contend that "compound" should include polymorphs in view of several passages in the specification.[6] Plaintiffs' contention is precisely why Defendants contend in the alternative that "compound" is indefinite.[7] In certain portions of the specification, the patentee asserted that "compounds described herein *include* crystalline forms, also known as polymorphs." '444 Patent, 60:40-42 (emphasis added). However, as previously discussed, the patentee of the Honigberg Patents differentiated compounds from polymorphs in other portions of the specification and the patentee of the '753 Patent explained that the Honigberg Patents do not enable polymorphs. To the extent the Court finds that the Honigberg Patents enable polymorphs, a POSA would not know whether "compound" in the claims of

---

[6] Plaintiffs appear to rely upon *On-Line Techs.* to contend that crystalline form is a preferred embodiment of "compound." However, Plaintiffs fail to explain how these passages from the Honigberg Patents show that crystalline forms are a preferred embodiment of "compound." In fact, Plaintiffs characterized the passage they quote in their Opening Brief as "a partial, non-limiting list of possible physical forms of compounds" in the Joint Claim Construction Brief submitted in the Capsule Action. C.A. No. 1:18-cv-192-CC, D.I. 144, 19-20. In all events, Plaintiffs' own criticisms of the Honigberg Patents as not enabling polymorphs trumps any stated relationship between "compound" and polymorphs in the Honigberg Patents.

[7] Defendants are not arguing indefiniteness now because we understand the Court does not address indefiniteness during claim construction.

the Honigberg Patents would include polymorphs of the molecules recited in the asserted claims. Ex. 42, Lepore Decl. ¶ 52 (B1326). A POSA would not be able to ascertain the scope of "compound" with reasonable certainty, and accordingly, this term is indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

Plaintiffs' criticism that Defendants' construction permits substances that are not "compounds" is misplaced for the reasons discussed above under "compound." None of the claims recites "compounds" with less than one element."

### c) **Plaintiffs' Reply Position**

Tablet Defendants do not dispute that the term "compound" has the plain and ordinary meaning previously adopted by this Court in the Consolidated Capsule Action. Ex. 42, Lepore Decl. ¶¶ 53–75 (B1327-34); *see also Markman* Tr. 12:17–15:19. The Federal Circuit permits courts to "depart from the plain and ordinary meaning of claim terms based on the written description in only two instances: lexicography and disavowal." *Hill-Rom Servs.,* 755 F.3d at 1371. Defendants can show neither, and their construction must be rejected.

*First*, Tablet Defendants mischaracterize the written descriptions in an attempt to show that patentees "acted as [their] own lexicographer[s]" to redefine "compound," so they can argue that the claims do not read on various types of compounds. *Supra* at 22–23; *infra* at 44. Tablet Defendants, however, are unable to

point to any specific redefinition of "compound" in the written description—because there is none. Although Tablet Defendants argue that the patentees "distinguished" the term "compound" from other chemistry terms, a review of those passages reveals no such thing. *Supra* at 22–23 (citing '444 Patent, 4:20–23; 4:55–57; 62:34–42; 83:32–38); *infra* at 43–44 (citing '857 Patent, 2:14–40; 10:9–11; 25:51–54; 70:23–27). Indeed, the very passages cited by Defendants support Plaintiffs' positions and clearly provide that the plain meaning of the term "compound" is not limited to any particular form of the compound. These passages do not—and cannot—meet the Federal Circuit's "exacting" standard for lexicography. *GE Lighting Sols., LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014).

To act as a lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to redefine the term." *Thorner v. Sony Comput. Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotation marks omitted). A statement that "does not accord with the linguistic formula used by the patentee to signal the designation of other defined terms" is not lexicography. *Meds. Co. v. Mylan, Inc.,* 853 F.3d 1296, 1306 (Fed. Cir. 2017). The statements identified by the Tablet Defendants as purportedly distinguishing the term "compound" from other chemistry terms are simply not definitions. When the patentees defined terms, they used a clear "linguistic formula": versions of the phrase "the term …as used herein, refers to …." *See, e.g.,* '444 Patent, 22:58–23:9; '857

Patent, 28:27–28 (same). The patentees do not use this "linguistic formula" for "compound." Instead, the patentees chose not to define "compound," and therefore its well-understood meaning reflected in Plaintiffs' construction applies. *See* '444 Patent, 11:18–21 ("Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of skill in the art."); '857 Patent, 25:66–26:2 (same).

Moreover, far from showing lexicography, the passages cited by Tablet Defendants reflect the errors in their claim construction positions. For example, the passage *"Compound 1,* or a pharmaceutically acceptable salt thereof, *is prepared in various forms,* including but not limited to, amorphous forms, *crystalline forms,* milled forms, and nano-particulate forms" ('857 Patent, 25:51–54 (emphases added), cited *infra* at 43), indicates that the compounds can be in any physical form, including crystalline forms. The written description of the '857 Patent provides that Compound 1 is a particular compound: ibrutinib. '857 Patent, 2:14–39. In line with the plain meaning, the passage explicitly states that the ibrutinib *compound may* be *prepared in its crystalline form.* In other words, the passage demonstrates that "compound" is not limited to particular physical forms. Indeed, Tablet Defendants themselves explain that a compound may exist in various physical forms. *Supra* at 10 ("'polymorphs' or 'crystalline forms,' . . . have distinct crystal structures and properties from other polymorphs of the *same compound*") (emphasis added); Ex. 43, Swift Decl. ¶ 45

(B1357) ("A given polymorph has a distinct crystal structure from that of other polymorphs *of the same compound*.") (citing Ex. 43, Swift Decl., Fig. 2 (B1358) (emphasis added)). Thus, a POSA would have understood that the term "compound" does not exclude its physical forms.

Moreover, Defendants' argument that this passage excludes pharmaceutically acceptable salts from compounds (*infra* at 43-44) is simply incorrect. The passage distinguishes pharmaceutically acceptable salts of ibrutinib from ibrutinib itself, because ibrutinib itself is not a salt (as is shown by the structure of Compound 1, '857 Patent, 2:20–50). The passage does not mean that salts of ibrutinib do not *include* the ibrutinib compound. It means that a salt of Compound 1 is a particular form of Compound 1.

Tablet Defendants' other passages fare no better. For example, Tablet Defendants cite to the following passage as purportedly excluding compositions, salts, N-oxides, metabolites, prodrugs, and solvates from the scope of the term compound:

> In addition, a method for treating any of the diseases … involves administration of pharmaceutical *compositions* containing at least one *compound* of any one of Formula (A), Formula (B), Formula (C), or Formula (D), described herein, or a *pharmaceutically acceptable salt, pharmaceutically acceptable N-oxide, pharmaceutically active metabolite, pharmaceutically acceptable prodrug, or pharmaceutically acceptable solvate thereof*, in therapeutically effective amounts to said subject.

'444 Patent, 83:30–39 (cited in part, *supra* at 23 (emphases added)). As explained above, this passage does not mean that the term "compound" excludes its various

forms. The passage first refers to the administration of compounds with particular formulas (chemical structures). The salts of a compound with a particular formula will have a separate formula that includes the compound. Similarly, pharmaceutical compositions of the compound *contain* the compound. Defendants' construction would mean that a pharmaceutical composition (for example a tablet) containing a given compound does not infringe a claim directed to that compound. That is legally and factually incorrect.

Tablet Defendants cite *D&M Holdings, Inc.* in support of their lexicography argument (*supra* at 23), but that case has nothing to do lexicography. Rather, *D&M* supports adopting the plain and ordinary meaning of "compound." In *D&M*, Defendants "present[ed] substantial extrinsic evidence that indicate[d]" the term at issue ("broadcast signals") "had a well understood meaning to one of skill in the art," and Plaintiffs "failed to point to any evidence … that would indicate the patentee intended for the term to have anything other than its plain and ordinary meaning." *Id.*

*Second*, Tablet Defendants invoke prosecution history disclaimer arguments, which are also without merit. They argue that the patentees disavowed "compositions, metabolites, solvates, and prodrugs from what is a 'compound'" during the prosecution of the '444 Patent. *Supra* at 23-24. Not so. There was no "clear and unmistakable" disavowal of the plain and ordinary meaning of the term

"compound"—none of the prosecution history portions Tablet Defendants rely upon address the meaning or scope of the term "compound."

A review of the relevant prosecution history leading to the '444 Patent cited by Tablet Defendants reveals no clear and unmistakable disavowal.[8] During prosecution of the '444 Patent, the patentees sought claims directed to a genus of compounds with particular structures, as well as the pharmaceutically active metabolites, pharmaceutically acceptable solvates or pharmaceutically acceptable prodrugs of those compounds. Ex. 36, '645 Application, 12/14/07 Election and Amendment (B1257–58). The Examiner apparently rejected "Claims 1–4, 6–31, 40, 41, 56, and 57 … under 35 U.S.C. 112, first paragraph, because the specification … does not reasonably provide enablement for the pharmaceutically active metabolites, pharmaceutically acceptable solvates or pharmaceutically acceptable prodrugs." Ex. 18, ¶ 6 (B0755).

The Examiner's rejection is far from clear, because only Claims 1–25 were pending at the time. Ex. 18, ¶ 1 (B0754). But regardless, Claim 1, which contained the rejected claim language, was directed at the time to a genus of compounds with particular structures, *as well as* the pharmaceutically active metabolites, pharmaceutically acceptable solvates or pharmaceutically acceptable prodrugs of

---

[8] In any event, statements from the prosecution history of the '444 Patent would not affect the meaning of the term "compound" in the Tablet Patents, which are unrelated to the '444 Patent and were filed years later.

those compounds. Ex. 36, '645 Application, 12/14/07 Election and Amendment (B1257–58). The Examiner's rejection does not indicate that compounds are not enabled. Rather, at best, it means the Examiner believed that the particular metabolites, solvates, and prodrugs of the then-pending claimed class of compounds were not fully enabled. In amending the claims to remove this language, the patentees nowhere limited or disclaimed the ordinary meaning of the phrase compound. Nor did the patentees somehow concede anything about the scope of the class of compounds themselves, as that language remained untouched. After amendment, the claims continued to be directed to classes of various compounds, and if one of those compounds is present in a composition or other physical form, that compound still falls within the claims. There is no clear and unmistakable disavowal.

*Third*, Tablet Defendants make a misplaced enablement argument, contending that giving the term "compound" its plain and ordinary meaning would somehow improperly broaden the scope of the term so that it covers crystalline forms. *Supra* at 24–27. Plaintiffs' construction in no way broadens the scope of "compound"—the plain meaning of the term "compound" (for example, ibrutinib) is silent on physical form and so it includes compounds in any form, whether amorphous or crystalline. It is similarly silent on whether the compound is part of a composition or not.

The Federal Circuit has long made clear that drug compound patents, such as the Honigberg Patents, cover all forms of the claimed compounds, including later

invented crystalline or polymorphic forms. *See Zenith Labs. Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1419 (Fed. Cir. 1994) (claims to the cefadroxil "compound per se" encompass "any and all forms of cefadroxil[,]" including a later discovered crystalline monohydrate form); *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1564 (Fed. Cir. 1997) (crystalline Form 2 of ranitidine hydrochloride was within the scope of both the "compound per se" patent and the later Form 2 patent); *see also Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043 (Fed. Cir. 1995) (compound patent and crystalline form patent); *Bristol-Myers Squibb Co. v. Apotex, Inc.*, C.A. No. 10–5810 (MLC), 2013 WL 1314733, at *7–9, 15–17 (D.N.J. Mar. 28, 2013) (construing "[a] compound or salt thereof selected from the group consisting of" and "[c]rystalline monohydrate of the compound of formula (IV)" consistent with the plain and ordinary meaning of those terms). That a later invention (such as a particular crystalline form) may fall within the scope of earlier, dominant patent claims (such as claims to a compound) is well-established in patent law. *Temco Elec. Motor Co. v. Apco Mfg. Co.*, 275 U.S. 319, 328 (1928); *Smith v. Nichols*, 88 U.S. 112, 118–19 (1874); *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 n.5 (Fed. Cir. 2001).

Moreover, Tablet Defendants misapprehend the law of enablement and its role in claim construction. *Supra* at 26–27.[9] The Honigberg and Tablet Patents do in fact

---

[9] Tablet Defendants cite *Digital Biometrix, Inc. v. Identix, Inc.,* 149 F.3d 1335 (Fed. Cir. 1998) in support of their position (*supra* at 26), but this case demonstrates Tablet

enable the claimed BTK inhibiting compounds. But the proper inquiry for claim construction is how a person of ordinary skill in the art would have understood the term "compound"—enablement will be assessed during the validity phase of the case, after claim construction, if at all.

