```
1                 IN THE UNITED STATES DISTRICT COURT

2                 IN AND FOR THE DISTRICT OF DELAWARE

3                           - - -

4
     PHARMACYCLICS LLC and          :   CIVIL ACTION
5    JANSSEN BIOTECH, INC.,         :
                                    :
6                    Plaintiffs,    :
                                    :
7         vs.                       :
                                    :
8    ALVOGEN PINE BROOK LLC and     :
     NATCO PHARMA LTD.,             :
9                                   :
                     Defendants.    :   NO. 19-434 (CFC)
10

11                          - - -

12                            Wilmington, Delaware
                              Monday, January 13, 2020
13                            9:04 o'clock, a.m.

14                          - - -

15   BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

16                          - - -

17   APPEARANCES:

18
                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP
19               BY:   JACK B. BLUMENFELD, ESQ. and
                       JEREMY A. TIGAN, ESQ.
20                     (New York, New York)

21
                         -and-
22

23

24
                                   Valerie J. Gunning
25                                 Official Court Reporter
```

1    APPEARANCES (Continued):

2

3              COVINGTON & BURLING LLP
               BY:  ERICA N. ANDERSEN, ESQ.,
4                   BRIANNA BHARKHDA, ESQ.,
                    CHANSON CHANG, ESQ. and
                    EVAN KRYGOWSKI, ESQ.
5                   (Washington, D.C.)

6
                         -and-
7

8              KRAMER LEVIN NAFTALIS & FRANKEL LLP
               BY:  IRENA ROYZMAN, ESQ. and
9                   MARCUS COLUCCI, ESQ.
                    (New York, New York).
10

11                  Counsel for Plaintiffs

12

13             YOUNG CONAWAY STARGATT & TAYLOR LLP
               BY:  MELANIE K. SHARP, ESQ. and
14                  JAMES L. HIGGINS, ESQ.

15
                         -and-
16

17             PROSKAUER ROSE LLP
               BY:  SIEGMUND Y. GUTMAN, ESQ.
18                  DAVID M. HANNA, ESQ. and
                    CHRISTOPHER D. LYNCH, ESQ.
19                  (Los Angeles, California)

20
                         -and-
21

22             ALVOGEN PINE BROOK
               BY:  ITHTI TOY ULIT, ESQ.
23

24                  Counsel for Defendants

25

```
 1                      P R O C E E D I N G S

 2
                        (Proceedings commenced in the courtroom at 9:04
 3      a.m.)

 4

 5              THE COURT:  Good morning.  Please be seated.

 6      Mr. Blumenfeld?  Do you want to introduce yourselves?

 7              MR. BLUMENFELD:  I was just going to do

 8      introductions.

 9              THE COURT:  Yes.  That's why I said

10      Mr. Blumenfeld.

11              MR. BLUMENFELD:  Oh, sorry.

12              THE COURT:  That's all right.

13              MR. BLUMENFELD:  Jack Blumenfeld from Morris

14      Nichols for the plaintiffs and at counsel table are Erica

15      Andersen, Brianna Bharkhda, Chanson Chang, all from

16      Covington & Burling, and they are here for Pharmacyclics.

17              Behind them is Evan Krygowski, who is also at

18      Covington & Burling, and to his left is Irena Royzman and

19      Marcus Colucci, who are from Kramer Levin for Janssen, and

20      in the back, Mr. Tigan, my partner, and behind Mr. Tigan,

21      Shera Kaplan, who is in-house at AbbVie, which is

22      Pharmacyclics' parent.

23              THE COURT:  Okay.

24              MR. BLUMENFELD:  And Claire Jiminez, who is at

25      Johnston & Johnston, and I think that's the cast, your
```

1    Honor.

2              THE COURT:  All right.  And Ms. Sharp or

3    Mr. Higgins?  Sorry.

4              MR. HIGGINS:  Good morning, Your Honor.  Jim

5    Higgins from Young Conaway on behalf of the defendants.

6              Melanie Sharp is also in the gallery on behalf

7    of defendants.

8              THE COURT:  All right.

9              MR. HIGGINS:  As well as at counsel table from

10   Proskauer Rose, Siegmund Gutman and David Hanna, and I would

11   like to introduce your Honor to in-house at Alvogen, Ithti

12   Toy Ulit, who is back here.

13             THE COURT:  Okay.  I would like to begin with

14   the solid tablet formulation and I would like to hear from

15   the defense first.

16             MR. HANNA:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. HANNA:  Your Honor, for the solid tablet

19   formulation term, the parties tried to in advance of the

20   Markman hearing today, last week we tried to resolve the

21   dispute because it seems like the parties are pretty close

22   in their construction.  And that is it seems like both

23   parties agree that the solid tablet formulation term and

24   those claims all require ibrutinib and an amount of

25   ibrutinib.  And we believe that because the parties agree

1      that it somehow have ibrutinib in these claims, that it

2      necessarily require more than the zero percent weight by

3      weight of ibrutinib.

4                And we tried to confront plaintiffs to get, to

5      ask them to agree to that construction in advance of today's

6      hearing, and they refused and said that they wanted to stick

7      by the plain and ordinary meaning and no construction is

8      necessary.

9                And so we're happy to go through the intrinsic

10      record, but it seems like we're close here.

11                THE COURT:  I'm befuddled.  I am going to ask

12      them.   I thought the whole case was about ibrutinib, so I

13      don't understand why in a way their position.  On the other

14      hand, as far as I can tell, is it fair to say your only

15      argument that there's a definition here comes from the fact

16      that high load solid tablet formulation is defined in the

17      written description?  Is that right?

18                MR. HANNA:  Your Honor, with respect to high

19      load solid tablet formulation, yes.

20                THE COURT:  My point is that you don't show, the

21      claims do not say that the tablet formulation has to be

22      comprised of ibrutinib.  Right?

23                MR. HANNA:  Actually, they do.  In each of the

24      claims, they do mention ibrutinib, and plaintiffs agree

25      that --

1          THE COURT:  I know they mention it, but they

2     don't say that solid tablet formulation is defined as being

3     comprised of ibrutinib, do they?

4          MR. HANNA:  The claims themselves, they state

5     solid tablet formulation, and then as part of that solid

6     tablet formulation, they identify the ingredient ibrutinib.

7          THE COURT:  All right.  So those are two

8     different things.  Right?

9          So one is to have a claim that has a solid

10    tablet formulation that goes on to claim that the

11    formulation contains ibrutinib.  That's one thing.

12         MR. HANNA:  Right.

13         THE COURT:  Right.  Then it is another thing,

14    isn't it, is to say that the claims for anything in the

15    patent define solid tablet formulation, which is a term, as

16    containing ibrutinib.  It's a different thing.  Right?

17         MR. HANNA:  That is a different thing, but we

18    think the intrinsic record actually supports defining solid

19    tablet formulation by amount of ibrutinib.

20         THE COURT:  Okay.  So as far as I can tell from

21    your briefing, the only argument that you really make is

22    that the written description explicitly defines high load

23    solid tablet formulation, because that's the only argument I

24    see.

25         Do you make any other argument besides that?

1           MR. HANNA:  With respect to the intrinsic

2   record, we make the argument also that throughout the

3   specification, every instance of a solid tablet formulation

4   identifies an amount of ibrutinib.

5           THE COURT:  Okay.

6           MR. HANNA:  So in view of that, we're

7   construing, and in view of that definition of high load,

8   we're construing solid tablet formulation to require more

9   than zero percent weight by way of ibrutinib, and that would

10  be consistent with the high load solid tablet formulation

11  definition.

12          THE COURT:  All right.  Is there any other

13  argument you're making?

14          MR. HANNA:  That is the -- that's, in essence,

15  the argument.

16          THE COURT:  Okay.  Let me hear from the other

17  side.

18          MS. BHARKHDA:  Your Honor, Brianna Bharkhda on

19  behalf of Pharmacyclics and Janssen with respect to this

20  argument.

21          Would you like slides?

22          THE COURT:  Sure.  Pass them up.

23          MS. BHARKHDA:  I appreciate my colleague for

24  reminding me, and if we could bring up slide 80.

25          So Your Honor is correct that the main argument

1    upon which Alvogen relies with respect to its construction

2    of solid tablet formulation is the fact that a different

3    term in the patent, high-load solid tablet formulation, is

4    defined, but that calls into stark contrast the fact that

5    solid tablet formulation in and of itself is not.

6            THE COURT:  Right.

7            MS. BHARKHDA:  According to the patent, we give

8    it its plain and ordinary meaning.

9            THE COURT:  I'm with you.  I follow the black

10    letter law.  There's no lexicography.  There's no disavowal.

11    The fact that they refer in claims to ibrutinib being a

12    solid tablet formulation definition, it's just a limitation.

13    Okay.  But I'm confused.  Your opening sentence in the brief

14    is, this is all about ibrutinib.  The patent, you agree all

15    the embodiments that are described contain ibrutinib.

16    Right?

17            MS. BHARKHDA:  Of the inventions claimed in the

18    patent.  I think the issue for us, Your Honor, is that

19    frankly, Alvogen also does not actually construe the term

20    solid tablet formulation.  So this doesn't appear to be a

21    dispute about what that term actually means.  They just

22    repeat it.

23            THE COURT:  No.  Again, that's my point.  Two

24    different things.

25            MS. BHARKHDA:  Correct.

1    THE COURT:  But I'm also trying to figure out

2  why this really matters.

3    MS. BHARKHDA:  Well, Your Honor, the point being

4  that we're not going to argue that the claims themselves do

5  not require the presence of ibrutinib.

6    THE COURT:  Right.

7    MS. BHARKHDA:  But that's accounted for by a

8  completely separate element of the claim.

9    THE COURT:  I get it.  I get that.  That's what

10  I'm trying to figure out.  So you're right.  In other words,

11  you know, you win on the Federal Circuit law.  You clearly

12  win.

13    All right.  I'm trying to figure out why it

14  matters.  Can you tell me, why do you think they want this

15  term to be defined?  Okay?  Give me your best guess.

16    MS. BHARKHDA:  So our best guess is that Alvogen

17  is attempting to probably set a validity argument.

18    THE COURT:  What's the validity argument?  Help

19  me understand it.

