# EXHIBITS A-D
# **REDACTED IN THEIR ENTIRETY**

# EXHIBIT E

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3                     ---oOo---

4    PHARMACYCLICS LLC and JANSSEN

     BIOTECH, INC.,

5

              Plaintiffs,

6

                 vs.              No. 18-192 (CFC)

7                                 CONSOLIDATED

8    FRESENIUS KABI USA, LLC, et

     al.,

9

              Defendants.

10   _____/

11

12   (Full captions listed on next page.)

13

14

15

16           VIDEOTAPED DEPOSITION OF

17              JOSEPH BUGGY, Ph.D.

18   _____

19           FRIDAY, NOVEMBER 1, 2019

20

21

22

23   REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

24                              (3602824)

25

Page 74

1  Medicine and Co-chief of the Division of Immunology
2  and Rheumatology at Stanford University Medical
3  Center and a member of Pharmacyclics' Scientific
4  Advisory Board."
5      Do you see that?
6  A. I do.
7  Q. Okay. Do you know why Dr. -- strike that.
8      Do you know Dr. Genovese personally?
9  A. We worked together -- I remember working
10  with him back in these days, but I haven't talked
11  to him in a long time.
12  Q. Back in these days when you were working
13  on the Btk project, you do remember talking with
14  him?
15  A. I do.
16  Q. Okay. And you talked to him about the Btk
17  project?
18  A. Yes.
19  Q. All right. And he was an advisor -- he
20  was on Pharmacyclics' Scientific Advisory Board.
21  Right?
22  A. Such as it was. I mean, the Scientific
23  Advisory Board was kind of small; but yes, he was
24  on the Scientific Advisory Board.
25  Q. Do you know why he was chosen to -- do you

Page 75

1  know why he was chosen to give a statement in this
2  press release?
3      MS. ANDERSEN: Objection. Calls for
4  speculation.
5      THE WITNESS: Well, Mark is an expert in
6  autoimmune disease; both clinically treats patients
7  as Stanford and also the state of drugs and how
8  they're tested. So he's an expert, and so that's
9  probably why he was asked to give a quote for the
10  press release.
11  BY DR. HSU:
12  Q. And as an expert in this field, he has a
13  good reputation in this field. Is that right?
14      MS. ANDERSEN: Objection to form. Calls
15  for speculation.
16      THE WITNESS: My understanding is that --
17  was, and is -- that Mark has a good reputation,
18  yes.
19  BY DR. HSU:
20  Q. Yeah. He's a co-chief at Stanford
21  University Medical Center. He can't be a slouch.
22  Right?
23  A. That -- I would agree, yes.
24      DR. HSU: We've got to change tapes, so I
25  need to take a break. Thanks.

Page 76

1      THE VIDEO OPERATOR: We're going off the
2  record. The time is 10:14 A.M., and this is the
3  end of Media Unit Number 1.
4      (Recess from 10:15 A.M. to 10:27 A.M.)
5      THE VIDEO OPERATOR: We're back on the
6  record at 10:26 A.M., and this is the beginning of
7  Media Unit 2.
8  BY DR. HSU:
9  Q. I'm still looking at Buggy Deposition
10  Exhibit Number 10, the press release.
11      Do you still have that in front of you?
12  A. I do.
13  Q. Now, there's a third paragraph in the
14  second page that you were looking at that refers to
15  a quote from Ranjana Advani.
16      Do you see that?
17  A. I do.
18  Q. And it identifies him as "Associate
19  Professor, Stanford University Medical Center, and
20  principal investigator of the Phase 1 clinical
21  trial."
22      Do you see that?
23  A. Yes.
24      MS. ANDERSEN: Objection to form.
25      THE WITNESS: I see it.

Page 77

1  BY DR. HSU:
2  Q. Okay. Do you know who Dr. Advani is?
3  A. Yes.
4  Q. Do you know him personally?
5  A. Yes. It's a woman.
6  Q. Oh, I'm sorry. God, I got that wrong
7  again.
8  A. It's okay.
9  Q. Okay. So she was the principal
10  investigator for the Phase 1 study on the Btk
11  project. Is that right?
12      MS. ANDERSEN: Objection to form.
13      THE WITNESS: She -- she was, yes.
14  BY DR. HSU:
15  Q. Okay. Did you work with her for that
16  study?
17  A. Yes. I worked closely with Ranjana.
18  Q. Okay. What was -- what was your
19  involvement in the Phase 1 study that's being
20  referred to here?
21  A. I helped design the study and write the
22  protocol and followed the data, again providing
23  guidance and oversight to the execution and
24  interpretation of the data.
25  Q. And Dr. Advani, does she have a good

20 (Pages 74 - 77)

Page 130

1 "peer-reviewing" means for an article?
2      MS. ANDERSEN:  Objection to form.
3      THE WITNESS:  So PNAS is a little bit
4 different than other journals in that you have to
5 have a member of the National Academy of Science --
6 so the National Academy of Science is a prestigious
7 membership organization -- a prestigious
8 organization of scientists that are elected.  And
9 so you have to get one of them to read it and say,
10 "This is good," and then they send it to peer
11 review after that.  So there's kind of like two
12 hurdles you have to get over.
13      And when they -- and "peer review," it
14 means you would send your manuscript -- or, I
15 should say, the editors would send your manuscript
16 out anonymously.  Well, if I'm writing a
17 manuscript, I don't know who's peer-reviewing it.
18 It's anonymous to me.  And it's to other scientists
19 in the field, and they would read it and critically
20 review it, and then the editor would decide whether
21 or not it should be published.
22 BY DR. HSU:
23      Q.  What member of PNAS first reviewed this
24 article?
25      A.  That's actually listed here.  That's --

Page 131

1 Dr. Ronald Levy was the -- was the member who
2 communicated it.
3      Q.  Oh, I see.  It's up at the top, it says
4 "Edited by Ronald Levy."  Right?
5      A.  Yes.
6      Q.  And he's at Stanford University.  Correct?
7      A.  Yes.
8      Q.  And I think this is -- goes without
9 saying, but you reviewed the article before it was
10 published.  Right?
11      A.  Yes.
12      Q.  And to the best of your understanding, it
13 was accurate when it was published.  Correct?
14      A.  Yes.
15      Q.  All right.  And you agreed with the
16 statements that were in this article.  Correct?
17      A.  I did, yes, and still do.
18      Q.  Now, I want to go back to the -- actually,
19 let me stay with this article.
20      If you look at the abstract -- so there's
21 a bold part in the front on the left-hand side in
22 the beginning of the article.  That's the abstract.
23 Correct?
24      A.  That's right.
25      Q.  I'm just looking at the last sentence.

Page 132

1 It's:
2      "These findings support Btk inhibition as
3 a therapeutic approach for the treatment of
4 human diseases associated with activation of
5 the BCR pathway."
6      Right?
7      A.  That's right.
8      Q.  Okay.  That BCR pathway, that would
9 include B-cell non-Hodgkins lymphoma.  Right?
10      MS. ANDERSEN:  Objection to form.  Calls
11 for expert testimony.
12      THE WITNESS:  There was at the time
13 evidence in the literature that the BCR pathway is
14 important in non-Hodgkins lymphoma.  It wasn't
15 proven to be true, but there was evidence that it
16 might be important.
17      So that's -- I would say is a hypothesis,
18 that the BCR pathway is important for a B-cell
19 lymphoma.
20 BY DR. HSU:
21      Q.  Got it.
22      If I go back to the Exhibit Number 18,
23 it's the National Cancer Institute slide
24 presentation.  I think it's -- yeah.  That one
25 right there.

Page 133

1      Let me direct your attention to Slide 36.
2 Do you see it has a box in it?
3      It says "PCI-32765, Clinical Results," and
4 underneath it, it says "Dr. Ahmed Hamdy, CMO."
5      Do you see that?
6      A.  I do.
7      Q.  So he's the chief medical officer at
8 Pharmacyclics at the time?
9      A.  Yes, he was.
10      Q.  All right.  How was he involved with the
11 Phase 1 studies of ibrutinib?
12      MS. ANDERSEN:  Objection to form and
13 foundation.
14      DR. HSU:  Yeah, let me restate that.
15      Q.  Was he involved with the Phase 1 studies
16 for ibrutinib?
17      A.  I'm having trouble remembering when Ahmed
18 came to Pharmacyclics and what stage of clinical
19 development we were.  Certainly Ahmed -- I remember
20 him as being very important in the Phase 2 studies
21 for mantle cell and CLL, which is a later stage of
22 clinical development.
23      But you're asking specifically about the
24 Phase 1 study, which I know we began that before
25 Ahmed came.  So at the very least, he would have

34 (Pages 130 - 133)

Page 134

1 been in charge of the medical monitoring of the
2 patients still on the study; but any more detail
3 than that, I can't really remember.
4    Q.  And when you say "the patients still on
5 the study," you mean the Phase 1 patients, patients
6 in the Phase 1 trial.  Correct?
7    A.  Correct.  Well, there's always some
8 patients, including on the Phase 1, that might be
9 staying on the drug for a long time because they're
10 continuing to benefit.  And this Phase 1, I don't
11 remember how long, but it was, you know, a year or
12 more, and those patients required monitoring, and
13 that would have been one of Ahmed's many
14 responsibilities as CMO.
15    Q.  Okay.  And I think you referred to he was
16 involved in the Phase 2 study for ibrutinib.  Is
17 that correct?
18    A.  Yes.  Ahmed was very important to the
19 Phase 2 studies.
20    Q.  How was he involved with the Phase 2
21 studies?
22    A.  Well, my recollection is that Ahmed came
23 up with the idea of the Phase 2 study in CLL.  In
24 that study, we compared ibrutinib to a drug called
25 ofatumumab, which was an FDA-approved treatment for

Page 135

1 CLL.  And how the design was studied and carried
2 out and executed, Ahmed made very important
3 contributions to that as well as the mantle cell
4 Phase 2 study.
5    Q.  What was his contribution to the mantle
6 cell Phase 2 study?
7    A.  I mean, I can remember Ahmed being a very
8 important voice in how the Phase 2 study was going
9 to be designed.
10       Usually, what we would do is get the
11 counsel of other experts in the field, so we would
12 talk to key opinion leaders and investigators who
13 were experts in mantle cell, and we would get their
14 input.  And someone like Ahmed who knows how to do
15 clinical trials would be important in assimilating
16 all that information, writing the protocol, and
17 then, even more importantly, executing on the
18 protocol to -- successfully.
19       So Ahmed was one of the people who was
20 important in that -- in all that.
21    Q.  Now, if you look at the next slide,
22 Slide 37, it -- are you there?
23    A.  Yes.
24    Q.  Okay.  It's discussing the Phase 1 study
25 design.  Is that right?

Page 136

1       MS. ANDERSEN:  Objection to form.
2       THE WITNESS:  Yes.
3 BY DR. HSU:
4    Q.  Okay.  And this is the study that was --
5 we had previously talked about in the poster, the
6 ASH 2009 poster that we -- sorry, abstract that we
7 looked at.  Correct?
8       MS. ANDERSEN:  Objection to form.
9       THE WITNESS:  The -- yeah, the ASH 2009
10 abstract refers to the Phase 1 study, and so does
11 this.
12 BY DR. HSU:
13    Q.  Got it.  Okay.
14       And if you turn to the next page,
15 Slide 38, it's referring to "Primary Objectives"
16 and "Secondary Objectives."
17       Do you see that?
18    A.  Yes.
19    Q.  And, in fact, you previously testified
20 about these two objectives and the Phase 1 study.
21 Correct?
22       MS. ANDERSEN:  Objection to form.
23 Mischaracterizes testimony.
24       THE WITNESS:  I can recall describing what
25 a Phase 1 study is and -- and making some of these

Page 137

1 points earlier, yes.
2 BY DR. HSU:
3    Q.  Well, let me ask it more directly.
4       Does this list the primary objectives and
5 the secondary objective for the Phase 1 ibrutinib
6 study that Pharmacyclics conducted?
7       MS. ANDERSEN:  Objection to form.
8       THE WITNESS:  Yes.
9       DR. HSU:  Okay.  We're going to run out of
10 tape relatively soon, so we'll have to take a
11 break.
12       THE VIDEO OPERATOR:  Going off the record.
13 The time is 11:52 A.M., and this is the end of
14 Media Unit 2.
15       (Lunch recess from 11:52 A.M. to
16       12:32 P.M.)
17       --o0o--
18       AFTERNOON SESSION
19       THE VIDEO OPERATOR:  We are back on the
20 record at 12:32 P.M., and this is the beginning of
21 Media Unit 3.
22 BY DR. HSU:
23    Q.  Welcome back, Dr. Buggy.
24    A.  Thank you.
25    Q.  During your breaks, did you ever talk

35 (Pages 134 - 137)

# EXHIBITS F-M
# **REDACTED IN THEIR ENTIRETY**

# EXHIBIT N

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 6000

**Via Email**                                        November 6, 2019

Thomas A. Rammer                          Natalie C. Clayton
Schiff Hardin LLP                         Alston & Bird LP
233 S. Wacker Drive                       90 Park Avenue, 15th Floor
Chicago, IL 60606                         New York, NY 10016-1387

Todd S. Werner                            Hershy Stern
Carlson, Caspers, Vandenburgh & Lindquist Kasowitz Benson Torres LLP
225 South Sixth Street, Suite 4200        1633 Broadway
Minneapolis, MN 55402                     New York, NY 10019

Siegmund Y. Gutman
Proskauer Rose LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010

> **Re:   Pharmacyclics LLC v. Fresenius Kabi, et al., C.A. No. 18-192
> (CFC) (D. Del.) (consolidated); Pharmacyclics LLC v. Alvogen
> Pine Brook LLC, et al., C.A. No. 19-434 (CFC) (D. Del.)**

Dear Tom,

We write in response to your November 3 email regarding Plaintiffs' Rule 30(b)(6) objections and designations. We are available to meet and confer Thursday or Friday afternoon. Please confirm a time and provide a dial-in for the call.

## I.      Deposition Scheduling

Dr. Gwen Fyfe has to move her deposition due to a personal scheduling conflict. She is now available for deposition on December 18 in Covington's San Francisco office.

## II.     Plaintiffs' Rule 30(b)(6) Designations

First, your complaint that Defendants are "without a witness" to testify about the "development and use of ibrutinib *at Celera*," is without merit. As you are aware, Celera is not a party to this lawsuit and no longer exists as a company. Pharmacyclics does not, nor did it ever, own Celera. Neither Pharmacyclics (nor Janssen) can speak on Celera's behalf. Plaintiffs are not obligated to provide a corporate witness on such issues and do not intend to do so.

Moreover, we disagree that our purportedly "piecemeal designation of corporate witnesses" is prejudicial to the Defendants. Plaintiffs have provided all of their designations to-date, which are in response to the eighty-six different topics that Defendants have collectively

**COVINGTON**

November 6, 2019
Page 2

served, in a timely fashion. Your suggestion to the contrary is without merit as evidenced by Defendants' own approach to designating witnesses. To date, none of the Defendants has provided a full list of designations and witnesses in response to Plaintiffs' notices. Indeed, multiple Defendants have requested confirmation of depositions for their Rule 30(b)(6) designees without identifying any topics for these witnesses.

In any event, Plaintiffs make the following additional designations.

### A.     Mr. Norbert Purro (November 12)

Plaintiffs designate Mr. Norbert Purro to testify as to Capsule Defendants' Topic Nos. 2 and 3, limited to the research and development leading to the ibrutinib formulations developed by the inventors of the '753, '382, '617, '455, '548, '140, '231, and '232 Patents.

Plaintiffs also designate Mr. Purro to testify as to Capsule Defendants' Topic No. 11, subject to the objections and limitations in scope reflected in Plaintiffs' Objections and Responses to the Topic.

Plaintiffs also designate Mr. Purro to testify as to Capsule Defendants' Topic No. 12, limited to dissolution characteristics, potency, or pharmacokinetics of non-Imbruvica® ibrutinib formulations developed by the inventors of the '753, '382, '617, '455, '548, '140, '231, and '232 Patents prior to June 4, 2012.

Plaintiffs also designate Mr. Purro to testify as to Capsule Defendants' Topic No. 13, limited to ibrutinib formulations developed by the inventors of the '753, '382, '617, '455, '548, '140, '231, and '232 Patents prior to June 4, 2012, and ibrutinib formulations Plaintiffs tested in animals or humans prior to June 28, 2013.

### B.     Dr. Sriram Balasubramanian (November 15)

Plaintiffs designate Dr. Sriram Balasubramanian to testify as to Capsule Defendants' Topic No. 1, limited to the decision to seek FDA approval for the indications in the Imbruvica® label.

Plaintiffs also designate Dr. Balasubramanian to testify as to Capsule Defendants' Topic No. 13, limited to the conditions or diseases for which Plaintiffs submitted Investigational New Drug Applications to FDA in connection with Imbruvica®.

### C.     Ms. Leslie Amendola (December 18)

Plaintiffs designate Ms. Leslie Amendola to testify as to Capsule Defendants' Topic Nos. 29, 30, 31, 32, 33, 34, 35, and 36, subject to the objections and limitations in scope reflected in Plaintiffs' Objections and Responses to the Topics.

Plaintiffs also designate Ms. Amendola to testify as to Capsule Defendants' Topic Nos. 45, 47, and 48, and Alvogen's Topic Nos. 22, 24, and 25, limited to non-privileged, factual information known or reasonably available to Plaintiffs with respect to the December 8, 2011

**COVINGTON**

November 6, 2019
Page 3

Collaboration and License Agreement between Pharmacyclics and Janssen, and any amendments or addendum thereto.

### D.    Dr. Ching (Kenneth) Chong (December 20)

Plaintiffs designate Dr. Kenneth Chong to testify as to Alvogen's Topic Nos. 1, 2, 4, limited to the research and development leading to the claimed inventions of the Tablet Patents.

Plaintiffs also designate Dr. Chong to testify as to Alvogen's Topic Nos. 7 and 33, limited to the ibrutinib formulations developed by the named inventors of the Tablet Patents prior to March 3, 2015.

### E.    Dr. David Loury (TBD)

Plaintiffs designate Dr. David Loury to testify as to Capsule Defendants' Topic Nos. 2 and 3, limited to the research and development leading to the claimed inventions of the '090, '999, '881, '883, and '746 Patents.