Defendants' indefiniteness argument fares no better than its enablement argument. Defendants argue a POSA would not know whether "compound" includes polymorphs of the compound. But as explained above, and as Defendants acknowledge, the Honigberg Patents expressly state that "compounds described herein include crystalline forms, also known as polymorphs." *Supra* at 27 (quoting '444 Patent, 60:40–42); *supra* at 10 ("'polymorphs' or 'crystalline forms,'… have distinct crystal structures and properties from other polymorphs *of the same compound*") (emphasis added); Ex. 43, Swift Decl. ¶ 45 (1357) ("A given polymorph has a distinct crystal structure from that of other polymorphs *of the same compound*.") (emphasis added). "Compound" includes all physical forms of the compound, including polymorphs and crystalline forms: that is its plain and ordinary meaning.

---

Defendants' error. In *Digital Biometrix*, the Federal Circuit explained a court is only to resort to a validity analysis during claim construction "if after consideration of the intrinsic evidence there remains doubt as to the exact meaning of the claim term[]." *Id.* at 1344; *id.* (*"[I]f the claim is susceptible to a broader and a narrower meaning*, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of enablement under § 112, ¶ 1, we will adopt the narrower of the two") (emphasis added). Here, the intrinsic evidence leaves no doubt that the plain and ordinary meaning of "compound" applies.

The only support for indefiniteness Tablet Defendants can manufacture from the intrinsic evidence of the Honigberg Patents is the following statement, which supports Plaintiffs' construction: "[t]he methods and formulations described herein include the use of …crystalline forms (also known as polymorphs)… of compounds described herein." Ex. 42, Lepore Decl. ¶ 52 (B1326) (quoting without citation the '444 Patent, 57:54–57). Dr. Lepore, Tablet Defendants' expert, concludes without explanation that this statement "suggest[s] that crystalline forms fall outside the scope of the 'compound' term." *Id*. This is just another statement that formulations may include compounds in crystalline form. The Court should not deviate from its prior construction of "compound."

### d)    Defendants' Sur-Reply Position[10]

Plaintiffs concede a salt/pharmaceutical composition/crystalline form of a compound is not a "compound," *supra* 30–32, and do not deny N-oxides, metabolites, acids, esters, prodrugs, and solvates of compounds are also not compounds.

"[T]here is no magic formula or catechism for conducting claim construction." *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324). Plaintiffs ask this Court to rigidly restrict claim construction to only presume plain and ordinary meaning divorced from the intrinsic

---

[10] This Section II.A.1.d's discussion of the proper approach to claim construction is incorporated by reference in each of Defendants' sur-reply positions.

record, absent clear disclaimer or lexicography.[11]  But the Federal Circuit holistically construes terms in the context of the *entire* patent.  *Phillips*, 415 F.3d at 1326; *Markman*, 52 F.3d at 979.  Plaintiffs' rigid approach ignores wholesale portions of the intrinsic record.[12]  *See, e.g.*, *Nystrom v. TREX Co.*, 424 F.3d 1136, 1144–45 (Fed. Cir. 2005) ("[plaintiff] is not entitled to a claim construction divorced from the context of the written description and prosecution history"); *Abbott Labs v. Sandoz, Inc.*, 566 F.3d 1282, 1289–91 (Fed. Cir. 2009); *Kinetic Concepts v. Blue Sky Med. Grp.*, 554 F.3d 1010, 1017–19 (Fed. Cir. 2009).

Although the patent does not explicitly define "compound," "[e]ven when guidance is not provided in explicit definitional format, the specification may define terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents."  *Phillips*, 415 F.3d at 1321; *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364-66 (Fed. Cir. 2016).

Plaintiffs' construction, neither grounded in nor informed by the intrinsic record, should be rejected.  Plaintiffs cite the '857 Patent (2:20-50, 25:51-54, 2:14-39) to contend the patentee did not exclude crystalline forms or pharmaceutically acceptable salts from "compound."  *Supra* at 32.  But the '857 Patent specification

---

[11] *GE Lighting Slns.* characterized the standard for lexicography as "exacting," but still considered whether there was any "defin[ition]" *or* "indication that the inventors intended to act as their own lexicographers."  750 F.3d at 1309.

[12] Plaintiffs' reliance on *Thorner* and *Meds. Co.* is misplaced.  The patents and specifications at issue in there are different than those at issue here.

(like other Tablet Formulation Patents) differs from the specification of the Honigberg Patents, which are at issue for this term and do not contain Plaintiffs' cited passages. Even were they present, a POSA would understand from context that a specific crystalline form was excluded from "compound" because: 1) a reference to a crystalline form (without more) would relate to a crystal (not amorphous) form, which is different from a specific crystalline form (Ex. 43, Swift Decl. ¶ 73 (B1365)); 2) the specification does not enable crystalline forms (Ex. 20, 10-13 (B0787-90); Ex. 39 (Hostetler Tr.) 271:2-272:9 (B1293) ███████████████████████ ██████████ Ex. 43, Swift Decl. ¶¶ 72, 74-77 (B1365, B1366-67)); and 3) other passages differentiate compounds from crystalline forms (*supra* at 22–23). A POSA would similarly understand a pharmaceutically acceptable salt was excluded from "compound" because: 1) the claims distinguish a compound from a salt (*see, e.g.*, '444 Patent, cl. 1 ("A compound . . . *or* a pharmaceutical acceptable salts thereof.")); and 2) the other passages differentiate compounds from salts. *Supra* at 22–23.

Plaintiffs identify one passage ('444 Patent, 83:30-39) to contend the patentee did not exclude compositions, salts, N-oxides, metabolites, prodrugs, and solvates from "compound." Plaintiffs contend Defendants' construction is legally and factually incorrect, but conflate claim construction and infringement, which is not at issue here. A "compound" is different from a composition, as evidenced by the intrinsic record. That does not mean that a composition cannot be made from a "compound."

*Compare* '444 Patent, cl. 1 ("A compound of Formula (D) . . . ."), *with id.*, cl. 6 ("A pharmaceutical composition comprising a compound of claim 1, and a pharmaceutically acceptable excipient.").

Plaintiffs contend, without legal support, there can be no "clear and unmistakable" disavowal without an explicit statement.  But courts look at what a POSA "would understand *about claim scope* from reading the prosecution history." *Blackbird Tech LLC v. ELB Elecs., Inc.*, 895 F.3d 1374, 1378 (Fed. Cir. 2018) (subject matter deleted to resolve § 112 issues outside disputed term's scope).

Plaintiffs' attempts to ignore unambiguous statements made during prosecution should be rejected.  The Examiner found no enablement for pharmaceutically [active/acceptable] metabolites, solvates or prodrugs.  *Supra* at 23–24.  The Examiner did not caveat his rejection in view of a certain genus of compounds, as Plaintiffs propose.

This clear and unmistakable disavowal of subject matter is consistent with a POSA's understanding.  *Supra* at 26.



Ex. 41 (Plaintiffs' Responses to First RFAs, 15-23) (B1297-1305).

Plaintiffs do not deny courts may construe terms to address validity, including construing a claim in a way that is enabled.  *Abbott*, 266 F.3d at 1289 (construing term

in view of written description and specification which enabled the construction). Even were Plaintiffs' interpretation of the case law correct,[13] the parties' conflicting positions regarding whether the intrinsic evidence shows "compound" includes crystalline forms reflects a dispute.

Contrary to Plaintiffs' assertions, multiple passages indicate Plaintiffs intended to differentiate compounds from crystalline forms. '444 Patent, 62:34-42. A POSA would understand the use of "in addition" and "crystalline forms" following a preceding sentence discussing compounds to show the patentee intended to distinguish compound from crystalline forms. *Supra* at 27–28; Ex. 42, Lepore Decl. ¶ 52 (1326). Plaintiffs' silence on this is unsurprising.

The unambiguous intrinsic record requires rejection of Plaintiffs' request that irrelevant constructions from other courts in other litigations involving different disputed terms, claims, patents, specifications, and prosecution histories be adopted. *Supra* at 35-36.

### 2.    "compound" (the '857 and '507 Patents)

### a)    Plaintiffs' Opening Position

Plaintiffs' construction should be adopted, and Tablet Defendants' Construction should be rejected for the reasons described in Section II.A.1.a.

---

[13] The Federal Circuit cautioned against construing a claim such that it would invalidate it, as that would contradict "the canon that courts should attempt to construe claims to preserve their validity." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1335 n.6 (Fed. Cir. 2003).

### b)     Defendants' Answering Position

"Compound" is present in certain asserted claims of the Tablet Formulation Patents. Defendants' proposed construction is consistent with the Court's prior construction for "compound" in the Capsule Action. However, Defendants' proposed construction identifies certain entities that, according to the intrinsic evidence, do not fall within the scope of "compound"—an issue that was not previously before the Court.

The intrinsic record supports Defendants' construction that certain entities do not fall within the scope of "compound." For example, in the specification of the '857 Patent,[14] the patentee distinguished "compound" from "composition," "formulation," "salt," "metabolite," solvate," "prodrug," "crystalline form," or "N-oxide." '857 Patent, 2:14-40 ("In one aspect is a *pharmaceutical composition* comprising ibrutinib, wherein ibrutinib is a *compound* . . . .) (emphases added), 10:9-11 ("In another aspect is a high-load solid tablet *formulation* comprising ibrutinib, wherein ibrutinib is a *compound* with the structure of *Compound* 1 . . . ."), 25:51-54 ("In yet other embodiments, *Compound* 1, or a pharmaceutically acceptable *salt* thereof, is prepared in various forms, including, but not limited to, amorphous phase, *crystalline forms*, milled forms and nano-particulate forms.")

---

[14] For convenience, Defendants cite to the written description of the '857 Patent for the Tablet Formulation Patents, which share a common specification.

(emphases added), 70:23-27 (". . . administration of *pharmaceutical compositions* containing *Compound* 1, or a pharmaceutically acceptable *salt*, pharmaceutically acceptable *N-oxide*, pharmaceutically active *metabolite*, pharmaceutically acceptable *prodrug*, or pharmaceutically acceptable *solvate* thereof . . . .") (emphases added). This Court should construe "compound" to exclude these entities[15] since the patentee acted as its own lexicographer and differentiated "compound" from these entities.[16]

A POSA would understand that "compound" excludes: 1) polymorphs because the '857 Patent does not enable polymorphs (Ex. 43, Swift Decl. ¶¶ 85-88 (B1370-71)); and 2) prodrugs, solvates, metabolites, and N-oxides because the '857 Patent does not enable prodrugs, solvates, metabolites, and N-oxides (Ex. 42, Lepore Decl. ¶¶ 57-74, 79 (B1327-34, B1335)).

### c)    Plaintiffs' Reply Position

Plaintiffs' construction should be adopted, and Tablet Defendants' Construction should be rejected for the reasons described in Section II.A.1.c.

### d)    Defendants' Sur-Reply Position[17]

---

[15] To the extent a "derivative," "acid," or "ester" is one of these excluded classes (*i.e.*, "prodrug"), this Court should also exclude these classes.

[16] Plaintiffs concede that "a compound is not a formulation."

[17] Plaintiffs provided no Reply to this term during the exchange of briefs, and only added the above sentence when they compiled the joint brief.

A POSA would understand that a specific crystalline form (*i.e.*, crystalline Form A) was excluded from "compound" because: 1) a reference to a crystalline form (without anything more) would relate to a crystal (and not an amorphous) form, which is different from a specific crystalline form (*i.e.*, crystalline Form A); 2) the specification does not enable crystalline forms; and 3) other passages differentiate compounds from crystalline forms. Section II.A.1.d.

A POSA would understand that a pharmaceutically acceptable salt was excluded from "compound" because other passages differentiate compounds from salts. *Supra* at 42-43.

Plaintiffs identify a passage ('444 Patent, 83:30-39) to contend the patentee did not exclude compositions, salts, N-oxides, metabolites, prodrugs, and solvates from "compound."[18] The '444 Patent (and other Honigberg Patents) is different from the Tablet Formulation Patents at issue here. The passage Plaintiffs identify is absent in the Tablet Formulation Patents. A "compound" is different from a composition, as evidenced by the intrinsic evidence. That does not mean that a composition cannot be made from a "compound."

Though Plaintiffs cite various cases to discount the intrinsic record, those cases are inapposite, as discussed in Section II.A.1.d.

---

[18] Plaintiffs conflate claim construction and infringement, the latter of which is not at issue here.

44

3.    "the structure […] "

a)    **Plaintiffs' Opening Position**

Claims from the Honigberg, Buggy, and Tablet Formulation Patents are directed to a compound or BTK inhibitor with "the structure […] ." When the claims use the term "the structure […]" followed by depictions of certain chemical structures, they refer to compounds with those chemical structures. There is no need for construction. A POSA would understand the term on its face. *See, e.g., Finjan v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010). Indeed, Tablet Defendants acknowledge in their construction that this term refers to the chemical structure(s) shown in the claims.

Tablet Defendants' "construction" simply inserts the same negative limitation proposed for numerous other terms. This exclusionary language should be rejected for all of the reasons described above in Section II.A.1.a.