20    MS. BHARKHDA:  It's not actually a hundred

21  percent clear to us, so that actually may be a question for

22  Alvogen's counsel about why this particular limitation they

23  are seeking would matter, but it appears to potentially be

24  something along the lines of a potential enablement argument

25  they want to make.

```
 1                    But to be perfectly honest, Your Honor, it's not
 2    a hundred percent clear to us, but it seems wrong as a
 3    matter of law, and it does seem to be setting up some
 4    argument that we're not -- we're not a hundred percent sure
 5    where they are going with this one, and because it's clearly
 6    wrong as a matter of claim construction, we are not willing
 7    to agree.  But we have made it clear to Alvogen that we
 8    don't plan to argue that the claims don't require a
 9    ibrutinib.  That's just a separate, complete other element.
10                    THE COURT:  Right.
11                    MS. BHARKHDA:  And it doesn't need to be
12    imported into this particular term.
13                    THE COURT:  So maybe, and I have not had a case
14    yet I don't think with enablement.  I've had indefiniteness.
15    Is it going to matter when it comes to enablement for some
16    reason?
17                    MS. BHARKHDA:  Your Honor, we don't think it
18    should.  We are comfortable with the enablement of the
19    patent.  However, whatever argument Alvogen seems to be
20    setting up from a claim construction perspective, it seems
21    to be wrong, and we're not comfortable agreeing with a
22    legally wrong construction even though we think ultimately
23    perhaps it won't matter.  That doesn't seem like given the
24    fact that there's nothing to support from a legal
25    perspective importing this limitation, we're not comfortable
```

1    agreeing to that when we've made our position about what the

2    claims require are clear and there's no dispute from a claim

3    construction perspective about what this term means or how

4    it should be construed.

5              So we have also had discussions about whether we

6    could take this off the table, because it doesn't seem like

7    we have a disagreement about what is actually required by

8    the claims.  Obviously, we're very concerned about what

9    argument they may, in fact, be set setting up here by trying

10   to import this limitation.

11             THE COURT:  All right.  I hear you.  All right.

12   Let me hear from the other side real quick.

13             MR. HANNA:  Your Honor, I forgot to hand up

14   slides.  May I approach?

15             THE COURT:  Sure.

16             (Mr. Hanna handed slides to the Court.)

17             THE COURT:  All right.  So why does this matter?

18   What you are trying to set up?

19             MR. HANNA:  Your Honor, this relates to at least

20   validity, and we just wanted to confirm that they are not

21   going to have a surprise later at trial and say that for

22   some reason, by the solid tablet formulation, it doesn't

23   require an amount of ibrutinib.

24             THE COURT:  So you keep saying it doesn't.  I

25   couldn't -- I don't think they could be clearer, that they

1    are not going to argue that there's a claim in the patent

2    that doesn't require ibrutinib.  That seems -- it's so

3    obvious to me.  Right?  Is that what your concern is?

4              MR. HANNA:  More importantly, that the solid

5    tablet formulation, the claim, the claims require an amount

6    of ibrutinib.

7              THE COURT:  They are not going to say that

8    either.  Correct?  You're going to say the claim, a claim.

9    Not the term.  The claim, they're going to admit every claim

10   in the patent requires ibrutinib.  Right?

11             MS. BHARKHDA:  Correct, Your Honor.

12             MR. HANNA:  And that amount of ibrutinib is

13   going to follow in the solid tablet formulation.  In every

14   claim where there's an amount of ibrutinib claimed, that

15   would be in a solid tablet formulation.  If plaintiffs agree

16   to that, then there's no dispute.

17             THE COURT:  Now I think maybe we're trying to

18   get -- now maybe what you are trying to set up -- so are you

19   going to say that the ibrutinib disappears in the final

20   tablet?  Like, what is it you're going to say?  I'm kind of

21   confused.

22             MR. HANNA:  So, Your Honor, we're just trying to

23   say that in terms of when we're analyzing validity and

24   trying the case, that there's no surprises that when we're

25   talking about ibrutinib, it's in the solid tablet

1    formulation.

2              THE COURT:  What else would it be in?

3              MR. HANNA:  Well, Your Honor, I don't know, but

4    they have not confirmed that to us.  We've asked them to

5    confirm that and they refused to confirm that.

6              THE COURT:  All right.  Is there going to be

7    some argument that the tablet -- like, if they have a tablet

8    and it doesn't contain ibrutinib, are you arguing

9    infringement?

10             MS. BHARKHDA:  Your Honor, we're not attempting

11   to stretch the claims to cover, for example, a placebo

12   tablet.

13             THE COURT:  That's what I'm trying to figure

14   out.  There's something going on.  We've got smart people

15   here.

16             MS. BHARKHDA:  Right.

17             THE COURT:  You think this is a no-brainer.  I'm

18   trying to figure it out.  You'd never know.

19             MS. BHARKHDA:  I think Mr. Hanna's statement

20   that we have not been willing to confirm, I think we

21   confirmed repeatedly even during this hearing that we have

22   no -- that there's going to be no attempt to argue that the

23   claims don't require ibrutinib.

24             THE COURT:  Right.  And they don't require it --

25   he seems now to be saying, well, you might be arguing, well,

1    the claims require ibrutinib, but it doesn't have to be in

2    the tablet.

3              MS. BHARKHDA:  It's a solid tablet formulation

4    comprising ibrutinib.

5              THE COURT:  Yes.  So does it have to be in the

6    tablet or not?

7              MS. BHARKHDA:  It would have to be in the solid

8    tablet formulation.

9              THE COURT:  Well, that's a difference.  What is

10    the difference between the solid tablet and solid tablet

11    formulation?  Maybe you are playing a game.  Does it have to

12    be in the tablet?

13              MS. BHARKHDA:  Yes, Your Honor.

14              THE COURT:  Okay.  We're there.  I'm not

15    construing the term.  Plain and ordinary meaning.  You've

16    got it on the record.  Right?

17              MR. HANNA:  Yes, Your Honor.  Thank you.

18              THE COURT:  All right.  Thank you.

19              Next term.  I want to hear about the mean AUC

20    whatever zero to infinity term, please.

21              MR. HANNA:  Would you like the defense to go

22    first?

23              THE COURT:  I will hear from Ms. Andersen first.

24    Incidentally, you're good.  Right?  Just so the Federal

25    Circuit doesn't think I'm just flipping a coin here, solid

1    tablet formulation, there's no lexicography.  There's no

2    clear disavowal.  There's certainly no explicit, clear,

3    unambiguous, unequivocal lexicography or disavowal with

4    respect to solid tablet formulation in any of the written

5    descriptions.  The term is not defined in the claims.  The

6    only definition, and it's clear there is a definition of

7    high load, solid tablet formulation.  The fact that there's

8    not a definition then that corresponds to simply a solid

9    tablet formulation is informative, and the bottom line is I

10   don't think a construction is necessary, especially since it

11   sounds now like the parties have worked it all out.

12             All right.  Next term.  Mean AUC.  Ms. Andersen.

13   What do you think this is all about?

14             MS. ANDERSEN:  Your Honor, candidly, it's hard

15   to tell.  What defendants say in their brief, that it's

16   about is how often and when these blood measures are taken

17   in patients, but, first, we don't think that their

18   construction addresses that issue, but second of all, these

19   sorts of tests that are done in these FASTING studies, these

20   AUC STUDIES, are performed by pharmaceutical companies all

21   the time.  They know how to take these blood measurements to

22   characterize the blood plasma curve and then to calculate

23   the AUC.

24             So, Your Honor, it's quite hard to tell what

25   this dispute is really about.  It's much like the term Ms.

1    Bharkhda was just discussing.

2              If we could go to slide --

3              THE COURT:  So tell me this.  How is this going

4    to work at the trial?  Let's saying you're going to have to

5    prove infringement of the limitation.  How are you going to

6    do it?

7              MS. ANDERSEN:  Yes, Your Honor.  So defendants

8    in their ANDA, they have to perform pharmacokinetic studies

9    in the fasted state and in the fed state, and they take

10   measurements from a number of, when you have an ANDA, it's

11   normally healthy subjects, and that's what it is here.

12   That's also what's required by the claim.

13             So they have taken those blood plasma

14   measurements already.  Those measurements are in the ANDA

15   and then they calculated AUC zero to infinity, and then

16   there's a mean value for all of their patients, and then

17   that is how we'll show infringement.  We'll have an expert

18   talk about the values that are obtained for their ANDA

19   product and whether they fall within the claim.

20             THE COURT:  Right.  So, in other words, you

21   know, if I were really literal about this patent, right, and

22   infringement, I think you'd almost have to say you've got to

23   do the test live as opposed to relying on historical data,

24   but there's no way to read the patent that way.  In other

25   words, it's understood that we basically posit, if you will,

1    that the tablet you've got is the same tablet that was used

2    for the ANDA, and therefore the wherein clause is proved by

3    referring back to the historical data.  Right?

4              MS. ANDERSEN:  Your Honor, that is correct.  And

5    this is, you know, often the case for Hatch-Waxman cases

6    since you don't have some product on the market, that you're

7    looking to data in the ANDA.  For example, for

8    pharmacokinetics in the patient population, they tested it

9    in to say that is how the drug is going to perform, because

10   it's not something that's on the market that patients are

11   taking all the time.  You are quite right.

12             THE COURT:  All right.  Let me hear from the

13   defense.

14             MR. HANNA:  Your Honor, this is also one of the

15   other two claim terms that we approached plaintiffs about

16   because we think that the parties are -- we have a mutual

17   understanding, and that mutual understanding is that the

18   mean AUC that's in this claim range relates to an

19   extrapolation based on AUC from zero to last.

20             And --

21             THE COURT:  Zero to what?

22             MR. HANNA:  AUC zero to last, and that last just

23   refers to the end of sample collection.  So that time point

24   might be whether it's 24 hours, 48 hours, whatever it may

25   mean.  Then you extrapolate the mean AUC from zero to

1    infinity based on that sample collection.

2              THE COURT:  All right.  So, wait.  Ms. Andersen,

3    and you're good.  Right?

4              MS. ANDERSEN:  Your Honor, we have told

5    defendants that we agree, you can't take blood measurements

6    out to infinite time, so those are extrapolated much the

7    same as what Ms. Bharkhda said.  What we couldn't understand

8    is why claim language from a portion of the claim was being

9    repeated.

10             THE COURT:  I can't understand either.

11             MS. ANDERSEN:  As part of their construction.

12             THE COURT:  Right.  So you just heard what Ms.

13   Andersen said on the record.  You are good.  Right?  Plain

14   and ordinary meaning is sufficient.

15             MR. HANNA:  And that means it's extrapolated

16   based on the AUC left.  Right?

17             MS. ANDERSEN:  That is plain and ordinary

18   meaning.  You can't take blood measurements out to infinite

19   time.

20             THE COURT:  You're good?

21             MR. HANNA:  We're good.

22             THE COURT:  Plain and ordinary meaning.  All

23   right.

24             MR. HANNA:  Thank you.

25             THE COURT:  All right.  Sometimes I wonder why

1    clients pay lawyers.

2            All right.  So we now have stipulations

3    essentially to the two terms.  Again, the mean term, which

4    is term number ten, there was no clear, unambiguous

5    lexicography or disavowal with respect to the term, and it

6    doesn't matter because the parties have just stipulated to

7    the meaning of the term, so I don't even need to construe it

8    other than to say for the record that it's plain and

9    ordinary meaning.