## III.   Plaintiffs' Offer to Meet and Confer with Respect to Certain Topics

If the parties are able to agree on limitations of scope that would allow Plaintiffs to make a witness available on the following topics, Plaintiffs intend to make the following additional designations.

### A.    Objective Indicia Topics

To be clear, Plaintiffs' willingness to offer witnesses testify as to Capsule Defendants' Topic Nos. 15–18, and 20 (directed to objective indicia of non-obviousness), is not to be construed as any type of limitation on the type of evidence and specific contentions that Plaintiffs intend to offer as objective indicia of non-obviousness of the asserted patents. *See* Section IV below. Nonetheless, in the spirit of compromise, Plaintiffs are willing to make the following designations:

Plaintiffs are willing to designate Dr. Balasubramanian to testify as to Capsule Defendants' Topic No. 15, limited to factual, non-privileged information known or reasonably available to Plaintiffs with respect to how Imbruvica® has met the need in the medical community for the indications for which Imbruvica® FDA approval to treat.

Plaintiffs are willing to designate Dr. Balasubramanian to testify as to Capsule Defendants' Topic No. 16, limited to factual, non-privileged information known or reasonably available to Plaintiffs with respect to how Imbruvica® has demonstrated unexpected clinical efficacy.

Plaintiffs are willing to designate Dr. Balasubramanian to testify as to Capsule Defendants' Topic No. 17, limited to factual, non-privileged information known or reasonably available to Plaintiffs with respect to how Imbruvica® has been viewed by the medical community.

**COVINGTON**

November 6, 2019
Page 4

Plaintiffs are willing to designate Dr. Tarak Mody to testify as to Capsule Defendants' Topic No. 17, limited to factual, non-privileged information known or reasonably available to Plaintiffs with respect to Pharmacyclics's efforts to partner with other companies to develop ibrutinib.

Plaintiffs are willing to designate Ms. Leslie Amendola to testify as to Capsule Defendants' Topic No. 18, limited to factual, non-privileged information known or reasonably available to Plaintiffs with respect to the actual market share of Imbruvica® from launch to present and sales of Imbruvica® from launch to present.

Plaintiffs are willing to designate Dr. Balasubramanian to testify as to Capsule Defendants' Topic No. 20, limited to factual, non-privileged information known or reasonably available to Plaintiffs with respect to praise and recognition for Imbruvica®.

## B. Other Topics

Assuming the parties are able to agree on a reasonable scope for Capsule Defendants' Topic No. 7, Plaintiffs are willing to designate Dr. Balasubramanian to testify as to the topic.

We have already provided a witness, Erick Goldman, to provide corporate testimony on Capsule Defendants' Topic Nos. 8, 9, and 10. That deposition was a week-and-a-half ago. As is clear from our Objections and Responses and prior correspondence, Plaintiffs do not intend to provide any further corporate testimony on these topics. To the extent Defendants contend otherwise, we disagree on the merits and further note Defendants have waived any such argument by waiting until now to attempt to raise an issue.

## IV. Defendants' Contention Topics

As for Defendants' contention topics, including the objective indicia topics identified above, you seem to acknowledge that such topics are improper as-noticed by Defendants. The fact that you now claim to seek only "underlying facts" does not cure the basic defect that Defendants are seeking fact witness testimony about Plaintiffs' litigation positions. As we have stated, contention topics are contrary to the practice in this District. *See, e.g., Chalumeau Power Sys. LLC v. Alcatel-Lucent USA, Inc.*, No. 11-1175-RGA, tr. at 27–28 (D. Del. Oct. 4, 2013) ("contention depositions are not fair to whomever's being asked to formulate these things"); *Medicis Pharm. Corp. v. Actavis Mid Atlantic LLC*, No. 11-409-LPS-CJB, tr. at 40–44 (D. Del. Sept. 28, 2012) (denying a request to require plaintiffs to put forward a 30(b)(6) witness on contention topics related to secondary considerations of nonobviousness); *Reliant Pharms., Inc. v. Par Pharm., Inc.*, No. 06-774-JJF, tr. at 20–21 (D. Del. Mar. 7, 2008) ("in this district there is a preference that contention discovery be conducted by interrogatory even when factual information is sought"); *Pharmacia & Upjohn Co. v. Sicor, Inc.*, No. 04-833-KAJ, tr. at 36 (D. Del. Oct. 11, 2005) ("[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party."); *McKesson Info. Solutions LLC v. The TriZetto Group, Inc.*, C.A. No. 04-1258-SLR, tr. at 21 (D. Del. Aug. 2, 2005) ("If you ask for depositions concerning the basis for a defense, that [should be] a contention interrogatory."); *Seagate Tech. LLC v. Cornice, Inc.*, No. 04-418-SLR, tr. at 38 (D. Del. June 28,

**COVINGTON**

November 6, 2019
Page 5

2005) ("No contention depositions. Those are in writing. There's no one person that should have to answer that."); *ArthroCare Corp. v. Smith & Nephew, Inc.*, No. 01-504-SLR, tr. at 13-14 (D. Del. Oct. 15, 2002) ("I would not put any credence in contention depositions to have one person be designated as the corporate spokesperson for legal issues . . . and even incorporating all the facts. That's what interrogatories are for . . . I would say don't bother taking them [i.e., contention depositions]. I think they're ridiculous . . ."); *Axiohm IPS, Inc. v. Epson Am., Inc.*, No. 00-420-SLR, tr. at 4 (D. Del. Mar. 28, 2001) ("[W]e don't do contention depositions in this district").

    Your position that "Plaintiffs will not rely on any facts in their possession to support their legal conclusions in expert discovery or at trial" and your attempt to use fact witness depositions as an attempt to close Plaintiffs out on contentions and litigation positions, show precisely why such topics are not typically permitted in this District. *See, e.g., Tiegel Mfg. Co. v. Globe Union, Inc.*, No. 84-483, tr. at 14 (D. Del. Oct. 5, 1984) ("It has been the consistent position of this Court that a lay person shouldn't be required to formulate a party's contention in response to deposition questioning and that not even a lawyer should be required to formulate trial strategy and contentions in immediate response to questions on deposition.").

    Your position that Plaintiffs' contentions and litigation positions should be limited by any proffered fact testimony is unfounded. Plaintiffs have disclosed and will continue to disclose the bases for their litigation positions, as appropriate under the Scheduling Order, Federal Rules, and District of Delaware Default Standard.

                                        Regards,

                                        Chanson Chang

# EXHIBIT O

| From: | Andersen, Erica |
|---|---|
| Sent: | Tuesday, December 10, 2019 4:18 PM |
| To: | Farnan, Kelly E.; Tigan, Jeremy A. |
| Cc: | 'Rammer, Thomas A.'; Shri.Abhyankar@alston.com; Alvogen_Ibrutinib@proskauer.com; bpalapura@potteranderson.com; Brian Farnan; CMarsili@carlsoncaspers.com; clynch@proskauer.com; Natalie.Clayton@alston.com; Moore; DGattuso@hegh.law; sgutman@proskauer.com; DHanna@proskauer.com; HStern@kasowitz.com; JHiggins@ycst.com; Ibrutinib-AB@alston.com; JDeshmukh@kasowitz.com; JGuhaniyogi@kasowitz.com; kirk.bradley@alston.com; Michael Farnan; movanesian@proskauer.com; SLockner@carlsoncaspers.com; SMatheson@carlsoncaspers.com; FKibrutinib; msharp@ycst.com; sobyrne@potteranderson.com; TWerner@carlsoncaspers.com; Zydus_Imbruvica@kasowitz.com; Melanie Sharp; JHiggins@ycst.com; bpalapura@potteranderson.com; DGattuso@hegh.law; JBlumenfeld; AbbVie_Imbruvica; 'KLJanssenImbruvicaANDAFresenius (KLJanssenImbruvicaANDAFresenius@kramerlevin.com)' |
| Subject: | RE: Imbruvica Hatch-Waxman: Fyfe Deposition |

Kelly,

We disagree with your characterization below. At any point between Friday evening and Tuesday morning, you could have offered Plaintiffs the courtesy of a response saying you were evaluating whether you could move forward with the deposition. You did not.

Instead, this morning you said Defendants intended to unilaterally call the Court about this issue. There was no indication whatsoever that Defendants were willing to accommodate this deposition. Based on our understanding--and the fact that it was 4:30 am PT when you emailed--our DE counsel tried to work with you to find a suitable proposal. There was no gamesmanship involved nor did we "reverse course" from what we have said in our multiple emails on this topic. If Defendants were available to take the deposition they should have made that clear--and should not have said they intended to call the Court without Plaintiffs' counsel after ignoring our multiple emails over three days.

Your email below makes no mention of our proposed compromise, which we understand our DE Counsel has conveyed to you. If Defendants will agree to drop the deposition of Dr. Fyfe, we agree not to call her at trial.

We are available to meet and confer at 4:30 pm ET/1:30 pm PT. Please provide a dial in.

Thanks,
Erica

**Erica N. Andersen**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5549 | eandersen@cov.com
www.cov.com

# COVINGTON

**From:** Farnan, Kelly E.
**Sent:** Tuesday, December 10, 2019 3:44 PM
**To:** Andersen, Erica ; Tigan, Jeremy A.
**Cc:** 'Rammer, Thomas A.' ; Shri.Abhyankar@alston.com; Alvogen_Ibrutinib@proskauer.com; bpalapura@potteranderson.com; Brian Farnan ; CMarsili@carlsoncaspers.com; clynch@proskauer.com; Natalie.Clayton@alston.com; Moore ; DGattuso@hegh.law; sgutman@proskauer.com; DHanna@proskauer.com; HStern@kasowitz.com; JHiggins@ycst.com; Ibrutinib-AB@alston.com; JDeshmukh@kasowitz.com; JGuhaniyogi@kasowitz.com; kirk.bradley@alston.com; Michael Farnan ; movanesian@proskauer.com; SLockner@carlsoncaspers.com; SMatheson@carlsoncaspers.com; FKibrutinib ; msharp@ycst.com; sobyrne@potteranderson.com; TWerner@carlsoncaspers.com; Zydus_Imbruvica@kasowitz.com; Melanie Sharp ; JHiggins@ycst.com; bpalapura@potteranderson.com; DGattuso@hegh.law; JBlumenfeld ; AbbVie_Imbruvica ; 'KLJanssenImbruvicaANDAFresenius (KLJanssenImbruvicaANDAFresenius@kramerlevin.com)'
**Subject:** RE: Imbruvica Hatch-Waxman: Fyfe Deposition

<mark>[EXTERNAL]</mark>
Erica,

We disagree with your characterizations of this dispute. Plaintiffs were notified on November 26 that the unilaterally changed date was difficult for Defendants and a December 5 email from Alvogen's counsel made clear that "Counsel for the Capsule Defendants and Tablet Defendants will not attend Dr. Fyfe's deposition." That situation was made all the more difficult by Plaintiffs' decision to dump 14,000 pages of documents on Defendants (despite disclosing on October 23 that Plaintiffs knew they needed to produce these documents). Defendants diligently evaluated whether there was any potential way to accommodate Dr. Fyfe's schedule while also adequately preparing in light of the nearly 14,000 pages of Dr. Fyfe's files produced last Tuesday evening. It only became apparent very late last night that it was not workable for defendants to proceed under these circumstances and we promptly contacted plaintiffs.

As of this morning, Defendants were prepared to seek emergency relief from the Court and, if that relief was denied, one defendant was prepared to travel to the deposition to ensure at least some testimony would be obtained from the witness. However, Plaintiffs encouraged Defendants to handle this in an orderly process and to try to confer today about the issue. It is for that reason only that the defendant cancelled their travel plans. It was not Defendants' understanding that Plaintiffs would attempt to take a substantive advantage based on that procedural suggestion. Rather than make an attempt to confer, Plaintiffs waited until nearly 3:00 pm to reverse course from this morning's call.

Given Plaintiffs' attempt to take a substantive advantage from their procedural suggestion, Defendants require that we confer immediately as we are still prepared to go to Court today. We have a limited window in which one defendant could still travel to take the deposition.

Defendants have agreed to accommodate Dr. Fyfe in any way possible – with the only caveat being that defendants have a bare minimum amount of time to review documents and actually be available for the deposition. We are hopeful Judge Connolly doesn't need to be burdened with this issue (especially on an emergency basis), but it appears Plaintiffs may have left us no choice.

Please let us know when you can confer today.

Kelly

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

**From:** Andersen, Erica <eandersen@cov.com>
**Sent:** Tuesday, December 10, 2019 2:05 PM
**To:** Farnan, Kelly E. <Farnan@RLF.com>; Tigan, Jeremy A. <JTigan@MNAT.com>
**Cc:** 'Rammer, Thomas A.' <TRammer@schiffhardin.com>; Shri.Abhyankar@alston.com; Alvogen_Ibrutinib@proskauer.com; bpalapura@potteranderson.com; Brian Farnan <bfarnan@farnanlaw.com>; CMarsili@carlsoncaspers.com; clynch@proskauer.com; Natalie.Clayton@alston.com; Moore <dmoore@potteranderson.com>; DGattuso@hegh.law; sgutman@proskauer.com; DHanna@proskauer.com; HStern@kasowitz.com; JHiggins@ycst.com; Ibrutinib-AB@alston.com; JDeshmukh@kasowitz.com; JGuhaniyogi@kasowitz.com; kirk.bradley@alston.com; Michael Farnan <mfarnan@farnanlaw.com>; movanesian@proskauer.com; SLockner@carlsoncaspers.com; SMatheson@carlsoncaspers.com; FKibrutinib <FKibrutinib@schiffhardin.com>; msharp@ycst.com; sobyrne@potteranderson.com; TWerner@carlsoncaspers.com; Zydus_Imbruvica@kasowitz.com; Melanie Sharp <msharp@ycst.com>; JHiggins@ycst.com; bpalapura@potteranderson.com; DGattuso@hegh.law; JBlumenfeld <JBlumenfeld@MNAT.com>; AbbVie_Imbruvica <AbbVie_Imbruvica@cov.com>; 'KLJanssenImbruvicaANDAFresenius (KLJanssenImbruvicaANDAFresenius@kramerlevin.com)' <KLJanssenImbruvicaANDAFresenius@kramerlevin.com>
**Subject:** RE: Imbruvica Hatch-Waxman: Fyfe Deposition

Kelly,

On Friday, we emailed stating the parties should proceed with Dr. Fyfe's deposition, and asked Defendants to confirm. We did not receive the courtesy of a response from Defendants that day or all weekend. We also did not receive the courtesy of a response to our two emails yesterday regarding the deposition. Plaintiffs' counsel flew to California for Dr. Fyfe's preparation and deposition, and were fully prepared to go forward with the deposition as scheduled. It is clear Defendants had no intention of taking the deposition all along, yet refused us the basic courtesy of informing us they would not show up until the morning before the deposition, wasting time and resources.

At 7:25 a.m. ET this morning you informed us Defendants would make an emergency call at to chambers at 9:00 am ET whether Plaintiffs' Delaware counsel joined or not -- and when Plaintiffs' lead counsel is in California (three times zones away) for Dr. Fyfe's deposition--without having responded to any of our emails over the past three days or attempting to meet and confer. We understand, per your call and emails with Plaintiffs' Delaware counsel, that Defendants object to holding Dr. Fyfe's deposition tomorrow and will seek the Court's assistance if Plaintiffs will not reschedule. We also understand that Defendants are willing to meet and confer and raise this issue on a non-emergency basis with the Court (e.g., in connection with the December 19 conference) if necessary.

As we have said before, Dr. Fyfe, a third party, has a busy schedule and Plaintiffs are not able to make her available for another deposition. She reserved the time for the preparation and deposition and we went forward with preparations yesterday. The production of 2500 documents--many previously produced--over a week before the deposition does not justify a last-minute refusal to hold her deposition tomorrow. Counsel promptly searched for, reviewed, and produced documents in light of Dr. Fyfe's travel schedule (and moved Dr. Fyfe's deposition once it was clear she had documents that would need to be produced). Moreover, Plaintiffs are still receiving productions--some significant--from Defendants themselves and continue to conduct depositions despite that.

Plaintiffs and Dr. Fyfe were put to burden and expense. Defendants should have agreed to attend the deposition as scheduled. We will oppose holding her deposition on any other date, but per this morning's call and correspondence, agree that it is unnecessary to burden the Court with this dispute on an emergency basis.