### b)    Defendants' Answering Position

This term is present in the Honigberg, Buggy, and Tablet Formulation Patents. Plaintiffs concede that a POSA would understand that this term refers to "compounds." Defendants agree—this is consistent with the specifications of the '444, '090, and '857 Patents which ascribe "structure" to "compound." *See, e.g.*, '444 Patent, 1:64-67 ("Compounds described herein include those that have a structure of any of Formula (A), Formula (B), Formula (C), or Formula (D) . . . ."); '090 Patent, 4:11-50; '857 Patent, 2:14-40.

Defendants' proposed construction, however, identifies entities that, according to the intrinsic evidence, do not fall within the scope of the term.  For the reasons described above for both "compound" terms in the Honigberg and Tablet Formulation Patents, the Court should also construe "structure" as recited in the claims of the Honigberg and Tablet Formulation Patents to exclude the entities recited in Defendants' proposed construction. *D&M Holdings,* 2017 U.S. Dist. LEXIS 122301, at *17-18. Similarly, the intrinsic record supports Defendants' construction that certain entities do not fall within the scope of "structure" as recited in the claims of the Buggy Patent. For example, in the specification of the Buggy Patent, the patentee distinguished "compound"/"structure" from "composition," "formulation," "salt," "metabolite," solvate," "prodrug," "crystalline form," or "N- oxide." '090 Patent, 45:57-63 ("In other embodiments, the Btk inhibitor used in the methods describe

herein has the *structure* of any of Formula (A), Formula (B), Formula (C), Formula (D), Formula (E), or Formula (F). Also described herein are pharmaceutically acceptable *solvates*, pharmaceutically active *metabolites*, and pharmaceutically acceptable *prodrugs* of such compounds.") (emphases added), 84:23-27 ("The methods and *formulations* described herein include the use of *N- oxides*, *crystalline forms (also known as polymorphs)*, or pharmaceutically acceptable *salts* of *compounds* described herein, as well as active *metabolites* of these *compounds* having the same type of activity.") (emphases added). This Court should thus construe this term to exclude these entities in the Buggy Patent[19] since the patentee acted as its own lexicographer and differentiated this term from these entities.

A POSA would understand that "structure" excludes: 1) polymorphs because the Honigberg, Buggy, and Tablet Formulation Patents do not enable polymorphs (Ex. 43, Swift Decl. ¶¶ 62-76, 78-88 (B1362-66, B1367-71)); and 2) prodrugs, solvates, metabolites, and N-oxides because the Honigberg, Buggy, and Tablet Formulation Patents do not enable prodrugs, solvates, metabolites, and N-oxides (Ex. 42, Lepore Decl. ¶¶ 57-74, 79, 85 (B1327-34, B1335, B1337)).

This Court should reject Plaintiffs' construction because it does not resolve the parties' dispute about whether the entities identified in Defendants' proposed

---

[19] To the extent a "derivative," "acid," or "ester" is one of these excluded classes (*i.e.*, "prodrug" or "metabolite"), this Court should also exclude these classes.

construction should fall within the scope of the term. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Plaintiffs' proposed construction does not address the current dispute and leaves open the questions of whether certain entities, like crystalline forms, fall within the scope of the claims; Defendants' proposed construction explains what entities should and should not be included.

### c) Plaintiffs' Reply Position

As with their construction of "compound," Tablet Defendants' construction of "the structure [. . .]" attempts to exclude crystalline forms of ibrutinib. *Supra* at 48 ("'structure' excludes . . . polymorphs"). But Tablet Defendants themselves concede that all crystalline forms (or polymorphs) of a compound possess the *same* molecular "structure," *i.e.,* contain the compound. *See supra* at 10-11, Fig. 2 (illustrating molecular "structures" as blue boxes and "polymorphs of the same compound" as the three-dimensional arrangements of those boxes). This is unsurprising: The concept of molecular "structure" is foundational to medicinal chemistry, and a person of ordinary skill in the art understood that the term "the structure [. . .]," as used in the Honigberg, Buggy, and Tablet Patents, has nothing to do with the physical form of a compound. A person of ordinary skill would have understood that the asserted claims are directed to "the structure[s] [. . . ]" drawn in the claim, and do not exclude particular physical forms (for example, crystalline or amorphous) of the compounds with those structures.

48

Tablet Defendants' efforts to insert exclusionary language into the constructions of "the structure [. . .]"—which are identical to their exclusions for the term "compound"—are legally flawed for the same reasons described above in Section II.A.1.c: (1) the patentees did not act as their own lexicographers to redefine "the structure [. . .]," and (2) there was no disavowal/disclaimer. The structures are enabled and the issue of enablement is irrelevant to the proper construction of the term. A person of ordinary skill understood the meaning of "the structure [. . .]," and that plain and ordinary meaning should apply here.

### d)     Defendants' Sur-Reply Position

Plaintiffs analyze *none* of the intrinsic record. Instead, Plaintiffs incorporate their "compound" analysis, which does not address statements concerning "the structure [. . .]."

Plaintiffs improperly analyze "the structure […]" in isolation. This analysis, divorced from the intrinsic record, is legally incorrect, for reasons discussed above. In view of the entire intrinsic record, a POSA would understand this term does not cover structures of the entities excluded in Defendants' construction. Section II.A.1.d.

Defendants never conceded all crystalline forms have the same molecular structure. Defendants said the opposite. *Supra* at 9-10.

Finally, Plaintiffs ask this Court to ignore enablement when construing terms. However, as discussed in Section II.A.1.d., claims should be construed to preserve their validity.

### 4.    "pharmaceutical[ly] acceptable [ . . . ] salt[s] thereof"

#### a)    Plaintiffs' Opening Position

The term "pharmaceutically acceptable [ … ] salt[s] thereof" does not require construction because its plain and ordinary meaning would be clear to a POSA: the claimed salts must be acceptable for pharmaceutical use. *See AstraZeneca AB v. Dr. Reddy's Labs., Inc.*, No. 11-CV-2317 JAP, 2013 WL 1847639, at *9 (D.N.J. May 1, 2013) ("Because its ordinary and customary meaning would be clear to one skilled in the art, the Court declines to construe 'pharmaceutically acceptable salt.'"); *Prometheus Labs., Inc. v. Roxane Labs., Inc.*, No. 11-CV-230 FSH, 2013 WL 5333033, at *6 (D.N.J. Sept. 23, 2013) ("'[A] compound of formula (III) … or a salt thereof' … require[s] no additional interpretation or construction for a person of ordinary skill in the art").

If the Court nonetheless believes construction is necessary, the Honigberg Patents provide an express definition of "pharmaceutically acceptable" consistent with the plain meaning:

The term "acceptable" or "pharmaceutically acceptable", with respect to a formulation, composition or ingredient, as used herein, means having no persistent detrimental effect on the general health of the subject being treated or does not abrogate the biological activity or properties of the compound, and is relatively nontoxic.

'444 Patent, 20:13–18. Tablet Defendants also use this definition in their proposed construction. This definition controls. *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls.").

Tablet Defendants' attempt to tack a negative limitation onto the end of the patents' express definition is improper as a matter of law. *See Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) (reversing construction modifying "clear definition").

It is also improper for all of the reasons described above in Sections II.A.1.a and II.A.2.a.

### b)    Defendants' Answering Position

This term is recited in the claims of the Honigberg Patents. Defendants' proposed construction incorporates the specification's express definition and identifies entities that, according to the intrinsic evidence, do not fall within the scope of the term.

The parties agree that the specification of the Honigberg Patents provides an express definition of "pharmaceutically acceptable"—"having no persistent detrimental effect on the general health of the subject being treated or does not abrogate the biological activity or properties of the compound, and is relatively nontoxic." '444 Patent, 20:13-18. Defendants' proposed construction and Plaintiffs'

proposed alternate construction adopt this express definition, which should be incorporated into the construction of this term.

Defendants' proposed construction also identifies certain entities that should not fall within the scope of the term.[20] The intrinsic record supports such a construction. For example, in the specification of the '444 Patent, the patentee distinguished "salt" from "compositions," "formulations", "metabolites," "solvates", "prodrugs," "crystalline forms," and "N-oxides." *See, e.g.*, '444 Patent, 4:12-17 ("In a further aspect are provided *pharmaceutical compositions*, which include a therapeutically effective amount of at least one of any of the compounds herein, or a pharmaceutically acceptable *salt*, pharmaceutically active *metabolite*, pharmaceutically acceptable *prodrug*, or pharmaceutically acceptable *solvate*.") (emphases added), 57:54-58 ("The methods and *formulations* described herein include the use of *N-oxides*, *crystalline forms (also known as polymorphs)*, or pharmaceutically acceptable *salts* of compounds described herein, as well as active *metabolites* of these compounds having the same type of activity."). "Salt" should be construed to exclude these entities[21] since the patentee acted as its own

---

[20] Defendants' proposed construction does not exclude a preferred embodiment, and Plaintiffs have not argued it does. Plaintiffs' reliance on *Braintree* is therefore misplaced.

[21] To the extent a "derivative," "acid," or "ester" is one of these excluded classes (*e.g.*, "prodrug"), this Court should also exclude these classes.

lexicographer and differentiated "salt" from these entities. *D&M Holdings*, 2017 U.S. Dist. LEXIS 122301, at *17-18.

The prosecution history of the '444 Patent also supports the exclusion of compositions, metabolites, solvates, and prodrugs. As previously discussed, the USPTO rejected pending claims for lack of enablement, explaining that the specification enabled salts and compositions (distinct from salts), but not metabolites, solvates, or prodrugs. Ex. 18, ¶ 6 (B0755) ("[T]he specification, while being enabling for a compound, *composition* or *pharmaceutically acceptable salt*, does not reasonably provide enablement for the pharmaceutically active *metabolites*, pharmaceutically acceptable *solvates* or pharmaceutically acceptable *prodrugs*.") (emphases added). In response, the patentee deleted metabolites, solvates, and prodrugs from the pending claims. Ex. 19, 2-3 (B0763-64). This Court should not permit Plaintiffs to recapture subject matter that it clearly surrendered when it deleted subject matter in response to an enablement rejection. *S.O.I.TEC*, 745 F. Supp. 2d at 499 n.11.

Furthermore, as previously discussed above under "compound," this term should exclude polymorphs because the prosecution history of the '753 Patent shows that the Honigberg Patents do not enable polymorphs, recent discovery shows that polymorphs were not made or synthesized until after September 22, 2006 (the earliest possible priority date of the Honigberg Patents), and a POSA would

understand that the Honigberg and Tablet Formulation Patents do not enable polymorphs (Ex. 43, Swift Decl. ¶¶ 71-74, 82-86 (B1365-66, B1369-70)).

Furthermore, a POSA would understand that this term excludes prodrugs, solvates, metabolites, and N-oxides because the Honigberg and Tablet Formulation Patents do not enable prodrugs, solvates, metabolites, and N-oxides (Ex. 42, Lepore Decl. ¶¶ 57-74, 79 (B1327-34, B1335)).

This term however is indefinite because some portions of the specification state that the term includes "solvates" and "polymorphs."[22] '444 Patent, 60:7-9 ("It should be understood that a reference to a pharmaceutically acceptable salt includes the solvent addition forms or crystal forms thereof, particularly solvates or polymorphs."), 60:22-24. This purported inclusionary language directly contradicts 1) other portions of the specification where the patentee differentiated salts from solvates and polymorphs (discussed above); and 2) the statements by the patentee of the '753 patent explaining that the Honigberg Patents do not enable polymorphs (discussed above). A POSA would not know whether "salt" in the claims of the Honigberg Patents would include polymorphs of the molecules recited in the asserted claims. Ex. 42, Lepore Decl. ¶¶ 100-102 (B1340-41). Thus, a POSA would

---

[22] Defendants are not arguing indefiniteness now because we understand the Court does not address indefiniteness during claim construction.

not be able to ascertain the scope of "compound" with reasonable certainty, and accordingly, the term is indefinite. *Nautilus*, 134 S. Ct. at 2129.

This Court should reject Plaintiffs' "no construction necessary/plain and ordinary meaning[23] because it does not resolve the parties' dispute about whether the entities identified in Defendants' proposed construction should fall within the scope of the term. *O2 Micro*, 521 F.3d at 1361. To the extent Plaintiffs contend this construction means "the claimed salts must be acceptable for pharmaceutical use," the Court should reject this construction because Plaintiffs' proffered construction does not appear in the JCCC, and Plaintiffs refused to provide their understanding of this construction despite repeated requests during the parties' claim construction meet-and-confer and their representation during the parties' 10/10/19 teleconference with the Court regarding Plaintiffs' deficient constructions. Ex. 23 (10/11/19 Teleconference Tr.) at 21:10-16 (B0863).

This Court should also reject Plaintiffs' "no construction necessary/plain and ordinary meaning" construction because it provides an "express definition" as Plaintiffs concede. *Collabo Innovations, Inc. v. Omnivision Techs., Inc.*, C.A. No. 16-197-JFB-SRF, 2017 U.S. Dist. LEXIS 136711, at *18 (D. Del. Aug. 25, 2017).