10           All right.  Now, the other eight terms.  It's

11   really on the defendants.  I think I ruled on all the terms.

12   What are you bringing to the table for me?

13           MR. GUTMAN:  Your Honor, one of the things that

14   we're bringing to the table that's new is the intrinsic

15   record, which was not presented to the Court.  The same

16   intrinsic record was not presented to the Court in the

17   capsule action.

18           We have admissions from plaintiffs that confirm

19   that the constructions that are being proposed by Alvogen

20   and Natco were the proper constructions, and one of the

21   things that I think really stands out in this case, and,

22   quite frankly, also in the capsule case, is that with

23   respect to these varies claim construction issues, the

24   plaintiffs have not pointed to any intrinsic record

25   whatsoever.  They have advanced their claim construction

1    arguments based on nothing more than extrinsic evidence, and

2    more specifically, expert testimony that we have not had an

3    opportunity to test through cross-examination, and I will

4    raise that issue in a minute.

5              But the stark difference between our case and

6    the capsule case is that we have different constructions

7    that are supported and advanced by the intrinsic record, and

8    whether --

9              THE COURT:  Okay.  So I don't see it.

10             So come on up to the podium, Mr. Gutman.  I just

11   don't see it at all and I spent a lot of time studying these

12   terms for the capsule hearing.  I guess really I shouldn't

13   have said all eight, because I do think the pharmaceutically

14   acceptable salt might be different.

15             All right.  On the compound, let's start with

16   that.  What is the intrinsic evidence that's different that

17   was not presented to me?

18             MR. GUTMAN:  Well, first of all, Your Honor, I

19   will start with --

20             THE COURT:  You can start with what I just asked

21   if you don't mind, Mr. Gutman.

22             MR. GUTMAN:  Yes, yes.

23             THE COURT:  I don't mean to be rude.  We only

24   have limited time.

25             MR. GUTMAN:  Yes.

```
 1                    THE COURT:  I see you all the time, so I can
 2      kind of speak directly with you.  Right?
 3                    MR. GUTMAN:  Yes, yes.
 4                    THE COURT:  So what do you have that's new on
 5      compound?
 6                    MR. GUTMAN:  All right.  So I want to start
 7      with slide -- if I could provide some background for the
 8      Court.
 9                    THE COURT:  I sat through the capsule hearing.
10                    MR. GUTMAN:  Okay.
11                    THE COURT:  I read your briefs.  They are good.
12      They're all repetitive, because you are making the same
13      argument, which is you're trying to get limitations on
14      forms.
15                    MR. GUTMAN:  Yes.  So the basic argument, Your
16      Honor, is that the intrinsic record distinguishes between
17      various terms that are being construed and what we're
18      calling the chemical entities that should be excluded from
19      those terms.
20                    THE COURT:  That was the same argument that was
21      made to me, right, in the capsule hearing.
22                    MR. GUTMAN:  Actually not, Your Honor.
23                    THE COURT:  Really?
24                    MR. GUTMAN:  And one example is with respect to
25      crystalline form.
```

1            THE COURT:  Crystalline form is perhaps the

2    clearest example where it is very clear that crystalline

3    form was not disavowed.

4            MR. GUTMAN:  Well, there was an agreement

5    between the capsule defendants and plaintiffs about whether

6    crystalline forms should be included, for example, within

7    the scope of the term compound.  Our position is that it

8    should not be included, and we think that conclusion is

9    advanced by the intrinsic record.

10            So let me get into the intrinsic record, Your

11    Honor.  If you could go to slide 16, please.

12            So, Your Honor, this is a claim from the

13    Honigberg compound patents, so this is a patent that recites

14    the term compound.  It's highlighted in yellow up above.

15    And what is very -- and this is the beginning of the

16    intrinsic record story.  And what is very interesting about

17    this claim, which is intrinsic evidence, is that on the

18    face of the claim itself, the patentee is distinguishing

19    between compound and pharmaceutically acceptable salts

20    thereof.  So -- all right.

21            THE COURT:  I've already heard this argument and

22    then the '444 patent at column 60, lines 38 to 42, it says,

23    "Compounds described herein include crystalline form."

24            So I read the briefs very carefully, and for the

25    reasons that I stated at the capsule Markman hearing, I do

1   not believe that there is a clear and unequivocal

2   lexicography or disavowal that would somehow exclude

3   crystalline forms as the defendants are asking to do it.

4           So I'm going to adopt the plain and ordinary

5   meaning, which is provided by the plaintiffs.  And you don't

6   disagree with that.  You just want the limitation, so I'm

7   going to adopt that.  All right?

8           MR. GUTMAN:  Your Honor, we don't know -- one of

9   the problems is we don't know what the plain and ordinary

10  meaning is that is being advanced by plaintiffs, and under

11  02Micro, there's a dispute, because we don't know what their

12  position is on what is the plain and ordinary meaning.

13          THE COURT:  All right.

14          MR. GUTMAN:  And I understand the -- yes, Your

15  Honor?

16          THE COURT:  I've heard a lot of argument on it.

17  I'm going to adopt it.  I'm going to adopt the plaintiffs'

18  proposed construction as I did in the capsule hearing.  It's

19  a substance formed when two or more elements are chemically

20  bonded together.  These elements cannot be separated by

21  physical means.

22          MR. GUTMAN:  And, Your Honor, I just want to be

23  clear that plaintiffs have not presented any intrinsic

24  evidence that supports the construction that you just

25  articulated.

1                    THE COURT:  Okay.  You can take that up to the

2      Federal Circuit.

3                    MR. GUTMAN:  All right.

4                    THE COURT:  All right.  Then that's the first

5      two terms.  Then we get to structure.

6                    I don't believe that there's any need to provide

7      further definition to structure.  I think the plain and

8      ordinary meaning is there.  Again, what the defendant is

9      seeking to do or defendants are to exclude certain forms,

10     and, in particular, again, crystalline form is perhaps the

11     best example.  I don't think that the specification excludes

12     those forms.  There's certainly no clear and unambiguous

13     disavowal of those forms, and therefore I'm going to adopt

14     the plain and ordinary meaning.  In this case I don't think

15     any further definition is required.

16                    MR. GUTMAN:  Your Honor, before we move onto the

17     next term, may I just make a point about their recitation of

18     the law in their briefing where they articulate that the law

19     requires that there be some clear express definition or some

20     clear disavowal relating to the claim terms in order to

21     advance a claim construction relating to the terms?

22                    We disagree that that is the law of the Federal

23     Circuit regarding claim construction, and we cite in our

24     brief numerous cases from the Federal Circuit that take a

25     more holistic approach to claim construction where they look

1    at the intrinsic record holistically, what is said in the

2    specification, what is said in the prosecution history, and

3    that the rigid approach that is being advanced by plaintiffs

4    is not the law of the Federal Circuit.

5              THE COURT:  Okay.  And I appreciate that you

6    stated that for the record.  I did take a holistic approach,

7    and I'm pointing specifically to language as the plaintiff

8    did, which expressly says that a compound can include a

9    crystalline form.  It's just one example.  I'm not going to

10   reiterate, because it's de novo review, all of the other

11   intrinsic evidence examples, but I hear you and you've got

12   an appeal issue.  I guess you can take it up.  All right.

13             MR. GUTMAN:  Your Honor, may I just show you one

14   claim?

15             THE COURT:  Actually, no.

16             MR. GUTMAN:  Okay.

17             THE COURT:  But thank you.  There was extensive

18   briefing.  I read it carefully.  I spent hours reading it.

19   My law clerk read it carefully.  We went back and we reread

20   the transcript of the Markman hearing in the capsule case.

21   We looked again at the briefing in the capsule Markman

22   hearing carefully and I don't think it will advance the

23   ball.

24             MR. GUTMAN:  I understand.

25             THE COURT:  But thank you.

1              All right.  But let's talk about

2    pharmaceutically acceptable salt.  Now, here it seems to me

3    there is clear unambiguous lexicography articulated in the

4    '444 patent at column 20, lines 13 to 18, and so my

5    inclination would be to adopt that construction.

6              But, again, I think, Mr. Gutman, you're really

7    just, as far as your dissatisfaction with that definition,

8    that you want to add on the limitation, exclusionary

9    limitations.  Right?  It's the same argument.  Right?

10             MR. GUTMAN:  Yes, Your Honor.  That based on the

11   intrinsic record, we believe that certain chemical entities

12   that have different chemical properties are not part of the

13   scope of the various terms that we're construing, and,

14   again, we think that's driven by the intrinsic record.

15             The one claim that I wanted to show you actually

16   explicitly recited different kinds of crystal forms in the

17   claim.  We think that's probably the best intrinsic evidence

18   that those entities are not included in the recitation of

19   other compounds in the claims.

20             THE COURT:  Right.  And I've dealt with that

21   argument before, and, again, you can make it to the Federal

22   Circuit.  I don't think that constitutes a definitional or

23   constitutes a definition -- constitutes, rather, a

24   definition in those claims, which would have to be proven to

25   establish infringement.  So I hear you.

1            Let me hear though from the plaintiffs unless

2     you're going to object to my adoption of the definition,

3     which I think is set forth in column 20, lines 13 through 18

4     of the patent.

5            MS. ANDERSEN:  Your Honor, we believe that's our

6     alternative construction where we incorporated that express

7     definition of pharmaceutically acceptable, so plaintiffs

8     have no problem.  I think Your Honor is saying with

9     construing it in line with plaintiffs' alternative proposal.

10           THE COURT:  I am.  I mean, basically, in

11     fact, the only thing I wonder is why you just don't agree

12     to it.  That seems to me to be clear lexicography, so why

13     don't you just agree not in the alternative.  You just

14     agree, yes.

15           MS. ANDERSEN:  We agree, Your Honor.

16           THE COURT:  Okay.

17           MS. ANDERSEN:  We agree.

18           THE COURT:  All right.  So I will adopt that

19     construction of term four.  Then we go to term five, which

20     is ibrutinib.

21           Here again, I've read the papers.  They are

22     just -- there is no lexicography.  There is no disavowal

23     that would add the limitations that the defense seeks.  I

24     don't believe further definition is necessary.  I'm going to

25     adopt the plain and ordinary meaning of ibrutinib.

1            MR. GUTMAN:  And, Your Honor, just to make one

2   point, I know you've read the briefing already, but I just

3   want to highlight one case, which is the DNM Federal Circuit

4   case, where the Federal Circuit reviewed the intrinsic

5   record and found that the patentee drew distinctions between

6   the claim term that was being construed and other entities

7   similar to this case that could be excluded from the claim

8   term based on those distinctions.  So I just wanted to

9   highlight that case.