Regards,
Erica

**Erica N. Andersen**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5549 | eandersen@cov.com
www.cov.com

**COVINGTON**

---

**From:** Farnan, Kelly E. <Farnan@RLF.com>
**Sent:** Tuesday, December 10, 2019 7:25 AM
**To:** Tigan, Jeremy A. <JTigan@MNAT.com>
**Cc:** 'Rammer, Thomas A.' <TRammer@schiffhardin.com>; Shri.Abhyankar@alston.com; Alvogen_Ibrutinib@proskauer.com; bpalapura@potteranderson.com; Brian Farnan <bfarnan@farnanlaw.com>; CMarsili@carlsoncaspers.com; clynch@proskauer.com; Natalie.Clayton@alston.com; Moore <dmoore@potteranderson.com>; DGattuso@hegh.law; sgutman@proskauer.com; DHanna@proskauer.com; HStern@kasowitz.com; JHiggins@ycst.com; Ibrutinib-AB@alston.com; JDeshmukh@kasowitz.com; JGuhaniyogi@kasowitz.com; kirk.bradley@alston.com; Michael Farnan <mfarnan@farnanlaw.com>; movanesian@proskauer.com; SLockner@carlsoncaspers.com; SMatheson@carlsoncaspers.com; FKibrutinib <FKibrutinib@schiffhardin.com>; msharp@ycst.com; sobyrne@potteranderson.com; TWerner@carlsoncaspers.com; Zydus_Imbruvica@kasowitz.com; Melanie Sharp <msharp@ycst.com>; JHiggins@ycst.com; bpalapura@potteranderson.com; DGattuso@hegh.law; JBlumenfeld <JBlumenfeld@MNAT.com>; AbbVie_Imbruvica <AbbVie_Imbruvica@cov.com>; 'KLJanssenImbruvicaANDAFresenius <KLJanssenImbruvicaANDAFresenius@kramerlevin.com>' <KLJanssenImbruvicaANDAFresenius@kramerlevin.com>
**Subject:** RE: Imbruvica Hatch-Waxman: Fyfe Deposition

[EXTERNAL]
Jeremy,

In light of Plaintiffs' refusal to offer alternative dates for the Fyfe deposition, I plan to call the Court at 9:00 a.m. to ask Judge Connolly for an emergency teleconference to have the deposition rescheduled. You can use the following dial-in information if you would like to join the call:

(866) 353-7635
Code 3026517705

Thanks,
Kelly

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

**From:** Denuyl, David S [mailto:DDenuyl@cov.com]
**Sent:** Monday, December 09, 2019 9:44 AM
**To:** Rammer, Thomas A. <TRammer@schiffhardin.com>; Hanna, David M. <DHanna@proskauer.com>; Jayita Guhaniyogi <JGuhaniyogi@kasowitz.com>; Clayton, Natalie <Natalie.Clayton@alston.com>; Sanchez, Linda <Linda.Sanchez@alston.com>; BinduPalapura <bpalapura@potteranderson.com>; Brian Farnan <bfarnan@farnanlaw.com>; David Moore <dmoore@potteranderson.com>; DGattuso@proctorheyman.com <DGattuso@hegh.law>; Ibrutinib - A&B <Ibrutinib-AB@alston.com>; Jay R. Deshmukh <JDeshmukh@kasowitz.com>; Michael Farnan <mfarnan@farnanlaw.com>; Aly, Imron T. <IAly@schiffhardin.com>; Hsu, John K. <JHsu@schiffhardin.com>; Nelson, Kevin M. <KNelson@schiffhardin.com>; Turnelius, Bridget <bturnelius@schiffhardin.com>; Stephane O'Byrne <sobyrne@potteranderson.com>; Zydus – Imbruvica <Zydus_Imbruvica@kasowitz.com>; Todd S Werner <TWerner@carlsoncaspers.com>; Samuel T Lockner <SLockner@carlsoncaspers.com>; DG-Ibrutinib <DG-Ibrutinib@goodwinlaw.com>; John Phillips <jcp@pgmhlaw.com>; dab@pgmhlaw.com; Hershy Stern <HStern@kasowitz.com>; Caroline L Marsili <CMarsili@carlsoncaspers.com>; Riaz, Ahmed M.T. <ARiaz@schiffhardin.com>; Ibrutinib - A&B <Ibrutinib-AB@alston.com>; Alvogen_Ibrutinib <Alvogen_Ibrutinib@proskauer.com>; Sharp, Melanie <msharp@ycst.com>; Higgins, James <JHiggins@ycst.com>
**Cc:** AbbVie_Imbruvica <AbbVie_Imbruvica@cov.com>; jtigan@mnat.com; JBlumenfeld@MNAT.com; KLJanssenImbruvicaANDAFresenius <KLJanssenImbruvicaANDAFresenius@kramerlevin.com> <KLJanssenImbruvicaANDAFresenius@kramerlevin.com>
**Subject:** [EXT] Imbruvica Hatch-Waxman: Fyfe Deposition

Counsel:

Dr. Fyfe's deposition will begin at 8:00 am on Wednesday at Covington's SF office. Please note that Dr. Fyfe has a hard stop at 5:00 pm. For purposes of security and ensuring adequate conference space and resources, please let us know who from Defendants will be attending, as well as the names of the court reporter and videographer, by COB PT today.

Regards,
David

**David Denuyl**

Covington & Burling LLP
Salesforce Tower, 415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T +1 415 591 7033 | ddenuyl@cov.com
www.cov.com

**COVINGTON**

5

This message
is from a law
firm and
may contain
information
that is
confidential
or legally
privileged. If
you are not
the intended
recipient,
please
immediately
advise the
sender by
reply e-mail
that this
message has
been
inadvertently
transmitted
to you and
delete this e-
mail from
your system.
Thank you
for your
cooperation.


----------------------------------------------------------------
This message and any attachments may contain confidential
information protected by the attorney-client or other privilege.
If you believe that it has been sent to you in error,
please reply to the sender that you received the message in
error. Then delete it. Thank you.
----------------------------------------------------------------

# EXHIBITS P-DD
# **REDACTED IN**
# **THEIR ENTIRETY**

# EXHIBIT EE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ASTELLAS PHARMA INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-905-JFB-CJB |
| | ) | Consolidated |
| ACTAVIS ELIZABETH LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

At Wilmington this **15th day of May, 2019.**

**WHEREAS**, on April 2, 2019, the parties in these consolidated Hatch-Waxman actions

filed a "Motion for Teleconference to Resolve Discovery Dispute" ("Motion") regarding their

various requests that: (1) certain material be stricken from the parties' expert reports; and (2) the

parties be precluded from raising the stricken subject matter at trial.[1]  (D.I. 391)  In this

Memorandum Order, the Court considers the portion of Defendants Sawai Pharmaceutical Co.,

Ltd., Sawai USA Inc. (together with Sawai Pharmaceutical Co. Ltd., "Sawai"), Zydus

Pharmaceuticals (USA) Inc. and Cadila Healthcare Ltd.'s (together with Zydus Pharmaceuticals

(USA) Inc., "Zydus" and collectively with Sawai, "Defendants") Motion relating to their

requests to strike Plaintiffs Astellas Pharma Inc., Astellas Ireland Co., Ltd. and Astellas Pharma

Global Development, Inc.'s (collectively, "Astellas" or "Plaintiffs") expert opinions and new

documents regarding two validity-related topics: (1) the need for the "selection" of mirabegron

for further development from the prior art (the "selection theory"): and (2) the inventorship story

---

[1]    Although the parties characterized their requests as "discovery disputes[,]" (D.I. 384 at 1), they are actually motions to strike.  Despite this, the Court noted that it would, as a procedural matter, treat the disputes as if they were discovery disputes.  (D.I. 389)  That is, the Court permitted the parties to file letter briefs regarding the disputes and thereafter held a teleconference to allow for oral argument.

relating to United States Patent Nos. 7,342,117 and 7,982,049 (collectively, the "polymorph patents").[2]  (D.I. 392 at 3-6; D.I. 409 at 3-4)  With respect to these issues, the Court has considered the parties' letter briefs, (D.I. 392, 399, 409), and the parties' arguments made during the April 17, 2019 telephonic argument, (D.I. 420 (hereinafter, "Tr."));[3]

**NOW, THEREFORE, IT IS HEREBY ORDERED** as follows:

1.      Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information . . . as required by Rule 26[ ](e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  In considering whether to exclude evidence relating to an untimely or otherwise improper disclosure, the United States Court of Appeals for the Third Circuit has directed district courts to weigh certain factors, known as "the *Pennypack* factors": (1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply; and (5) the importance of the testimony sought to be excluded.  *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977), *overruled on other grounds, Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997).  Because "[t]he exclusion of critical evidence is an extreme sanction," the Third Circuit has explained that it should be reserved for circumstances amounting to "willful deception or

---

[2]      Plaintiffs presently assert four patents in this case.  The polymorph patents recite mirabegron crystals (or "polymorphs").  (*See* D.I. 392 at 1 n.2)  The other two patents recite methods of treating overactive bladder with mirabegron.  (*Id.*)

[3]      The Court will resolve the other issues raised by Defendants' Motion in separate Order(s).

flagrant disregard of a court order by the proponent of the evidence." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (internal quotation marks and citations omitted).

      2.      With respect to Plaintiffs' selection theory, the Court DENIES Defendants' request to strike this material (and any new supporting documents) from Plaintiffs' experts' Rebuttal Reports. Defendants assert that they served initial invalidity contentions with respect to, *inter alia*, the polymorph patents over 18 months ago, and subsequently sought Plaintiffs' rebuttal validity contentions through Interrogatories served in September 2017 and during Rule 30(b)(6) depositions in the summer of 2018. (D.I. 392 at 3-4 & nn. 19, 20)[4] Defendants complain that Plaintiffs were unhelpful in that regard, "provid[ing] bare-bones responses[,] refus[ing] to substantially supplement despite [] repeated requests[, and] inadequately prepar[ing] and/or improperly limit[ing] its corporate witnesses on related topics." (*Id.* at 3-4 & nn. 21-23) As an example, Defendants point to Plaintiffs' response to Defendants' Interrogatory No. 15, which requested a "detailed explanation" and "claim by claim analysis" in support of Plaintiffs' disagreement with Defendants' Joint Invalidity Contentions. (D.I. 394, ex. K at 26) Plaintiffs responded, *inter alia*, that:

> Defendants have not identified any prior art reference that anticipates any claim of the [asserted] patents. Defendants have not identified any prior art reference or combination of references that renders any claim of any of the aforesaid patents obvious. Defendants' Joint Invalidity Contentions, served on August 25, 2017, are erroneous in their entirety; and Astellas disagrees with Defendants' Joint Invalidity Contentions in their entirety.

---

[4]      Fact discovery in this case closed on July 13, 2018. (*See* D.I. 275)

(*Id.* at 27)  Accordingly, Defendants assert that they were "surprised" to see Plaintiffs' "new theory" in all four of their rebuttal expert reports regarding the "need for the 'selection' of mirabegron for further development from the prior art as part of the analysis of Defendants' obviousness defenses."  (D.I. 392 at 4-5; Tr. at 63 (Sawai's counsel asserting that Plaintiffs' Response to Defendants' Interrogatory No. 15 amounted to "nothing, essentially saying that our invalidity contentions were just wrong and with no reasoning whatsoever.  So we had no idea that they were going to argue that . . . you would select something else besides [m]irabegron"))  Defendants argue that this disclosure was untimely and that the *Pennypack* factors weigh in favor of striking Plaintiffs' selection theory.  (D.I. 392 at 5)

       3.      For their part, Plaintiffs contend that their selection theory directly rebuts Defendants' experts' invalidity opinions and therefore is permissible in their experts' rebuttal reports.  (D.I. 399 at 4)  For instance, one of Defendants' experts, Michael B. Chancellor, M.D., opines in his opening report on invalidity that certain of the asserted claims are invalid over, *inter alia*, United States Patent No. 6,346,532 (the "'532 patent").  In support, Dr. Chancellor asserts that "[a] [person of ordinary skill in the art, or POSA] would have been motivated to select mirabegron as a ß3-adrenoceptor agonist" and "would have had a reasonable expectation of success in treating overactive bladder ['OAB'] with mirabegron because it was known to be a selective ß3-AR agonist[.]"  (D.I. 394, ex. F at ¶¶ 117, 150-53, 169)  In Plaintiffs' expert Martin C. Michel, M.D.'s Rebuttal Report, in a section entitled "Astellas's '532 Patent Concerns the Potential Treatment of Obesity/Diabetes—There was No Motivation for a POSA to Select Astellas's '532 Patent When Looking For an OAB Treatment[,]" Dr. Michel opines that the '532 patent does not allow for the selection of any compound with the reasonable expectation of success for treating OAB, and furthermore, that there was no motivation for a POSA to select

any of one of the more than 100 compounds disclosed in that patent for OAB treatment, including the Example 41 compound (i.e., mirabegron).  (*Id.*, ex. C at ¶¶ 217-20, 225-26, 228) These are among the paragraphs that Defendants seek to strike.[5]

4.      The material relating to Plaintiffs' selection theory does not amount to an untimely or otherwise improper disclosure.  Rather, the Court finds that this theory is proper rebuttal to Defendants' experts' invalidity assertions.  *See, e.g.*, *Withrow v. Spears*, 967 F. Supp. 2d 982, 1001-02 (D. Del. 2013) (noting that rebuttal is proper if the intent is to rebut evidence on the same subject matter identified by the opposing party's expert report, and that such rebuttal "may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert") (internal quotation marks and citation omitted); *see also* (D.I. 409 at 3 (Defendants acknowledging that "Astellas relies heavily on the 'selection' theory . . . as part of its rebuttal to Defendants' invalidity defenses"))  While it may be true that Defendants sought information from Plaintiffs regarding their validity contentions during the discovery period, to the extent that Defendants were unsatisfied with Plaintiffs' responses, they could have filed a motion to compel a more complete or narrow response.  (Had they, they almost certainly would have obtained relief, at least with regard to Plaintiffs' response to Defendants' Interrogatory No. 15, which said little but basically left open the possibility that Plaintiffs might argue *anything* in later rebutting Defendants' invalidity positions.).  But

_____

[5]      As another example, Defendants seek to strike portions of the Rebuttal Expert Report of Plaintiffs' expert Allan S. Myerson, Ph.D. wherein Professor Myerson opines that Defendants' experts Michael J. Cima, Ph.D. and Craig Eckhardt, Ph.D. fail to consider, in their invalidity analysis, the full scope and content of the '532 patent because the person of ordinary skill would have been looking at hundreds (if not thousands) of possible candidate compounds, not just mirabegron, and the experts provide no basis for motivation to focus on mirabegron. (*See, e.g.*, D.I. 394, ex. A at ¶¶ 150-51, 154-56)

Defendants did not.  And, having failed to do so, Defendants had to have anticipated that

Plaintiffs' Rebuttal Expert Reports regarding invalidity would say more than simply

"Defendants' experts are wrong."[6]  *Cf. San Disk Corp. v. Round Rock Research LLC*, No. C 11-

5243 RS, 2014 WL 2700853, at *3 (N.D. Cal. June 13, 2014) (denying plaintiff's motion to

strike expert's descriptions of new indirect infringement theories not sufficiently set out in

infringement contentions on that topic, and agreeing that "if [plaintiff] believed the infringement

contentions were inadequate, it should have moved to compel amended contentions during

discovery[;]" but granting the motion to strike as to additional accused products other than those

that were "expressly" identified in infringement contentions because "[u]ntil the expert reports

were served that identified [new] product lines [plaintiff] had not understood to be part of the

case, [plaintiff] had no reason to know of any inadequacies in [defendant's] infringement

contentions").  The Court therefore DENIES Defendants' Motion as it relates to Plaintiffs'

selection theory.

     5.     With regard to Plaintiffs' inventorship story, the Court reaches the same

conclusion.  While Defendants suggested during the discovery period (i.e., by way of deposition

questioning) that they would assert, *inter alia*, that Mr. Susumu Igarashi should have been a

named inventor of the polymorph patents, (*see, e.g.*, D.I. 394, ex. R at Awamura Dep. Tr. at 244-

45, 255-68; *see also* D.I. 409, ex. HH at 2), Plaintiffs first learned all of the details of

Defendants' improper inventorship claim only when Defendants served their Final Invalidity

---

     [6]     Defendants further assert that they were surprised by Plaintiffs' selection theory
because it "has been rejected by the Federal Circuit."  (D.I. 392 at 5 & n.26; Tr. at 62-63 ("The
selection theory was surprising in that the [F]ederal [C]ircuit has rejected it before, so we were . .
. surprised that they went that way."))  The issue of whether the selection theory is legally sound,
however, is not presently before the Court.  (Tr. at 63)

Contentions in October 2018, (D.I. 394, ex. V at 204-06), with the claim being further discussed in Professor Cima's November 2018 opening report, (*id.*, ex. E at ¶¶ 198-206; *see also, e.g.*, D.I. 392 at 5 n.28 ("Defendants' Final [Infringement Contentions] and Cima Opening [Report] summarize our understanding of the . . . invention story [relating to the polymorph patents] after fact discovery.")) To the extent that Defendants were unsatisfied during the discovery period with Plaintiffs' "minimal additional information [beyond largely "rehashed information" from the publicly available polymorph patents] about when each of the asserted claims was invented and by whom[,]" (D.I. 392 at 5-6), Defendants could have moved for relief from the Court, but they did not. The portions of Professor Myerson's Rebuttal Report that Defendants seek to strike regarding the inventorship story of the polymorph patents directly rebut Professor Cima's inventorship analysis. (*See* D.I. 394, ex. A at Section IX.F; D.I. 392 at 5 n.27; D.I. 399 at 5; D.I. 409 at 3 (Defendants acknowledging that "Astellas relies heavily on the . . . new PM 'inventorship' story as part of its rebuttal to Defendants' invalidity defenses")) Under these circumstances, the Court concludes that this disclosure is not untimely or otherwise improper. Defendants' Motion as it relates to the inventorship story is DENIED.

6.      Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **May 20, 2019**, for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation

marks and citation omitted).  The Court will subsequently issue a publicly-available version of

its Memorandum Order.

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

8

# EXHIBIT FF

ORAL ORDER: The Court, having considered the parties' letter submissions, (D.I. 376, 380, 382), relating to Defendants Motion to Strike Plaintiffs New Biocompatibility Theory ("Motion"), (D.I. 375), as well as the parties' arguments made during the teleconferences on November 28, 2017 and December 12, 2017, HEREBY ORDERS that Defendants Motion be DENIED for the following reasons: (1) The Court finds there is some merit to Plaintiffs point that Defendant never followed up with Plaintiffs about Plaintiffs' response to Interrogatory No. 3 (relating to Plaintiffs validity positions), nor filed a motion to compel a more complete response thereto. If Defendant was not satisfied with Plaintiffs answer, Defendant could have taken up the issue during the discovery period. (2) Plaintiffs assert that, for a few different reasons, they did not come up with the biocompatibility theory until HyperBranch served Dr. Lowmans opening expert report upon them, and therefore, they could not have earlier disclosed such a theory. (D.I. 382, ex. 11 at 4; D.I. 423 at 1-2; D.I. 454) Even assuming that these reasons are not meritorious, and that Plaintiffs thus did fail to fulfill their discovery obligations in not earlier identifying this theory and informing Defendant of the theory, the Court is not convinced that the Pennypack factors militate in favor of striking Plaintiffs biocompatibility theory from their rebuttal experts reports. More particularly, with respect to the second and third Pennypack factors, the biocompatibility theory seems to be one that can sufficiently be addressed by the experts, the intrinsic record and the disclosures of the prior art. Defendants expert Dr. Lowman provided a rebuttal opinion with respect to the theory and Defendant has deposed Plaintiffs experts with respect to the theory. (See D.I. 380 at 4 (citing D.I. 380, ex. 10 at 330-49; D.I. 381, ex. 8 at 22-80; id., ex. 9 at 319-49)) To the extent that further discovery would be needed with respect to the biocompatibility theory such that it would make it impossible to keep the current trial date, that has not been sufficiently explained to the Court. (In a separate oral order, the Court will order the parties to meet and confer to discuss what further process, if any, is required on both sides with respect to the biocompatibility theory.). With respect to the fourth Pennypack factor, there is not a strong indication that there was any bad faith on the part of Plaintiffs in disclosing their biocompatibility theory for the first time in their experts rebuttal reports. And so, a majority of the Pennypack factors militate against grant of the Motion. Ordered by Judge Christopher J. Burke on 12/14/2017. (dlb) (Entered: 12/14/2017)

As of December 17, 2017, PACER did not contain a publicly available document associated with this docket entry. The text of the docket entry is shown above.