---

[23] Plaintiffs cite *AstraZeneca* and *Prometheus* in support of their construction but those cases involved different patents, different specifications, and different disputed issues than those here—namely whether certain entities fall within the scope of the term in view of the intrinsic record of the Honigberg Patents.

### c)    Plaintiffs' Reply Position

Tablet Defendants admit that (1) salts have an understood meaning (*supra* at 11-12; Ex. 43, Swift Decl. ¶ 43 (B1356)); and (2) the Honigberg and Tablet Patents contain an express definition of "pharmaceutically acceptable" that applies here (*supra* at 52). This should end the inquiry.

It is Defendants—not Plaintiffs—that ignore the express definition of "pharmaceutically acceptable" by tacking on a list of exclusions to the Patents' definition. *Supra* at 54. Plaintiffs maintain that no construction is necessary because the Patents' express definition of "pharmaceutically acceptable" is fully consistent with the ordinary meaning of the phrase. Nonetheless, Plaintiffs have proposed an alternative construction that uses that express definition.

Tablet Defendants' construction is a transparent attempt to exclude crystalline forms of a claimed pharmaceutically acceptable salt from the scope of the asserted claims. Not only is their rewrite of an express definition contrary to law, but it is also wrong as a matter of science. Pharmaceutically acceptable salts can be in crystalline form. The Honigberg Patents expressly confirm this point: "It should be understood that a reference to a ***pharmaceutically acceptable salt includes*** the solvent addition forms or ***crystal forms*** thereof, particularly solvates or ***polymorphs***." '444 Patent, 60:7–9 (emphases added). Therefore, crystalline forms and polymorphs are within the scope of "pharmaceutical[ly] acceptable [. . .] salt[s] thereof." Tablet Defendants'

exclusionary language should be rejected for all of the reasons described in Sections II.A.1.c and II.A.2.c.

### d)    Defendants' Sur-Reply Position

A POSA would understand that the '444 Patent (60:7-9) alone does not permit "pharmaceutical[ly] acceptable [. . .] salt[s]" to cover crystalline forms because 1) the specification does not enable crystalline forms (Ex. 20, 10-13 (B0787-90), Ex. 43, Swift Decl. ¶¶ 72, 74-77 (B1365, B1366-67)); and 2) the passages in the Honigberg Patents differentiate salts from crystalline forms (*supra* at 22-23).  A POSA would understand from the intrinsic record this term does not cover structures of the entities excluded from Defendants' construction.  Section II.A.1.d.

### B.    Disputed Ibrutinib Terms

| CLAIM TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|
| "ibrutinib" | No construction necessary/plain and ordinary meaning. | "the molecule:  (excluding compositions, formulations, derivatives, salts, metabolites, solvates, prodrugs, [esters], acids, crystalline forms ("also known as polymorphs"), and N-oxides thereof)" |
| "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1Hpyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" | No construction necessary/plain and ordinary meaning. | "the molecule:  (excluding compositions, formulations, derivatives, salts, metabolites, solvates, prodrugs, [esters], acids, crystalline forms ("also known as polymorphs"), and N-oxides thereof)" |

1.    "ibrutinib"

a)    **Plaintiffs' Opening Position**

"Ibrutinib" is the name of the compound at issue in this case. It is the active ingredient in Imbruvica and Tablet Defendants' proposed product. *See, e.g.*, D.I. 21 ¶ 1. This term does not require construction; it has a plain meaning. *See, e.g., Finjan*, 626 F.3d at 1207. This meaning is confirmed by the patents and would be understood by a POSA. *See, e.g.*, '857 Patent, 1:14–22, 1:41–49, 24:40–65; Myerson Decl. ¶ 54 (B0128). Indeed, the patents (1) explain that ibrutinib is a BTK inhibitor, (2) provide the chemical name and chemical structure of ibrutinib, and (3) state that the various ways of referring to ibrutinib can be used interchangeably ('857 Patent, 1:14–22, 24:40–65, claims 1, 25, 27, and 36):

> 1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one is also known by its IUPAC name as 1-{(3R)-3-[4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl]piperidin-1-yl}prop-2-en-1-one or 2-Propen-1-one, 1-[(3R)-3-[4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl]-1-piperidinyl-, and has been given the USAN name, ibrutinib. The various names given for ibrutinib are used interchangeably herein.

*Id.* at 1:41–49.

Tablet Defendants' construction replaces the name ibrutinib with a depiction of the chemical structure of ibrutinib. This alteration is neither helpful nor necessary. More importantly, neither the patents nor their prosecution histories restrictively define or otherwise limit "ibrutinib," so the negative limitation should be rejected. *See Hill-Rom Servs.*, 755 F.3d at 1371; Sections II.A.1.a, II.A.2.a, II.A.3.a. Indeed, the

intrinsic evidence confirms that ibrutinib can be in any physical form, including crystalline forms. '857 Patent, 10:63–11:4.

### b)    Defendants' Answering Position

"Ibrutinib" is present in certain asserted claims of the Tablet Formulation Patents. Defendants' proposed construction is the depicted entity—nothing more. Defendants' proposed construction, however, identifies entities that, according to the intrinsic evidence, do not fall within the scope of the term.

The intrinsic record supports Defendants' construction that "ibrutinib" should be the compound itself (*i.e.*, a compound with the structure of Compound 1). The '857 Patent[24] refers to "ibrutinib" as a "compound."[25] *See, e.g.*, '857 Patent, 2:15- 16 ("***ibrutinib*** is a ***compound*** with the structure of Compound 1"). In fact, Plaintiffs concede that ibrutinib is a compound. *Supra* at 59 ("'Ibrutinib' is the name of the compound at issue in this case."). Notably, Plaintiffs only cite intrinsic evidence in the Opening Position in support of their proposed construction (*e.g.*, '857 Patent, 1:14-22, 1:41-49, 24:40-65, cls. 1, 25, 27, 36) that characterizes ibrutinib as a compound, and nothing more (*i.e.*, the excluded entities in Defendants' proposed construction).

The intrinsic record also supports Defendants' construction that "ibrutinib" should exclude certain entities. For example, in the specification of the '857 Patent,

---

[24] For convenience, Defendants cite to the written description of the '857 Patent for the Tablet Formulation Patents, which share a common specification.
[25] Plaintiffs concede that ibrutinib is a compound in its Opening Position.

the patentee distinguished "ibrutinib" from "composition," "formulation," "derivative," "salt," "metabolite," "solvate," "prodrug," "crystalline form ('also known as polymorph[]')," and "N-oxide." *See, e.g.*, '857 Patent, 2:63-65 ("In another embodiment is a high-load solid tablet *formulation* comprising a *pharmaceutical composition* comprising at least 50% w/w of *ibrutinib* . . . .") (emphases added); 70:23-28 (" . . . involves administration of *pharmaceutical compositions* containing *Compound 1*, or a pharmaceutically acceptable *salt*, pharmaceutically acceptable *N-oxide*, pharmaceutically active *metabolite*, pharmaceutically acceptable *prodrug*, or pharmaceutically acceptable *solvate* thereof.") (emphases added); 25:51-54 ("In yet other embodiments, *Compound 1*, or a pharmaceutically acceptable *salt* thereof, is prepared in various forms, including but not limited to, amorphous phase, *crystalline forms*, milled forms and nano- particulate forms.") (emphases added). This Court should construe "ibrutinib" to exclude these entities[26] since the patentee acted as its own lexicographer and differentiated "ibrutinib" from these entities.[27] *D&M Holdings*, 2017 U.S. Dist. LEXIS 122301, at *17-18.

Furthermore, the exclusion of "crystalline form" from "ibrutinib" is consistent with how the USPTO has distinguished "crystalline form" from "ibrutinib" during the prosecution of the '455 Patent. Ex. 24 (U.S. App. No. 15/497,896, 06/08/17 Notice of

---

[26] To the extent a "derivative," "acid" or "ester" is one of these excluded classes (*i.e.*, "prodrug"), this Court should also exclude these classes.

[27] Plaintiffs concede that "a compound is not a formulation."

Allowance), 2 (B0869) ("Being directed to a *crystalline form* of *ibrutinib*, the Examiner considers U.S. Published Patent Application No. 2017/0002009 . . . to be the closest prior art.") (emphases added).

A POSA would understand that "ibrutinib" excludes: 1) polymorphs because the '857 Patent does not enable polymorphs (Ex. 43, Swift Decl. ¶¶ 82-85, 88 (B1369-70, B1371)); and 2) prodrugs, solvates, metabolites, and N-oxides because the '857 Patent does not enable prodrugs, solvates, metabolites, and N-oxides (Ex. 42, Lepore Decl. ¶¶ 57-74, 79 (B1327-34, B1335)).

This Court should reject Plaintiffs' "no construction necessary/plain and ordinary meaning." To the extent Plaintiffs contend this construction means "the name of the compound at issue in this," "the active ingredient in Imbruvica and Tablet's Defendants' proposed product," or any construction offered in the Myerson declaration, the Court should reject this construction because Plaintiffs' proffered construction does not appear in the JCCC, and Plaintiffs refused to provide their understanding of this construction despite repeated requests during the parties' claim construction meet-and-confer and their representation during the parties' 10/10/19 teleconference with the Court regarding Plaintiffs' deficient constructions. Ex. 23, 21:10-16 (B0863).

Putting aside their untimely disclosure of what their construction covers, this construction should be rejected because it does not resolve the parties' dispute about

whether the entities identified in Defendants' proposed construction should fall within the scope of the term.[28] *O2 Micro*, 521 F.3d at 1361. Plaintiffs contend that under its plain meaning, "ibrutinib" is both a compound and a particular polymorph.[29] Plaintiffs' expert understands "ibrutinib" to refer to "a particular crystalline form of ibrutinib, referred to as crystalline form A."  Myerson Decl. ¶ 54 (B0128). Plaintiffs and Dr. Myerson's understanding of "ibrutinib" in the context of the claims is incorrect and contradicts the patentee's differentiation of "ibrutinib" from "crystalline forms" (also known as polymorphs) (as discussed above).  This dispute between the parties is precisely why the Court should reject Plaintiffs' "no construction/plain and ordinary meaning."  *O2 Micro*, 521 F.3d at 1361.

### c)    Plaintiffs' Reply Position

The term "ibrutinib" covers the compound ibrutinib, regardless of its physical form. Tablet Defendants' assertion that the term "ibrutinib" should be construed as limited to a drawing, plus a series of exclusions, cannot be reconciled with the plain text of the Tablet Patents. *Supra* at 61-62. The written description makes clear that

---

[28] Plaintiffs' reliance on *Finjan* is misplaced for this reason.  Unlike *Finjan*, the parties do have a dispute regarding what does and does not fall within the scope of "ibrutinib."

[29] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

"ibrutinib" is the name of a specific compound with a specific molecular structure and provides a number of synonyms for "ibrutinib." *See, e.g.*, '857 Patent, 1:41–49 (listing multiples names, including "ibrutinib," and explaining "[t]he various names given for ibrutinib are used interchangeably herein"). Moreover, the patents explicitly state "[i]n some embodiments, a pharmaceutical composition comprising ***crystalline*** Compound 1"—ibrutinib—"is administered to a human." *Id.* at 10:9–35, 63–65 (emphasis added). A person of ordinary skill would have understood the plain meaning of "ibrutinib" as described in the written description, and thus, no construction is necessary. *Finjan v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010).

As evidenced by the written description, the plain and ordinary meaning covers ibrutinib in all its forms—it does not broaden the scope of the claims, as Tablet Defendants contend (*supra* at 14-15). Indeed, it is unclear what actual forms of ibrutinib—other than a drawing on a page—would fall under Tablet Defendants' interpretation of the claims. Tablet Defendants' proposed construction of "ibrutinib" is also scientifically and legally wrong for at least the reasons provided in Sections II.A.1.c, II.A.2.c, II.A.3.c, and should be rejected.

### d)    Defendants' Sur-Reply Position

Plaintiffs' construction should be rejected because it is divorced from the intrinsic record. Plaintiffs identify a passage ('857 Patent 1:41-49) but that passage refers to making a crystal from Compound 1, not that Compound 1 is a crystal, as

confirmed by the drawing of Compound 1 at 10:14, the structure of a molecule of "ibrutinib" and not the structure of a crystal. Plaintiffs' reliance on these isolated passages, divorced from the rest of the intrinsic record, is legally incorrect. A POSA would understand "ibrutinib" does not cover the entities excluded in Defendants' construction. *Supra* at 60-62. It is improper to construe "ibrutinib" to cover, *e.g.*, crystalline forms, because such a construction is not enabled. *Supra* at 62. *Omega*, 334 F.3d at 1335 n.6.

Plaintiffs contend "it is unclear what actual forms of ibrutinib—other than a drawing on a page—would fall under Tablet Defendants' interpretation of the claims."[30] *Supra* at 64. Plaintiffs conflate claim construction and infringement, which is not at issue here. As a matter of claim construction, "ibrutinib" excludes the entities identified in Defendants' construction.