10            THE COURT:  And that said, you can find certain

11   instances in the written description where there's an

12   arguable differentiation between the way a compound is used

13   in formulation, but at the end of the day, there is no clear

14   and unambiguous definition that is afforded by the written

15   description.  So the same rationale would apply to the sixth

16   term.  I do not believe construction is necessary.  I'm

17   going to go with the plain and ordinary meaning.  I don't

18   think that there has been equivocal adoption in the

19   specification of the exclusionary limitations that have been

20   proposed by the defendants, and again I harken back to the

21   Markman hearing in the capsule case where there was a little

22   bit more exposition of that ruling.

23            And then the seventh term is the crystalline

24   form, and here, I think again it's the clearest example

25   where there's no exclusionary limitation.  That said, what I

1   do think is that there's slight difference in the

2   definitions that are proposed by the plaintiffs.  In

3   particular, you cite two cases.  I think it's on page 72 of

4   the brief.

5              So on page 72, plaintiffs cite Takeda

6   Pharmaceutical Company at 2012 Westlaw, 1243, 109.

7   Crystalline compound means "regularly repeating patterns

8   of molecules with long range order extending three

9   dimensions."

10             And then the AstraZeneca case at 2013 Westlaw,

11   1847639, defines a crystalline form to mean "at least

12   some of the salt is in a solid with the repeating pattern

13   of atoms or molecules of the constituent chemical

14   species."

15             So, you know, let me hear from plaintiffs

16   briefly.  I get the repeated pattern of molecules, atoms.  I

17   mean, do you want to come up with something that is

18   definitive maybe?  It would seem to me to be the same thing

19   as a layperson.

20             MS. BHARKHDA:  Your Honor, I think there is a

21   generally accepted meaning in the art.  I think that the two

22   cases that we've cited here provide slightly different

23   formulations of it, because as you read in the AstraZeneca

24   case, the particular compound they were dealing with there

25   was a salt, and so salts were particularly mentioned.

1              In Takeda, excuse me, the Takeda case, it was

2     frankly more of a generic definition.  I think particularly

3     with regard to this record, if the Court is looking for what

4     we have in front of us, Dr. Myerson, who submitted a

5     declaration from plaintiffs in the capsule action said that

6     crystals are solids made up of molecules, atoms or ions or

7     combinations thereof arranged in a regularly repeating

8     periodic three-dimensional array.  That's paragraphs 118 and

9     119 I believe of the that declaration.

10             Similarly, Alvogen's expert declaration from

11    Swift described a crystalline solid as a solid material with

12    atoms, molecules or ions are arranged in a highly ordered

13    structure forming a three-dimensional lattice that extends

14    in all dimensions.  I think either of those would be

15    acceptable.

16             THE COURT:  Well, why don't we adopt the

17    defendants' expert's definition?

18             MS. BHARKHDA:  I don't think we would have a

19    problem with that.  That's found -- I'm looking for the pin

20    cite.  Paragraph 42 of Dr. Swift's declaration is where that

21    appears.

22             THE COURT:  Okay.  So, Mr. Gutman, you're going

23    to preserve, you want an exclusionary limitation here.

24    Right?  You want to exclude solvate, salts and compositions.

25    Right?

1                    MR. GUTMAN:  Yes, Your Honor.

2                    THE COURT:  Okay.

3                    MR. GUTMAN:  And I think there is one -- you

4      know, the starting point for this is obviously what someone

5      might understand that term to be, but obviously that

6      understanding can be changed through the intrinsic record,

7      for example, that was done through prosecution.

8                    And I do want to highlight one very important

9      event that occurred during the prosecution of the Honigberg

10     compound patent because it's highly relevant to this term.

11     And during prosecution, and Your Honor read about this in

12     the brief, the patentee in response to an enablement

13     rejection where the Patent Office took the position that the

14     claims weren't enabled or solvates were hydrates, for

15     example.

16                    Now, solvates and hydrates are types of

17     crystalline forms, and so the Patent Office took the

18     position that the claims aren't enabled for solvates or

19     hydrates.  Those are specific types of crystalline form.

20     And in response to that, the patentees deleted that language

21     of solvates and hydrates from the claims.

22                    So we think, you know, we have other chemical

23     entities that we think should be excluded, but we think at

24     the very least given that prosecution history, solvates and

25     hydrates, and I think it's -- hold on.  I want to be very

1    specific about it.   Solvates, metabolites.

2              THE COURT:   And what page are you on so I

3    have it in front of me?   I don't know who is going to argue

4    this.

5              MR. GUTMAN:   Can you go to slide 50.

6              MS. BHARKHDA:   Your Honor, just for

7    clarification, I believe that Mr. Gutman may be talking

8    about a different term.   We're talking about the crystalline

9    form term.

10             THE COURT:   Right.

11             MS. BHARKHDA:   Which is in the '455 and '753,

12   '548 and '140 patent.   Mr. Gutman was just talking I believe

13   about the Honigberg '444 patent and the limitations relating

14   to the constructions for those claims.   It seems like there

15   may be some confusion.

16             MR. GUTMAN:   No.   That's correct, Your Honor,

17   but the point that I'm making is that --

18             THE COURT:   But hold on.   So what term --

19             MR. GUTMAN:   This, Your Honor, relates to a term

20   that is --

21             THE COURT:   I was only asked to interpret -- I

22   wasn't asked to interpret crystalline form with respect to

23   that patent, was I?

24             MS. BHARKHDA:   Correct.   That term does not

25   appear in that patent.

1          THE COURT:  Okay.

2          MR. GUTMAN:  My point, Your Honor, is that the

3    exclusions can be driven by things that the patentee said as

4    part of the intrinsic record, including prosecution.  And

5    this is just one clear example where even though plaintiffs

6    are arguing that the term compound that is recited in the

7    Honigberg patents include crystalline forms, this is an

8    action that was taken by the patentees as part of the

9    intrinsic record that narrowed that down.

10          So we think that, you know, the intrinsic record

11   can actually narrow the scope of claim term by virtue of

12   actions taken by the patentee, for example, during

13   prosecution, and I'm pointing to this as one example where

14   this clearly excludes certain chemical entities from the

15   scope of the claim term.

16          And so by analogy, I think it's important to

17   consider the intrinsic record and what was said and what

18   actions were made by the patentee in understanding what the

19   different claim terms mean, and that's true with respect to

20   the crystalline form term, and it's correct with respect to

21   all the terms that we're asking the Court to construe by

22   excluding certain claim -- chemical entities from the scope

23   of those claim terms.

24          So --

25          THE COURT:  But this is dealing with the same

1    patent that when it described the invention says including

2    compositions and solvates, among other things, correct, in

3    column 1?

4              MR. GUTMAN:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MR. GUTMAN:  But, but during prosecution they

7    took actions that altered the scope of that claim.

8              THE COURT:  Right.  See, the thing is, you've

9    just admitted that the patent itself in column 1 refers to

10   solvates and then you're trying to tell me it's clear and

11   unambiguous disavowal of solvates because there's a

12   reference in it?  It might be a good argument, but it has to

13   be clear and unambiguous.

14             MR. GUTMAN:  Well, we think that there are many,

15   many, many, many references within the specification itself

16   where --

17             THE COURT:  I read your briefs.  Okay.  You've

18   preserved the argument.  I don't think that you have

19   established -- I gave you one more example in column 1 of

20   the patent, the '455.  I just don't think you have

21   established that there is a clear and unequivocal disavowal

22   of solvates, and I'm going to adopt your own expert's plain

23   and unambiguous, or sorry, plain and ordinary meaning

24   definition term.

25             MS. BHARKHDA:  Your Honor, I just want to point

1    out one thing for clarity, which is in the capsule action, I

2    believe the Court decided that no construction of the term

3    crystalline term was needed beyond the plain and ordinary

4    meaning.

5              I think there's lots of evidence in the record

6    about what that ordinary meaning is, but I just wanted to

7    alert you to the fact that it could be slightly different.

8              THE COURT:  Wasn't this in the context where

9    they wanted me to limit it?

10             MS. BHARKHDA:  It's a slightly different issue.

11             THE COURT:  I'm just trying to get the ball and

12   move forward here.  I am skeptical that the experts in the

13   room could -- they wouldn't know what they were both talking

14   about when it came to what the crystalline form is.

15             MS. BHARKHDA:  We agree with that, Your Honor.

16             THE COURT:  I have a very smart law clerk here.

17   She has her Ph.D. in bio.  I'm confident from talking to her

18   that all the Ph.D.s in the room would know what crystalline

19   form here is.  All right.  But to give a bone to Mr. Gutman,

20   because he's quite the bulldog, you can tell.  He's

21   relentless.  Give him a bone.  I mean, is there a negative

22   to going with Alvogen's own expert's definition?

23             MS. BHARKHDA:  Your Honor, I think we're all

24   comfortable that that represents the plain and ordinary

25   meaning.  I just wanted to point out that there will be

1  quite of a slight difference in the applicable constructions

2  despite the fact that we think that --

3          THE COURT:  Well, we don't have a construction.

4          MS. BHARKHDA:  Correct.

5          THE COURT:  Do you think any of the defendants

6  in the first case are going to give you a hard time?

7          MS. BHARKHDA:  I wouldn't want to speak to them

8  or predict what they will do, but I just wanted to lay that

9  out for Your Honor.

10          THE COURT:  All right.  So I am going to adopt

11  Alvogen's experts with respect to Alvogen right now and then

12  we'll revisit on the eve of trial whether I need to go with

13  no definition or go with Alvogen's.

14          MS. BHARKHDA:  Understood, Your Honor.  Thank

15  you.

16          THE COURT:  Okay.

17          MR. GUTMAN:  One thing I want to emphasize, Your

18  Honor, because I think what a crystal is was slightly

19  mischaracterized in the briefing from plaintiffs.  You know,

20  plaintiffs --

21          THE COURT:  All right.  I've heard argument.

22  We're good.  You've got that preserved for the Federal

23  Circuit.  I'm sure a fulsome argument up there.

24          Let's proceed to limitation number eight, the

25  X-ray powder diffraction pattern, infrared spectrum, DMC

1    thermogram for thermogravimeter analysis, thermograph.

2              I will hear, I guess, Mr. Gutman.  I just don't

3    understand why we need to construe this term.  This seems to

4    me quintessential I hear the testimony of the two experts at

5    trial.

6              MR. GUTMAN:  Well, Your Honor, we do think that

7    that it's appropriate for claim construction because there

8    is a dispute.

9              If you could go, please, to slide 111.  There is

10   a dispute about whether the claim term permits some margin

11   of error within the recited spectra and other figures and we

12   think that that is appropriate for claim construction

13   because if you can go to the next slide, please, again,

14   starting with the intrinsic evidence, the language that

15   we're focused on is here at the top, where it clearly says

16   that the crystalline form has an X-ray powder diffraction

17   pattern as shown in Figure 1.  And the dispute is, what does

18   it mean to have an X-ray powder diffraction pattern as shown

19   in Figure 1?

20             We're saying it means what it says -- that it

21   has got to have the pattern shown in Figure 1.  Plaintiffs

22   are saying, well, there's wiggle room there.  It could be

23   some deviation from what is shown in Figure 1.