*Integra LifeSciences Corporation et al v. HyperBranch Medical Technology, Inc.*
1-15-cv-00819 (DED), 12/14/2017, docket entry

# EXHIBIT GG

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WYETH HOLDINGS CORPORATION,        )
WYETH-AYERST LEDERLE LLC, and      )
WYETH LLC,                          )
                                    )
    Plaintiffs and Counterclaim-      )
    Defendants,                        )
                                    )
v.                                  )  Civ. Action No. 09-955-RGA-CJB
                                    )
SANDOZ, INC.,                       )
                                    )
    Defendant and                     )
    Counterclaimant.                   )

## MEMORANDUM ORDER

Pending before the Court in this patent case are two motions to strike expert reports: (1)

Sandoz Inc.'s Motion to Strike Expert Report of George G. Zhanel, Ph.D. (D.I. 80, hereinafter

"Sandoz's Motion"); and (2) Plaintiffs' Motion Pursuant to Fed. R. Civ. P. 37(c)(1) to Strike the

Expert Report of Margaret A. Riley, Ph.D. (D.I. 86, hereinafter "Wyeth's Motion"). For the

reasons that follow, the Court GRANTS-IN-PART Sandoz's Motion and DENIES Wyeth's

Motion.

## I.    BACKGROUND

### A.    Procedural Posture

This case arises from Sandoz's filing of Abbreviated New Drug Application ("ANDA")

No. 91-620 with the United States Food and Drug Administration ("FDA"). Sandoz's ANDA

seeks to market an injectable form of tigecycline, an antibiotic that Wyeth currently markets

under the brand name Tygacil®. (D.I. 1 at ¶ 10) Wyeth first filed suit against Sandoz on

1

December 11, 2009. (D.I. 1) Wyeth alleges that Sandoz's generic tigecycline product infringes at least one valid claim of U.S. Reissue Patent No. 40,183 ("the '183 patent") and U.S. Patent No. 7,879,828 ("the '828 patent") (collectively, "the patents-in-suit") and seeks a permanent injunction barring Sandoz from manufacturing, using, selling, or offering to sell in the United States, or importing into the United States, any drug product that infringes a valid claim of the patents-in-suit. (*See* D.I. 48)

Sandoz has stipulated that by submitting ANDA No. 91-620, it has committed an act of infringement under 35 U.S.C. § 271(e)(2), and has further stipulated that the commercial manufacture, use, and/or sale of its generic tigecycline antibacterial products would infringe the asserted claims of the patents-in-suit, if any of those claims are found valid and enforceable. (D.I. 62 at 5, ¶ 16; 6, ¶ 24) While conceding infringement, Sandoz challenges the validity of both of the patents-in-suit (*id.* at 7), and asserts that the '828 patent is unenforceable based upon several acts of inequitable conduct (*id.* at 8–17).

Fact discovery closed on October 19, 2011. (D.I. 59) On February 10, 2012, Sandoz filed a single motion for summary judgment of invalidity of the '828 patent for obviousness-type double-patenting. (D.I. 96) Briefing on that motion has not yet been completed. Neither of the expert reports that are the subject of the present motions are cited or otherwise are at issue in Sandoz's summary judgment motion.

On March 5, 2012, this case was reassigned from Judge Leonard P. Stark to Judge Richard G. Andrews, and remains before me on referral to resolve all pre-trial matters. A final pre-trial conference is scheduled for May 11, 2012, and a ten-day bench trial is scheduled to begin on June 4, 2012. (D.I. 23, 41)

2

## B.     The Parties' Expert Reports

Although the Scheduling Order in this case has been amended by request of the parties

multiple times, the case schedule has always contemplated just three rounds of expert reports:

(1) opening reports from the party with the burden of proof on an issue; (2) rebuttal reports; and

(3) reply reports.  (D.I. 23 at 3)  The Court's Scheduling Order provides that "[n]o additional

expert reports may be filed without leave of Court or consent of all parties."  (*Id.*)

Because there is no dispute regarding infringement, the parties' expert reports focus on

the issue of invalidity—an issue for which Sandoz bears the burden of proof.[1]  Sandoz timely

served its opening expert reports on October 21, 2011, including a report by Jeffrey D. Winkler,

Ph.D.  (D.I. 82, ex. 2 ("the Winkler Report"))  Dr. Winkler, a professor of chemistry at the

University of Pennsylvania, opined that the asserted claims of the '183 patent are invalid for lack

of enablement, indefiniteness, and lack of written description.  (*See id.*)  As a rebuttal to Dr.

Winkler's opinions, Wyeth timely served a report from Andrew G. Myers, Ph.D., a professor of

chemistry at Harvard University, on November 16, 2011.  (D.I. 82, ex. 4 ("the Myers Report"))

On December 14, 2011, Sandoz served two reports in reply to Dr. Myers—one from Dr. Winkler,

and one from Margaret A. Riley, Ph.D., a microbiologist at the University of Massachusetts

Amherst (D.I. 82, ex. 5 ("the Riley Report")).  This was the first report from Dr. Riley that had

been offered by Sandoz.  On January 8, 2012, Wyeth served an additional, "sur-rebuttal" expert

report from George G. Zhanel, Ph.D., a microbiologist at the University of Manitoba.  (D.I. 82,

ex. 6 ("the Zhanel Report"))  Dr. Zhanel had not previously served an expert report in this case.

---

[1]     *See, e.g., Stamps.com Inc. v. Endicia, Inc.*, 437 F. App'x 897, 907 n.2 (Fed. Cir.
2011) ("[A] party asserting invalidity in a district court always bears the burden of proof by clear
and convincing evidence.").

Although numerous issues relevant to the alleged invalidity of the patents-in-suit are discussed in the parties' expert reports, the Riley Report and the Zhanel Report are addressed principally to the question of whether the '183 patent has a written description that satisfies 35 U.S.C. § 112. In particular, the Riley Report and the Zhanel Report both address how the biological data in the '183 patent would have been (and should have been) assessed and evaluated at the time the patent issued.

### C.    The Parties' Respective Motions to Strike

Sandoz's Motion was filed on January 17, 2012, and requests that the Zhanel Report be stricken, such that Dr. Zhanel would not be permitted to testify at trial. (D.I. 81 at 1) Sandoz asserts that the Zhanel Report violates the Court's Scheduling Order, and that Sandoz would suffer prejudice if Dr. Zhanel is permitted to testify based on this untimely report. (*Id.* at 2) Wyeth opposes Sandoz's motion, arguing that the Zhanel Report was a proper response to certain new microbiological opinions set forth in the Riley Report. (D.I. 87 at 2–3) In the alternative, Wyeth filed its own motion to strike the Riley Report, arguing that if the Court elects to strike the Zhanel Report, then the Riley Report should likewise be stricken. (*Id.* at 13–14)

Briefing on these motions was completed on March 5, 2012 (D.I. 110), and the Court heard further argument from the parties during a teleconference held on March 7, 2012 (D.I. 114). Both motions are ripe for resolution.

### II.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure require a testifying expert to prepare and sign a written report containing, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them . . . at the times and in the sequence that the court

4

orders." Fed. R. Civ. P. 26(a)(2)(B)(i) & (a)(2)(D).  "If a party fails to provide information or

identify a witness [in the manner required by the Court under Rule 26], the party is not allowed

to use that information or witness . . . at a trial, unless the failure was substantially justified or is

harmless."  Fed. R. Civ. P. 37(c)(1).  If an expert report is stricken, that action effectively

precludes the expert from testifying as to the subject matter and opinions contained in the report.

*See, e.g., Kenexa Brassring, Inc. v. Taleo Corp.*, 751 F. Supp. 2d 735, 759 (D. Del. 2010) (noting

that expert "testimony is [generally] limited to subjects addressed in [the expert's] report (or

otherwise vetted through expert discovery)"); *Inline Connection Corp. v. AOL Time Warner, Inc.*,

472 F. Supp. 2d 604, 615 (D. Del. 2007) (same).[2]

Although the Federal Rules clearly contemplate the exclusion of untimely or improper

expert disclosures (and the concomitant exclusion of expert testimony), the Third Circuit has

cautioned that because "[t]he exclusion of critical evidence is an extreme sanction," it should not

be imposed where an untimely or improper expert disclosure amounts to only a "slight deviation

from pre-trial notice requirements" or occasions only "slight prejudice" to the movant.  *In re

Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791–92 (3d Cir. 1994) (internal quotation marks and

citations omitted).  Instead, the remedy of exclusion should be reserved for circumstances

amounting to "willful deception or flagrant disregard of a court order by the proponent of the

evidence."  *Id.* at 792 (internal quotation marks and citation omitted); *see also Bridgestone

Sports Co. v. Acushnet Co.*, No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15,

---

[2]     Because the discovery matter at issue here is not unique to patent law, the law of
the Third Circuit applies.  *See Bridgestone Sports Co. v. Acushnet Co.*, No. Civ. A. 05-132 JJF,
2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (citing *Micro Chem, Inc. v. Lextron, Inc.*, 317
F.3d 1387, 1390–91 (Fed. Cir. 2003)).

5

2007) (noting that while the decision to exclude expert testimony is context-specific, "evidence should be excluded sparingly and only in circumstances involving litigation conduct that is clearly unprofessional or inappropriate, and in circumstances creating prejudice to the party against whom the evidence is offered").

In considering whether to exclude expert testimony, the Third Circuit has directed district courts to weigh five factors: (1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the testimony sought to be excluded. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 133 (3d Cir. 1985); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997).[3] Although district courts tend to err on the side of admitting expert testimony in such cases, this Court has noted that such testimony may be excluded in order to protect against the "flouting of discovery deadlines," so as to maintain "fidelity to the constraints of Scheduling Orders and deadlines[, which] is critical to the Court's case management responsibilities." *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D. Del. 2005) (internal quotation marks and citation omitted), *rev'd on other grounds*, 543 F.3d 1306 (Fed. Cir. 2008).

## III. DISCUSSION

### A. Timeliness of the Riley Report & the Zhanel Report

---

[3] Although these factors are sometimes articulated in slightly different ways, they are generally referred to as "the *Pennypack* factors." *See, e.g.*, *Paoli*, 35 F.3d at 792.

6

Both Wyeth and Sandoz question the timeliness of the opposing side's final expert reports on the issue of written description. Wyeth argues that the content of the Riley Report was not akin to that of a true reply report, and that it therefore should have been served by no later than the deadline for opening expert reports. (D.I. 87 at 9–10) For its part, Sandoz contends that the Zhanel Report was served weeks after the last allowable date for the service of expert reports. (D.I. 81 at 4–5)

### 1.    The Riley Report

The Court first considers whether the Riley Report was served in accordance with the dictates of the Scheduling Order. In that regard, Wyeth argues that it was improper for Sandoz to introduce Dr. Riley's opinions at the expert reply stage. It asserts that serving the report of a "new" expert at that stage contravened the spirit, if not the letter, of the Scheduling Order—particularly where, as here, Dr. Riley's area of expertise (microbiology) differs from that of the experts who had previously issued reports in the case (chemistry). (D.I. 87 at 9–10)

In support of this argument, Wyeth relies on *Oracle America Inc. v. Google Inc.*, No. C 10–03561 WHA, 2011 WL 5572835 (N.D. Cal. Nov. 15, 2011). In that case, plaintiff Oracle, in advance of the deadline to serve opening expert reports, informed the district court that it might serve expert reports from two economists: a Dr. Cockburn and a Dr. Serwin. *Id.* at *2. However, at the deadline for opening reports, Oracle served only a report authored by Dr. Cockburn. *Id.* After defendant Google served its opposition expert reports in response (and after the deadline for filing *Daubert* motions had passed), Oracle then served lengthy reply reports from both Dr. Cockburn and Dr. Serwin. *Id.* Google objected to Dr. Serwin's reply, arguing that it was improper for a "new expert who did not serve any opening report [to] nonetheless make a

7

reply submission attacking the opposition reports served by the other side." *Id.*

      The *Oracle* Court ruled in Google's favor and struck Dr. Serwin's reply expert reports. Although noting that the *Oracle* Scheduling Order did not explicitly limit reply reports to those written by the authors of opening reports, the district court said it "thought this was already clear" and remarked that "in twelve years of using [its form Scheduling Order], this [was] the first time anyone has suggested to the contrary." *Id.* at \*3. The district court also noted that the case schedule provided no opportunity for a deposition of a new reply expert, and that there would be no opportunity for an opposing expert to directly respond to Dr. Serwin's reply reports. *Id*

      I believe that the factual circumstances in this case are meaningfully different from those at play in *Oracle*. In *Oracle*, the fact that plaintiff had identified Dr. Serwin as a potential testifying expert prior to the service of opening expert reports—but then withheld any report from him until the reply stage—appears to have contributed to the district court's conclusion that the plaintiff "sandbagg[ed]" the defendant by intentionally "sav[ing] its best points for reply." *Id.* In contrast, here there is no similar indication that Sandoz's decision to serve the Riley Report was motivated by such gamesmanship. To the contrary, Sandoz asserts that the motivation to prepare the Riley Report arose only after Dr. Myers made particular arguments in his opposition report, which Sandoz felt were best rebutted by a microbiologist (as opposed to by its expert chemist, Dr. Winkler). (D.I. 100 at 9 ("And unlike the opposition report in *Oracle*, [Wyeth's] opposition report from Dr. Myers for the first time raised issues requiring the expertise of a microbiologist for proper rebuttal."))

      The fact that Dr. Serwin (like Dr. Cockburn) was an economist also appears to have contributed to the *Oracle* Court's decision to strike Dr. Serwin's replies, because it was not

evident why Dr. Cockburn would not have himself been qualified to render the same opinions that Dr. Serwin provided, and Oracle made no claim that the issues addressed in Dr. Serwin's replies "might require or be enhanced by some speciality [of his]." *Id.* In contrast, here both parties assert that a particular expertise in microbiology (first introduced by Dr. Riley, and shared by Dr. Zhanel) is important to the assessment of whether the '183 patent is invalid for lack of a sufficient written description. Moreover, unlike the case in *Oracle*, here the Riley Report was served prior to the expiration of the *Daubert* motion deadline, and in sufficient time for Dr. Riley to have been deposed prior to the close of expert discovery.

In this case, while it may have been somewhat unusual, I find that it was not improper for Dr. Riley's first expert report to have been served at the reply stage. The Scheduling Order did not specifically preclude such a filing, and the Court is not aware of (nor have the parties identified) any other local rule or practice that would have prohibited it. *Cf. B. Braun Melsungen AG v. Terumo Med. Corp.*, 749 F. Supp. 2d 210, 221 (D. Del. 2010) (finding that where a scheduling order was "silent" as to whether the parties could file new expert declaration at the summary judgment stage, this counseled against excluding an expert report submitted at that stage in the proceedings, because the report could not be said to have been served in "flagrant disregard" of the order or with willful deception). Indeed, other courts have permitted an expert to serve his or her first report at the reply stage, so long as that report narrowly focused on responding to an opposition report. *See, e.g.*, *Alloc, Inc. v. Pergo, L.L.C.*, No. 00-C-0999, 2010 WL 3808977, at *8–11 (E.D. Wis. Sept. 23, 2010) (denying a motion to strike a reply report served by an expert disclosed for the first time at that stage, where the report was properly and narrowly focused on responding to two discrete issues). Thus, the fact that Dr. Riley did not

9

serve an opening report does not mean that her reply report violated the Scheduling Order.

Wyeth's other argument is that the *content* of the Riley Report demonstrates that it was not the subject of a proper reply. In this regard, Wyeth alleges that the Riley Report "introduced a new analysis of the '183 patent microbiological data, allegedly in support of Sandoz's contention that the '183 patent claims are allegedly invalid for lack of written description." (D.I. 87 at 10) Wyeth asserts that "[t]hese opinions are directed to the same written description defense and some of the very same . . . data about which Dr. Winkler opined." (*Id.*) As such, Wyeth contends that "Dr. Riley's opinions should have been included in an opening report." (*Id.*)

After reviewing the content of the expert reports submitted by the parties in connection with their motions, the Court concludes that the Riley Report was a proper reply to the Myers Report. The Riley Report is seven pages long and consists primarily of a two-pronged critique of a specific line of argument from the Myers Report. First, Dr. Riley notes Dr. Myers' conclusion that a person of ordinary skill in the art would "evaluate . . . compounds as a class, rather than individually, when considering the various modifications that might present advantages for antibacterial activity." (D.I. 82, ex. 5 at ¶ 24) In Dr. Riley's view, Dr. Myers then arbitrarily selected *individual* compounds and *individual* bacterial strains to analyze as part of this evaluation process. (*Id.* at ¶¶ 25–27) Dr. Riley contends that Dr. Myers should have examined "the activity of candidate compounds against a wide range of strains," rather than just against selected individual strains. (*Id.* at ¶ 30) Second, Dr. Riley argues that if a person of ordinary skill in the art was pursuing the class-based approach advocated by Dr. Myers, then that person would have analyzed the average Minimum Inhibitory Concentration ("MIC") for the classes of

10

strains.[4]  (*Id.*)

The Riley Report thus focuses narrowly on critiquing the approach set forth in a portion

of the Myers Report. Indeed, in her analysis, Dr. Riley repeatedly cites to the corresponding

paragraphs of the Myers Report with which she takes issue.  (*Id.* at ¶¶ 24–26 (citing paragraphs

80–114 of the Myers Report))  The first time that it was possible for Sandoz and Dr. Riley to

respond to Dr. Myers was at the expert reply stage. *See, e.g.*, *Hans v. Tharaldson*, Civil No.