### 2.    "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one"

#### a)    Plaintiffs' Opening Position

"1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" is the chemical name for ibrutinib.[31] This chemical

---

[30] Defendants' construction is not limited to a *drawing*, plus a series of exclusions. *Supra* at 64. Instead, it is a specific molecule that excludes certain entities.

[31]    "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl) piperidin-1-yl)prop-2-en-1-one" is recognized by the authority on chemical nomenclature and terminology, IUPAC, as a chemical name for ibrutinib. *See*

name would be well-understood by a POSA. Myerson Decl. ¶ 54 (B0128). This term requires no construction, and its meaning is reiterated by the written description of the Crystalline Form Patents. For example, the Background and Field of the Invention sections explain that "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" is the chemical name for ibrutinib (*see, e.g.*, '455 Patent, 1:19–27, 1:45–53):

> Described herein is the Bruton's tyrosine kinase (Btk) inhibitor 1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one, including crystalline forms, solvates and pharmaceutically acceptable salts thereof, as well as pharmaceutical compositions that include the Btk inhibitor and methods of using the Btk inhibitor in the treatment of diseases or conditions that would benefit from inhibition of Btk activity.

> 1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one is also known by its IUPAC name as 1-{(3R)-3-[4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl]piperidin-1-yl}prop-2-en-1-one or 2-Propen-1-one, 1-[(3R)-3-[4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl]-1-piperidinyl-, and has been given the USAN name, ibrutinib. The various names given for ibrutinib are used interchangeably herein.

Tablet Defendants' construction is clearly wrong, and directly at odds with the claim language, as it would exclude "crystalline forms," even though the asserted claims of the Crystalline Form Patents expressly include "crystalline forms." For example, claim 1 of the '140 Patent expressly recites a "crystalline form" of ibrutinib. The claim is reproduced below, with the Tablet Defendants' construction inserted in red and the contradictory claim language in bolded blue:

| '140 Patent: Claim 1 | '140 Patent: Claim 1 with Defendants' construction |
|---|---|
| 1. A **crystalline form** of l-((R)-3-( 4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1- | 1. A crystalline form of [the molecule |

https://pubchem.ncbi.nlm.nih.gov/compound/Ibrutinib#section=Names-and-Identifiers.

| | |
|---|---|
| yl)piperidin-1-yl) prop-2-en-1-one that has an X-ray powder diffraction (XRPD) pattern comprising 2-Theta peaks at about 16.1°, about 18.9°, and about 21.6°. | <br><br>**excluding** compositions, formulations, derivatives, salts, metabolites, solvates, prodrugs, esters, acids, **crystalline forms** (also known as polymorphs), or N-oxides thereof] that has an X-ray powder diffraction (XRPD) pattern comprising 2-Theta peaks at about 16.1°, about 18.9°, and about 21.6°. |

Moreover, the written description of the Crystalline Form Patents repeatedly explains that crystalline forms are amongst the embodiments of "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" in the patent. *See* '753 Patent, Abstract, 1:14–22, 1:52–62; '140 Patent, Abstract, 1:60–2:3, 1:24–31.

Tablet Defendants' construction should be rejected for the reasons provided in Sections II.A.1.a, II.A.2.a, II.A.3.a and Section II.B.1.a.

## b)    Defendants' Answering Position

"1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" is present in the asserted claims on the Honigberg, Crystalline Form, and Tablet Formulation Patents.

The intrinsic record supports Defendants' construction that "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" should be the compound itself. The patents refer to "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" as a "compound." '444 Patent, 3:52-4:11.

The intrinsic record also supports Defendants' construction that "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1- yl)prop-2-en-1-one" should exclude certain entities. *See, e.g.*, *id.*, 4:12-19; *see also* Section II.B.1.b, *supra*. This Court should construe   "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1- one" to exclude the entities listed in Defendants' construction since the patentee acted as its own lexicographer and differentiated "ibrutinib" from these entities. *D&M Holdings*, 2017 U.S. Dist. LEXIS 122301, at *17-18.

A POSA would understand that "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" excludes: 1) polymorphs because the Honigberg Patents do not enable polymorphs (Ex. 43, Swift Decl. ¶ 76 (B1366)); and 2) prodrugs, solvates, metabolites, and N-oxides because the Honigberg and Tablet Formulation Patents do not enable prodrugs, solvates, metabolites, and N-oxides (Ex. 42, Lepore Decl. ¶¶ 57-74 (B1327-34)).

This Court should reject Plaintiffs' "no construction necessary/plain and ordinary meaning" for the same reasons discussed in Section II.B.1.b, *supra*. Putting aside their untimely disclosure of what their construction covers, this construction should be rejected because it does not resolve the parties' dispute about whether the entities identified in Defendants' proposed construction should fall within the scope of the term.[32] *O2 Micro*, 521 F.3d at 1361; *see also* Section II.B.1.b, *supra*.

### c)    Plaintiffs' Reply Position

Tablet Defendants appear to agree that the plain meaning of this term refers to "the compound [ibrutinib] itself." *Supra* at 69. Regardless, they argue that the plain meaning should not apply because "the patentee[s] acted as [their] own lexicographer[s]" to redefine the term and exclude various forms of ibrutinib, including crystalline and polymorphic forms. *Id.* Tablet Defendants, however, do not identify a purported definition from the written description—because there is none. Indeed, as provided in Plaintiffs' Opening Position, Tablet Defendants' proposed construction would render the claims nonsensical. *Supra* at 67-68. As just one example, under Defendants' construction, Claim 1 of the '455 Patent would read "***A crystalline Form A*** of 1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-

---

[32] Plaintiffs' reliance on *Finjan* is misplaced for this reason. Unlike *Finjan*, the parties do have a dispute regarding what does and does not fall within the scope of "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one."

d]pyrimidin-1-yl)piperidinl-yl)prop-2-en-1-one *'excluding … crystalline forms'"* (emphases added). Once again, the crux of Tablet Defendants' position is not about claim construction; it is an improper (and incorrect) enablement argument.

Tablet Defendants' construction should further be rejected for the reasons provided in Sections II.A.1.c, II.A.2.c, II.A.3.c and Section II.B.1.c.

### d)    Defendants' Sur-Reply Position

Plaintiffs' "analyses" in Sections II.A.1.c, II.A.2.c, II.A.3.c and II.B.1.c (*supra* at 68) do not address the intrinsic record concerning "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one" and whether certain entities were excluded from this term.

Plaintiffs wrongly argue Defendants' construction renders the claims "nonsensical." *Id*.  It is improper to interpret claims so rigidly by juxtaposing one construction against another.  Plaintiffs conflate claim construction with infringement, which is not at issue here.  For claim 1, '455 patent, a POSA would understand the claim was directed towards crystalline form A made from the molecule "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one"—consistent with  Defendants' constructions for "crystalline form" and "1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one," both grounded in the intrinsic record.

Finally, Plaintiffs ask this Court to ignore enablement when construing terms.

However, as in Section II.A.1.d., claims should be construed to preserve their validity.

## C.    Disputed Crystalline Form Terms

| CLAIM TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|
| "crystalline form" | No construction necessary/plain and ordinary meaning. Not limited to a particular crystalline form. (C.A. No. 18-192, D.I. 169, Transcript of May 20, 2019 Hearing) | "crystalline form (excluding solvates, salts, and compositions of the recited molecule)" |
| "[X-ray powder diffraction (XRPD) pattern; Infrared (IR) Spectrum; DSC thermogram; or thermogravimetric analysis (TGA) thermograph] as [shown/the one set forth] in [FIG. 1; 2; 3; or 4, respectively]" | No construction necessary/plain and ordinary meaning. (C.A. No. 18-192, D.I. 169, Transcript of May 20, 2019 Hearing) | "[X-ray powder diffraction (XRPD) pattern; Infrared (IR) Spectrum; DSC thermogram; or thermo-gravimetric analysis (TGA) thermograph] that is the same as shown in [FIG. 1; 2; 3; or 4, respectively]" |

### 1.    "crystalline form"

#### a)    Plaintiffs' Opening Position

This term is clear; no construction is necessary. Indeed, the Court already

addressed this term during the claim construction proceeding involving the Capsule

Defendants. The Court concluded "crystalline form" is not limited to a particular

form, namely Form A, and declined to construe the term further. *Markman* Tr. at

118:20–120:2. There is still no need to construe this term beyond its plain and

ordinary meaning. *See Cipla Ltd. v. Sunovion Pharms. Inc.*, CA No. 15-424 (LPS), 2017 WL 2778352, at *6 (D. Del. June 27, 2017) ("The Court further agrees with Cipla that 'crystalline form' is a known term in the art."). Tablet Defendants have not shown any reason why the Court should revisit this ruling.

A POSA would understand that "crystalline form" refers to the solid state form of a compound, here ibruintib, where the ibrutinib molecules are part of a three-dimensional structure with long range order. Myerson Decl. ¶¶ 27, 54, 116–19 (B0116–17, B0128, B0152–53); Capsule Action, D.I. 144 at 86–96; *see Takeda Pharm. Co. v. Handa Pharms., LLC*, No. 11-CV-00840 JCS, 2012 WL 1243109, at *51 (N.D. Cal. Apr. 11, 2012) ("crystalline compound" means "regularly repeating pattern of molecules with long range order extending in three dimensions"); *AstraZeneca*, 2013 WL 1847639, at *11 ("in crystalline form" means "at least some of the . . . salt . . . is in a solid with a repeating pattern of atoms or molecules of the constituent chemical species"). That the term has a plain meaning is apparent from Tablet Defendants' construction, which repeats the term "crystalline form," but does not construe it.

Once again, Tablet Defendants seek a negative limitation—one which would exclude "solvates, salts, and compositions" from the term "crystalline form"—without any evidence of lexicography or disavowal in the intrinsic evidence. Indeed, the patents state that the inventions include "pharmaceutical compositions that include

the crystalline forms." '455 Patent, 17–18. *On-Line Techs.,* 386 F.3d at 1138 (improper for construction to exclude embodiments). For all these reasons, Tablet Defendants' construction should be rejected.

### b) Defendants' Answering Position

"Crystalline form" is present in certain asserted claims of the Crystalline Form Patents. Defendants' proposed construction is consistent with the Court's prior construction for "crystalline form" in the Capsule Action. Defendants' proposed construction identifies certain entities that, according to the intrinsic evidence, do not fall within the scope of this term—an issue that was not previously before the Court.

Defendants' proposed construction emphasizes that the term does not include certain entities. The intrinsic record supports this construction. For example, in the specification of the '455 Patent,[33] the patentee distinguished "crystalline forms" from "solvates," "salts," and "compositions." *See, e.g.,* '455 Patent, Abstract ("Described here is the Bruton's tyrosine kinase (Btk) inhibitor . . . including *crystalline forms*, *solvates*, and pharmaceutically acceptable *salts* thereof. Also disclosed are pharmaceutical *compositions* . . . .") (emphases added), 1:19-26 ("Described herein is the Bruton's tyrosine kinase (Btk) inhibitor . . . including *crystalline forms*, *solvates* and pharmaceutically acceptable *salts* thereof, as well as pharmaceutical *compositions*

---

[33] For convenience, Defendants cite to the written description of the '455 Patent for the Crystalline Form Patents, which share a common specification.

that include the Btk inhibitor . . . .") (emphases added); 2:11-19 ("Also described herein are methods for preparing *crystalline forms* of 1-((R)-3-(4-amino-3-(4-phenoxyphenyl)-1H-pyrazolo[3,4-d]pyrimidin-1- yl)piperidin-1-yl)prop-2-en-1-one. Further described are *pharmaceutical compositions* that include the *crystalline forms* . . . .") (emphases added). This Court thus should construe "crystalline form" to exclude "solvates," "salts," and "compositions" since the patentee acted as its own lexicographer and differentiated "crystalline form" from these entities.[34] *D&M Holdings*, 2017 U.S. Dist. LEXIS 122301, at *17-18.

This Court should reject Plaintiffs' "no construction necessary/plain and ordinary meaning."[35] This construction should be rejected because it does not resolve the parties' dispute about whether the entities identified in Defendants' proposed construction should fall within the scope of the term. *O2 Micro*, 521 F.3d at 1361. To the extent Plaintiffs contend this construction means "solid state form of a compound, here ibrutinib, where ibrutinib molecules are part of a three- dimensional structure with long range order," "regularly repeating pattern of molecules with long range

---

[34] Plaintiffs appear to rely upon *On-Line Techs.* to contend that "pharmaceutical composition" is a preferred embodiment of "crystalline form." However, Plaintiffs have not explained how this passage from the Crystalline Form Patents show that "pharmaceutical composition" is a preferred embodiment of "crystalline form."