24             THE COURT:  Right.  Did you read the transcript

25   of the Markman hearing?

```
 1                    MR. GUTMAN:  I did, Your Honor.

 2                    THE COURT:  I feel like this is déjà vu, isn't

 3          it?

 4                    MR. GUTMAN:  Well, I think -- I think we are

 5          arguing slightly different positions than the capsule

 6          defendants, but I can tell you we're certainly relying on

 7          intrinsic evidence that was not before Your Honor in the

 8          capsule action.

 9                    THE COURT:  So show me.

10                    MR. GUTMAN:  Well, I think -- I'm starting with

11          claim 1, Your Honor, because that is part of the intrinsic

12          record, and what you see in claim 1 is that you have a

13          reference to the crystal having an X-ray powder diffraction

14          pattern shown in Figure 1.

15                    And then you see here in B -- please go to the

16          next slide -- that when the patentees knew that they wanted

17          to have some wiggle room, they knew how to say it.  Right?

18          So here in this part of the claim --

19                    THE COURT:  I've heard this argument.  I've

20          ruled on this argument.  Right?

21                    MR. GUTMAN:  There's additional intrinsic

22          record.

23                    THE COURT:  Keep going.

24                    MR. GUTMAN:  Okay.

25                    THE COURT:  But bring up only the new stuff.  We
```

```
1    talked about this when we did the scheduling of this case.

2    I mean, I don't do Markman's for sport.  I spent a lot of

3    time preparing for the last Markman hearing.

4              MR. GUTMAN:  I understand, Your Honor.  I know

5    that.

6              THE COURT:  So what's new?

7              MR. GUTMAN:  Can you go to Figure -- slide 115,

8    please.

9              So these are the figures that are recited in the

10   claims, and what is very important about these figures, and

11   this is part of the intrinsic record, is, there is no

12   mention whatsoever of any margin of error, standard

13   deviation.  The figures exist on their own.

14             Next slide, please.  Here's some extrinsic

15   evidence.

16             THE COURT:  I don't want to hear extrinsic

17   evidence.  I don't need to.  I didn't need to in the first

18   hearing.

19             MR. GUTMAN:  Can you go to slide 118.

20             THE COURT:  Because I'm prepared to make a

21   ruling.  I'm just giving you a chance if you want to show me

22   the error of my way.

23             MR. GUTMAN:  Yes.  Here is a description of the

24   figures, Your Honor, and, again, even though this would have

25   been an opportunity to state that the figures included some
```

1    margin of error, they didn't say that.

2                THE COURT:  All right.

3                MR. GUTMAN:  Now, I think --

4                THE COURT:  In my view, that's clearly not

5    clearly and unequivocally stating that there's a particular

6    margin of error.  Go ahead.

7                MR. GUTMAN:  If you could go to slide 119,

8    please.

9                So here, now, this is going to sound similar to

10   Your Honor to an argument that you considered in the capsule

11   case, but I can tell you it's very different, because in the

12   capsule case, what the capsule defendants were arguing,

13   which we are not arguing here, they were arguing disclaimer,

14   that when the original claim recited substantially the same,

15   that that included the margin of error, and therefore by

16   deleting that language from the claim, they deleted the

17   margin of error.  That's not our argument.  But our argument

18   does start with the proposition that the original claims do

19   recite a pattern that is substantially the same as shown in

20   Figure 1.

21               Next slide, please.

22               And that substantially language carried into the

23   recitation in the claims to the other analytical techniques

24   that the claims refer to.  So, again, they used

25   substantially to create that wiggle room with respect to

1     figure two, figure three and Figure 4.

2          Next.

3          Now, what we're relying on is that the Federal

4     Circuit has said in the Johnston & Johnston case, when a

5     patentee discloses broad subject matter in the patent but

6     only claims a subset of that broad subject matter, the

7     difference in scope between what was disclosed in the

8     specification and what was actually claimed is dedicated to

9     the public.  And so, Your Honor, even within the context of

10    a clear disclaimer or disavowal, this couldn't be any

11    clearer.

12         They purport to have described in the

13    specification a broad scope of subject matter, something

14    that would have a pattern that is substantially similar to

15    some figure, and then they deleted that and what they ended

16    up claiming was only something that has the same, or it

17    says, has the pattern shown as Figure 1.

18         And so we think at least under Johnston &

19    Johnston, that is a clear disavowal of claim scope because

20    they disclosed broadly and claimed narrowly.

21         Now, if you could go to slide 122.  Here is more

22    intrinsic evidence, Your Honor.  This was during prosecution

23    of these claims.  And what the Patent Office said was, look,

24    I'm not really understanding what you mean by substantially

25    and similar, so for purposes of prosecuting the claims, I'm

 1    going to interpret that as identical.

 2            Now, this actually is in stark contrast to an

 3    argument advanced by plaintiffs that it's somehow

 4    scientifically impossible to get spectra that are identical.

 5    At least the Patent Office disagreed with that.  And their

 6    sole search logic for determining whether the patent claims

 7    were allowable was predicated on the fact that they were

 8    looking for prior art that had identical spectra, and

 9    certainly, the Patent Office would not have gone on an

10    adventure that they thought was irrelevant.

11            And that emphasizes the point that the claim

12    language that resulted from the deletion of the

13    substantially similar language, particularly in the Patent

14    Office's mind, meant that the patterns were identical, no

15    differences between the patterns.

16            Next.

17            I won't talk about that, but that generally is

18    the argument relating to the claim terms in the crystal form

19    patents that recite to the patterns of the Figures 1 through

20    4 that are disclosed in the patent.

21            And, Your Honor, this is a very important point,

22    because this is how the patentee decided to claim their

23    purported invention.  They could have expressly, which they

24    did originally, they could have expressly described the

25    relationship between the patterns and figures in a way to

1    give them the wiggle room that they wanted.  But when

2    confronted with the Patent Office, they decided to narrow

3    the scope of their claims.

4              They disclosed the subject matter broadly, and

5    now they are trying to recapture through a claim

6    construction argument, which I'm not even sure I understand

7    their argument for claim construction, because it's not

8    based on any intrinsic evidence, Your Honor.  It's based

9    solely on expert testimony.  That the intrinsic evidence

10   that we're identifying for Your Honor doesn't accurately

11   depict what the claim term means, and we think the intrinsic

12   record is the best source of determining what the scope of

13   the claim term is.  We think that they clearly disclaimed

14   claim scope in the language that compares these patterns to

15   figures.  It means it has to be the same, and that's driven

16   by the intrinsic record.

17             Now, I do want to add one point, Your Honor,

18   because this actually -- well, I will wait to make the

19   point, because it's a broad point that is important for all

20   the different claim terms with respect to what they are

21   relying on their expert declarations for.  So I will reserve

22   that argument.  But otherwise, I think that that is our

23   position.

24             THE COURT:  Okay.  Thank you.  So incidentally,

25   the claim where this is relevant, can you pull up the claim

1    where this is relevant?

2              MR. GUTMAN:  Yes.  Can you go to slide 110.

3              So this is relevant to all the claims that

4    recite a crystalline form that has a particular X-ray powder

5    diffraction as shown in Figure 1.

6              THE COURT:  Right.  And you are just trying to

7    insert the same as essentially, correct, as opposed to

8    identical, which is what I dealt with before.  Correct?

9              MR. GUTMAN:  Yes, Your Honor.

10             THE COURT:  Okay.

11             MR. GUTMAN:  That is the same.

12             THE COURT:  And so for the same reasons, I'm

13   going to go with the plaintiffs on this one.  I don't think

14   construction is necessary.  I think a lot of the argument

15   that you've articulated will come up at trial because the

16   experts are going to probably have different views as to

17   whether or not there has been a showing of an X-ray powder

18   diffraction pattern as shown in Figure 1.

19             So I don't think my construction really

20   prejudices you in any way.  I fully expect to entertain the

21   experts' testimony, competing experts' testimony, and make a

22   decision based on their credibility.

23             So I don't think there has been a clear and

24   unambiguous definition, lexicography in the written

25   description for the figures that would require the insertion

1    of the same as, just as I didn't see such a clear and

2    unambiguous lexicography or disavowal that would require the

3    insertion of the term identical in this claim limitation.

4              MR. GUTMAN:  I understand Your Honor.

5              THE COURT:  But I actually think as a practical

6    matter, this is of no moment.

7              MR. GUTMAN:  And, Your Honor, one of the

8    concerns that we have is, we do think this is a claim

9    construction issue, because at trial, the experts are not

10   going to -- you know, what this term means is driven by the

11   intrinsic record, and so obviously, you know, the experts,

12   you know, they are not patent attorneys and they are not

13   able to assess what the law is regarding the consequence of

14   the patentees taking certain actions or making certain

15   statements.

16             THE COURT:  And they are free to make those

17   arguments.  That's my point.  They'll make the arguments.

18   Presumably, the plaintiffs will come in.  I don't know.

19   Maybe they'll have some treatise that going to say, no, when

20   you look at Figure 1, you know, this is the margin of error.

21   This is what it is and this is the treatise that proves

22   that.  And your expert is going to say it's not that easy,

23   and, in fact, you would be informed by the rest of the

24   testing that's referenced in the margins of error that are

25   referenced throughout the written description and I will

1    make a credibility determination.

2              I always forget.  Is it an ANDA?  Yes.  I will

3    make the credibility determinations based on that.

4              So I don't view this as a consequential ruling,

5    but having said that, applying the rules as I understand

6    them from the Federal Circuit, I think the plaintiffs have a

7    better argument.  I think you are basically just repeating

8    claim limitation language and trying to insert essentially a

9    defined margin of error that is just not set forth

10   unequivocally in the patent.  All right.

11             MR. GUTMAN:  And, Your Honor, I understand that.

12   If you think the claim language is unambiguous, that the

13   patterns have to be the same, you know, then I see your

14   point.

15             THE COURT:  Great.  They've got to be the ones

16   that were shown in Figure 1, and then what that means, it

17   depends how precise your measurement is and what the experts

18   say.  Thank you.

19             MR. GUTMAN:  Thank you, Your Honor.

20             THE COURT:  I think that dispenses of all of the

21   terms.  Is that true?