3:05-cv-115, 2011 WL 6937598, at *10 (D.N.D. Dec. 23, 2011) (noting that "[t]he function of

rebuttal evidence is to explain, repel, counteract or disprove evidence of the adverse party" and

that "[e]xperts are typically allowed to introduce new methods of analysis in a rebuttal report if

they are offered to contradict or rebut another party's expert") (internal citations and quotation

marks omitted).  It does appear to be the case, as Wyeth contends, that Dr. Riley's opinions "are

directed to the same written description defense and some of the very same MIC data about

which [Sandoz opening expert report author] Dr. Winkler opined; they simply approach them

from a different perspective." (D.I. 87 at 10)  But the motivation to approach the data from this

"different perspective" only arose in response to the particular way that data was analyzed in the

Myers Report.  That type of motivation goes to the heart of what constitutes a proper reply.  As

such, the Riley Report was timely and properly served.

## 2.    The Zhanel Report

Sandoz argues that "[t]here can be no dispute that Dr. Zhanel's report is untimely." (D.I.

81 at 4)  Wyeth does not directly dispute that the Zhanel Report was served outside the time

---

[4]      "MIC" refers to the lowest concentration of a compound that inhibits growth of
the test organism.  (D.I. 1, ex. A at col. 95:45–55)

11

limits established by the Scheduling Order, but instead argues that the alleged untimeliness of the Riley Report and the lack of prejudice to Sandoz from the Zhanel Report justifies its late service. (D.I. 87 at 11)

Under the Court's Scheduling Order, all expert reports were to have been served by no later than December 14, 2011, with expert discovery closing on February 3, 2012. (D.I. 59 at 2; D.I. 74 at 2) The Zhanel Report, although served before the close of expert discovery, was nonetheless served more than three weeks after the date that the last expert reports were required to be served. Moreover, the Scheduling Order specifically prohibited service of any reports beyond the reply stage, absent "leave of Court or consent of all parties." (D.I. 23 at 3) When Wyeth served Dr. Zhanel's report on Sandoz, Wyeth did not have Sandoz's consent to file a "sur-rebuttal" report, nor did it have leave of the Court to do so.

In light of these facts, the Court finds that the Zhanel Report is untimely under the Scheduling Order. However, that finding does not resolve the question of whether Wyeth's noncompliance was harmless or was substantially justified, such that Dr. Zhanel should nonetheless be permitted to testify at trial. To make this determination, the Court must analyze the Zhanel Report in light of the *Pennypack* factors.

## B. Applying the *Pennypack* Factors to the Zhanel Report

### 1. The Content of the Zhanel Report

In order to analyze how the *Pennypack* factors should apply to the Zhanel Report, it is helpful to first examine the content of that report.

As noted above, the Riley Report criticizes the Myers Report in a limited number of respects, by arguing that (1) Dr. Myers' focus on analyzing antimicrobial candidate compounds

12

against only particular bacterial strains was improper, because a person of ordinary skill in the art would look to a broader class of microbiological data; and that (2) if a person of skill in the art were to generally follow Dr. Myers' approach, that person would look to average MIC values to analyze the various compounds.

The Zhanel Report, after providing background information about Dr. Zhanel (*see* D.I. 82, ex. 6 at ¶¶ 1–13), then sets forth a summary of his opinions (*see id.* at ¶¶ 14–18). Much of that summary responds to Dr. Riley's assertions. In particular, Dr. Zhanel claims that Dr. Riley mischaracterized Dr. Myers' approach, and that a person of skill in the art would not have calculated mean MIC values or analyzed those values in the manner suggested by Dr. Riley. (*See id.* at ¶¶ 17, 18)

Next, after setting forth his understanding of the level of ordinary skill in the art (*id.* at ¶¶ 19–20), Dr. Zhanel provides a lengthy "Technology Overview" that does not appear to respond to any information or opinions in the Riley Report (*id.* at ¶¶ 21–32). However, this information simply provides context and background for the opinions that Dr. Zhanel will later offer. As such, it is more along the lines of "[a] technology and terminology tutorial," which even Sandoz has acknowledged is not particularly objectionable in this context, as it does not "pertain to issues for which [either] party bears the burden of proof." (D.I. 100 at 5)

Dr. Zhanel next offers context for his first opinion, which is that "Dr. Riley mischaracterize[d] Dr. Myers'[] analysis" when she asserted that Dr. Myers wrongly focused only on biological activity against one particular bacterial strain. To the contrary, Dr. Zhanel concludes, Dr. Myers was simply highlighting the results against that particular strain as one example of a broader approach to identifying preferred sets of compounds. (D.I. 82, ex. 6 at ¶¶

13

33–36) This portion of the Zhanel Report directly responds to corresponding arguments in the

Riley Report. Dr. Zhanel then offers his opinion that "microbiologists would not pool or average

data across bacterial strains," as Dr. Riley suggested in her report, but instead would evaluate the

classes of novel compounds against "[e]ach strain" listed in Tables I through V of the '183 patent.

(*Id.* at ¶¶ 37–39; *see also* ¶ 40) This portion of Dr. Zhanel's analysis also is clearly responsive to

Dr. Riley's critiques, as it disputes Dr. Riley's opinion that a microbiologist (in contrast to a

chemist) would approach the '183 patent in a different way than Dr. Myers did.

  However, Dr. Zhanel then undertakes a lengthy analysis of several asserted claims of the

'183 patent, peppered with multiple points of agreement with Dr. Myers. (*Id.* at ¶¶ 40–85) This

section of the Zhanel Report appears to be what Sandoz calls "an entirely new validity analysis"

that is largely "a recitation of all the reasons [Dr. Zhanel] believes Dr. Myers is correct." (D.I. 81

at 7–8) Dr. Riley is almost never mentioned in this portion of the Zhanel Report. Instead, in

these paragraphs, Dr. Zhanel offers detailed characterizations and conclusions regarding the data

of the '183 patent, going so far as to provide a claim-by-claim analysis of that patent rather than

merely contradicting the validity of the criticisms in the Riley Report.

  With the content of the Zhanel Report in mind, the Court now considers how the

*Pennypack* factors apply in the present circumstances.

## 2.  The *Pennypack* Factors

### a.  Surprise/Prejudice

  The Court first considers the extent to which the Zhanel Report came as a surprise to

Sandoz or would otherwise prejudice Sandoz, and whether any such prejudice could be cured.

*Pennypack*, 559 F.2d at 904. First, Sandoz claims that the "surprise disclosure" by Dr. Zhanel

14

"has prejudiced [it] . . . [with] the time and expense of a two-month impact on the case schedule."
(D.I. 81 at 1, 5)  Sandoz argues that it has been and will be prejudiced if Dr. Zhanel's testimony is
permitted because:  (1) Sandoz had to spend time and money reviewing the Zhanel Report and
briefing the instant motions; (2) if the Zhanel Report is not stricken, Sandoz will have to prepare
for and depose Dr. Zhanel; (3) in such a circumstance, Drs. Winkler and Riley will also need to
prepare new reply reports; and (4) Dr. Winkler had "virtually no time to review the [Zhanel]
[R]eport and include it in his deposition preparation." (*Id.* at 5; D.I. 100 at 6)

As to the "surprise" nature of the Zhanel Report, Sandoz's claims are not strong.  The fact
that Wyeth served a "sur-rebuttal" report from Dr. Zhanel should not have come as a great
surprise to Sandoz.  Although the Riley Report was not precluded by the Scheduling Order, the
filing of a reply report from a new expert (especially one in a different field of expertise from that
of prior experts) is, as the *Oracle* Court noted, an unusual occurrence.  Sandoz should reasonably
have expected that introducing Dr. Riley's opinions at that stage of expert discovery, in that
manner, was bound to produce some response from Wyeth.  Indeed, the Riley Report seems to
suggest as much, given Dr. Riley's acknowledgment that "Wyeth may serve an expert report
concerning one or more of the issues addressed [in her] report." (D.I. 82, ex. 5 at ¶ 4)

Moreover, as to Sandoz's claims of prejudice regarding the Zhanel Report's impact on its
resources and on the case schedule, any such impact can be largely mitigated.  It is true that
allowing some portion of the Zhanel Report would extend the expert discovery period for a
moderate length of time, in order to accommodate the deposition of Dr. Zhanel (along with that
of Dr. Riley).  In addition to the money it has expended regarding the instant motions, Sandoz
will also face moderate additional expense associated with Dr. Zhanel's deposition, which would

15

be avoided if his testimony was excluded entirely. However, Wyeth has repeatedly represented

that it will promptly make Dr. Zhanel available for a deposition (*see, e.g.*, D.I. 87 at 12), and

given the current posture of this case, there is still ample time for that deposition to take place.

Sandoz's ability to depose Dr. Zhanel well before trial will help mitigate any surprise or prejudice

it might have faced due to the late receipt of his report.[5] Similarly, the time remaining before the

June 2012 trial will likely allow the parties to find a time and venue for the deposition that is

convenient to Sandoz, which should minimize any associated expenses.

Lastly, contrary to Sandoz's claim, the Court does not believe that allowing some portion

of the Zhanel Report would justify the filing of additional reply reports from Dr. Winkler or Dr.

Riley. The Zhanel Report (with the exception of paragraphs 40–85), does not directly respond to

the Winkler Report, but instead is focused on criticizing Dr. Riley's limited methodological

analysis. Moreover, as Sandoz itself has acknowledged, Dr. Riley's report is directed to the

"usual analytical framework used by *microbiologists*." (D.I. 81 at 7 (emphasis added)) Because

Dr. Winkler is a chemist, not a microbiologist, any further report from him would be from a

different perspective as that provided by Drs. Riley and Zhanel, which lessens the need for such a

---

[5]      Courts have regularly found that when there is sufficient time for the opposing
party to depose an expert who serves an untimely report, this militates in favor of allowing the
expert's testimony. *Compare Paoli*, 35 F.3d at 792 (finding district court erred in excluding
untimely expert submission where the specifics of expert's testimony was provided to defendants
four months before trial and 60 days before end of expert discovery, giving defendants "abundant
time to depose" the expert before the discovery deadline) *and Power Integrations, Inc. v.
Fairchild Semiconductor Int'l, Inc.*, No. C.A. 04-1371-JJF, 2006 WL 2435083, at *1 (D. Del.
Aug. 22, 2006) (rejecting a party's claim that it would be prejudiced by a supplemental expert
report where the party had almost three weeks to review the report before having the opportunity
to depose the expert), *with Praxair*, 231 F.R.D. at 463 (excluding supplemental expert report
regarding summary judgement motions, but only where the "report was filed ten days before the
summary judgment motions were due, so plaintiffs had no opportunity to conduct rebuttal
discovery" for the motions).

16

report, at least at this juncture.[6]  Moreover, Sandoz has not identified a sufficient justification for Dr. Riley to serve another report, particularly given that Dr. Riley has not yet been deposed.  In light of the additional findings and conclusions set forth below, the Court believes that a deposition will likely offer Dr. Riley the opportunity to appropriately respond to Dr. Zhanel's opinions and elaborate on her own opinions from her report.

Sandoz's second claim of prejudice is addressed to the content of the Zhanel Report. Sandoz argues that allowing Dr. Zhanel to testify about paragraphs 40–85 of his report would cause it prejudice, because those paragraphs "go[] well beyond merely responding to [the Riley Report]," and instead are cumulative of Dr. Myers' opinions and provide "new, alternate grounds to support [those] opinions."  (D.I. 81 at 8; D.I. 100 at 1, 3)  I agree that permitting Dr. Zhanel to testify regarding these paragraphs of his report would cause prejudice to Sandoz, in a way that permitting his testimony on the remaining topics of the Zhanel Report would not.

Paragraphs 1–39 of the Zhanel Report provide:[7]  (1) necessary background information on Dr. Zhanel; (2) a helpful summary of the relevant technology at issue; or (3) a direct, specific response to Dr. Riley's criticisms of Dr. Myers.  For the reasons set forth above, Sandoz would be subject to minimal prejudice, at most, were it required to now marshal the resources necessary to

---

[6]     Similarly, although Sandoz complains that the late service of the Zhanel Report gave Dr. Winkler little time to review that report prior to his deposition, Sandoz does not specify how Dr. Winkler's deposition testimony was compromised as a result.  In the absence of the articulation of such prejudice, the Court is not convinced that an additional report from Dr. Winkler is warranted at this stage.

[7]     Paragraph 40 of the Zhanel Report primarily provides a summary of Dr. Zhanel's view of Dr. Riley's opinions.  However, it is located in a section of the Zhanel Report (section IV.C) that otherwise focuses on a claim-by-claim analysis of the '183 patent.  In restricting the Zhanel Report to paragraphs 1–39, I do not mean to exclude Dr. Zhanel from summarizing his opinions, consistent with the first four sentences of paragraph 40.

confront this limited, focused portion of the Zhanel Report. Moreover, these specific portions of the Zhanel Report are true rebuttal (albeit rebuttal not explicitly permitted by the Scheduling Order), in that they are a clear response to arguments made in Dr. Riley's reply.

However, in paragraphs 40–85 of his report, Dr. Zhanel conducts an extensive analysis of claims 2 and 99–103 of the '183 patent, repeatedly emphasizing the ways in which he agrees with Dr. Myers' view of those same claims. These paragraphs do not directly respond to the specific arguments made in the Riley Report[8] regarding Dr. Myers' use of individual bacterial strains to analyze certain compounds, nor to Dr. Myers' failure to analyze the mean MICs of various compounds.[9] Were Dr. Zhanel permitted to provide the type of broad testimony suggested in these paragraphs, the impact would be, as Sandoz suggests, tantamount to having "an additional expert witness to testify to the correctness of another expert's opinions." (D.I. 81 at 8); *cf. Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 763 F. Supp. 2d 671, 692 (D. Del. 2010) (allowing service of an additional rebuttal expert report, but only so long as it was "solely devoted to" the opinions that were introduced by the opposing expert). This type of wide-ranging analysis should have been provided at the opposition report stage—and indeed was provided, in significant part, by Dr. Myers.[10] Allowing Dr. Zhanel to opine on the contents of these many

---

[8]     Dr. Riley did not interpret the data of the '183 patent, nor undertake a claim-by-claim analysis of the patent. Instead, she confined her report solely to a discussion of particular *methods* that a microbiologist would (or would not) have applied to that data.

[9]     Indeed, at oral argument, counsel for both parties agreed that paragraphs 33 to 39 of the Zhanel Report were more explicitly directed to the core of Dr. Riley's analysis than were the remaining paragraphs of the Zhanel Report. (D.I. 114 at 25, 45–46)

[10]     This is underscored by the sheer number of times in paragraphs 40–85 of the Zhanel Report that Dr. Zhanel either summarizes or agrees with Dr. Myers' approach, or cites the Myers Report. (*See, e.g.,* D.I. 82, ex. 6 at ¶¶ 40–48, 56, 60–63, 69, 75, 83–85)

18

paragraphs would require Sandoz to outlay significant additional resources in response. Moreover, it would create an imbalance at trial, giving Wyeth two experts (to Sandoz's one) to provide claim-by-claim analyses of the '183 patent in connection with Sandoz's written description defense, even though one of those experts (Dr. Zhanel) did not file a timely report.

For the foregoing reasons, the *Pennypack* factors relating to surprise and prejudice weigh in favor of allowing testimony based on paragraphs 1–39 of the Zhanel Report, but not based on the remaining paragraphs of that report.

### b.     Potential Disruption to Trial

The next *Pennypack* factor requires the Court to assess whether allowing testimony based upon the Zhanel Report would potentially disrupt the trial proceedings. 559 F.2d at 904. As outlined in the preceding subsection, trial is months away, and the scope of that trial is still in flux. For instance, briefing on Sandoz's motion for summary judgment will not even be complete until later this month, and no motions *in limine* have yet been filed. Although both parties will need to prepare for expert testimony from Drs. Riley and Zhanel at trial, there is sufficient time to do so, especially if the scope of that testimony is appropriately cabined.[11] This is particularly true given that, unlike the typical patent case, which is tried to a jury and involves contested issues of infringement, this case is scheduled for a bench trial—where only issues of invalidity and enforceability could be contested. (D.I. 23 at 7) Given the streamlined nature of these proceedings (and Sandoz's failure to identify any specific disruption to trial that would likely occur), the Court finds that this factor weighs in favor of allowing Dr. Zhanel to testify in

---

[11]     *Cf. Praxair,* 231 F.R.D. at 463 (excluding supplemental expert report in circumstance where allowing additional discovery would "undoubtedly disrupt the trial process, [which was] set to begin in less than a month").

19

response to Dr. Riley's opinions.

### c.    Alleged Bad Faith or Willfulness

The Court must also assess whether Wyeth acted willfully or in bad faith by serving the Zhanel Report in contravention of the Court's Scheduling Order. 559 F.2d at 904–05. Sandoz does not explicitly use the term "bad faith" to describe Wyeth's service of the Zhanel Report. However, Sandoz does state that "while the parties spent weeks negotiating the expert deposition schedule after Sandoz served its rebuttal reports . . . [Wyeth] never disclosed [its] intent to serve" the Zhanel Report; it thus accuses Wyeth of making a "calculated decision" to "spring Dr. Zhanel's report on Sandoz." (D.I. 81 at 4–5) Wyeth strongly disputes this characterization, arguing that but for Sandoz's service of the Riley Report, "Wyeth would not have needed to submit . . . a rebuttal report from its own microbiology expert." (D.I. 87 at 11) Wyeth contends that rather than "intentionally withholding Dr. Zhanel's report, [it] responded as quickly as it reasonably could" to the Riley Report. (*Id.*) Wyeth represents that it had not planned to serve a report from its own microbiologist until receiving the Riley Report, did not contact Dr. Zhanel until after the Riley Report was served on December 14, 2011, and offered to make Dr. Zhanel available for a deposition before the close of expert discovery. (*Id.* at 12)

The Court discerns no evidence that Wyeth acted willfully or in bad faith by serving the Zhanel Report when it did. Although the parties may dispute whether the issue of how a microbiologist would interpret the data of the '183 patent should have been raised earlier, the first time it arose was in the context of Dr. Riley's report. As previously noted, it is understandable that Wyeth may have been surprised by Dr. Riley's entrance into the case. And it appears that it was the Riley Report—not any intentional effort to surprise Sandoz—that motivated Wyeth to

seek Dr. Zhanel's response. As such, the lack of any discernible bad faith on the part of Wyeth weighs in favor of permitting at least those portions of the Zhanel Report that truly rebut the Riley Report. *See, e.g., Johnson v. Portz*, 707 F. Supp. 2d 494, 499 (D. Del. 2010) (allowing testimony from a witness where there was "no indication of bad faith on the part of" the proponents of the testimony, which was first identified in response to late-raised issues, and where the testimony "[did] not represent a significant portion of the case").