[35] Plaintiffs cite *Cipla, Takeda*, and *AstraZeneca* in support of their construction but these cases involved different patents, different specifications, and different disputed issues—namely whether certain entities fall within the scope of the term in view of the intrinsic record of Crystalline Form Patents.

order extending in three dimensions" as set forth in *Takeda*, "at least some of the . . . salt . . . is in a solid with a repeating pattern of atoms or molecules of the constituent chemical species" as set forth in *AstraZeneca*, or any other purported definition or construction set forth in the Myerson Declaration, the Court should reject this construction because Plaintiffs' proffered construction does not appear in the JCCC, and Plaintiffs refused to provide their understanding of this construction despite repeated requests during the parties' claim construction meet-and-confer and their representation during the parties' 10/10/19 teleconference with the Court regarding Plaintiffs' deficient constructions. Ex. 23, 21:10-16 (B0863).

Putting aside their untimely disclosure of what their construction covers, this construction should be rejected because it does not resolve the parties' dispute about whether the entities identified in Defendants' proposed construction should fall within the scope of the term.[36] *O2 Micro*, 521 F.3d at 1361. Plaintiffs' proposed construction does not address the current dispute and leaves open the questions of whether certain entities, like solvates, salts, and compositions of the recited molecule fall within the scope of the claims; Defendants' proposed construction explains what entities should and should not be included.

### c)    Plaintiffs' Reply Position

---

[36] Plaintiffs' reliance on *Finjan* is misplaced for this reason. Unlike *Finjan*, the parties do have a dispute regarding what does and does not fall within the scope of "ibrutinib."

This Court has already concluded that "crystalline form" requires no construction and is not limited to Form A. *Markman* Tr. at 119:3–120:2. Tablet Defendants provide no reason for the Court to revisit its prior rulings. Here, Tablet Defendants seek to limit "crystalline form" by excluding "solvates, salts, and compositions of the recited molecule." *Supra* at 75. This attempt should be rejected.

Tablet Defendants admit that "[c]rystalline solids are solid materials whose atoms, molecules, or ions are arranged in a highly ordered structure, forming, a three-dimensional lattice that extends in all directions." *Supra* at 9; Ex. 43, Swift Decl. ¶ 42 (B1356). That is the plain and ordinary meaning of "crystalline form," and there is no reason to deviate from the Court's prior construction.

In a bare attempt to avoid infringement, Tablet Defendants argue that a composition (for example, a tablet) including a crystalline form is somehow excluded from the scope of the claims. As the written description makes clear, however, the claims do not exclude crystalline forms that have been further formulated into compositions. *See, e.g.*, '455 Patent, 2:9–10 ("Further described are pharmaceutical compositions that include the crystalline forms."); *id.* at 7:39–44 ("In some embodiments, the pharmaceutical composition comprises Form A. In some embodiments, the pharmaceutical composition comprises Form B. In some embodiments, the pharmaceutical composition comprises Form C.").

Moreover, there is no dispute that as a scientific matter, crystalline forms can include salts and solvates. Ex. 17 (Brittain) at 228 (B0701) (solvates are "forms containing solvent molecules within the crystal structures"). Indeed, Tablet Defendants' own expert agrees that "crystalline forms" can exist as "polymorphs, solvates, hydrates or salts." Ex. 43, Swift Decl. ¶ 44 (B1357). The intrinsic evidence is consistent with the plain and ordinary meaning of crystalline form. For example, the written description explains that the inventions include crystalline solvates of ibrutinib. '140 Patent, 34:32–33, 35:6–7, 36:3–4. Indeed, three preferred crystalline forms described in the patents, Forms D, E, and F, can be in solvated form. '140 Patent, 34:32–33, 35:6–7, 36:3–4.

Tablet Defendants further mischaracterize the intrinsic evidence. They selectively cite passages, but the ellipses reveal critical context. For example, Tablet Defendants cite the '455 Patent, 1:19–26, which provides in full:

> Described herein is the Bruton's tyrosine kinase (Btk) inhibitor 1-((R)-3-(4-amino-3-(4-phenoxypheny1)-1H-pyrazolo[3,4-d]pyrimidin-1-yl)piperidin-1-yl)prop-2-en-1-one, including crystalline forms, solvates and pharmaceutically acceptable salts thereof, as well as pharmaceutical compositions that include the Btk inhibitor and methods of using the Btk inhibitor in the treatment of diseases or conditions that would benefit from inhibition of Btk activity.

This is not a general passage discussing crystalline forms, as Defendants' selective quoting would indicate. *Supra* at 75. Rather this passage addresses a specific compound—ibrutinib. The passage separately recites crystalline forms, solvates, salts

and pharmaceutical compositions because not all crystalline forms of ibrutinib are solvates or salts or contained in a composition. It does not somehow redefine "crystalline form" to exclude salts, solvates, or compositions, or disavow its plain meaning. *In re Rambus Inc.*, 694 F.3d 42, 47 (Fed. Cir. 2012) (narrowing the plain meaning of a claim term requires "words of manifest exclusion or clear disavowals" of the full scope of the term). Defendants' construction should be rejected.

### d)    Defendants' Sur-Reply Position

Plaintiffs concede: 1) the '455 Patent "separately recites crystalline forms, solvates, salts, and pharmaceutical compositions," and 2) "not all crystalline forms of ibrutinib are solvates or salts or contained in a composition." *Supra* at 78. Indeed, crystalline forms do not include solvates, salts, and other compositions because crystalline forms contain the freebase alone. Crystalline forms are distinguished from solvates, salts, and pharmaceutical compositions on the face of the patent, '455 Patent, Abstract, 1:19-26,   and ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████  Ex. 40 (Smyth Tr.) 291:15-17 (B1295).

Plaintiffs rely on isolated statements in the specification (*supra* at 77), but these statements (*e.g.*, "the pharmaceutical composition comprises Form A") do not speak to the term's scope.  Again, Plaintiffs conflate claim construction and infringement. For claim construction, the intrinsic record shows a crystalline form is different from a

pharmaceutical composition. That does not mean that a pharmaceutical composition cannot contain a crystalline form, as emphasized in the patentee's claims. *Compare* '444 Patent, cl. 1 ("A compound of Formula (D) . . . ."), *with id.*, cl. 6 ("A pharmaceutical composition comprising a compound of claim 1 . . . .").

Plaintiffs cite to the '140 Patent (34:32-33), but this indicates embodiments in which crystalline Form D *is solvated*, not that crystalline Form D itself *is a solvate*. *Supra* at 77-78. Based on a plain reading of the specification, "crystalline form" does not include solvates.

Without intrinsic support, Plaintiffs rely on external references generally stating crystalline forms can exist in the forms of salts and solvates. *Supra* at 77. Plaintiffs ignore that the specification is the "single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1316. A POSA's understanding of the specification, which distinguishes "crystalline form" from other entities, is that the claim term does not include those entities. *Supra* at 73-74.

> **2.** **"[X-ray powder diffraction (XRPD) pattern; Infrared (IR) Spectrum; DSC thermogram; or thermo-gravimetric analysis (TGA) thermograph] as [shown/the one set forth] in [FIG. 1; 2; 3; or 4, respectively]"**

> **a)** **Plaintiffs' Opening Position**

The Court already dealt with one of these terms—"an X-Ray powder diffraction (XRPD) pattern a shown in FIG. 1"—during the claim construction proceeding involving the Capsule Defendants. There, the Court rejected the Capsule Defendants'

argument (based on prosecution history disclaimer) that this term requires an "an X-Ray powder diffraction pattern identical to FIG. 1." *Markman* Tr. at 96:12–101:3. Tablet Defendants seek essentially the same construction (using "the same as" rather than "identical to"), but take it a step further, asking the court to impose a requirement of sameness for a number of limitations that call for the comparison of analytical results to patent Figures.

Tablet Defendants' attempt to re-write these terms to require XRPD patterns, IR spectra, DSC thermograms, and TGA thermographs that are "***the same as***" those shown in Figures 1–4 should be rejected. This construction ignores the claim language. Indeed, when the patentee wanted to use the phrase "the same as" in the claims, it did so expressly, *see* '753 Patent, claims 1–3, 17, but the patentee did not do so for any of the disputed terms. Moreover, a POSA would not understand the terms to require analytical results that are an exact match to the reference figures. *E.g.*, Myerson Decl. ¶¶ 46–53, 93–95 (B0124–28, B0143–45). As explained above in Section I.A.2, some variation would be expected with experimental techniques such as XRPD, IR, DSC, and TGA.

Courts have consistently rejected attempts to limit claim terms such as these to require an exact match with figures or analytical results in a patent. *See, e.g.*, *AstraZeneca*, 2013 WL 1847639, at *9 (rejecting construction requiring an XRPD "perfectly identical to Figure 1" because it was "too rigid"); *Kowa Co., Ltd. v. Amneal*

*Pharms., LLC*, No. 14-CV-2758 PAC, 2017 WL 10667089, at *37 (S.D.N.Y. Sept. 19, 2017) (skilled artisan would understand that claims "require an approximate, not exactly identical, match of the characteristic pattern as depicted in Figure 1, viewing the patterns in totality and taking into account experimental errors and variation associated with XRPD analysis"), *aff'd*, 745 F. App'x 168 (Fed. Cir. 2018).

There is no lack of clarity as to what "as shown in" or "set forth in" means. Ultimately, the question of whether the results of a particular analytical technique are "as shown in" or as "set forth in" a figure in the patent is a question for the experts at the merit stage; it is not a question of claim construction. *Markman* Tr. at 115:17–118:5. Accordingly, these terms do not require further construction.

### b)    Defendants' Answering Position

This set of four terms is present in the '753 Patent. Construction of this term is limited to require precisely the XRPD patterns, IR spectrum, DSC thermogram, or TGA thermograph as depicted in Figures 1, 2, 3, or 4, respectively, of the '753 Patent.[37] While this Court previously construed one of the four terms ("an X-ray powder diffraction (XRPD) pattern as shown in FIG. 1"),[38] the Court has not

---

[37] The arguments in this section address XRPD and Figure 1, but apply to the IR spectrum, DSC thermogram, and TGA thermograph and their respective Figures.

[38] Plaintiffs mischaracterize the Court's construction. The Court did not address this claim term with respect to experimental error. *Markman* Tr., 116:18-117:25 (providing a construction "except for the open-ended issue as to whether or not it includes experimental error").

considered Defendants' proposed construction in view of certain intrinsic and extrinsic evidence.[39]

Defendants' construction is consistent with the intrinsic record. For example, independent claims 1 and 17 of the '753 Patent include, *inter alia*, the following limitations: "an X-ray powder diffraction (XRPD) pattern as shown in FIG. 1" (the disputed claim term) and "an X-ray powder diffraction (XRPD) pattern with characteristic peaks at 5.7±0.1° 2-Theta, 13.6±0.1° 2-Theta, 16.1±0.1° 2-Theta, 18.9±0.1° 2-Theta, 21.3±0.1° 2-Theta, and 21.6±0.1° 2-Theta." As a matter of claim differentiation, the term "as shown in FIG. 1" must be distinguishable from the peaks with "±0.1° 2-Theta." *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1332-33 (Fed. Cir. 2014) ("[D]ifferent claim terms are presumed to have different meanings.") (internal quotation marks omitted). Indeed, claim 1 (prior to amendment) shows the patentee intended for these terms to be different by identifying them as separate "properties." Ex. 20, '949 Application Prosecution, 08/24/2015 Response to Non-Final Office Action, 4 (properties (a) and (b)) (B0781).

---

[39] Defendants reserve the right to argue that there is a clear disavowal. Ex. 25, 3-4 (B0874-75) (Examiner's rejection); Ex. 20, 4-8 (B0781-85) (Applicant's amended claims). For the purposes of claim construction, Defendants only present new arguments.

Defendants' proposed construction is supported by the specification of the '753 patent. The disputed claim term includes Figure 1. A POSA would understand that Figure 1 has no error margin because there is no error margin in the figure, and the specification does not state that Figure 1 has any margin of error.  Ex. 43, Swift Decl. ¶ 67 (B1363). Additionally, a POSA would understand that Figure 1 has no error margin because the patentee knew how to identify error margin in connection with XRPD patterns, but it chose not to with Figure 1. '753 Patent, 30:58-62 ("In some embodiments, Form A has an X-Ray powder diffraction (XRPD) pattern with characteristic peaks at 5.7±0.1° 2-Theta, 13.6±0.1° 2-Theta, 16.1±0.1° 2-Theta, 18.9±0.1° 2-Theta, 21.3±0.1° 2-Theta, and 21.6±0.1° 2-Theta."); *Id.*, ¶¶ 67-70 (B1363-64).