22             MS. ANDERSEN:  Yes, Your Honor.

23             MR. GUTMAN:  There's one administrative issue.

24             THE COURT:  Do you agree we're done with all of

25   the terms?

```
 1                    MR. GUTMAN:  I believe so, Your Honor.

 2                    THE COURT:  All right.  I'm going to ask for

 3       plaintiffs to submit an order that sets forth the

 4       definitions, or constructions, rather, that have been

 5       adopted.

 6                    Did we have such an order in the capsule case or

 7       did we just go from the bench?

 8                    MS. BHARKHDA:  You said on the record that the

 9       transcript of the record would be considered the

10       memorialization of the constructions.

11                    THE COURT:  All right.  Ms. Bharkhda, could you

12       also make sure that we have a similar order in writing that

13       adopts the constructions from the capsule hearing?

14                    MS. BHARKHDA:  Yes, Your Honor.

15                    THE COURT:  And, in fact, what I prefer to do

16       now since we've got consolidated actions, why don't we have

17       one order for both hearings.  And it seems to me the only

18       issue though that would be outstanding would be whether or

19       not the other defendants agree to the Alvogen expert's

20       definition.  If you could raise this issue with the other

21       defendants.  If they are okay with it, then let's adopt the

22       Alvogen expert definition and have one order for both

23       hearings.  If they are not okay with it for right now,

24       you'll have to have two different definitions for, or two

25       different constructions for that term.
```

1              MS. BHARKHDA:  Understood.

2              THE COURT:  Is that clear?  All right.  I'm

3    going to leave it for the plaintiffs to do that.

4              And you want to submit it by -- Ms. Andersen,

5    did you have a question?

6              MS. ANDERSEN:  I just wanted to make one

7    clarification for Your Honor.  This action is on the same

8    schedule as the capsule action, and we think there's going

9    to be, you know, expert discovery is on the same track.

10   We're having one trial.  It has not been formally

11   consolidated.

12             I just wanted to --

13             THE COURT:  No.  I mean if you mean by one

14   trial --

15             MS. ANDERSEN:  Yes, Your Honor.

16             THE COURT:  Yes, but I thought I even

17   discussed -- it's funny.  I don't remember most of what I do

18   in these phone calls in patent cases, but I thought we

19   talked about we would try it together and then we would kind

20   of give the tablet folks a separate time for whatever they

21   had to do with tablets.  No?

22             MR. GUTMAN:  I think it was at the same time as

23   the trial for the capsule defendants, Your Honor.

24             THE COURT:  Yes.

25             MR. GUTMAN:  It's scheduled for October of this

1    year.

2              MS. ANDERSEN:  Your Honor, so Your Honor is

3    remembering quite right that we would have one trial, but

4    the tablet-specific patents, we said, oh, maybe those would

5    go at the end.  And Your Honor has a teleconference on

6    March 9th with all the parties in the capsule action and in

7    this action to discuss what trial will look like, how it

8    will be structured.

9              THE COURT:  Okay.

10             MS. ANDERSEN:  Yes.

11             THE COURT:  Now, we'll still have that

12   conference.  My inclination would be one trial.  You need an

13   hour or two for the tablets.  If they have separate issues,

14   we could deal with it, again.

15             MS. ANDERSEN:  Yes.  Whatever Your Honor was

16   contemplating.

17             THE COURT:  All right.  Then in terms of getting

18   an order in, what do you want?  A week?  Is that enough?

19             MS. BHARKHDA:  Since there is a little bit of

20   coordination, perhaps ten days?

21             THE COURT:  Yes.  That's fine.  Just give me a

22   date though.  I'm sure my deputy clerk is listening in on

23   the microphone.  What do you want?

24             MS. ANDERSEN:  How about the 23rd?

25             THE COURT:  The 23rd of January.  That's great.

1    We'll have the parties jointly submit, but the burden is on

2    the plaintiffs to file a written proposed order that

3    memorializes the constructions that I give today and at the

4    earlier Markman hearing.  All right?

5              MR. GUTMAN:  Yes.

6              THE COURT:  All right.  Now, Mr. Gutman, you

7    have another issue you want to raise?

8              MR. GUTMAN:  Yes.  So there are two issues I

9    wanted to raise, Your Honor.

10             THE COURT:  See, I said one.  You gave me two.

11   If I said two, you would have slipped in a third.

12             MR. GUTMAN:  No, no.  It was always two.  I

13   promise.

14             THE COURT:  All right.

15             MR. GUTMAN:  So the first issue is in connection

16   with plaintiffs' use of expert declarations in this action,

17   because if you could go to slide 6, please.

18             So during the capsule Markman hearing, Your

19   Honor, you asked defendants whether they needed to rely on

20   extrinsic evidence like expert testimony in order to

21   construe the claims.  After some work and give-and-take, Ms.

22   Bharkhda -- I apologize if I mispronounced it.

23             MS. BHARKHDA:  No.  You got it right.

24             MR. GUTMAN:  Stated that we don't think you need

25   to rely on them.

1          THE COURT:  Yes, I remember that.

2          MR. GUTMAN:  And so whether we received

3    plaintiffs' opening claim construction brief, we were

4    actually surprised to see that they resubmitted all of the

5    expert declarations that were submitted in the capsule

6    case.

7          THE COURT:  Okay.  I didn't rely on them.

8          MR. GUTMAN:  I'm sorry?

9          THE COURT:  I didn't rely on them.

10         MR. GUTMAN:  Right.  But what we think should

11   happen, Your Honor, is not only that the Court should

12   disregard them, but in view of our request to cross-examine

13   their experts, which we didn't have an opportunity to do,

14   even though we subpoenaed them and plaintiffs and their

15   experts ignored our subpoenas, we think they should actually

16   be stricken from the record, and that's important because

17   the record as it exists in this case should be defined for

18   purposes of claim construction.

19         THE COURT:  So you want me to strike the

20   declarations that the plaintiffs submitted in connection

21   with this Markman hearing today.  Is that right?

22         MR. GUTMAN:  In connection with this case.  Yes,

23   Your Honor.

24         THE COURT:  No, no.  Wait, wait.  You slipped in

25   this case.  See, I said in connection with this Markman

1    hearing.

2         MR. GUTMAN:  Yes.  Yes, Your Honor.

3         THE COURT:  Again, so we have a clear record,

4    you're asking me to strike from the record the declarations

5    that the plaintiffs submitted in connection with their

6    Markman briefing for today's hearing?  Right?

7         MR. GUTMAN:  Yes, Your Honor.

8         THE COURT:  I'm not going to do that.  Denied.

9         MR. GUTMAN:  Okay.  And I just -- you know --

10        THE COURT:  I mean, look, the reason is,

11   Mr. Gutman, you all try these things for the Federal

12   Circuit.  That's why I don't engage in long, lengthy Markman

13   opinions.  I put on the record as succinctly as I can my

14   best construction.  I don't give every single rationale.  I

15   highlight what I think are the most important details and

16   you go and you argue it on appeal to the Federal Circuit.

17        MR. GUTMAN:  The problem, Your Honor, is that in

18   connection with today's hearing, we were not able to

19   cross-examine, we were not given an opportunity to test

20   any --

21        THE COURT:  It doesn't matter because I didn't

22   read their expert declaration.  Incidentally, I tell all the

23   parties, and you were one of them.  You appear here all the

24   time, and I tell folks, you would be better if you didn't

25   submit all this expert declaration.  Don't cite it if you

1    are not going to come in here and rely on it.

2              Now, in this case, Ms. Bharkhda is lucky because

3    I knew what she had answered in the first hearing.  I

4    wouldn't have been pleased if it's a new case and we're

5    getting ready for a Markman hearing and somebody

6    submitted -- and I'm holding up for the record for the

7    benefit of the court reporter, what's that, probably seven

8    inches of appendices that I had to go through to prepare for

9    this hearing.  I ignored in this case the expert, anything

10   relating to an expert, because I was told, don't have to

11   rely on experts.

12             But I think this was a new case when somebody

13   did that and it required me to read all of that stuff, and

14   they walked into the hearing at the outset and said we're

15   not relying on extrinsic evidence.  I would not have been

16   pleased.  I probably would have struck it.

17             MR. GUTMAN:  And the reason why I think this is

18   a significant issue, Your Honor, is, again, without their

19   expert testimony and ignoring it, there's no evidence in the

20   record for their propositions of what the plain and ordinary

21   meanings are.

22             THE COURT:  I know.  You've made that maybe a

23   hundred times.

24             MR. GUTMAN:  Okay.

25             THE COURT:  If I count all the times you say it

1    in the briefs and orally.

2              MR. GUTMAN:  I understand, Your Honor.

3              The last issue, if you can go to slide 2.

4              So plaintiffs have asserted 147 claims against

5    Alvogen and Natco, so they've asserted 18 claims in the

6    Honigberg plaintiffs.

7              Slide three, please.  63 claims in the

8    crystalline forms patents.

9              Slide 4, please.  One claim of the patent.  And,

10   finally, slide 5.  65 claims of the formulation tablets.

11             We're now at a stage of the case where we're

12   preparing contentions, final contentions, invalidity,

13   infringement contentions on the part of plaintiffs, and we

14   are -- we will be preparing expert reports that will be

15   served soon.  We think there's no way they are going to try

16   to Your Honor 147 claims at trial.

17             THE COURT:  I hope not.

18             MR. GUTMAN:  I hope not too.  And so we think

19   that now is the time to have them narrow the scope of their

20   case and say what claims are you really going to assert at

21   trial.

22             Now, we addressed this with plaintiffs and their

23   response was, we're not reducing the claims unless you

24   concede infringement, which we think is a non-reasonable

25   position, Your Honor.  And given where we are in the stage

1    of the case procedurally, we think that it would benefit the

2    parties, and it's ultimately going to benefit the Court,

3    because I think Your Honor will force them to narrow the

4    scope of their case before trial anyway, that now is the

5    time for them to reasonably -- you know, we've now completed

6    fact discovery, to now reasonably say what claims are you

7    really bringing to trial to save the parties and the Court

8    some resources.

9              THE COURT:  So my inclination is to treat this

10   as an ANDA case as different from all other types of cases.

11   You get the benefit of ANDA because you piggyback on all the

12   work that plaintiff did, and that's how you get in front of

13   the FDA and you get expedited approval.  So I think you have

14   to go first.

15             And so if you want them to reduce claims, you

16   are going to have to reduce your invalidity contentions

17   first.  All right?

18             MR. GUTMAN:  And so if -- I just want to make

19   sure I understand Your Honor.

20             So if we say that with respect to certain claims

21   we will not assert invalidity, then those claims will be

22   taken off the table.  Is that --

23             MR. GUTMAN:  No.  I don't want to get into the

24   weeds of your discussions.  You should be able to work this

25   out unless there's something in the order, and tell me if

1    there is something in the order.  In this case, was there

2    something that said by such and such a date, claims will be

3    reduced to blank and prior art references will be reduced to

4    Y?

5           MR. GUTMAN:  No, Your Honor.

6           THE COURT:  So I think you can work stuff out

7    notwithstanding the fact that we had stipulations of two

8    terms that we didn't get to today.  You all work it out.

9    But in terms of the normal, say plaintiffs should have to

10   reduce the number of claims and then we get a corresponding

11   reduction of prior art references.  I think ANDA is

12   different.  So I'm not going to apply that model to this

13   case.