### d. Importance of Testimony from Dr. Zhanel

The final *Pennypack* factor directs the Court to analyze the importance of the testimony from Dr. Zhanel to Wyeth. 559 F.2d at 904. Testimony from technical experts is often of paramount importance in patent cases. *See, e.g., Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1098 (N.D. Cal. 2004) (noting that "in high-technology patent infringement cases . . . the courts, as well as the public, rely on experts to explain complicated technologies"). Indeed, Wyeth asserts that it would suffer "extreme prejudice" if the Court strikes the Zhanel Report, whereby Dr. Riley's opinions would be "immunize[d] . . . from challenge by Wyeth." (D.I. 87 at 4, 13) Wyeth contends that Dr. Zhanel's testimony is essential because it "will allow for a complete airing by both parties of all the issues . . . [thus] providing the Court with a complete record on which to base its decision" in this case. (*Id.* at 13 (emphasis in original omitted))

For the reasons set forth above, the Court agrees with Wyeth that testimony from Dr. Zhanel—insofar as it responds directly to Dr. Riley's specific critiques—will be important to Wyeth at trial. Without Dr. Zhanel's testimony, Wyeth would be unable to try to rebut Dr. Riley's specific criticisms of Dr. Myers from a microbiological perspective. It is also likely to be

21

important to the Court, which would then have the benefit of opposing microbiological viewpoints when assessing the data of the '183 patent.[12] On the other hand, any testimony by Dr. Zhanel based upon paragraphs 40–85 of his report appears to be largely cumulative of Dr. Myers' conclusions. Such testimony would not have significant importance at trial, particularly because its substance could be conveyed in large part by another expert witness.

As with the other *Pennypack* factors, the importance of Dr. Zhanel's testimony in response to Dr. Riley weighs against the "extreme sanction" of striking the entire Zhanel Report.

### e.    Conclusion

In light of the analysis set forth above, the Court finds that although the Zhanel Report was untimely, the *Pennypack* factors weigh in favor of permitting Dr. Zhanel to testify about the subjects set forth in paragraphs 1–39 of his report. However, those same factors also counsel in favor of granting Sandoz's motion to strike paragraphs 40–85 of the Zhanel Report, and prohibiting Dr. Zhanel from testifying as to the content of those paragraphs. In light of its decision to strike those portions of the Zhanel Report that extend beyond the scope of the Riley Report, the Court finds no basis for Sandoz's request to serve "additional reply reports from Dr. Winkler and Dr. Riley."[13]  (D.I. 100 at 10 n.3)  The Court likewise finds no basis to award

---

[12]    Neither party has objected to the credentials or relevance of the testimony sought to be offered by Dr. Riley or Dr. Zhanel pursuant to the principles in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Under the Court's Scheduling Order, the deadline for making such motions has passed.  (D.I. 23 at 3)  Although the Court notes that Dr. Winkler opined that the art of the '183 patent is "multidisciplinary, spanning organic chemistry, medicinal chemistry, and microbiology," (D.I. 82, ex. 2 at ¶ 23), the issue of whether Drs. Riley and Zhanel (or any other experts that have served reports in this case) are appropriately considered persons of skill in the art of the '183 patent is not before the Court.

[13]    This decision does not alter the obligation of all parties to supplement their expert disclosures as required by Fed. R. Civ. P. 26(e)(2).

22

Sandoz any costs associated with the filing of its motion or with deposing Dr. Zhanel, given the limited nature of the Zhanel Report (as modified by this Order), the ample time remaining for Sandoz to schedule and prepare for Dr. Zhanel's deposition, and the other considerations discussed in this Order.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Sandoz's motion is GRANTED-IN-PART and that Wyeth's motion is DENIED. Dr. Riley will be permitted to testify based upon her report, as served on December 14, 2011. Dr. Zhanel will be permitted to testify only as to those portions of his report that are directly responsive to Dr. Riley's report, as outlined above.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single jointly proposed redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **March 21, 2012** for review by the Court. The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: March 14, 2012

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

23

# EXHIBIT HH

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTEGRA LIFESCIENCES CORP.,            )
INTEGRA LIFESCIENCES SALES LLC,        )
CONFLUENT SURGICAL, INC., and          )
INCEPT LLC,                            )
                                       )
                Plaintiffs,            )
                                       )
        v.                             )        Civil Action No. 15-819-LPS-CJB
                                       )
HYPERBRANCH MEDICAL                    )
TECHNOLOGY, INC.,                      )
                                       )
                Defendant.             )

## <u>MEMORANDUM ORDER</u>

Presently pending in this patent infringement case is Defendant HyperBranch Medical

Technology, Inc.'s ("Defendant" or "HyperBranch") letter motion to strike portions of Plaintiffs

Integra LifeSciences Corp., Integra LifeSciences Sales LLC, Confluent Surgical, Inc. and Incept

LLC's (collectively, "Plaintiffs") expert report offered by Plaintiffs' damages expert, John C.

Jarosz (the "Motion"). (D.I. 345)[1] The portions of Mr. Jarosz's report at issue are those that

provide a basis for seeking damages in the form of lost profits based on: (1) price erosion; and

(2) market share apportionment. For the reasons set forth below, the Court GRANTS-IN-PART

and DENIES-IN-PART Defendant's Motion.

---

[1]        Our Court has treated motions to strike as non-dispositive motions, which may be
resolved by the Court pursuant to 28 U.S.C. § 636(b)(1)(A) and D. Del. LR 72.1(a)(2). *See, e.g.,
Novartis Pharms. Corp. v. Actavis, Inc.*, Civil Action No. 12-366-RGA-CJB, 2013 WL 7045056,
at *1 n.1 (D. Del. Dec. 23, 2013); *Withrow v. Spears*, 967 F. Supp. 2d 982, 987 n.1 (D. Del.
2013) (citing cases). This is in line with decisions of other courts in this Circuit, which have also
treated such motions as non-dispositive, at least where the ultimate decision was not
determinative of a party's claims (just as the decision is not here). *See, e.g. Hawkins v.
Waynesburg Coll.*, Civil Action No. 07-5, 2007 WL 2119223, at *1 n.1 (W.D. Pa. July 20, 2007);
*Reedy v. CSX Transp., Inc.*, Civil Action No. 06-758, 2007 WL 1469047, at *1 n.1 (W.D. Pa.
May 18, 2007).

## I.    BACKGROUND

### A.    Procedural Background

Plaintiffs filed the instant case on September 15, 2015. (D.I. 1) Plaintiffs allege that HyperBranch directly and indirectly infringes the six asserted patents (directed to biocompatible crosslinked polymers, i.e., hydrogels, having certain features and methods for their preparation and use) by the manufacture, sale, and offers to sell of products including its Adherus AutoSpray Dural Sealant, Adherus Dural Sealant and Adherus Spinal Sealant. (D.I. 1 at ¶¶ 11-16, 28, 35, 42, 49, 56) The parties are direct competitors in the dural sealant market, as they are the only two FDA-approved suppliers in that market. (*See, e.g.*, D.I. 164 at 5, 29-30) Plaintiffs' competing dural sealant product is known as "DuraSeal." (*See, e.g.*, *id.* at 5)

On September 25, 2015, Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve all pretrial matters, up to and including the resolution of case-dispositive motions. (D.I. 15) After a lengthy preliminary injunction stage, the Court recommended denial of Plaintiffs' request for a preliminary injunction, (D.I. 164), and a schedule for the remainder of the case issued soon after, (D.I. 173). Fact discovery closed on May 26, 2017. (D.I. 278 at 5)

Pursuant to multiple Court-ordered amendments to the expert-related deadlines (all issued at the parties' joint requests), opening expert reports were due on September 8, 2017; rebuttal reports were due on October 2, 2017, and reply reports were due on October 13, 2017. (D.I. 322) Expert discovery closed on November 10, 2017, (D.I. 374), with dispositive motions due three weeks later, on November 21, 2017, (D.I. 322). A pre-trial conference is scheduled for April 6, 2018, and trial is to begin on April 16, 2018. (D.I. 173 at ¶ 24; July 28, 2017 Oral Order)

### B.    Factual Background

2

On September 9, 2016, Plaintiffs served Defendant with their Initial Identification of

Asserted Patents, Accused Products, and Damages Model, in which they stated as part of their

Initial Identification of Damages Model that for certain alleged infringement, they would seek

"lost profits (including a price erosion component) to the extent that those lost profits are not less

than a reasonable royalty." (D.I. 359, ex. A at 2) Two weeks later, on September 23, 2016,

Defendant served Plaintiffs with its First Set of Interrogatories, which included an interrogatory

seeking Plaintiffs' damages contentions as follows (hereinafter, the "first damages Interrogatory

request"):

> INTERROGATORY NO. 5 [13]. Describe in detail the amount,
> method of calculation, and all facts and evidence supporting any
> calculation for any damages You claim in this Action, and
> specifically identify and explain the damages suffered by each
> particular Plaintiff.

(D.I. 346, ex. B at 14) On October 27, 2016, Plaintiffs filed their Objections and Answers to

these interrogatories, and in response to Defendant's first damages Interrogatory request, they

stated, *inter alia*:

> OBJECTION AND ANSWER TO INTERROGATORY NO. 5
> [13]:
> . . . Plaintiff[s] further object to this Interrogatory as seeking
> information that is properly the subject of expert discovery and
> expert testimony in advance of the schedule set for the disclosure
> of expert reports and expert discovery as set forth in the
> Scheduling Order entered by the Court. Plaintiffs reserve the right
> to supplement this response to identify additional information
> and/or documents as more facts arise in discovery in accordance
> with the Rules. . . . For infringement in the United States, the
> monetary damages that only encompass a small portion of the total
> harm suffered by plaintiffs and would be equal to *at least
> plaintiff[s]'[] lost profits (or no less than a reasonable royalty)*[.]

(*Id.* at 14-15 (emphasis added))

Defendant was not satisfied with this response, and the parties had a meet-and-confer to "clarify Plaintiffs' position[]" with respect to Defendant's first damages Interrogatory request. (D.I. 346 at 1) Following up on that meet and confer, Defendant's counsel wrote a letter to Plaintiffs' counsel on November 2, 2016, asserting that, with respect to Defendant's first damages Interrogatory request, Plaintiffs stated during the meet-and-confer that "as of November 1, 2016, Plaintiffs have no factual evidence of any lost profits due to actual sales that were allegedly lost to sales by HyperBranch. Rather, Plaintiffs are relying solely on the theory that the relevant market is only a 'two party' market and that such lost sales are presumed under such circumstances." (*Id.*, ex. C at 2) Two days later, Plaintiffs responded by letter as follows:

> With respect to [Defendant's first damages Interrogatory request], your statement that Plaintiffs have no factual evidence of lost profits is an inaccurate summary of Plaintiffs' statements during the meet and confer. Specifically, Plaintiffs informed you that *it is their current understanding that the relevant U.S. market at issue in this case is a two party market. In a two party market, lost sales are presumed, such that each sale made by the accused infringer is a potential sale lost by the patent owner.* From that perspective, much of the evidence of lost sales is likely to be found in HyperBranch's own sales records. As Plaintiffs further informed you, and as set forth in their response to [Defendant's first damages Interrogatory request], that this interrogatory is directed to information that is properly the subject of expert discovery and Plaintiffs will provide the requested information consistent with the dates in the Court's Scheduling Order for the disclosure of expert reports and expert discovery.

(*Id.*, ex. D at 2 (emphasis added)) Plaintiffs never supplemented or amended their response to Defendant's first damages Interrogatory request. (*See* D.I. 346 at 1)

Towards the end of the fact discovery period, on April 26, 2017, Defendant served three additional interrogatories to Plaintiffs directed to ascertaining additional facts relevant to

4

Plaintiffs' damages theories. (*Id.*, ex. E at 11-17) In particular, Defendant requested that Plaintiffs: (1) "[i]dentify all products which compete with [] DuraSeal"; (2) describe in detail the facts and evidence supporting Plaintiffs' "assertion that the relevant market for purposes of [Plaintiffs'] infringement allegations and/or damages claim comprises the DuraSeal and the Accused Products to the exclusion of any other products"; and (3) describe in detail each sale Plaintiffs claim to have lost as a result of HyperBranch's alleged infringement. (*Id.* at 11-14)

In response to each of these three interrogatories, on May 26, 2017 (the last day of the fact discovery period), in addition to making objections, Plaintiffs affirmed their reliance on facts demonstrating that the relevant market was a two-party market. (*Id.* at 12 ("Plaintiffs rely on facts and evidence (including those identified in the previously served and future declarations of Mr. John Jarosz) that show that the appropriate U.S. market for DuraSeal[] products is the market for synthetic dural sealants approved for use in cranial and/or spinal procedures. In the U.S. market, the only known approved products that compete with DuraSeal[] are the Adherus AutoSpray Dural Sealant (NUS-106) and Adherus AutoSpray Extended Tip (ET) Dural Sealant (NUS-109)."); *id.* at 14 ("Plaintiffs rely on facts and evidence . . . that show that the market for FDA approved synthetic dural sealants for use in cranial procedures in the United States is limited to DuraSeal[] and the Adherus AutoSpray Dural Sealant (NUS-106) and Adherus AutoSpray Extended Tip (ET) Dural Sealant (NUS-109)."), *id.* at 16 ("Plaintiffs rely on facts and evidence . . . that show that each sale of the Adherus Autospray Dural Sealant (NUS-106) and Adherus Autospray Extended Tip (ET) Dural Sealant (NUS-109) in the United States is a lost sale of the DuraSeal[] product.")) Plaintiffs never amended or supplemented these responses either.

5

On September 8, 2017, Plaintiffs served Mr. Jarosz' damages expert report, (D.I. 329), which itself is dated August 25, 2017, (D.I. 346, ex. A (hereinafter, "Jarosz Report")). The Jarosz Report asserts that Plaintiffs are entitled to lost profits based on: (1) price erosion; and (2) market share apportionment based on synthetic sealants being used "much more frequently than non-synthetic sealants" in "certain types of surgeries[.]" (*See* Jarosz Report at ¶¶ 8, 10, 90-137, 318 and 320) With respect to Plaintiffs' price erosion theory, Mr. Jarosz calculated Plaintiffs' lost profits damages from price erosion as corresponding to the amount of additional profit Plaintiffs would have made on DuraSeal sales in the United States for which prices were eroded due to infringing competition by Defendant's products—an amount of        through March 2017, and        through April 2018. (*Id.* at ¶ 320) With respect to Plaintiffs' market share apportionment theory, Mr. Jarosz acknowledged in his report that some purchasers of Defendant's accused products in the relevant time period would *not* have purchased DuraSeal had the accused products been unavailable; he allowed that some of those sales would have been replaced by the purchase and use of fibrin glue, a non-synthetic sealant. (*Id.* at ¶¶ 100, 103, 113, 114) Mr. Jarosz then calculated Plaintiffs' lost profits damages for lost sales as corresponding to the amount of profit that Plaintiffs would have made on DuraSeal sales in the United States that were displaced by Defendant's products—an amount of between

through April 2017, and between        through April 2018. (*Id.* at ¶ 318) With respect to any infringing sales upon which Plaintiffs do not receive lost profits, Mr. Jarosz calculated reasonable royalty damages in the amount of        through April 2017, and        through April 2018. (*Id.* at ¶ 319)

On September 29, 2017, Defendant filed the instant Motion. (D.I. 345) With it,

6

Defendant requested that the Court strike Mr. Jarosz's analysis of and the conclusions drawn from the price erosion and market share apportionment theories set forth in his report, and that the Court preclude Plaintiffs from presenting these theories at trial.  (D.I. 346 at 3)[2]  On October 25, 2017, the Court held telephonic oral argument on the Motion.  (D.I. 377 (hereinafter, "Tr."))

## II.    LEGAL STANDARD[3]

Federal Rule of Civil Procedure 26 imposes a continuing obligation to timely supplement or correct discovery disclosures, requiring that "[a] party who has . . . responded to an interrogatory . . . must supplement or correct its . . . response:  (A) in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court." Fed. R. Civ. P. 26(e)(1)(A) & (B). "If a party fails to provide information or identify a witness [in the manner required by Rule 26], the party is not allowed to use that information or witness . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Additionally, pursuant to Federal Rule of Civil Procedure 16(f), the court may impose sanctions

---

[2]      Specifically, Defendant requests that the Court strike paragraphs 8, 10, 90-137, 318 and 320 of the Jarosz Report.  (D.I. 346 at 3)  Paragraphs 8, 90–121 and 318 relate to Plaintiffs' market share apportionment theory.  (*Id.*, ex. A)  Paragraphs 10, 122-137 and 320 relate to Plaintiffs' price erosion theory.  (*Id.*)

[3]      Because the discovery matters at issue here are not unique to patent law, the law of the United States Court of Appeals for the Third Circuit applies. *See INVISTA N. Am. S.A.R.L. v. M & G USA Corp.*, Civ. No. 11-1007-SLR-CJB, 2013 WL 3216109, at *1 (D. Del. June 25, 2013) (citation omitted); *Bridgestone Sports Co. Ltd. v. Acushnet Co.*, No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (citing *Micro Chem, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003)).

7

(such as the exclusion of expert testimony), including those authorized by Rule 37(b)(2)(A),[4] if,

*inter alia*, a party "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C);

*see also INVISTA N. Am. S.A.R.L. v. M & G USA Corp.*, Civ. No. 11-1007-SLR-CJB, 2013 WL

3216109, at *2 (D. Del. June 25, 2013).[5]

    Although a court clearly has the authority to strike an expert report and/or exclude

evidence (such as expert testimony) pursuant to Rule 37, it should be mindful that because "[t]he

exclusion of critical evidence is an extreme sanction," such a remedy should not be imposed

where an untimely or improper disclosure amounts to only a "slight deviation from pre-trial

notice requirements" or occasions only "slight prejudice" to the movant. *In re Paoli R.R. Yard

PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (internal quotation marks and citations omitted).