Furthermore, the patentee characterized an XRPD pattern according to Figure 1 in the specification of the '753 Patent as two alternative claim limitations: 1) Form A has an XRPD diffraction pattern as shown in Figure 1; and 2) "Form A has an X-Ray powder diffraction (XRPD) pattern *substantially the same* as shown in in Figure 1." '753 Patent, 30:56-58 (emphasis added). A POSA would understand these as two separate disclosed alternative claim limitations, and that the claims are only directed towards the former (*i.e.*, the disputed claim term).  Ex. 43, Swift Decl. ¶ 69 (B1363-64). By only claiming the former, the patentee dedicated the alternative claim limitation (*i.e.*, "substantially the same" limitation) to the public.  *Johnson &*

*Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc) ("[W]hen a patent drafter discloses but declines to claim subject matter . . . this action dedicates that unclaimed subject matter to the public.") (internal quotation marks omitted).

The prosecution history also supports Defendants' construction that an XRPD "as shown in FIG. 1" as claimed does not mean an XRPD "substantially the same as FIG. 1," and also does not mean a pattern with characteristic peaks at 5.7±0.1° 2-Theta, 13.6±0.1° 2-Theta, 16.1±0.1° 2-Theta, 18.9±0.1° 2-Theta, 21.3±0.1° 2-Theta, and 21.6±0.1° 2-Theta. Rather, these three phrases reflect varying degrees.

In response to the Examiner's rejection of the terms "substantially" and "similar" as indefinite for "failing to point out and distinctly claim the subject matter," the Applicant amended the claims by deleting "substantially the same" and "substantially similar to" from several of the listings of properties defining the claimed subject matter, thereby leaving only the language "an X-Ray powder diffraction (XRPD) pattern as shown in Figure 1" in the claims. Ex. 25 ('949 Application Prosecution, 06/11/15 Non-Final Office Action), 3-4 (B0874-75); Ex. 20, 4-7 (B0781-84).

The Examiner searched for prior art by interpreting those terms "as meaning identical to the recited XRPD pattern, IR spectrum, DSC thermogram, and TGA thermogram . . . ." This demonstrates that (1) the Examiner believed Defendants

were claiming a crystalline Form A with the same XRPD pattern as shown in the figures, and (2) contrary to Plaintiffs' argument, it is indeed possible for two XRPD patterns to be compared in this way and under this interpretation. Ex. 25, 4 (B0875); *supra* at 80-82; Ex. 43, Swift Decl. ¶ 63 (B1362).

The Examiner's reasons for allowance also clearly distinguish the precise pattern "as shown in FIG. 1" from the characterization by peak positions with an error margin of ±0.1°. Ex. 26 ('949 Application Prosecution, 11/17/15 Notice of Allowance), 6 (B0957) (using the conjunction "or" in the Reasons for Allowance).

Plaintiffs' reliance on *AstraZeneca* and *Kowa* are misplaced because those cases involved different patents and different specifications.

### c)    Plaintiffs' Reply Position

Tablet Defendants seek to relitigate a construction the Court rejected in the Capsule Action. *Markman* Tr. 96:12–101:3. There, the Court found there was "not a clear and unmistakable disavowal," requiring the XRPD pattern to be identical to Figure 1. *Id.* 100:12–19. The Court further indicated that the parties were to offer any "alternative theories" on the proper amount of experimental error during expert discovery and trial. *Id.* at 111:12–112:15, 115:3–13.

Nonetheless, Tablet Defendants admit that their construction would not permit *any variation* from the XRPD, IR, DSC, and TGA Figures in the Patents. Instead, it would require "***precisely*** the XRPD pattern[], IR spectrum, DSC thermogram, or TGA

thermogra[m] as depicted in Figures 1, 2, 3, or 4" (emphasis added). *Supra* at 83. This unrealistically restrictive construction is unmoored from the science of the relevant analytical techniques and the Patents.

A person of ordinary skill would have understood that it would be unrealistic to consistently obtain a precise match to a reference XRPD pattern, IR spectrum, DSC thermogram, or TGA thermogram, such as those shown in the Patents. *See* Section I.A.2.b. For example, XRPD measurements are known to be subject to experimental error and variation. *See also* Myerson Decl. ¶¶ 46–53 (B0124–28). The United States Pharmacopeia—a well-established compendium of drug information—confirms that such variability in XRPD measurements is to be expected. Ex. 38, *X-Ray Powder Diffraction, in* THE UNITED STATES PHARMACOPEIA 427, 430–31 (35th rev. 2012) (B1290-91) ("The agreement in the $2\theta$-diffraction angles between specimen and reference is within 0.2° for the same crystal form, while relative intensities between specimen and reference may vary considerably due to preferred orientation effects."); *see* Myerson Decl. ¶¶ 49–50 (B0125–26). Even two XRPD experiments using two samples of the same material, run on the same machine using the same conditions, may result in XRPD measurements that are not identical. Myerson Decl. ¶ 94 (B0143). Tablet Defendants admit that variance is expected in XRPD. *Supra* at 13 ("For any two samples of the same test material, the resultant XRPD patterns show little variance, if any, regarding peak positions, *though peak intensities may vary*.")

(emphasis added); Ex. 43, Swift Decl. ¶¶ 57–58 (B1360). This is consistent with the teaching throughout the written description of the Crystalline Form Patents that peak position in an XRPD pattern will vary slightly. *E.g.*, '548 Patent, 2:56–59, 4:1–4, 6:23–28.

Requiring a precise match to the patent Figures, which were all generated from experimental analytical techniques and intended to be exemplary, is incompatible with the applicable science. Terms should not be construed to require a scientific impossibility. *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 972 (Fed. Cir. 2018) (finding district court's construction of "fixed switching frequency" as "non-varying" "does not exclude the possibility of natural variation because doing so would impermissibly render the claims inoperable"); *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1089–90, 1092–93 (Fed. Cir. 2009) (modifying construction of "displaying real-time data" to remove requirement that data be displayed "immediately" due in part to limitations in technology); *Ansell Healthcare Prods. LLC v. Reckitt Benckiser LLC*, C.A. No. 15-915-RGA, 2018 WL 620968, at *3 (D. Del. Jan. 30, 2018) (rejecting construction parties agreed would be "scientifically impossible").

Tablet Defendants' claim differentiation argument based on the language of the '753 Patent claims similarly fails. The limitations of claims 1 and 17 on which Tablet Defendants rely are different on their face: one limitation refers to six specific

"characteristic peaks," while the other limitation refers to an entire XRPD pattern (which has more features than just the six specific peaks). Nothing about their comparison supports Tablet Defendants' construction.

Judge Stark recently rejected a similar attempt to limit the phrase "as shown in" an XRPD to a precise match with an XRPD Figure in a patent. *H. Lundbeck A/S v. Apotex, Inc. et al.*, C.A. No. 18-88-LPS, 2019 WL 3206016, at *7 (D. Del. Jul. 16, 2019). In *H. Lundbeck*, the court rejected the construction "having an XRPD pattern with all the peaks and corresponding relative intensities shown in the recited Figure[s]," explaining that a "POSA would be able to assess the crystalline form and exemplary XRPD patterns provided in the patent and discern with reasonable certainty whether a particular crystalline form is characterized by a particular XRPD pattern." *Id.* at 4. The same reasoning applies here.

### d)    Defendants' Sur-Reply Position

Plaintiffs criticize Defendants' construction as requiring a "match" in the figures that is "unrealistic" and "incompatible" with science. *Supra* at 87-88. Such approach is realistic—the Examiner performed this analysis. *Supra* at 85-86; Ex. 43, Swift Decl. ¶ 63 (B1362).

Plaintiffs fail to cite intrinsic support for their argument regarding XRPD measurements beyond excerpts of '548 Patent,[40] which merely repeat the claim language. Moreover, Plaintiffs fail to identify any evidence relating to IR spectrum, DSC thermogram, or TGA thermogram. *See supra* at 82 n.42.

Despite the unambiguous intrinsic record, Plaintiffs ask this Court to rely upon the USP and constructions from courts in other litigations involving different disputed claim terms, patents, and prosecution histories—all irrelevant to the intrinsic record here. *Supra* at 88-89. Plaintiffs improperly import these external guides into the claims when a POSA would have looked to the intrinsic record. *Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[T]erms . . . are construed with the meaning with which they are presented in the patent document.").

---

[40] The disputed term is in the '753 Patent, not the '548 Patent.

### D.    Disputed Tablet Formulation Terms

| CLAIM TERM | PLAINTIFFS' PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|
| "solid tablet formulation" | No construction necessary/plain and ordinary meaning. | "solid tablet formulation that comprises more than 0% w/w ibrutinib" |
| "mean $AUC_{0-\infty}$ of about 465 ng*h/ml +/- 248 ng*h/ml" | No construction necessary/plain and ordinary meaning. | "mean $AUC_{0-\infty}$ of about 465 ng*h/ml +/- 248 ng*h/ml after oral administration of one or more tablet(s) of the solid tablet formulation in an amount sufficient to deliver 560 mg of ibrutinib to a population of healthy human adults in a fasted state" |

### 1.    "solid tablet formulation"

#### a)    Plaintiffs' Opening Position

This term does not require construction. The plain and ordinary meaning of "solid tablet formulation" should apply. *See*, *e.g. Cephalon Inc. v. Mylan Pharms. Inc.*, 962 F. Supp. 2d 688, 699–700 (D. Del. 2013) (no construction of "providing a solid oral dosage form" necessary; "the ordinary meaning suffices"); *Warner Chilcott Co., LLC v. Mylan Inc.*, No. CIV.A. 11-6844 JAP, 2013 WL 3336872, at *3 (D.N.J. July 2, 2013) ("plain and ordinary meaning [of 'tablet'] shall govern"). The patent provides numerous examples of such tablet formulations including, images of examples of "tablets of the invention" (Figure 3, B–E). '857 Patent, 12:21–24; *see generally id*. at 2:63–7:42, Examples 1–3.

Tablet Defendants' "construction" again simply repeats the phrase "solid tablet

formulation" and then adds on additional language: "that comprises more than 0% w/w ibrutinib." But, a "solid tablet formulation" refers to the type of dosage form; the term itself does not require any particular active or inactive ingredients. Indeed, the presence and amount of ibrutinib are separate limitations in the asserting claims. For example, claim 1 of the '857 Patent specifies that the claimed "solid tablet formulation comprises at least 50% w/w of ibrutinib," while claim 25 specifies that ibrutinib "is present at about 60% w/w to about 80% w/w and in an amount of about 70 mg to about 840 mg." As other limitations of the claims address the presence and amount of ibrutinib, it is improper to inject the limitation Tablet Defendants' seek into the term "solid tablet formulation." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1361–62 (Fed. Cir. 2007) (rejecting a construction that rendered portions of a claim superfluous). Accordingly, Tablet Defendants' construction should be rejected and the term should be given its plain meaning.

### b)    Defendants' Answering Position

The claims of the '507 Patent recite a "solid tablet formulation;" the claims of the '857 Patent recite either a "solid tablet formulation" or a "high-load solid tablet formulation." The patents only explicitly define the latter term: "a solid tablet formulation comprising at least 50% w/w of ibrutinib per tablet." '857 Patent, 29:10-12. That the patents explicitly define what is a "high-load solid tablet formulation" highlights the need to construe what is a "solid tablet formulation" that is not "high

91

load." Since all solid tablet formulations disclosed in the patents contain ibrutinib, the claimed "solid tablet formulation[s]" are "solid tablet formulation[s] that comprise[] more than 0% w/w ibrutinib." This is consistent with the definition of a "high-load solid tablet formulation" that specifies above what percent w/w makes it "high-load"—"at least 50% w/w of ibrutinib per tablet." '857 Patent, 29:10-12.

Plaintiffs argue that it is improper to include the presence and amount of ibrutinib in this construction because other limitations in the claims address those aspects of the formulations. Plaintiffs' argument, however, ignores that every claim drawn to "high-load solid tablet formulation[s]" separately indicates the presence and amount of ibrutinib despite the patent providing an explicit definition of that term that makes reference to the amount of ibrutinib on a percent w/w basis that is present in the tablet. *Id.*, cls. 1-24, 29-35.[41]

Plaintiffs offer no construction of "solid tablet formulation" other than "plain and ordinary meaning," but fail to identify what that meaning should be. As a result, Plaintiffs' construction is improper since there remains a dispute over the meaning of the term. *O2 Micro*, 521 F.3d at 1361. All Plaintiffs muster is a vague, unsupported suggestion that the term "refers to the type of dosage form" and that "the term itself does not require any particular . . . ingredients." Moreover, though Plaintiffs point to

---

[41] Plaintiffs misleadingly quote '857 Patent claims 1 and 25 as reciting "solid tablet formulation[s]." The claims instead recite "high-load solid tablet formulation[s]," for which an explicit definition, as described above, is provided by the patent.

numerous purported examples of "solid tablet formulation[s]," none use the term in a context other than "high-load solid tablet formulation[s]."

In sum, while Plaintiffs have failed to offer any construction of the term, or any meaningful evidence to guide the Court in its interpretation, Defendants offer a construction rooted in the patent's intrinsic evidence, and thus should prevail.