14          MR. GUTMAN:  But we don't think they are going

15   to be able to try regardless under any circumstance 147

16   claims within a reasonable amount of time at the bench trial

17   in October.

18          THE COURT:  So I don't either, but it's an ANDA

19   case, and I would hold the defendants as much responsible

20   for the plaintiffs if you all came to me and I'm trying an

21   infringement case with a massive number of claims.

22          MR. GUTMAN:  Well, Your Honor, there's no way

23   that we can force them to narrow their case.  I mean, even

24   if we told them, you know, hypothetically, we will not

25   challenge the validity of any and all of the claims that you

1    are asserting against us, they could still assert all of

2    those claims against us.

3                    THE COURT:  Right.

4                    MR. GUTMAN:  We have no leverage.

5                    THE COURT:  There's no way they would do that.

6    I just can't imagine they would do that.

7                    And do you think there's any chance you are not

8    going to assert invalidity?

9                    MR. GUTMAN:  Well, if they remove claims, we

10   won't be asserting invalidity of those claims.  I mean,

11   those claims are taken off the table.

12                   THE COURT:  All right.

13                   MR. GUTMAN:  They are the ones who have the

14   burden of proof on infringement.  They have all of our, you

15   know, all of our technical information and they know now

16   that fact discovery has closed what their infringement case

17   is going to look like.

18                   I mean, we'll be, you know, receiving their

19   infringement contentions and they are going to be drafting

20   expert reports purportedly on 147 claims.  We think that

21   that, you know, at this point they know what their best case

22   is, what their best claims are, and the case should be

23   narrowed accordingly.

24                   THE COURT:  So I understood you were asking me

25   for some essentially guidance on how to narrow the case.  Is

1    that what you were asking?

2              MR. GUTMAN:  It was, Your Honor.

3              THE COURT:  What I tried to do was afford you

4    that by saying I don't think this is a normal case, i.e.,

5    non-ANDA case where in terms of narrowing, the plaintiff

6    ought to start by narrowing infringement, its infringement

7    case, and then see a corresponding narrowing of prior art

8    claims.

9              So that's all I was offering.  I don't think

10   that model applies here.  I didn't tell you how, what to do,

11   but it seems to me that ANDA cases normally are about

12   invalidity, certainly in the main, and so I could see if the

13   plaintiffs said, you all ought to tell us what are your

14   theories and we'll correspondingly narrow our infringement

15   case.

16             MR. GUTMAN:  And at what point, Your Honor, do

17   you think it would be proper for plaintiffs to narrow the

18   number of claims prior to trial, assuming that --

19             MR. GUTMAN:  I don't know.  I don't have

20   something right in front of me to make that decision.

21             Mr. Blumenfeld?

22             MR. BLUMENFELD:  Your Honor, we, in some

23   respects, share Mr. Gutman's concerns and we're certainly

24   not going to come before you in October with 147 claims.

25   That's not in our interest.  It's certainly not in your

1    interest.

2              THE COURT:  Right.

3              MR. BLUMENFELD:  But we see things a little bit

4    differently.

5              THE COURT:  Mr. Gutman, why don't you give

6    Mr. Blumenfeld some room.  Go ahead.

7              MR. BLUMENFELD:  And here is the difference.  We

8    think that they infringe all of those claims.  After the

9    Court's claim constructions in the other case and this case,

10   we don't think that they have serious noninfringement

11   contentions as to all or most of those claims.

12             We've been trying to work that out, so we're

13   happy to reduce claims, but what we don't want to happen is

14   this, and we've had this happen in a lot of ANDA cases.  We

15   have to spend hundreds of thousands of dollars doing

16   infringement expert reports because they won't stipulate to

17   infringement even though they don't really have a defense,

18   and then two months later, when it's time for their

19   responsive reports, we get no responsive reports.

20             We're heading into a trial where they don't have

21   expert opinions on noninfringement, but we have to move

22   forward.  And that doesn't make sense to us.  I've never

23   cited in my career a Federal Rule of Civil Procedure 1

24   before, but it does talk about the just, speedy and

25   expensive determination of actions.

1                    THE COURT:  Sure.

2            MR. BLUMENFELD:  Making us go forward with

3    infringement contentions, expert reports on things that

4    really aren't subject to being contested is not inexpensive

5    and is not speedy.  And so we've been trying to talk to

6    them, as Mr. Gutman said, about reducing, narrowing the

7    scope of the case, but also as part of that, taking the

8    noninfringement contentions off of the table.  And if we can

9    get the noninfringement contentions off the table, of

10   course, we can reduce the claims that we're asserting.

11              The problem is, until today -- and this has come

12   up in the other case, too, in the capsule case.  Before

13   today, it has been, no, we're not stipulating to

14   infringement of anything.  I would hope that after today,

15   their attitude is going to be different.  We're supposed to

16   talk on Wednesday and we are happy to continue talking about

17   this.

18              The concern that we have is that if we don't

19   make any progress in our conversation on Wednesday, we

20   really don't want to spend the hundreds of thousands of

21   dollars doing expert reports on things that really aren't at

22   issue, and those expert reports I think are due in about

23   five weeks.

24                    THE COURT:  This is going to come up in other

25   ANDA cases, so maybe we ought to use this as an experiment.

1    I mean, thinking out loud, the concern you raised makes a

2    lot of sense to me, and essentially I could see, it's a

3    source of leverage for defendants in these cases.

4              It doesn't seem fair because, again, I mean

5    what's kind of the premise of ANDA is you're making a

6    similar drug.  That's why you get the expedited approval.

7    You know, as a practical matter, the real issue is

8    invalidity.

9              So is there a way to maybe make them pay for

10   your experts if they don't similarly engage an expert, and

11   it wouldn't be enough to just have a pro forma expert

12   rebuttal report that just says, you know, denied, denied,

13   denied.  They'd have to -- if they didn't have a meaningful

14   noninfringement expert report, maybe they pay for yours.

15             MR. BLUMENFELD:  We obviously would be happy to

16   have that arrangement.

17             THE COURT:  So let's figure out how we could

18   actually make it work though, because what -- like I said,

19   why I put upfront is if we just say, if they don't engage in

20   expert, then they have to pay for yours, well, then they'll

21   just have an expert.  I'm not saying these particular

22   defendants.  I'm saying cynically, a defendant in the kind

23   of ANDA case you are describing, they would just have an

24   expert come forward and don't spend much money, and say

25   denied, denied, denied.

1          Do you have any wording you would put in an

2     order or how you would frame it?

3          MR. BLUMENFELD:  I guess I would like to think

4     about that because I don't know exactly what wording to put

5     in, but we would be happy to work on that and submit

6     something.

7          Alternatively, we're happy to try to work it out

8     in advance.  I hate to ask Your Honor to invest more time in

9     this case, but sometimes if there is something scheduled

10    with the Court, people get more cooperative.

11         THE COURT:  Right.

12         MR. BLUMENFELD:  And if there's a way that we

13    could talk to them, and if we can't resolve this, maybe

14    talk to you and see whether there is a way to get it

15    resolved.

16         THE COURT:  Well, and in a way I kind of would

17    like to do that, but I would also say, I mean, I thought the

18    defendants defendants' call, I made this clear on the phone,

19    but convening that emergency call was not good.  That was an

20    unnecessary call.

21         I moved stuff, got on the phone, and I do fault

22    the defendants for that call, especially after reading that

23    Markman -- reading the briefing.  That was an inappropriate

24    request.  So I'm hesitant in this case to set up, you know,

25    another hearing.  Let me hear from the defense before I

1    think about it.

2           So, Mr. Gutman, are you amenable to we set up

3    some mechanism that if you, your clients, and this is just

4    not you.  It's going to be the defendants, but that they pay

5    a price if their inability to come forward now and narrow

6    the infringement case requires the defense to spend a lot of

7    money doing an infringement analysis?

8           MR. GUTMAN:  I would have to think about it,

9    Your Honor, because what I don't know, you know, they're

10   asserting 150 claims.  I can't in my mind go through now

11   sitting here, you know, whether I think we have

12   noninfringement arguments with respect to all 150 of those

13   claims, particularly in view of, you know, Your Honor's

14   rulings today.

15          I believe we do have noninfringement arguments,

16   and, you know, to Your Honor's point about this being an

17   ANDA case where, you know, the ANDA applicants are producing

18   something that is similar to the drug held by plaintiffs, I

19   get that point, Your Honor, and that is true.  That's what

20   an ANDA is.  But that doesn't mean that they have patent

21   claims that cover even their branded product or defendants'

22   product.

23          THE COURT:  That's a fair point.

24          MR. GUTMAN:  And so with that in mind, I don't

25   know that I really necessarily agree that given the context

1    of this case being an ANDA case, it requires a different,

2    you know, procedure than other cases, because at the core of

3    it, the issue really is, do they have patent claims that

4    cover what we're doing.  And the fact that we submitted an

5    ANDA doesn't automatically mean that we infringe some claim.

6            And so, you know, the issues really are do we

7    infringe, are the claims invalid?  This really is just like

8    any other case except the regulatory aspect of it, you know,

9    is specific to ANDAs.  And I get Your Honor's point on that,

10   and that's true.  Where I think there's a little bit of a

11   disconnect in my mind is how that regulatory procedure

12   that's an ANDA relates to whether patent claims cover what

13   defendants are doing, and, you know, that is where I start

14   to think about, you know, I can't agree that because we're

15   submitting an ANDA, that means we necessarily infringe.

16           THE COURT:  No.  You make a good point.  They

17   can aggressively list patents in the Orange Book.  I mean,

18   would you all just agree that the loser pays expert fees on

19   infringement?  That makes sense.  We agree up front who

20   should pay expert fees on infringement.

21           MR. GUTMAN:  We would be happy to consider that,

22   Your Honor, but I don't know that --

23           THE COURT:  Is there anything that prevents me

24   from having that rule?

25           MR. GUTMAN:  Well, I would have to think about

1    it, Your Honor, and look at the case law on that because I

2    don't know that that -- I don't know that that is consistent

3    with the rules regarding civil trials where unless there's

4    an explicit statutory provision, that that shifts fees and

5    costs to one party or the other.  For example, a winning

6    party or a losing party.

7                    THE COURT:  I think you are probably right, but,

8    on the other hand, if I tie it to the narrowing of the case,

9    it becomes a case management issue that I do have discretion

10   over.  So doesn't that give me authority over it?

11                   MR. GUTMAN:  I don't believe so, Your Honor,

12   but, again, I would have to take a closer look at the law.

13   My immediate reaction is that it's inconsistent with the law

14   that speaks to fee shifting and the requirement that that be

15   explicitly provided in the statutory -- in the statute

16   that's at issue.

17                   My co-counsel has handed to me, has handed me a

18   Post-It that makes reference to the Bayer versus Mylan case,

19   which is an ANDA case from the District of Delaware, where

20   there was claim narrowing in that case.