Instead, exclusion should be reserved for circumstances amounting to "willful deception or

flagrant disregard of a court order by the proponent of the evidence." *Id.* at 792 (internal

quotation marks and citations omitted); *see also Bridgestone Sports Co., Ltd. v. Acushnet Co.*,

No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (noting that while the

decision to exclude expert testimony is context-specific, "evidence should be excluded sparingly

and only in circumstances involving litigation conduct that is clearly unprofessional or

---

    [4]    Under Rule 37(b)(2)(A)(ii), if a party "fails to obey an order to provide . . . discovery . . . the court . . . may . . . prohibit[] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]" Fed. R. Civ. P. 37(b)(2)(A)(ii); *see also Meyer v. Callery Conway Mars HV, Inc.*, Civil Action No. 2:13-cv-00109, 2015 WL 65135, at *16 (W.D. Pa. Jan. 5, 2015).

    [5]    If portions of an expert report are stricken, that action effectively precludes the expert from testifying as to the subject matter and opinions contained in those portions of the report. *See, e.g., Withrow*, 967 F. Supp. 2d at 1000; *see also Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 604, 615 (D. Del. 2007).

inappropriate, and in circumstances creating prejudice to the party against whom the evidence is offered"); *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D. Del. 2005) (finding that although "the exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure [that] should be avoided where possible[,]" it can be appropriate to prevent against the "flouting of discovery deadlines[,]" so as to maintain "fidelity to the constraints of Scheduling Orders and deadlines[, which] is critical to the Court's case management responsibilities") (internal quotation marks and citations omitted), *rev'd on other grounds*, 543 F.3d 1306 (Fed. Cir. 2008).

In considering whether to exclude evidence relating to an untimely or otherwise improper disclosure, the United States Court of Appeals for the Third Circuit has directed district courts to weigh certain factors, known as "the *Pennypack* factors": (1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the testimony sought to be excluded. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997).

## III.   DISCUSSION

Below, the Court will first assess Defendant's Motion as it relates to Plaintiffs' disclosure of their lost profits theory relating to price erosion. Second, the Court will turn to Plaintiffs' disclosure of their lost profits theory relating to market share apportionment.

### A.   Price Erosion

9

Price erosion damages "fall under the lost profits umbrella." *See Global Traffic Techs., LLC v. Emtrac Sys., Inc.*, Civ. No. 10-4110 (ADM/JJG), 2012 WL 12899092, at \*3 (D. Minn. Dec. 20, 2012) (internal quotation marks omitted); *see also* (Tr. at 10). A lost profits claim based on a theory of price erosion "essentially alleges that due to the low sales price by the infringer, the patentee was forced to lower its sales price to stay competitive." *Syngenta Crop Protection, LLC v. Willowood, LLC*, Civ. No. 16-mc-171-RGA, 2016 WL 4925099, at \*3 (D. Del. Sept. 14, 2016); *see also W.R. Grace & Co.—Conn. v. Intercat, Inc.*, 60 F. Supp. 2d 316, 327 (D. Del. 1999). For the reasons set out below, the Court finds that Plaintiffs did not untimely disclose the price erosion component of their claim for lost profit damages.

At the beginning of the discovery period in this case (following the preliminary injunction phase), on September 9, 2016, Plaintiffs expressly informed Defendant that they intended to seek "lost profits (including a price erosion component)." (D.I. 359, ex. A at 2) To be sure, were it not for the fact of this (admittedly sparse) initial disclosure, Plaintiffs' lost profits theory based on price erosion would stand on shaky ground. This is because Plaintiffs' subsequent response to Defendant's first damages Interrogatory request approximately six weeks later (which was never supplemented) did not specifically mention price erosion, instead broadly referencing only "lost profits" or a reasonable royalty. Indeed, Plaintiffs failed to cite to *any* facts or evidence in support of their claim for "lost profits (or no less than a reasonable royalty)" in that response. (D.I. 346, ex. B at 15)

But Plaintiffs *did* make that initial disclosure, and that has to count for something here. Defendant was aware of the disclosure. And so, when Defendant then saw Plaintiffs' response to Defendant's first damages Interrogatory request, there was good reason for Defendant to believe

10

that when Plaintiffs were there referencing their plan to seek "lost profits" in the case, they were

referring to a plan to seek, *inter alia*, price erosion damages. If Defendant was unsure of whether

that was still Plaintiffs' plan after receiving Plaintiffs' response to the first damages Interrogatory

request, or if Defendant believed that Plaintiffs' response did not otherwise shed sufficient light

on the substance of their price erosion theory, then Defendant had options. It could have pressed

Plaintiffs to provide more detail by way of a further response on the price erosion issue.[6] And,

were it not satisfied with Plaintiffs' answer, Defendant could have moved to compel a more

complete response with regard to that issue.

There is little question in the Court's mind that if Defendant *had* brought that kind of

motion to compel, the Court would have granted the motion. After all, the first damages

Interrogatory request asked Plaintiffs to describe "in detail . . . all facts and evidence supporting

any calculation for any damages" Plaintiffs were seeking. (D.I. 346, ex. B at 14) And Plaintiffs'

response contained reference to basically no facts or evidence at all. That is unacceptable, and it

is a failing that would have been remedied had Defendant promptly sought such a remedy. *See,*

*e.g.*, *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, Civil Action No. 14-878-LPS-CJB, D.I.

101 at 1-2 (D. Del. Jan. 28, 2016) (granting a motion to compel a supplemental response to

defendant's interrogatory relating to plaintiff's claim for lost profits damages that "shall amount

---

[6]     The record does demonstrate that Defendant engaged in a further meet-and-confer
with Plaintiffs after receiving Plaintiffs' response to the first damages Interrogatory request. But
it appears that the focus of Defendant's frustration in that meet-and-confer was on Plaintiffs'
failure to elaborate and provide evidence in support of their theory of lost profits *from lost sales*.
That is what Defendant seems to have inquired about during the meet and confer, leading
Defendant to later write to confirm that Plaintiffs' lost sales-related theory was that "the relevant
market is only a 'two party' market[.]" (D.I. 346, ex. C at 2) It does not appear that Defendant
ever specifically followed up on Plaintiffs' initial, express disclosure that Plaintiffs' lost profits
theory of damages would include a price erosion component. (*See* Tr. at 14-15)

to a meaningful articulation of the bases for [plaintiff's] contention that it is entitled to such damages" and include "a narrative explanation as to how the information contained in [certain documents referenced in a supplemental response to the interrogatory] shed light on [plaintiff's] contention that it is entitled to lost profits damages").

But Defendant determined not to press the point further. Moreover, (and this is the key point here), because Plaintiffs *had previously disclosed* their plan to seek lost profits based on price erosion damages in September 2016, Defendant cannot now claim to be completely blind-sided by the fact that Plaintiffs' expert's report references that theory. Because of the fact of that prior disclosure, and Defendant's failure to follow up on it, this is one of those circumstances where: (1) it is true that Plaintiffs did not say much of anything in discovery on the topic, but (2) it is also true Defendant at least equally shares the blame for the fact that the discovery record is not more robust.

For these reasons, Plaintiffs did timely disclose their lost profits theory based on price erosion damages, and Defendant's Motion as it relates to that theory is DENIED. The facts relating to the other issue raised by Defendant, though, are very different. And they will compel a different outcome.

### B.   Market Share Apportionment

Sometimes the patentee and accused infringer are the only suppliers in the market, and in such a circumstance, the patentee would typically seek to recover lost profits from every sale made by the infringer. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989). That is because it can be reasonable to assume in this scenario (provided the patent owner has the necessary manufacturing and marketing capabilities) that the patent owner would have

made the infringer's sales. *Id.* In those instances, the application of the test for proving an

entitlement to lost profits is "usually straightforward and dispositive." *Id.*; *see also Micro

Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1322 (Fed. Cir. 1990) (referring to a "two-

supplier market" lost profits theory as a "simple" one).

But the United States Court of Appeals for the Federal Circuit has also recognized that

when there are multiple competitors in the market, a patentee may still prove entitlement to lost

profits damages from an alleged infringer, by using a market share apportionment theory. *State*

*Indus., Inc.*, 883 F.2d at 1577-78; *see also Micro Motion, Inc.*, 894 F.2d at 1322 (explaining that

"litigants have been held entitled to lost profits damages calculated on a portion of an infringer's

sales based on the patentee's market share"). A showing of entitlement to lost profits damages

based on a market share appointment theory (or an accused infringer's efforts to contest such a

showing) will necessarily be more complicated than reliance on the "straightforward" two-party

market theory.

The Court agrees with Defendant that Plaintiffs had an obligation to disclose their market

share apportionment theory well before they served Defendant with the Jarosz Report on

September 8, 2017. It also agrees that Plaintiffs failed to fulfill this obligation. The Court will

first explain why all this is so. Then it will examine how the *Pennypack* factors inform the

decision as to whether evidence regarding the theory should be excluded.

### 1.    Timeliness of Plaintiffs' Disclosure of their Market Share Apportionment Theory of Lost Profits Damages

The Court here reaches a different conclusion with respect to the timeliness of Plaintiffs'

disclosure of their market share apportionment theory than it did above with respect to Plaintiffs'

13

disclosure of their price erosion theory. This is because not only did Plaintiffs *never disclose* a market share apportionment theory, but they also instead disclosed (and repeatedly confirmed their reliance on) a theory that is in real conflict with that theory: "that the relevant U.S. market at issue in this case is a two party market." (D.I. 346, ex. D at 2; *see also, e.g., id.*, ex. E at 11-17) And never until Defendant received Mr. Jarosz's report, served on September 8, 2017, was Defendant made aware that Plaintiffs' theory had changed. This was not a timely supplementation of Plaintiffs' damages theory regarding lost profits from lost sales.

Plaintiffs seem to assert two primary reasons why they were justified in doing what they did here. First, Plaintiffs note that in addition to stating their reliance on a two-player market theory in their interrogatory responses and related communications, they also: (1) objected that Defendant's damages-related interrogatories prematurely called for expert analyses, and (2) indicated that their responses "rely on facts and evidence (including those identified in the previously served and future declarations of Mr. John Jarosz)[.]" (D.I. 358 at 2-3 (internal citations omitted)) This, Plaintiffs assert, somehow excuses their failure to disclose facts relating to the market share apportionment theory until the Jarosz Report was served. (*Id.*) Second, Plaintiffs assert that their newly-disclosed theory "is consistent with the position that *Defendant* has taken throughout this litigation[,]" and that, as a result, it can be said that the information used by Mr. Jarosz was made known to Defendant during the discovery period in compliance with Federal Rule of Civil Procedure 26(e)(1)(A). (*Id.* at 3 (emphasis added))

Below, the Court will address why it disagrees with Plaintiffs on both points. And then it will further explain why Plaintiffs should have earlier supplemented the relevant interrogatory responses.

14

###### a. Plaintiffs' Arguments are Not Persuasive

####### (1) Plaintiffs' Reason #1: The Requests were "Premature"

Plaintiffs' first asserted reason why there was no discovery violation here is that the interrogatories prematurely called for expert analysis. But it is worth remembering that interrogatories (including those directed to exploring the basis for a patentee's claim for damages) serve a meaningful, significant purpose in a case like this. Indeed, the "purpose of contention interrogatories is to narrow and define issues for trial and to enable the propounding party to determine the proof required to rebut the respondent's position." *CIBA Vision Corp. v. Bausch & Lomb, Inc.*, Civil Action No. 2:99-CV-0034-RWS, 2003 WL 25774307, at *3 (N.D. Ga. Dec. 22, 2003) (internal quotation marks and citation omitted).[7]

The responding party's goal in answering interrogatories, then, should not be (as Plaintiffs suggested their goal was here) to (1) answer as "briefly" as possible, and then (2) simply rely on a later-filed expert's report, served after discovery closes, in order to disclose contrary positions. (Tr. at 48) Instead, Defendant was entitled to learn something about the facts

---

[7]     *See also, e.g.*, *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012) ("Contention interrogatories . . . serve an important purpose in helping to discover facts supporting the theories of the parties. Answers to contention interrogatories also serve to narrow and sharpen the issues thereby confining discovery and simplifying trial preparation."); *Bayer Healthcare Pharms., Inc. v. River's Edge Pharms., LLC*, CIVIL ACTION FILE NO.: 1:11-cv-1634-HLM, 2015 WL 11142425, at *7 (N.D. Ga. July 31, 2015) (explaining that the "entire point of [an] interrogatory request is to allow the propounding party to identify the facts and evidence the responding party intends to rely on for particular issues so that the propounding party can determine whether and how to proceed. Such interrogatory requests focus discovery and relieve the propounding party from having to guess or surmise which of the myriad of documents produced and legal theories available to the responding party the responding party intends to pursue"); *First Health Grp. Corp. v. United Payors & United Providers, Inc.*, No. 96 C 2518, 1999 WL 515499, at *1 (N.D. Ill. July 12, 1999) (explaining that the "whole purpose [of a damages contention interrogatory is] to get out on the table plaintiff's damages contentions so that defendant could explore them during the discovery period").

15

that Plaintiffs' damages expert would be relying upon prior to being served with the Jarosz

Report, so that those facts could then be vetted in discovery. *See, e.g., THX, Ltd. v. Apple, Inc.*,

Case No. 13-cv-01161-HSG (DMR), 2016 WL 2899506, at \*7-8 (N.D. Cal. May 13, 2016)

(granting a motion to compel a supplemental response to a damages interrogatory where the

plaintiffs' "disclosure and responses are insufficient, for they do not provide any specifics as to

[the plaintiff's] basis for damages in this case" and because "[c]ourts in this district have

compelled patent plaintiffs to provide the factual bases for their damages claim through initial

disclosures and written discovery, over protestations that responsive information will be

forthcoming through expert reports"); *In re Cyclobenzaprine Hydrochloride Extended-Release*

*Capsule Patent Litig.*, Civ. No. 09-MD-2118-SLR, Civ. No. 08-889-SLR, 2013 WL 12291705,

at \*1 (D. Del. Oct. 22, 2013) (explaining that while "the final calculation of damages is properly

the subject of expert opinion. . . . experts must rely on facts for their opinions" and a party must

disclose such facts in the course of fact discovery, *before* they are presented in expert reports);

*Mobile Storage Tech., Inc. v. Fujitsu Ltd.*, No. C 09-03342 JF (PVT), 2010 WL 1292545, at \*1

(N.D. Cal. Mar. 31, 2010) (granting defendant's motion to compel with respect to an

interrogatory seeking the factual basis for plaintiff's damages claim and requiring plaintiff to

"provide [*inter alia*] the factual basis for its damages claim [and] the identification of all facts to

support its damages theories").[8] That did not happen here.

### (2)    Plaintiffs' Reason #2:  Reliance on Defendant's Position

Plaintiffs' other asserted justification for their failure to supplement is that their newly

---

[8]    *Cf. INVISTA N. Am. S.a.r.l.*, 2013 WL 3216109, at \*5 (granting motion to strike new and untimely disclosed defense where such defense "alters the entire infringement and non-infringement landscape that was developed and vetted during fact and expert discovery").

disclosed market share apportionment theory "is consistent with the position that *Defendant* has taken throughout this litigation" and that therefore the information used by Mr. Jarosz was "made known to Defendant during the discovery process." (D.I. 358 at 3 (emphasis added)) However, a party's duty to supplement discovery responses set out in the Rules would be meaningless if a party could later simply point to cherry-picked information produced by its *opponent* as fulfilling the party's duty. *Cf. Hologram USA, Inc. v. Pulse Evolution Corp.*, Case No. 2:14-cv-00772-GMN-NJK, 2016 WL 3965190, at *2 (D. Nev. July 21, 2016) (explaining that Rule 26(e) "is not a loophole through which a party who . . . wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has long passed") (internal quotation marks and citations omitted).[9] As noted above, Federal Rule of Civil Procedure 26(e)(1)(A) requires a party to

---

[9]       Plaintiffs cite to two cases in support of the proposition that "[r]esponses to any interrogatories seeking factual information used by Mr. Jarosz in reaching his opinions were clearly supplemented and that information was disclosed in accordance with Fed. R. 26(e)(1)[,]" (D.I. 358 at 4), but the cited cases are distinguishable from the facts at hand. In *Marical, Inc. v. Cooke Aquaculture Inc.*, 1:14-cv-00366-JDL, 2017 WL 3812866 (D. Me. Aug. 31, 2017), the court denied the motions to strike at issue where the late disclosures did not "fundamentally change" the expert's opinion and "do not involve unfair surprise[.]" 2017 WL 3812866, at *2-3. Here, in contrast, the Court is sympathetic to Defendant's claim of surprise where Plaintiffs repeatedly disclosed in discovery a theory that is in real conflict with a theory found in their expert report. And in *Baltimore Aircoil Co., Inc. v. SPX Cooling Techs. Inc.*, Civil No. CCB-13-2053, 2016 WL 4426681 (D. Md. Aug. 22, 2016), the Court found that deposition testimony that had identified a potential witness amounted to sufficient supplementation under Rule 26(e)(1), and put the defendant on notice that this witness (who had not previously been mentioned as a person with knowledge of the subject matter in plaintiff's prior discovery responses) indeed had relevant information. 2016 WL 4426681, at *21-22. That scenario is a far cry from relying on a completely different theory of damages for the first time in an expert report, which is what is now before the Court. (D.I. 365 at 2 n.2) Indeed, in the same opinion, the *Baltimore Aircoil* Court excluded the patentee's late disclosed opinion on the doctrine of equivalents, explaining that the untimely disclosure "deprived [defendant] of the opportunity to conduct meaningful discovery on this new theory of infringement" and "[a]llowing [the plaintiff] to advance this position after the close of fact discovery would significantly prejudice [defendant]." 2016 WL 4426681, at *16-

17

supplement or correct an interrogatory response in a timely manner if the party learns that the

response is incorrect, and if the additional or corrective information "has not otherwise been

*made known to the other parties* during the discovery process or in writing." Fed. R. Civ. P.