### c)   Plaintiffs' Reply Position

Tablet Defendants argue that the term "solid tablet formulation" should be construed to require "more than 0% w/w ibrutinib" because "all solid tablet formulations disclosed in the patents contain ibrutinib." *Supra* at 94. But the ordinary meaning of "solid tablet formulation," in itself, does not require any particular active or inactive ingredients. Tablet Defendants' construction rewrites the claims, ignores that the claims *separately* specify that the tablets contain ibrutinib, and is contrary to law. *See Info-Hold, Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015) ("[E]xpressly reject[ing] … contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.") (citation and quotation marks omitted).

Tablet Defendants admit that the patentees did not "explicitly define" the term "solid tablet formulation." *Supra* at 93. Thus, according to the written description of the patents, the plain and ordinary meaning of "solid tablet formulation" applies. '857 Patent, 25:66–26:2 ("Unless defined otherwise, all technical and scientific terms used

herein have the same meaning as is commonly understood by one of skill in the art"). That patentees chose to separately and expressly define a specific type of "solid tablet formulation"—"high-load solid tablet formulation"—as "solid tablet formulation comprising at least 50% w/w of ibrutinib per tablet" is of no moment. To the contrary, the patent's express definition of "high-load solid tablet formulation" does not redefine the phrase "solid tablet formulation." The definition therefore supports Plaintiffs' position that "solid tablet formulation" is a well-understood term that needs no further explanation or construction.

Tablet Defendants' argument that their construction is supported by the "high-load" claims, which "separately indicate the presence and amount of ibrutinib[,]" despite the patent definition (*supra* at 94), similarly fails. Each claim to "high-load solid tablet formulation[s]" separately indicates the amount of ibrutinib because each claim further specifies the *particular* high-load percentage of ibrutinib—sometimes well over 50%—that is required. *See, e.g.,* '857 Patent, Claims 9, 10. In any event, the construction that Tablet Defendants propose does not actually construe the term "solid tablet formulation." Instead, their proposal repeats the term "solid tablet formulation" without construing it and adds an unnecessary and inappropriate limitation. It should be rejected.

#### d) Defendants' Sur-Reply Position

Defendants' construction is supported by Plaintiffs' definition of "high-load solid tablet formulation" based on the presence and amount of ibrutinib. '857 Patent, 29:10-12. Plaintiffs do not deny the claims directed to the high-load solid tablet formulations identify the presence/amount of ibrutinib. *Supra* at 95. Thus, "solid tablet formulation" should similarly identify the presence/amount of ibrutinib.

Plaintiffs' argument that Defendants' construction imports a "redundant" limitation concerning the presence of "ibrutinib" into the claims is contradicted by the intrinsic record, as Plaintiffs' "high-load solid tablet formulation" claims include the same purported "redundancy." *Supra* at 91-92, 95; '857 Patent, 100:15-102:18, 103:53-61 (reciting "at least 50% w/w of ibrutinib"). Plaintiffs' argument is meritless because the claims include the same amount of "ibrutinib" as the amount of ibrutinib identified in the specification.

### 2. "mean AUC$_{0-\infty}$ of about 465 ng*h/ml +/-248 ng*h/ml"

#### a) Plaintiffs' Opening Position

This term does not require construction. Indeed, the parties are in agreement that the term itself—"mean AUC$_{0-\infty}$ of about 465 ng*h/ml +/-248 ng*h/ml"—requires no further explanation. It refers to mean AUC (area under the blood plasma concentration-time curve)—a well-known concept in pharmaceuticals and pharmacokinetics, commonly used with respect to analysis of data for regulatory approvals. It is a pharmacokinetic parameter measuring the total exposure of drug

from administration to elimination from the body and is discussed throughout the patent. *See, e.g.*, '386 Patent, 27:29–52, Examples 5 and 6, Figures 1 and 2; *see also id.* at 96:39–40 ("$AUC_{0-\infty}$: Area under the concentration-time curve from time 0 to infinite time."). Accordingly, this term would be understood by a POSA and need not be construed by the Court.

Tablet Defendants simply repeat the language "mean $AUC_{0-\infty}$ of about 465 ng*h/ml +/-248 ng*h/ml" verbatim in their proposed construction, and then add on language found earlier in the claim, rendering claim language superfluous. As an example, claim 1 of the '386 Patent is reproduced below (with the Tablet Defendants' construction inserted in red and the claim language it repeats in blue):

| '386 Patent: Claim 1 | '386 Patent: Claim 1 with Defendants' Construction |
|---|---|
| 1. A solid tablet formulation comprising<br><br>a. ibrutinib, and<br><br>b. one or more pharmaceutically acceptable excipients, wherein the ibrutinib is present in an amount of at least about 50% w/w, and<br><br>wherein oral administration of one or more tablet(s) of the solid tablet formulation in an amount sufficient to deliver 560 mg of ibrutinib to a population of healthy human adults in a fasted state results in a **mean $AUC_{0-\infty}$ of about 465 ng*h/ml +/-** | 1. A solid tablet formulation comprising<br><br>a. ibrutinib, and<br><br>b. one or more pharmaceutically acceptable excipients, wherein the ibrutinib is present in an amount of at least about 50% w/w, and<br><br>wherein **oral administration of one or more tablet(s) of the solid tablet formulation in an amount sufficient to deliver 560 mg of ibrutinib to a population of healthy human adults in a fasted state** results in a [mean AUC0-∞ of about 465 ng*h/ml +/-248 ng*h/ml after **oral administration of one or** |

| | |
|---|---|
| **248 ng*h/ml.** | **more tablet(s) of the solid tablet formulation in an amount sufficient to deliver 560 mg of ibrutinib to a population of healthy human adults in a fasted state**]. |

Thus, Tablet Defendants' construction injects redundancy into the claims without providing any construction or clarity. *See Digital-Vending Servs. Int'l., LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (declining construction that would render other claim elements unnecessary surplusage); *Stumbo*, 508 F.3d at 1361–62 (rejecting a construction that rendered portions of a claim superfluous).

### b) Defendants' Answering Position

The '386 Patent claims are ambiguous as drafted—for example, they can be read as referring to a mean $AUC_{0\to\infty}$ calculated from blood sample measurements taken only when a population of healthy human adults is in a fasted state or, more broadly, blood sample measurements taken any time after oral administration of the recited amount of the claimed tablet formulation, particularly over 48 hours after dosing. Defendants' construction clarifies that the correct interpretation is the latter, whereas Plaintiffs again fail to offer any guidance for interpreting their claims.

$AUC_{0\to\infty}$ is a pharmacokinetic measure of the "total exposure" to a drug experienced by a subject who received the drug. '386 Patent, 27:31-32. It refers to the "[a]rea under the concentration-time curve from time 0 to infinite time." *Id.*, 96:39-41. Since it is impossible to measure a subject's exposure to a drug to an

infinite time, $AUC_{0\to\infty}$ is an extrapolation, and its accuracy increases with the number of measurements it reflects.

The patent discloses that "[b]lood samples for pharmacokinetic (PK) analysis of ibrutinib were collected before dosing and *over 48 hours after dosing* in each treatment period" (*id.*, 96:26-28 (emphasis added)), but that healthy human adults existed in a fasted state for only 4 hours after receiving the tablet formulation. *Id.*, 95:39-96:25. Thus, the patent makes clear that the pharmacokinetic analysis embodied by $AUC0\to\infty$ is conducted by taking blood samples "over 48 hours after dosing" (*i.e.,* over 48 hours after an amount sufficient to deliver a dose of 560 mg has been administered). As such, the mean $AUC0\to\infty$ recited in the claims results from measurements taken at least over 48 hours after dosing the tablet formulation, and is not limited merely to measurements taken during the limited 4 hour fasted state.

### c) Plaintiffs' Reply Position

Tablet Defendants' "construction' contains the full claim term "mean $AUC0\text{-}\infty$ of about 465 ng*h/ml +/-248 ng*h/ml," but then tacks on other portions of the claim: "after oral administration of one or more tablet(s) of the solid tablet formulation in an amount sufficient to deliver 560 mg of ibrutinib to a population of healthy human adults in a fasted state." The parties appear to agree that $AUC0\text{-}\infty$ refers to a patient's "total exposure" ('857 Patent, 27:7–10) to a drug, and is calculated using blood concentration measurements taken after administration of the drug (time 0). $AUC0\text{-}\infty$

refers to the "total area under the plasma concentration time curve," ('857 Patent,

27:24–25) or the "area under the concentration-time curve from time 0"

(administration) "to infinite time," ('857 Patent, 95:1–10). The parties also appear to

agree that AUC0-∞ is extrapolated from an AUC0-last value: because a patient's

blood concentration cannot be directly measured into infinity, measurements are taken

until a set "last" time point, a time versus blood concentration curve is created, and the

AUC0-∞ is extrapolated from that curve.

Nonetheless, Tablet Defendants argue their construction is necessary because

the claims refer to measurements in the "fasted state," and in light of this language a

person of ordinary skill would not know the duration of time over which to take blood

measurements to construct the AUC0-∞. But Tablet Defendants' construction, which

merely repeats other parts of the claims, provides no guidance on this issue. More

importantly, a person of ordinary skill would have understood how to take blood

concentration measurements after "oral administration . . . to a population of healthy

adults in a fasted state" (Claim 1). Indeed, FDA has provided guidance on how to

conduct fasted studies in line with Example 6 of the Patent ('857 Patent, 94:1–95:47)

that would be well understood by a person of ordinary skill:

> Fasted Treatments: Following an overnight fast of at least 10 hours,
> subjects should be administered the drug product with 240 mL (8 fluid
> ounces) of water. No food should be allowed for at least 4 hours post-
> dose. Water can be allowed as desired except for one hour before and
> after drug administration. Subjects should receive standardized meals
> scheduled at the same time in each period of the study.

\*   \*   \*

> For both fasted and fed treatment periods, timed samples in biological fluid, usually plasma, should be collected from the subjects to permit characterization of the complete shape of the plasma concentration-time profile for the parent drug.

Ex. 37, FDA Guidance for Industry, Food-Effect Bioavailability and Fed Bioequivalence Studies at 6 (2002) (B1280).[42] Nor does Tablet Defendants' construction actually define the term "fasted state" or provide a specific time frame for taking measurements. Their improper attempt to rewrite the claim term should be rejected.

### d)    Defendants' Sur-Reply Position

A POSA would understand the patentee claimed a mean $AUC_{0-\infty}$ calculated from blood sample measurements taken any time after oral administration of the recited amount of the claimed tablet formulation (Figure 3, Option A), and not to a population of fasted-state, healthy human adults (Figure 3, Option B). *Supra* at 98-99.



Figure 3. Timeline depicting disputed term's ambiguity

---

[42] *Available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/ food-effect-bioavailability-and-fed-bioequivalence-studies.

Plaintiffs concede this term covers "A", not "B," admitting "$AUC_{0-\infty}$ . . . is calculated using blood concentration measurements taken *after administration* of the drug." *Supra* at 99-100 (emphasis added). Accordingly, this Court should adopt Defendants' construction. If Plaintiffs are advancing Option B, the Court should reject it because "B" is not enabled or adequately described. *Omega*, 334 F.3d at 1335 n.6.

But, Defendants' construction is enabled and adequately described by the specification, which explains food was provided beginning 4 hours after each dose; and blood samples were collected over 48 hours after each dose (44 hours after the fasted state ends). '386 Patent, 96:26-28. Blood sample collection was not limited to the 4-hour period (*i.e.*, "B"). There is no mention of limiting blood sample collection to only the fasted period in the specification.

Plaintiffs mischaracterize Defendants' construction (*supra* at 100-01—Defendants' construction explains $AUC_{0-\infty}$ is calculated from blood sample measurements taken *after* oral administration of one or more tablet(s) , and is not limited to the fasted state (*i.e.*, "B").[43]

---

[43] Use of the word 'after' immediately following the disputed term resolves the ambiguity of whether Option A or Option B is covered by the term.

Plaintiffs' reliance on the 2002 FDA Guidance, extrinsic evidence, is misplaced because it does not address when to stop taking blood measurements and fails to resolve whether "A" or "B" should be covered.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com
jlyons@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Christopher N. Sipes
Erica N. Andersen
Brianne Bharkhda
Chanson Chang
Nicholas L. Evoy
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

*Attorneys for Pharmacyclics LLC*

Irena Royzman
Marcus A. Colucci
Cristina Martinez
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ James L. Higgins*

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com

*Attorneys for Alvogen Pine Brook LLC and Natco Pharma Ltd.*

OF COUNSEL:

Siegmund Y. Gutman
David M. Hanna
Michelle M. Ovanesian
Christopher D. Lynch
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
(310) 557-2900

Kimberly Q. Li
One International Place
Boston, MA 02110-2600
(617) 526-9600

*Attorneys for Alvogen Pine Brook LLC and Natco Pharma Ltd.*

Hannah Lee
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
(650) 752-1700

*Attorneys for Janssen Biotech, Inc.*

December 12, 2019