21                   THE COURT:  There was what?

22                   MR. GUTMAN:  There was claim narrowing prior to

23   trial in that case, which is an ANDA case, similar to the

24   proposition that we're discussing now, and the fact that it

25   was an ANDA case did not shift the burden on any of the

1    parties regarding fees or conceding infringement of any

2    claim.

3              THE COURT:  Well --

4              MR. GUTMAN:  I can get the specifics.

5              THE COURT:  I guess where I am, I'm going to

6    stay right now where I am.  My inclination is to say, at

7    least in this ANDA case, defense has got to narrow

8    noninfringement first.  So why don't we just leave it at

9    that.

10             Now, Mr. Blumenfeld just set a date.  You've got

11   five weeks.  Not much time.

12             MR. BLUMENFELD:  If we can do the five

13   contentions that are due next week on both sides.  I think

14   expert reports are due February 22nd.  So we have a little

15   bit of time, but not much, and we would like to work with

16   them in narrowing.

17             Just to give you an example, Your Honor, I don't

18   have any doubt that you have inherent authority and Section

19   1927 authority to award fees when it's appropriate, but I

20   don't understand how the defendants here are going to argue

21   with a straight face that they don't infringe the compound

22   claims because you can argue about, you know, certain

23   claims, there's formulations, there's methods, whatever, and

24   maybe they can make some arguments about those.  When they

25   are making an ANDA product that has ibrutinib in it, how

1    they make noninfringement arguments on the compound claims

2    is just beyond us, and if they force us to do expert reports

3    on that, I think there's a good basis for fee shifting.

4              And we're happy to get specific with them on

5    discussing claims where we'll drop claims once they tell

6    us their noninfringement positions, and maybe that will

7    work, but there has to be some consequence if they don't do

8    that.

9              MR. GUTMAN:  Your Honor --

10             THE COURT:  And my inclinations are with you on

11   that.

12             Now, the flip side is, it's hard with the

13   compounds to envision this, but say the patent doesn't cover

14   ibrutinib.  I mean, it's hard to imagine.

15             MR. GUTMAN:  Well, and, Your Honor, that really

16   is, I mean, one of the core issues on the compound patents,

17   right, is, it's not whether, you know, we -- our active

18   pharmaceutical ingredient is a certain kind of crystal, but

19   the compound patents on the face of their claims recite

20   different things with certain chemical properties.

21             One of the things that I think is important

22   for Your Honor to understand, and perhaps you already

23   understand this, so I apologize if I'm being redundant, but

24   crystals have different properties from -- chemical

25   properties that are significant from other sorts of things,

1     and different forms of crystals have different properties

2     from each other.

3             So it's not just a question about what is in

4     them, but it's a question about what properties are provided

5     by what is being claimed and whether those properties are

6     satisfied by our active pharmaceutical ingredient, which is

7     very different in terms of its properties.  This is our

8     position, Your Honor, than what is claimed in the Honigberg

9     compound patents.

10            And so with that in mind, I know that

11    Mr. Blumenfeld would like to assume that there's no way, no

12    possible way that we could not infringe the compound patent,

13    but I think there are a lot of assumptions built into that

14    that when you take a close look at the claims and you take a

15    close look at the patents, don't necessarily hold true.

16            So I understand he wants to make those

17    assumptions, but I don't necessarily agree with those

18    working assumptions.

19            THE COURT:  All right.  Hold on a second.

20            Mr. Blumenfeld?

21            MR. BLUMENFELD:  Your Honor, I'm kind of

22    interested to hear what their noninfringement arguments are,

23    but it sounded to me from that presentation like what may

24    happen here is that we're going to get some noninfringement

25    positions that essentially counter what happened this

1        morning.  Mr. Gutman can say, no, that's not what is going

2        to happen.

3                    THE COURT:  Mr. Gutman, why don't you let him

4        approach the podium.

5                    MR. GUTMAN:  Yes.

6                    MR. BLUMENFELD:  If that is what happens, or if

7        we get noninfringement positions which are just not based on

8        what's in the claims, I think that that is a basis for us to

9        be able to come back and seek fees for having to deal with

10       those claims.

11                   I don't know that I can tell you anything more

12       than that, because I don't really know what it is that

13       they -- I thought I understood coming in today what their

14       noninfringement arguments are going to be, but now that

15       those have been taken away from them, it sounds like there's

16       going to be a second line of noninfringement arguments that

17       we don't even understand.

18                   THE COURT:  All right.  Actually, go off the

19       record for a second.

20                   (Discussion held off the record.)

21                   THE COURT:  All right.  We're back on the

22       record.

23                   All right.  So where we had left it is what to

24       do as far as case manage management.  The expert reports are

25       due in five weeks, contentions are due in a week or two.  Is

1     that right?

2              MR. BLUMENFELD:  Next week, I believe.

3              MS. ANDERSEN:  The 22nd, Your Honor.

4              THE COURT:  Okay.  And this was one of the cases

5     that I inherited, so you don't have the original contentions

6     really matter.  You can --

7              MR. BLUMENFELD:  Well, that's right.  One of the

8     interesting things is that we have noninfringement

9     interrogatory answers from the defendant, and essentially,

10    their noninfringement interrogatory answers hinge on claim

11    construction, and so I'm kind of interesting if they've got

12    other things after today to learn what they are or that they

13    have none.  I'm not going to go back and reargue that whole

14    point.

15             THE COURT:  Right.

16             MR. BLUMENFELD:  I think we know where we are on

17    that.  But, yes, we do have, I guess it's six weeks until

18    our infringement expert are due and it would be nice to

19    narrow things down.  It would be nice not to have to put in

20    infringement reports at least on certain claims.

21             MR. GUTMAN:  Your Honor, just to follow up on

22    something that Mr. Blumenfeld said.  You know, again, I want

23    to emphasize that plaintiffs bear the burden on

24    infringement, and although they have produced purported

25    infringement contentions to us earlier in the case, those

1    infringement contentions don't articulate really what their

2    infringement positions are and we think they are sufficient.

3    We think they hid them all from us on the course of

4    discovery on what their theories of infringement actually

5    are.

6                    THE COURT:  Even on the compound?

7                    MR. GUTMAN:  Yes, Your Honor, even on the

8    compound.  And I'm happy to brief this issue where we can

9    brief the adequacy of their infringement contentions.

10                   THE COURT:  We are not going to do that.

11                   MR. GUTMAN:  But, Your Honor, our position is

12   that their infringement contentions are deficient, and to

13   this day we still don't know what their infringement

14   theories are on the compound patents or any of the other

15   patents, and we're waiting patiently for their find

16   infringement contentions, but ultimately, they bear the

17   burden.

18                   We --

19                   THE COURT:  I'm just at a loss to understand how

20   they are missing stuff in their infringement contentions for

21   the infringement of the compound.  What is it they are

22   missing do you think?  They say this is the formula?

23                   MR. GUTMAN:  One example, Your Honor, they say,

24   under the doctrine of equivalents, you infringe, but they

25   don't relate their doctrine of equivalents argument to any

1   element in the claim.  They don't tell us what the

2   equivalents is in our product that is driving their doctrine

3   of equivalents argument.  So there's a lot of generic -- no

4   pun intended, Your Honor.  There's a lot of generic language

5   in there that we infringe.  You know, we literally infringe.

6   We infringe under the doctrine of equivalents but the

7   details are lacking.  The I's aren't dotted and the T's

8   aren't crossed.

9          And they've never really articulated, certainly

10  not in view of what their purported claim constructions are,

11  how we infringe the claims of even the compound patents let

12  alone the other patents in this case.  And that's why we've

13  been waiting for their final infringement contentions, where

14  we hope that they finally provide those details so we can

15  see, okay.  You know, do we think they've met their burden

16  or do we think they have not met their burden?  And that

17  really is the driving force behind our decision about

18  whether to, you know, stipulate to infringement or

19  articulate a defense of noninfringement.

20          THE COURT:  All right.  So do you want to push

21  back the expert reports or something so that when the

22  defendants get the infringement contentions, they can then

23  respond, or how do you want to do it?

24          MR. BLUMENFELD:  Your Honor, we should discuss

25  that, because I think that solves part of the problem and

1       maybe it gets us past the March 9th conference.

2               Our only concern is we have, what, until

3       October, the trial is in October.  I just want to make sure

4       that a schedule works on all issues where we get everything

5       done and we're not then asking to move the trial, because

6       that's the last thing that we want.

7               THE COURT:  We can't move the trial.  I've

8       looked at my October, November, December and January.  I

9       mean, I'm quintuple booked.  There's no room to move it.

10              MR. BLUMENFELD:  But it may well be that there's

11      a little bit of room for us to move expert reports, and we

12      have --

13              THE COURT:  There may be.  I'm kind of

14      regretting I got myself mired into this.

15              MR. GUTMAN:  Your Honor, if I could make a

16      proposal.  Why don't the parties get together and talk about

17      what would be the best way to move forward in view of our

18      lack of clarity on what their infringement theories are and

19      the fact that expert reports are coming up, and perhaps we

20      can jointly submit something to the Court in the next week

21      or so.

22              MR. BLUMENFELD:  We don't have a problem with

23      that.  We do disagree about the clarity of our infringement

24      contentions.

25              THE COURT:  Well, here's the thing.  Okay.  I'm

1    going to let the parties do that.  I'm going to say this to

2    the defense.  The credibility of the defense is right now in

3    my book less than the credibility of the plaintiffs because

4    of the phone call.  In other words, you cried wolf, and so

5    you need to keep that in mind.  There's no question because

6    of that, when it comes to case management issues, I give

7    more credibility to what the plaintiffs say, because we

8    should never have had this phone call.

9            So I'm going to leave it at that.  That means

10   that if there's a dispute and it comes before me on this

11   narrowing thing, my inclinations are going to be to go with

12   the plaintiffs, so the defendants better make sure they are

13   not taking an unreasonable position.  And I just learned in

14   dealing with these case management issues, that's kind of

15   what you have to do.  You only get one shot and you lose

16   your credibility.  So can I leave it at that and then you're

17   going to work it out and see if you can't come up with a way

18   to narrow this case?

19            MR. BLUMENFELD:  Yes, Your Honor.  Thank you.

20            THE COURT:  And my comment is not addressed to

21   any particular lawyer in the room.  It's addressed

22   collectively to the folks on the defense side.  I do not

23   mean to impugn at all the credibility of any individual

24   lawyer.  It's not the intent of my comment, but that was a

25   strategic error or tactical error.  All right?  I think it's

1      the best way to move forward.

2                   All right.  Anything else we need to address

3      today?

4                   MR. BLUMENFELD:  Not from our side, Your Honor.

5                   MR. GUTMAN:  No, Your Honor.

6                   THE COURT:  Okay.  Thank you, all.

7                   MR. GUTMAN:  Thank you.

8                   (Hearing concluded at 10:49 a.m.)

9                              -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25