26(e)(1)(A) (emphasis added). It makes no sense (as Plaintiffs attempt to do here) to point to

*HyperBranch*'s expert's declaration and deposition, documents produced by *HyperBranch*, and

*HyperBranch's* questions to Plaintiffs' Rule 30(b)(6) deponent as the portions of the record that

fairly made it known that *Plaintiffs* would be taking the position that there were more than two

choices in the relevant market. (D.I. 365 at 1-2) A party cannot be expected to fairly understand

what an opponent's position will be by being required to look inside its own mind for the answer.

### b. Plaintiffs Should Have Earlier Supplemented Their Interrogatory Responses Relating to Damages

Ultimately, having rejected Plaintiffs' arguments to the contrary, the Court concludes that

Plaintiffs did not timely supplement their discovery responses relating to lost profit damages

from lost sales.

As mentioned above, a key part of Plaintiffs' argument here is that Defendant should

have realized, during the discovery period, that Plaintiffs were (or at least soon would be)

abandoning their two-player/product theory—and that Plaintiffs would instead be asserting that

the appropriate market includes more than just DuraSeal and Defendant's products. (D.I. 358 at

3-4; *see also* Tr. at 32-35) In fact, Plaintiffs go so far as to assert that "to say that [D]efendant

did not know about a potential opinion [from Plaintiffs] that the appropriate market includes

more than just DuraSeal and Adherus or that an appropriate market share allocation may be less

---

17.

than 100% is disingenuous at best." (D.I. 358 at 4)  In support of this strong statement, Plaintiffs

point to a significant amount of discovery that was provided and obtained during the discovery

period (dating from early 2016); Plaintiffs assert that this discovery made it clear that they would

be taking the "more than two-player market" position in this case.  (D.I. 358 at 4; *see also* Tr. at

32-33 (Plaintiffs' counsel stating that, in light of what was disclosed in discovery, Defendant was

not "surprised at all that we were going after these types of losses [e.g., losses attributable to a

market share apportionment theory]"))  More specifically, Plaintiffs point to the following

categories of information, (D.I. 358 at 3-4):

> (1) opinions of Defendant's own damages expert, Douglas Kidder, from early Spring 2016, in which Mr. Kidder stated that lost profits might be an appropriate damages methodology, that fibrin glue was a part of the relevant market, and that he would expect to follow a market-share apportionment theory "with particular attention to the switching behavior of surgeons and the reasons for any such switching[,]" (D.I. 359, ex. C at ¶ 70; *see also id.*, ex. D at 89-90, 107, 110-12);

> (2) evidence HyperBranch produced during discovery, such as a document entitled "Estimated DuraSeal U.S. Marketplace Share in 2015 Based on Adherus Distributor Questionnaire Responses," (*see* D.I. 358 at 3);

> (3) documents produced by Plaintiffs on December 23, 2016, (*see id.* & D.I. 359, ex. E); and

> (4) June 6, 2017 deposition testimony of Plaintiffs' Rule 30(b)(6) witness, Curtis Lenox, in response to questions from Defendant's counsel, (D.I. 359, ex. F at 27-43, 55-57, 110-13, 138-42, 147-48, 200-05, 222-24, 227-29 & 233-38), in which Mr. Lenox testified, *inter alia*, that fibrin glue is often used instead of DuraSeal for dural sealing, and provided views on the relative market share captured by DuraSeal and fibrin glue products.

But this line of argument proves too much.  That is because the logical extension of the

argument is that if Defendant had to know, as early as 2016, that Plaintiffs would be asserting

that the market was broader than a two-party market, then *Plaintiffs had to know that too at the*

*same time.* At a minimum, Plaintiffs surely would have been on notice that this was going to be

their theory immediately following Mr. Lenox's deposition, in which, according to Plaintiffs, Mr.

Lenox testified "all about" the relevant market and how it included fibrin glue options. (Tr. at

32) Yet Plaintiffs never supplemented their interrogatory responses. (D.I. 346, ex. E at 12-17)

This constitutes a violation of Rule 26(e)(1). *See, e.g.*, *Woods v. DeAngelo Marine Exhaust, Inc.*,

692 F.3d 1272, 1280 (Fed. Cir. 2012) ("Rule 26(e) requires that as theories mature and as the

relevance of various items of evidence changes, responses to interrogatories, and particularly

contention interrogatories, be corrected or supplemented to reflect those changes."); *Goodman-*

*Gable-Gould Co. v. Tiara Condo. Ass'n Inc.*, 595 F.3d 1203, 1210-13 (11th Cir. 2010) (affirming

the district court's exclusion of evidence relating to a new theory and category of damages, and

finding that statements made during a deposition and references to expenses in a discovery

supplement did not provide notice of the party's new theory of liability and damages claimed;

instead the party "had a duty to supplement [its interrogatory responses] if it would introduce

evidence on the" new liability and damages theories at trial) (cited in *Woods*, 692 F.3d at 1279).

The Court also takes a moment to address a seemingly inconsistent and irreconcilable

argument that Plaintiffs made during oral argument on the Motion. During oral argument—and

despite the above-referenced position taken in their briefing (that discovery produced during the

case should have made it long clear to Defendant that Plaintiffs would be abandoning the two-

party market theory)—Plaintiffs' counsel now was asserting that even *Plaintiffs* did not know

that they would be relying on a market share apportionment theory until Plaintiffs' counsel

20

reviewed Mr. Jarosz's draft report (which was generated months after the close of the fact discovery period). (Tr. at 33 ("Your Honor, until [Mr. Jarosz] did his calculation, how could we even know that that was the way we were going to go forth?"); *id*. at 37-38) That assertion, obviously, is completely inconsistent with Plaintiffs' above-referenced position that *Defendant* should have *anticipated* many months earlier that Plaintiffs were (or were going to be) relying on this market share apportionment theory, based on the content of discovery. (*Id.* at 32-33)

The Court does not credit this late-provided, inconsistent argument. Federal Rule of Civil Procedure 26(g)(1) requires that when an attorney signs a discovery response, he or she "certifies that to the best of the person's knowledge, information and belief formed *after a reasonable inquiry*" that the response is not "unreasonable[.]" Fed. R. Civ. P. 26(g)(1) (emphasis added); *see also* Fed. R. Civ. P. 26(g)(1) advisory committee's note to 1983 amendment (explaining that Rule 26(g)(1) "imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of [the Federal Rules regarding discovery]. . . . The rule simply requires that the attorney *make a reasonable inquiry into the factual basis* of his response, request, or objection") (emphasis added); *Woods*, 692 F.3d at 1279 (noting that "Rule 26 imposes an obligation on parties to conduct a reasonable inquiry into the factual basis of their discovery responses"). It is the fault of Plaintiffs for not earlier identifying and disclosing that they would be relying on a market share apportionment theory—especially when, throughout the discovery period, Plaintiffs continued to double down on their repeated assertion to the contrary. In May 2017, for example, as the discovery period was closing, Plaintiffs prepared and sent responses to Defendant's damages interrogatories in which Plaintiffs again expressed their two-party market theory. And yet by Plaintiffs' own admission: (1) Plaintiffs did

21

not consult with their expert, Mr. Jarosz, before they submitted those interrogatory responses, (Tr. at 38-39), and (2) it should have been clear at that time to Plaintiffs that they were in fact going to be relying on a different theory.[10]

For all of the above reasons, the Court determines that Plaintiffs' market share apportionment theory, first articulated in the Jarosz Report, was untimely. The Court must next assess whether the relevant portions of the report should be stricken by applying the *Pennypack* factors.

## 2.    Application of *Pennypack* Factors

The Court agrees with Defendant that the first *Pennypack* factor clearly weighs in its favor. Plaintiffs' failure to disclose the market share apportionment theory prior to service of the Jarosz Report understandably surprised Defendant, especially in light of Plaintiffs' prior repeated reliance on a completely different, contrary theory. (*See* D.I. 346 at 2) And this late disclosure could cause prejudice to Defendant. If the market share apportionment theory remained in the case, Defendant will be required to address it at a disruptive time, when the parties are otherwise preparing for the filing of case dispositive motions. Defendant has suggested that to sufficiently do so, it will need to undertake a significant amount of additional discovery including: (1) third-party depositions, in-depth interviews, and/or scientific surveys of hospitals and surgeons as to

---

[10]    Additionally, once Plaintiffs' counsel reviewed the draft Jarosz Report (the final version of which was dated August 25, 2017), Plaintiffs should have then immediately supplemented their incorrect series of discovery responses. At least this would have allowed Defendant and the Court to recognize and assess this issue earlier. Instead, Plaintiffs did nothing, and simply served the Jarosz Report on September 8, 2017. This required Defendant to independently find and realize the shift in theories after the report was served, and then to respond appropriately. This, in turn, meant that the issue was not presented to the Court until late September/early October 2017.

22

the players that make up the relevant market and as to surgeon preference regarding a preferred

dural sealant for various types of procedures; (2) testing the information that Mr. Jarosz relied

upon for his market share apportionment theory; and (3) obtaining business reports from third-

party market share firms. (*Id.*; Tr. at 21-23)

Plaintiffs' arguments to the contrary on the prejudice issue are not persuasive. Plaintiffs

contend that Defendant should not be prejudiced because Mr. Jarosz relied on Defendant's own

evidence in forming his opinion. (D.I. 358 at 4-5) But it is a substantively different thing for

Defendant (on the one hand) to go about discovery by mainly trying to disprove Plaintiffs'

position that the relevant market is a two-party market, as opposed to (on the other hand) being

focused on using the discovery period to delineate exactly what the scope of a more-than-two-

party/product market actually looks like. (*See* Tr. at 51) The former is a more "straightforward"

issue to defend against, *State Indus., Inc.*, 883 F.2d at 1578, while the latter would require

significantly different (and more expansive) discovery efforts. Plaintiffs also miss the point

when they assert that Defendant has not been prejudiced because Defendant's damages expert

was able to submit a rebuttal report, in which he opined on the appropriate market share

allocation. (D.I. 358 at 5) In that rebuttal report, Defendant's expert expressly noted Plaintiffs'

late disclosure and how it had resulted in an incomplete factual record regarding the relevant

market. (D.I. 359, ex. H at ¶¶ 65-66) That Defendant's expert was able to provide some

response does not "replace the months of analysis and discovery that HyperBranch would have

conducted had it known Plaintiffs' true damages theories." (D.I. 365 at 2)[11]

_____

[11]     For example, while Defendant's expert, Mr. Kidder, cites to some third-party data
that helps to articulate the scope of a more-than-two-party/product market, (*see, e.g.*, D.I. 359,
ex. H at ¶ 27), he repeatedly explains how more data is needed to determine whether the relevant

23

As to the second and third *Pennypack* factors, while Defendant could cure the prejudice it faces by undertaking the discovery referenced above, the Court is doubtful that this cure could be accomplished in sufficient time so as to avoid disruption of the pre-trial process and the trial. Trial is set to begin in five months, with case-dispositive and *Daubert* motions due in one week. Defendant estimates that it will need "significant additional fact discovery" that would take months to obtain, in order to be in a position to sufficiently rebut Plaintiffs' market share apportionment theory. (D.I. 346 at 3; *see also* D.I. 365 at 2) In the Court's view this does not seem to be an unreasonable estimate, since at least the bulk of the discovery needed will be third-party discovery.[12] (*See, e.g.*, D.I. 359, ex. H at ¶ 64 (Defendant's expert asserting that "third party data" is needed for reliable market share figures)) But the current schedule to trial would not allow for that kind of disruption. These factors then favor Defendant's position.

With respect to the fourth *Pennypack* factor—whether Plaintiffs acted willfully or in bad faith by failing to supplement their response to the damages Interrogatory request—courts have tended to reserve such a finding for clear, egregious examples of misconduct. *See Novartis Pharms. Corp. v. Actavis, Inc.*, Civil Action No. 12-366-RGA-CJB, 2013 WL 7045056, at *11

---

market should be defined more broadly and/or what the contours of that market are, (*id.* at ¶¶ 57, 64, 65, 69).

[12] This is in contrast to other cases from this Court in which motions to strike have been denied and the opposing party permitted to proceed with late-disclosed theories. *See, e.g.*, *GlaxoSmithKline LLC v. Teva Pharms. USA Inc.*, Civil Action No. 14-878-LPS-CJB, D.I. 243 at 20 (D. Del. Jan. 20, 2017) (denying motion to strike late-disclosed damages theory where the theory did not appear to be "especially complex," and where "even by Defendant's estimate any supplemental discovery" would be "focused" and "could be completed in a short timeframe"); *cf. Insight Equity v. Transitions Optical, Inc.*, No. 10-cv-635 (RGA), 2016 WL 7031281, at *2 (D. Del. Nov. 30, 2016) (denying motion to strike plaintiff's damages theory and allowing plaintiffs to submit an alternative damages model and report, where trial was scheduled for seven months away and plaintiffs were required to base their new theory on "facts currently in the record").

(D. Del. Dec. 23, 2013); *Withrow v. Spears*, 967 F. Supp. 2d 982, 1006 (D. Del. 2013) (citing cases). Under this *Pennypack* factor, courts may also consider the non-movant's justifications for failing to timely disclose the relevant information. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012).

Here, as explained above, Plaintiffs should have earlier served a supplemental interrogatory response articulating the facts underlying their market share apportionment theory. The Court is not satisfied with Plaintiffs' wanting (and at times inconsistent) explanations for their failure to do so. At best, Plaintiffs' approach here amounted to disregard for their discovery obligations, and was not a responsible approach to take. But on the other hand, there is no direct evidence of bad faith or a willful intent to sandbag Defendant (as opposed to mere negligence). And so the record falls a bit short of the type of heightened or "egregious" showing of bad faith required by the caselaw in this Circuit. Thus, this factor does not favor exclusion of the evidence (though it does not exactly provide strong support for Plaintiffs' position, either).

As to the final *Pennypack* factor, Plaintiffs' market share apportionment theory is surely important to their case. Plaintiffs seek, pursuant to the theory, between ▮▮▮▮▮▮▮▮▮ from lost sales through April 2018, which constitutes a significant amount of their overall damages estimate. (D.I. 346, ex. A at ¶ 318; *see also* D.I. 358 at 5) The Court notes, however, that the lost profits damages allegedly at issue here are not as large as they are in many other competitor patent infringement cases. This is likely because Plaintiffs currently appear to have a much larger share of the relevant market (as compared to Defendant). (*See, e.g.*, D.I. 346, ex. A at ¶¶ 94-95 (noting that between July 2015 and April 2017, Defendant sold ▮▮▮▮ of the accused products in the United States and generated revenues of ▮▮▮▮▮, while Plaintiffs

25

sold [redacted] in the United States and generated revenues of [redacted] ))

Additionally, exclusion of evidence relating to this theory would not foreclose Plaintiffs'

damages case entirely. Plaintiffs would be able to assert a right to lost profits damages from

price erosion and reasonable royalty damages, (D.I. 346, ex. A at ¶¶ 319-20), and could further

seek injunctive relief if they prevail, (*see id.*, ex. B at 14-15 (Plaintiffs noting that "monetary

damages [] only encompass a small portion of the total harm" in the case)). Moreover, the Court

would permit Plaintiffs to submit a supplemental damages expert report in which they could

pursue the lost profits theory that they disclosed throughout the case—one based on a two-player

market—if Plaintiffs wished to do so and thought they could do so credibly. This factor, then,

favors Plaintiffs but not to an overwhelming degree.

A majority of the *Pennypack* factors militate in favor of granting the sanction called for

by Defendant's Motion. And indeed, the Court believes that such a sanction is warranted here.

Again, this is a case where:

> (1) Plaintiffs consistently promoted a particular theory of damages
> throughout the case.
>
> (2) Plaintiffs repeatedly reaffirmed their reliance on that theory in
> the face of continued efforts by Defendant to ascertain whether
> Plaintiffs' position had changed.
>
> (3) Plaintiffs reaffirmed that reliance again at the end of the
> discovery period without consulting their own damages expert.
>
> (4) Plaintiffs did not disclose a new, contrary theory until the time
> when their damages expert's report was submitted.
>
> (5) Plaintiffs, by their own admission, should have known that they
> would be asserting this new theory many months (perhaps over a
> year) before they disclosed it.

>(6) At oral argument, Plaintiffs introduced a new explanation for
>why they had not earlier disclosed this theory, which seems to
>contradict their prior arguments.
>
>(7) The new disclosure would require significant new discovery,
>significant re-adjustment to the pre-trial schedule, and would likely
>threaten the trial date.

In light of all of this, the Court will GRANT the motion as it relates to Plaintiffs' lost profits theory based on market share apportionment. *See, e.g.*, *Greatbatch Ltd. v. AVX Corp.*, Civil Action No. 13-723-LPS, D.I. 381 (D. Del. Aug. 17, 2015) (granting motion to strike late-filed infringement contentions where those contentions reflected a "new infringement theory [that is] inconsistent with its previous theory" and "prejudice [] could not be cured without dramatic change to the case schedule, which includes summary judgment motions being filed a week from now"); *Silver State Intellectual Techs., Inc. v. Garmin Int'l, Inc.*, 32 F. Supp. 3d 1155, 1166-67 (D. Nev. 2014) (granting motion to strike amendments adding two references as prior art for two of the asserted patents where "[a]lthough [the plaintiff/patentee] knew about these prior art references, [the plaintiff] did not know until the last day of discovery that [defendant] was contending both prior art references applied to both patents" and the plaintiff would "therefore [] be prejudiced by the late amendment"); *World Wide Stationary Mfg. Co., Ltd. v. U.S. Ring Binder, L.P.*, No. 4:07-CV-1947 (CEJ), 2009 WL 1605866, at *2 (E.D. Mo. June 8, 2009) (granting motion barring plaintiff from relying on a particular product model (EZ Comfort) on which to base its claim of lost profits, where during fact discovery, the patentee asserted it was relying on a different product model for its lost profits claim and where the patentee did not produce lost profit information regarding EZ Comfort until eight days after fact discovery had closed, despite having such information during the discovery period).

## IV.    CONCLUSION

For the reasons set forth above, the Court hereby ORDERS that the Motion is GRANTED-IN-PART and DENIED-IN-PART. The portions of the Jarosz Report relating to Plaintiffs' lost profits theory based on price erosion will not be stricken. The portions of the Jarosz Report relating to Plaintiffs' lost profits theory based on market share apportionment will be stricken.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **November 17, 2017** for review by the Court, along with a motion for redaction that includes a clear, factually-detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: November 14, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

28