IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PHARMACYCLICS LLC and JANSSEN BIOTECH, INC. | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.:  18-192-CFC (CJB) (CONSOLIDATED) |
| v. | ) ) | ███████████████ |
| CIPLA LIMITED, et al., | ) ) | ███████████████ |
| Defendants. | ) ) | **REDACTED - PUBLIC VERSION** |
| PHARMACYCLICS LLC and JANSSEN BIOTECH, INC. | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.:  19-434-CFC (CJB) |
| v. | ) ) | ███████████████ |
| ALVOGEN PINE BROOK LLC and NATCO PHARMA LTD., | ) ) ) | ███████████████ |
| Defendants. | ) ) | **REDACTED - PUBLIC VERSION** |

## <u>ALVOGEN'S OPENING POST-TRIAL BRIEF</u>

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Steven W. Lee (No. 6676)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
slee@ycst.com

PROSKAUER ROSE LLP
Siegmund Y. Gutman
Amir A. Naini
David M. Hanna
Christopher D. Lynch
Michelle M. Ovanesian*
2029 Century Park East, Suite 2400
Los Angeles, CA  90067-3010
(310) 557-2900

Gourdin W. Sirles
Kimberly Q. Li
One International Place
Boston, MA  02110-2600
(617) 526-9600

*Admitted to Practice in Delaware and
Washington, D.C. Only

*Attorneys for Alvogen Pine Brook LLC and Natco Pharma Ltd.*

Filed:  December 23, 2020

      Served:  November 25, 2020

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................1

II.   LEGAL STANDARDS...........................................................................2

    A.    Anticipation ..................................................................................2

    B.    Obviousness..................................................................................2

        1.    Secondary Considerations.......................................................3

    C.    Written Description.........................................................................5

    D.    Enablement ....................................................................................5

III.  INVALIDITY OF THE COMPOUND CLAIM .........................................6

    A.    Summary .......................................................................................6

    B.    Anticipation ..................................................................................7

        1.    Pan Anticipates the Compound Claim.....................................7

        2.    The Compound Claim Cannot Claim Priority to the '720 or '590 Applications....................................................................7

            a.    Law Regarding Priority Date ..........................................7

            b.    Plaintiffs Failed to Meet Their Burden on Priority Date ..8

            c.    The '720 and '590 Applications Do Not Support the Compound Claim Under § 112 .......................................9

                (1)    Example 1a, Example 1b, and Scheme 1 .............10

                (2)    Scheme I ..........................................................14

IV.   INVALIDITY OF THE METHOD OF TREATMENT CLAIM .................15

    A.    The Claim......................................................................................15

    B.    The MOT Claim is Not Adequately Described or Enabled ..............16

C.    The MOT Claim is Obvious ............................................................19

    1.    Treatments for MCL, Including BTK Inhibitors, Were In The Prior Art ....................................................................................19

    2.    Summary of the Prior Art ........................................................21

    3.    Obviousness in View of Claim 20 of the '015 Patent .............24

    4.    Obviousness in View of '015 Patent (or '921 Publication), Pollyea 2009 and the December 2009 Press Release ..............26

    5.    Purported Secondary Considerations Do Not Overcome Obviousness .............................................................................28

        a.    Long-Felt But Unmet Need ...........................................28

        b.    Failure of Others .........................................................29

        c.    Unexpected Results.......................................................30

        d.    Skepticism ...................................................................31

        e.    Praise ..........................................................................31

        f.    Commercial Success .....................................................32

V.    INVALIDITY OF THE CRYSTALLINE FORM PATENT ......................33

    A.    Claim 5 of the '455 Patent ("Crystalline Form Claim") ...................33

    B.    Crystalline Forms ............................................................................33

    C.    The Crystalline Form Claim is Inherently Anticipated .....................35

    1.    Law of Inherent Anticipation .................................................35

    2.    Scope of the Prior Art .............................................................36

    3.    Pollyea 2009 and Fowler 2010 Inherently Anticipate the Crystalline Form Claim..........................................................36

    D.    Crystalline Form Claim is Obvious .................................................38

    1.    Scope of the Prior Art .............................................................38

2.    A POSA Would Be Motivated to Make the Crystalline Form Claim, and Would Have Had a Reasonable Expectation of Success ................................................................... 39

3.    A POSA Would Have Been Motivated to Combine Honigberg 2010, the '444 Patent, Miller 2007, and Bauer 2008 .............. 41

4.    Purported Secondary Considerations Do Not Overcome Obviousness ................................................................... 42

      a.    Copying ................................................................... 42

      b.    Unexpected Results ................................................... 42

VI.   INVALIDITY OF THE TABLET FORMULATION CLAIMS ................. 43

   A.  The Tablet Claims are Obvious ........................................ 43

      1.    The Asserted Claims .................................................. 43

      2.    Solid Tablet Formulations and Classes of Excipients Were Well Known ................................................................... 44

      3.    The Prior Art ............................................................. 44

      4.    Drawbacks of Capsules Provided Motivation to Develop Ibrutinib Tablet Formulations ..................................... 47

      5.    It Would Have Been Obvious to Develop a 560 mg High-Load Solid Tablet Formulation of Ibrutinib ....................... 48

      6.    A POSA Would Have Been Motivated to Combine the Prior Art ............................................................................ 49

      7.    Purported Secondary Considerations Do Not Overcome Obvious .................................................................... 50

         a.    No Nexus ............................................................. 50

         b.    Skepticism .......................................................... 51

         c.    Copying .............................................................. 52

d.    Purported Skepticism and Copying is Not Commensurate in Scope ........................................................................52

e.    Commercial Success .....................................................53

8.    The Tablet Claims Have Inadequate Written Description .......54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Baxter Pharm. Prods., Inc.*,
  471 F.3d 1363 (Fed. Cir. 2006) .......................................................35

*Abbott Labs. v. Geneva Pharms., Inc.*,
  182 F.3d 1315 (Fed. Cir. 1999) ..................................................37, 38

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014) .........................................................5

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. Of Rheumatology Trust*,
  764 F.3d 1366 (Fed. Cir. 2014) .......................................................24

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
  903 F.3d 1310 (Fed. Cir. 2018) ..................................................33, 54

*Allergan, Inc. v. Watson Labs., Inc.-Florida*,
  869 F. Supp. 2d 456 (D. Del. 2012) ...........................................31, 51

*ALZA Corp. v. Andrx Pharm.*,
  LLC, 603 F.3d 935 (Fed. Cir. 2010) ................................................16

*Amgen Inc. v. F. Hoffmann-La Roche, Ltd.*,
  580 F.3d 1340 (Fed. Cir. 2009) .......................................................27

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) ....................................................5, 16

*AstraZeneca LP v. Breath Ltd.*,
  88 F. Supp. 3d 326 (D.N.J. 2015), *aff'd*, 603 F. App'x 999
  (Fed. Cir. 2015) ...............................................................................29

*Asyst Techs., Inc. v. Emtrak, Inc.*,
  544 F.3d 1310 (Fed. Cir. 2008) ..................................................28, 31

*In re Barker*,
  559 F.2d 588 (C.C.P.A. 1977) ...........................................................5

*Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*,
    713 F.3d 1369 (Fed. Cir. 2013) ..................................................................28, 42

*Bos. Sci. Corp. v. Johnson & Johnson*,
    647 F.3d 1353 (Fed. Cir. 2011) .......................................................................17

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*,
    752 F.3d 967 (Fed. Cir. 2014) ..........................................................................30

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
    541 F.3d 1115 (Fed. Cir. 2008) .......................................................................55

*Cephalon, Inc. v. Watson Pharm., Inc.*,
    707 F.3d 1330 (Fed. Cir. 2013) .........................................................................9

*Cooper Cameron Corp. v. Kvaerner Oilfield Prod., Inc.*,
    291 F.3d 1317 (Fed. Cir. 2002) .........................................................................5

*Dow Jones & Co. v. Ablaise Ltd.*,
    606 F.3d 1338 (Fed. Cir. 2010) .......................................................................31

*E.I. duPont de Nemours & Co. v. Synvina C.V.*,
    904 F.3d 996 (Fed. Cir. 2018) ..........................................................................26

*Eli Lilly & Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ..........................................................................24

*Enzo Life Scis., Inc. v. Roche Molecular Sys.*,
    928 F.3d 1340 (Fed. Cir. 2019) .........................................................................6

*Fox Factory, Inc. v. SRAM, LLC*,
    944 F.3d 1366 (Fed. Cir. 2019) ....................................................................3, 4

*Game and Tech. Co., Ltd., v. Activision Blizzard Inc.*,
    926 F.3d 1370 (Fed. Cir. 2019) .......................................................................24

*In re Geisler*,
    116 F.3d 1465 (Fed. Cir. 1997) .......................................................................42

*Genentech, Inc. v. Novo Nordisk A/S*,
    108 F.3d 1361 (Fed. Cir. 1997) .........................................................................6

*Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC,*
  618 F.3d 1294 (Fed. Cir. 2010) ............................................................ 32, 44, 54

*Go Med. Indus. Pty, LTD. v. Inmed Corp.,*
  471 F.3d 1264 (Fed. Cir. 2006) ............................................................ 8

*In re GPAC Inc.,*
  57 F.3d 1573 (Fed. Cir. 1995) ............................................................ 52

*In re Grasselli,*
  713 F.2d 731 (Fed. Cir. 1983) ............................................................ 30

*Hewlett-Packard Co. v. Mustek Sys., Inc.,*
  340 F.3d 1314 (Fed. Cir. 2003) ............................................................ 2

*Idenix Pharm. LLC v. Gilead Scis. Inc.,*
  941 F.3d 1149 (Fed. Cir. 2019) ............................................................ 6, 11

*KSR Int'l Co. v. Teleflex Inc.,*
  550 U.S. 398 (2007) ............................................................ 2, 48

*L.A. Biomedical Research Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly
  & Co.,*
  849 F.3d 1049 (Fed. Cir. 2017) ............................................................ 13

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
  485 F.3d 1157 (Fed. Cir. 2007) ............................................................ 28

*In re Longi,*
  759 F.2d 887 (Fed. Cir. 1985) ............................................................ 24, 27

*Merck & Co. v. Biocraft Labs., Inc.,*
  874 F.2d 804 (Fed. Cir. 1989) ............................................................ 49

*Monsanto Co. v. Syngenta Seeds, Inc.,*
  503 F.3d 1352 (Fed. Cir. 2007) ............................................................ 6

*Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.,*
  878 F.3d 1336 (Fed. Cir. 2018) ............................................................ 35, 36

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.,*
  298 F.3d 1290 (Fed. Cir. 2002) ............................................................ 8

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ...................................................................4, 31

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ...................................................................4, 29

*In re Paulsen*,
30 F.3d 1475 (Fed. Cir. 1994)...........................................................................50

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
587 F.3d 1324 (Fed. Cir. 2009) ........................................................................29

*Pernix Ireland Pain Dac v. Alvogen Malta Operations Ltd.*,
316 F. Supp. 3d 816 (D. Del. 2018) .................................................................21

*Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*,
323 F. Supp. 3d 566 (D. Del. 2018) ...................................................................2

*In re Peterson*,
315 F.3d 1325 (Fed. Cir. 2003) ........................................................................44

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ..........................................................................3

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) ......................................................................3, 9

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008) ..........................................................................7

*Purdue Pharm. Prods., L.P. v. Actavis Elizabeth*, *LLC*,
No. 12-5311, 2014 U.S. Dist. LEXIS 80920 (D.N.J. June 11, 2014) ...............12

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000) ....................................................................5, 10

*Rivera v. ITC*,
857 F.3d 1315 (Fed. Cir. 2017) ........................................................................13

*Rohm & Haas Co. v. Brotech Corp.*,
127 F.3d 1089 (Fed. Cir. 1997) ..........................................................................9

*Schering Corp. v. Geneva Pharm., Inc.*,
  339 F.3d 1373 (Fed. Cir 2003) ......................................................2, 35

*Sciele Pharma, Inc. v. Lupin Ltd.*,
  684 F.3d 1253 (Fed. Cir. 2012) ...........................................................3

*Senju Pharm. Co. v. Lupin Ltd.*,
  780 F.3d 1337 (Fed. Cir. 2015) .........................................................49

*In re Seversky*,
  474 F.2d 671 (C.C.P.A. 1974)............................................................12

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005) .....................................................2, 37

*Stone Strong, LLC v. Del Zotto Prods. of Fla., Inc.*,
  455 F. App'x 964 (Fed. Cir. 2011) .................................................4, 28

*Storer v. Clark*,
  860 F.3d 1340 (Fed. Cir. 2017) .........................................................10

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001) .........................................................35

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  593 F.3d 1325 (Fed. Cir. 2010) ...............................................4, 52, 53

*Tokai Corp. v. Easton Enters.*,
  632 F.3d 1358 (Fed. Cir. 2011) .........................................................32

*Tyco Healthcare Grp. v. Mutual Pharm.*,
  642 F.3d. 1370 (Fed. Cir. 2011) ...................................................26, 44

*United States v. Rockwell*,
  781 F.2d 985 (3d Cir. 1986) ..............................................................21

*Univ. of Rochester v. G.D. Searle & Co.*,
  358 F.3d 916 (Fed. Cir. 2004) ...........................................................16

*In re Vogel*,
  422 F.2d 438 (C.C.P.A. 1970)............................................................25

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988)..........................................................................17

*In re Woodruff*,
   919 F.2d 1575 (Fed. Cir. 1990)........................................................................25

*Zenon Envtl., Inc. v. United States Filter Corp.*,
   506 F.3d 1370 (Fed. Cir. 2007).......................................................................12

*ZUP, LLC v. Nash Mfg.*,
   896 F.3d 1365 (Fed. Cir. 2018).........................................................................3

STATUTES

35 U.S.C. § 112 ..................................................................................................7

35 U.S.C. § 119(e)(1)..........................................................................................7

35 U.S.C. § 120 ..................................................................................................7

RULES

Fed. R. Evid. 608(b).........................................................................................21

Fed. R. Evid. 702 ..............................................................................................9

OTHER AUTHORITIES

37 C.F.R. § 1.57(b)(2004).................................................................................12

MPEP § 2164.02 (8th ed.).................................................................................17

## I.      INTRODUCTION

Plaintiffs assert four patents against Defendants Alvogen Pine Brook LLC and Natco Pharma Ltd. (collectively, "Alvogen"): U.S. Patent Nos. 8,008,309 (the "'309 Patent," purporting to claim ibrutinib), 8,754,090 (the "'090 Patent," purporting to claim a method of treating mantle cell lymphoma), 9,725,455 (the "'455 Patent," purporting to claim a particular crystalline form of ibrutinib), and 9,655,857 (the "'857 Patent," purporting to claim a particular ibrutinib tablet formulation).

Despite having knowledge of the technology claimed in the asserted patents as of the filing of the earliest-filed patent (the '309 Patent), Plaintiffs staggered the filing of the patents in an apparent attempt to extend the exclusivity on Imbruvica. However, Plaintiffs' efforts to prolong their purported exclusivity failed by *creating the prior art that renders the asserted patents invalid*.  For example, Plaintiffs waited to file a patent application that described how to make ibrutinib until ibrutinib was no longer novel.  Plaintiffs' published Phase I dose escalation study for ibrutinib disclosed the method of treatment of the '090 Patent and the crystalline form of ibrutinib of the '455 Patent.  And Plaintiffs' drug Imbruvica is invalidating prior art to the tablet formulation of the '857 Patent.

## II.   LEGAL STANDARDS

### A.   Anticipation

A claim is anticipated if every element is disclosed, expressly or inherently, in a single prior art reference.  *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir 2003).  "Anticipation is a question of fact" (*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005)) that "asks solely whether the prior art reference discloses and enables the claimed invention" (*Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1324 n.6 (Fed. Cir. 2003)).

### B.   Obviousness

Obviousness is a question of law based on factual determinations: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claims and the prior art; and (4) secondary considerations, if any, of nonobviousness.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399, 415, 421 (2007).

Obviousness is judged under "an expansive and flexible approach" driven by "common sense."  *Id.* at 415. A claim is obvious if "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and . . . would have had a reasonable expectation of success from doing so."  *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 595 (D. Del. 2018).

That a reference was considered by the PTO does not increase the burden of proof. *Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012) ("The burden does not suddenly change to something higher . . . simply because the prior art references were considered by the PTO."). In fact, "it could be reasonable to give *more weight* to new arguments or references that were not explicitly considered by the PTO when determining whether a defendant met its burden of providing clear and convincing evidence of invalidity." *Id.* (emphasis added). Even if the PTO substantively addressed a reference, no deference needs to be given to the PTO if it failed to give the reference proper consideration. *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1366 (Fed. Cir. 2007) (claims obvious in view of prior art considered by examiner because examiner's analysis was "flawed").

### 1.    Secondary Considerations

A patentee may attempt to rebut obviousness through evidence of secondary considerations of nonobviousness. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1369 (Fed. Cir. 2007). "[A] patentee bears the burden of production with respect to evidence of secondary considerations" (*ZUP, LLC v. Nash Mfg.*, 896 F.3d 1365, 1373 (Fed. Cir. 2018)) and "the burden of showing that a nexus exists" to the claims (*Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019)). "Where the inventions represent no more than the predictable use of prior art

elements according to their established functions, the secondary considerations are inadequate to establish nonobviousness as a matter of law." *Stone Strong, LLC v. Del Zotto Prods. of Fla., Inc.*, 455 F. App'x 964, 971 (Fed. Cir. 2011).

For "nexus," "there must be a legally and factually sufficient connection between the evidence [of secondary considerations] and the patented invention." *Fox Factory*, 944 F.3d at 1373. To determine whether the patentee met its burden on nexus, courts "consider the correspondence between the objective evidence and the claim scope." *Id*. Secondary considerations must be "commensurate in scope with the claims . . ." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) (evidence not commensurate in scope because it related to narrow aspect of a broader claim).

"Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1330-31 (Fed. Cir. 2017) ("the identified objective indicia must be directed to what was not known in the prior art[.]"); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("if the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

## C.    Written Description

The specification must clearly convey "that an applicant has invented the subject matter which is claimed" (*In re Barker*, 559 F.2d 588, 592 n.4 (C.C.P.A. 1977))—an "objective inquiry into the four corners of the specification from the perspective of" a POSA (*Ariad Pharms., Inc. v. Eli Lilly & Co.,* 598 F.3d 1336, 1351 (Fed. Cir. 2010)).  A POSA "reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000)[1].  "[A] broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope." *Cooper Cameron Corp. v. Kvaerner Oilfield Prod., Inc.*, 291 F.3d 1317, 1323 (Fed. Cir. 2002); *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.,* 759 F.3d 1285, 1299 (Fed. Cir. 2014) (claims cannot "overreach the scope of the inventor's contribution . . . as described in the patent specification.").  "[A] description that merely renders the invention obvious does not satisfy the [written description] requirement." *Ariad*, 598 F.3d at 1352. Compliance with written description is a question of fact.  *Id.* at 1351.

## D.    Enablement

"[T]he specification of a patent [must] teach those skilled in the art how to make and use the full scope of the claimed invention without undue

---

[1] Internal citations are omitted throughout unless otherwise stated.

experimentation." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997).  "An enabling disclosure must be commensurate in scope with the claim."  *Idenix Pharm. LLC v. Gilead Scis. Inc*., 941 F.3d 1149, 1160 (Fed. Cir. 2019).  Where "working examples are present but are 'very narrow, despite the wide breadth of the claims at issue,' this factor weighs against enablement."  *Id.* at 1161.  "Enablement is a question of law based on underlying factual findings."  *Enzo Life Scis., Inc. v. Roche Molecular Sys.*, 928 F.3d 1340, 1345 (Fed. Cir. 2019).

## III.   INVALIDITY OF THE COMPOUND CLAIM

### A.    Summary

Claim 10[2] of the '309 Patent ("Compound Claim") recites ibrutinib.  FOF¶3.  The '309 Patent purports to arise from Application No. 11,617,645 ("the '645 Application"), filed on December 28, 2006.  FOF¶1.  The '645 Application purports to claim priority to U.S. Provisional Application Nos. 60/826,720 ("the

---

[2] Claim 10 depends from Claim 1, which recites, in part, "[a] compound of Formula (D) …, or pharmaceutically acceptable salts thereof."  Alvogen contends that "pharmaceutically acceptable salts thereof" renders the Compound Claim invalid.  The Court determined, however, that "Alvogen is trying to read pharmaceutically acceptable salt thereof in claim 10 and that's impermissible" and that Claim 10 "necessarily is limited to the compound of claim 1 and not the pharmaceutically acceptable salt of the compound . . . ."  Tr. 72:9-18, 76:21-77:5; *see also* Tr. 2067:23-2068:16.  Alvogen believes this was in error because dependent claims include all limitations of the independent claim incorporated therein under § 112.  *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007).

'720 Application"), filed on September 22, 2006, and 60/828,590 ("the '590

Application"), filed on October 6, 2006.  FOF¶2.

### B.      Anticipation

#### 1.      Pan Anticipates the Compound Claim

Pan (published on December 12, 2006) undisputedly anticipates the

Compound Claim if its priority date is not earlier than December 28, 2006—the

filing date of the '645 Application.  FOF¶¶6-11.  Plaintiffs incorrectly contend that

the Compound Claim can claim priority to the '720 and '590 Applications, filed

before Pan.  FOF¶11.

#### 2.      The Compound Claim Cannot Claim Priority to the '720 or '590 Applications

##### a.      Law Regarding Priority Date

Plaintiffs bear the burden to produce evidence of entitlement to a priority

date earlier than the '645 Application, such that Pan would not constitute prior art.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1303-05 (Fed. Cir. 2008).

The '720 and '590 Applications are subject to the pre-America Invents Act

("AIA") requirements, and consequently the Compound Claim can claim priority

to them only if the '720 and '590 Applications comply with the § 112 "written

description," "enablement," and "best mode" requirements.  *PowerOasis,* 522 F.3d

at 1306; 35 U.S.C. §§ 112, 119(e)(1), 120 (pre-AIA).  "[T]he specification of the

*provisional* must 'contain a written description of the invention and the manner

and process of making and using it, in such full, clear, concise, and exact terms,'
35 U.S.C. § 112 ¶ 1, to enable an ordinarily skilled artisan to practice the invention
*claimed* in the *non-provisional* application." *New Railhead Mfg., L.L.C. v.
Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002).  Plaintiffs must also
satisfy the "best mode" requirement.  *See Go Med. Indus. Pty, LTD. v. Inmed
Corp.*, 471 F.3d 1264, 1272 (Fed. Cir. 2006) (application that failed to disclose
invention "in a manner that satisfies the best mode requirement . . . not entitled to
claim the priority date of that application").  Best mode could be established with
evidence that "[inventor] subjectively considered a particular mode of practicing
the invention to be superior to all other embodiments" when earlier application was
filed and, if so, that the inventor "provided a sufficient disclosure to allow others to
practice that best mode." *Id.* at 1271.

### b.   Plaintiffs Failed to Meet Their Burden on Priority Date

Plaintiffs produced no reliable evidence that the '720 or '590 Applications
support the Compound Claim under § 112.  FOF¶¶12, 45.  Plaintiffs' only witness
provided unsupported opinion that an "undergraduate" could "work out the
synthesis and make known intermediate two" and ibrutinib from these applications.
FOF¶¶42-44.  He provided no evidence about the amount of experimentation
required to synthesize intermediate 2 or ibrutinib, even if a student could determine
how to do so.  *Id.*

This conclusory testimony does not meet Plaintiffs' burden of production. *See Pharmastem*, 491 F.3d at 1354-56 (conclusory expert testimony consisting of "quoting from [certain materials] . . . and drawing inferences" should have been struck as unhelpful); *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092-93 (Fed. Cir. 1997) (plaintiff could not prove infringement by "offer[ing] nothing more than its expert's general opinion that the accused product or process infringed the patents"); *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1338 (Fed. Cir. 2013) ("Despite the district court's finding according credibility to [defendant's expert], his testimony is largely unsupported, and therefore, carries little weight in this analysis."); Fed. R. Evid. 702, Committee Notes on Rules— 2000 Amendment ("gatekeeping function requires more than simply 'taking the expert's word for it.'").

Even if the Court accepted Plaintiffs' unsupported opinion, Plaintiffs presented *no evidence* regarding whether the '720 and '590 Applications satisfy the enablement (*e.g.*, undue experimentation) or best mode requirements. FOF¶45. Absent this evidence (and reliable evidence regarding written description), the Compound Claim cannot claim priority to the '720 or '590 Applications.

### c.   The '720 and '590 Applications Do Not Support the Compound Claim Under § 112

Reliable evidence demonstrates that the '720 and '590 Applications do not support the Compound Claim under § 112. The '720 and '590 Applications fail to

9

describe components essential for the synthesis of ibrutinib, and therefore a POSA[3] could not immediately discern that the applicants were in possession of ibrutinib as required by § 112.  FOF¶¶13-44; *Purdue*, 230 F.3d at 1323.  Similarly, absent the description of components essential to synthesize ibrutinib, a POSA could not do so without undue experimentation.  *Storer v. Clark*, 860 F.3d 1340, 1345 (Fed. Cir. 2017) ("application must enable production or synthesis of the new compounds.").

### (1)   Example 1a, Example 1b, and Scheme 1

There is only one specific reference to the synthesis of ibrutinib in the '720 or '590 Applications—Example 1b of the '590 Application discusses the "[s]ynthesis of Compound 13" (ibrutinib).  FOF¶¶14-15.

Example 1b provides a paltry discussion regarding the synthesis of "Compound 13," stating "[t]he synthesis of this compound was accomplished using a procedure *analogous* to that described in Example 1a."  FOF¶15.  The specification does not explain "analogous" or how the synthesis of "Compound 13" differs from Example 1a.  FOF¶15.  Example 1a[4] does not describe the synthesis of ibrutinib—it purports to describe the synthesis of "Compound 4,"

---

[3] A POSA for the '309 Patent would have a Ph.D. in chemistry, organic chemistry, or a related field.  FOF¶¶4-5.

[4] Example 1a is contained in the '590 Application, and is identical in substance to Example 1 in the '720 Application.  FOF¶17.  There is no analogue in the '720 Application to Example 1b in the '590 Application.  *Id*.

which is undisputedly *not* ibrutinib.  FOF¶¶15-17.  A POSA would not understand that the applicants possessed ibrutinib or could synthesize it without undue experimentation based on the disclosure of Example 1b.  FOF¶16.

The same is true regarding Example 1a, which *does not even describe how to make "Compound 4*."  FOF¶19.  Under Example 1a, Compound 4 requires synthesizing "known intermediate 2," which is essential to synthesizing Compound 4.  FOF¶¶20, 24.  Example 1a does not describe how to make "known intermediate 2."  FOF¶21.  A POSA would not know whether "known intermediate 2" is "intermediate 2" of Example 1a, the compound labeled "2" in Scheme 1 of the '720 and '590 Applications ("Compound 2"), "iodo-compound 2" of paragraph [00110], or a compound the applicants did not identify.  FOF¶¶18, 21.  Even assuming that "known intermediate 2" is Compound 2, Scheme 1 does not describe how to make it.  FOF¶¶14, 25-26.   And, Compound 2 was not commercially available prior to December 2006, as admitted by Dr. Reider.  FOF¶22.

Plaintiffs erroneously contend that WO'829, identified via bare citation in the '720 and '590 Applications' specifications, cures the § 112 deficiencies because WO'829 allegedly discloses how to synthesize "known intermediate 2." FOF¶27.  However, the '720 and '590 Applications failed as a matter of law to incorporate WO'829 by reference. Therefore, WO'829 is not within the "four corners of the specification" (*Idenix*, 941 F.3d at 1163) and cannot be used to

"bring a disclosure within the requirements of 35 U.S.C. § 120 so as to give a later application the benefit of the filing date of an earlier application." *In re Seversky,* 474 F.2d 671, 674 (C.C.P.A. 1974).

"To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents"—a "question of law." *Zenon Envtl., Inc. v. United States Filter Corp.*, 506 F.3d 1370, 1378-79 (Fed. Cir. 2007) (patent not entitled to earlier filing date due to improper incorporation by reference that stated "[f]urther details relating to the construction and deployment of a most preferred skein are found in the parent U.S. Pat. No. 5,639,373, and in Ser. No. 08/690,045, the relevant disclosures of each of which are included by reference thereto as if fully set forth herein."); *see also Purdue Pharm. Prods., L.P. v. Actavis Elizabeth*, *LLC*, No. 12-5311, 2014 U.S. Dist. LEXIS 80920, at *37 (D.N.J. June 11, 2014) (patentee "may not point to boilerplate language" to argue "that the [application cited] is incorporated by reference in its entirety."); 37 C.F.R. § 1.57(b)(2004) ("an incorporation by reference must be set forth in the specification and must (1) [e]xpress a clear intent to incorporate by reference by using the root words 'incorporat(e)' and 'reference' (*e.g.*, "incorporate by reference; and (2) [c]learly identify the referenced patent, application, or publication.").

The '720 and '590 Applications failed to incorporate WO'829 by reference because they merely cited WO'829 in brackets without identifying (with any particularity) what subject matter the applicant sought to incorporate, and failed to even use the terms "incorporate" or "reference" [5]:

> [0080]     To 101 mg of a known intermediate **2** [WO 2001019829] and 330 mg polymer-bound Triphenylphosphine (polymerlab) in 5 ml THF, 200 mg (2.0 eq.) of 3-OH N-Boc piperidine was added followed by 0.099 ml diisopropyl diazodicarboxylate. The reaction mixture stirred at room

FOF¶28.  Several facts further confirm that the applicants only later "possessed" what particular WO'829 information was important to written description.

*First*, applicants waited until the '645 Application to describe the essential synthesis of "known intermediate 2"—replacing the bracketed citation to WO'829 with the detailed synthesis of "intermediate 2" from the text of WO'829. FOF¶¶32-33.  Had the '720 and '590 Application descriptions been sufficient, applicants would not have needed to make this correction.  FOF¶33.

---

[5] The Court asked why it would matter whether WO'829 was incorporated by reference, since it was in the prior art.  "Possession" of the claimed invention must be within the "four corners of the specification."  That WO'829 was prior art is insufficient under § 112. *L.A. Biomedical Research Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*, 849 F.3d 1049, 1057-58 (Fed. Cir. 2017) (patentee "cannot rely on standalone references that it failed to incorporate into the provisional application in order to make out its priority claim" and without such incorporation, patentee's argument "depends on several assumptions regarding the knowledge of a person of skill in the art"); *Rivera v. ITC*, 857 F.3d 1315, 1322 (Fed. Cir. 2017) (rejecting that "the background knowledge of those skilled in the art can supplement the teaching in the specification to provide written description support").

*Second*, applicants clearly knew how to properly incorporate by reference, as evidenced by their compliance in other portions of the '720 and '590 Applications. FOF¶29.

*Third*, applicants' bare citation to WO'829 would be meaningless to a POSA.  Whereas the '720 and '590 Applications reference "known intermediate 2" and "intermediate 2" only by that name, and, potentially, Compound 2, WO'829 does not use the term "known intermediate 2."  FOF¶23.  A POSA could not readily identify "known intermediate 2" in WO'829 from the citation, to the extent the POSA even knew its identity.

### (2)   Scheme I

Scheme I, in only the '590 Application, is merely a prophetic scheme that purports to disclose the synthesis of a compound labeled "6" ("Compound 6-I"), which has the same structure as Compound 4 in Scheme 1.  FOF¶34.  Scheme I's disclosure is more deficient than that in Examples 1a and 1b, and likewise fails to support the Compound Claim under § 112.  FOF¶¶41-42.

The synthesis of Compound 6-I requires details absent from the '590 Application.  FOF¶35.  For example, Scheme I provides an illustration of a compound labeled "3" ("Compound 3-I"), which Scheme I identifies as a

component in the synthesis of Compound 6-I.  FOF¶34 .Details necessary to synthesize Compound 3-I are not disclosed.  FOF¶¶35-36.

Moreover, a compound labeled "5" ("Compound 5-I") is used to make Compound 6-I, but Scheme I does not provide required information to synthesize it.  FOF¶37.  Compound 5-I is produced via a Mitsunobu reaction coupling Compound 3-I with a compound labeled "4" ("Compound 4-I").  *Id.*  The '590 Application does not identify several components of the Mitsunobu reaction that would permit a POSA to synthesize Compound 5-I, including without undue experimentation.  FOF¶¶37-39.

## IV.   INVALIDITY OF THE METHOD OF TREATMENT CLAIM[6]

### A.   The Claim

Claim 2 of the '090 Patent is to a method for treating mantle cell lymphoma ("MCL") in an individual who has already received at least one prior therapy comprising administering to the individual once per day about 560 mg of ibrutinib. FOF¶45.  Although claim 2 ("MOT Claim") refers to a range of doses when it

---

[6] Alvogen contends that the MOT Claim is invalid due to improper inventorship. For example, inventor Dr. Buggy admitted that he made no meaningful contribution to the purported invention, and therefore should not have been named as an inventor.  He also admitted that individuals not named as inventors made substantive contributions to the MOT Claim, and therefore should have been named as inventors.  The Court did not permit Alvogen to pursue this argument at trial over Alvogen's objection, and Alvogen preserves the issue for appeal.  Tr. 1621:23-1622:2.

states the dose is "about 560 mg," it is not necessary to determine the precise

boundaries of the range to find that claim 2 is invalid.

### B.   The MOT Claim is Not Adequately Described or Enabled

The MOT Claim lacks adequate written description because it

"overreach[es] the scope of the inventor's contribution to the field of art as

described in the patent specification," (*Ariad*, 598 F.3d at 1353-54), which merely

"discloses nothing more than a hoped-for function for an as-yet-to-be discovered

[invention]" (*Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 926-27 (Fed.

Cir. 2004)).   Relatedly, the '090 Patent does not enable the MOT Claim because

the specification fails to "teach those skilled in the art how to make and use the *full*

*scope* of the claimed invention without 'undue experimentation.'"   *ALZA Corp. v.*

*Andrx Pharm.,* LLC, 603 F.3d 935, 940 (Fed. Cir. 2010) (emphasis added).

The only alleged disclosures in the '090 Patent that specifically concern the

treatment of MCL with a BTK inhibitor appear in Examples 7 and 13.   FOF¶¶59-

60.

Example 7 does not support the full scope of the MOT Claim.   FOF¶¶61-

68.   For example, it does not discuss ibrutinib—it discloses a Phase I dose

escalation clinical trial of compounds of the patent's "Formula (D)," which

encompasses a laundry list of potential BTK inhibitors without clarifying which

compound was used in the trial.   FOF¶62.   Whereas the MOT Claim requires

"about 560 mg" ibrutinib for the treatment of MCL, Example 7 discusses

administering the compound of Formula (D) in patient weight-based dosing.

FOF¶63.   Example 7 provides *no disclosure* of flat dosing, and therefore no

disclosure of flat dosing of "about 560 mg" as required by the MOT Claim.

FOF¶64.  Example 7 is not a working example[7] of the MOT Claim because there is

no specific disclosure of ibrutinib, and no disclosure of a fixed dose of about 560

mg.  FOF¶¶65-66.

To the extent even possible from Example 7, it would require undue

experimentation to treat relapsed or refractory MCL ("R/R MCL") with about 560

mg/day of ibrutinib given the lack of guidance regarding which of the many

compounds of Formula (D) to use and the lack of any disclosure of a fixed dose,

much less a fixed dose of "about 560 mg."  FOF¶67.

Example 13 has the defects of Example 7 to an even greater extent.  Example

13 does not describe, or teach how to practice, the full scope of the MOT Claim.

FOF¶¶69-77.  It discusses a *hypothetical* clinical trial in R/R MCL of BTK inhibitors

---

[7]  A working example is based on work actually performed.  MPEP § 2164.02 (8th
ed.).  "Although examples are not always required to satisfy the written description
requirement, the lack of any disclosure of examples may be considered when
determining whether the claimed invention is adequately described."  *Bos. Sci.
Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1364 (Fed. Cir. 2011). "[T]he
presence or absence of working examples" is also one of the factors used to
determine whether a disclosure would require undue experimentation.  *In re
Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

at a dose of 560 mg/day, with no specific mention of ibrutinib, and no actual clinical results.  FOF¶69.  Example 13's BTK inhibitors encompass compounds of not just Formula D in Example 7, but Formulas *A through F*—each encompassing a large array of potential compounds.  FOF¶70.  Example 13 discusses a dose of *exactly* 560 mg, rather than the full scope of the MOT Claim, "about 560 mg." FOF¶72.  Example 13 is also not a working example of the MOT Claim because there is no specific disclosure of ibrutinib, and it is a theoretical trial without enough guidance to practice the MOT Claim.  FOF¶74.  Even if a POSA could determine how to practice the MOT Claim from Example 13, it would require undue experimentation given the lack of guidance in Example 13 regarding which of the many compounds of Formulas A through F to use and the lack of any disclosure of the results of a trial with any of the compounds of the example.  FOF¶75.

Plaintiffs resort to a PTO Office Action and article published in 2013 to attempt to salvage their written description and enablement arguments, but they were not available when the specification was filed and do not appear within the four corners of the specification.  FOF¶77.

### C.   The MOT Claim is Obvious

#### 1.   Treatments for MCL, Including BTK Inhibitors, Were In The Prior Art

BTK was known in the art before the '090 Patent.  FOF¶48.   It was, for example, being investigated as a target for inhibitors to treat cancers, including lymphomas.  *Id*.

Before the '090 Patent, a variety of MCL treatments were available, including alkylators based (COP/CVP), anthracycline based (CHOP), cladribine or fludarabine based (FC, FCM), and bendamustine based (BOP) regimens, usually combined with rituximab.  FOF¶¶49-52.

The progression-free survival[8] responses ranged from about 7 to 21 months.  FOF¶52.   Clinical benefit is the concept of the overall benefit of a drug, taking into account its impact on the quality of life, response rate, and toxicity.  *Id*.  Neither overall response rate nor progression-free survival indicates how long a patient with R/R MCL might live with a particular therapy.  *Id*.  Once a patient's disease progresses, the patient is said to have relapsed; refractory refers to a non-response to the last line of therapy.  FOF¶52.   MCL patients inevitably relapse.  FOF¶100.

---

[8] Progression-free survival refers to how long the response lasts, whereas overall survival refers to the length of time of survival.  FOF¶54.

A single Phase I dose escalation study, which can provide efficacy information, was performed for ibrutinib before FDA approval.[9]  FOF¶¶55-56.   It indicated that ibrutinib was effective for treating R/R MCL.  FOF¶57.

Several other efficacious therapies for R/R MCL were known in the art before the '090 Patent, including PCI-31523, bendamustine/rituximab, thalidomide/rituximab, bortezomib, lendalidomide, and temsirolimus. FOF¶53.   Some therapies, such as bendamustine/rituximab, which resulted in response rates of 75-92% and complete remission[10] in 42-50% of patients, were remarkably effective.  *Id.*   In contrast, the response rate for ibrutinib in R/R MCL is about 68%, indicating bendamustine/rituximab was a more effective regimen than ibrutinib alone.  *Id.*  While the response rate in R/R MCL is not available for ibrutinib combined with rituximab, in front-line treatment the response rate is in excess of 80%, indicating that ibrutinib/rituximab is roughly comparable in effectiveness with bendamustine/rituximab.  *Id.*[11]

---

[9] A Phase I dose escalation study design has many parameters, such as starting dose and dose increments, and a goal of identifying a dose-limiting toxicity or maximum tolerated dose.  FOF¶55.

[10] The total disappearance of disease is termed complete remission.  Partial remission refers to decrease of disease by 50% or more, but not complete. FOF¶54.

[11] During trial, the Court made a credibility determination as to Alvogen's expert witness, Dr. Grossbard, based upon a document (the DAWN study) submitted by Plaintiffs' attorney *after* Dr. Grossbard completed his testimony, and first

### 2.    Summary of the Prior Art

The priority date of the MOT Claim is no earlier than June 3, 2010

(FOF¶58)—*after* Pharmacyclics disclosed treating R/R MCL with ibrutinib.

Because Plaintiffs deferred seeking patent protection for the MOT Claim despite

---

mentioned (without being presented) during the direct examination of one of
Plaintiffs' experts. Tr. 1407:11-20, 2094:3-10.  Plaintiffs' expert's testimony
regarding the DAWN study was not made in connection with any document in
front of the witness or the Court (Tr. 1407:21-1408:3) and attempted to use the
DAWN study to impeach Dr. Grossbard's credibility, when in fact Dr. Grossbard
was referring to a different study.  *See* Tr. 1838:2-23.  The Court later accepted
Plaintiffs' attorney's representation that "had said this is the article he [Dr.
Grossbard] was referring to" in his testimony, and "dr[e]w an inference about Dr.
Grossbard's credibility based on the entirety of his testimony, based on the manner
in which he made it," as a result of accepting Plaintiffs' attorney's representation
made after Dr. Grossbard's testimony.  Tr. 2094:3-10.  The Court overruled
Alvogen's objection to this determination and the manner in which Plaintiffs
purported to impeach the witness.  Tr. 2171:1-2172:20.  Alvogen believes this is
improper, including because it was improper to use the DAWN study to impeach
Dr. Grossbard after his testimony concluded, and because the DAWN study itself
is hearsay and collateral in nature and cannot be relied upon to impeach the
witness.  *See, e.g., Pernix Ireland Pain Dac v. Alvogen Malta Operations Ltd.*, 316
F. Supp. 3d 816, 827 (D. Del. 2018) (while Rule 608(b) permits cross-examination
into specific instances of a witness's conduct that shed light on credibility,
it  prohibits use of extrinsic evidence for that purpose); *United States v. Rockwell*,
781 F.2d 985, 989 (3d Cir. 1986) ("a party's right to impeach the credibility of the
opposing party's witness is limited to the questioning of *that* witness on cross
examination.").  In any event, Dr. Grossbard's testimony was fully consistent with
the Barrett *et al.* study of single-agent ibrutinib in R/R follicular lymphoma.
*Compare* Tr. 1350:11-13 ("In fact, if you look at Imbruvica in follicular
lymphoma, it's not actually approved, but the response rate is in excess of 50
percent."); *with* DTX-2773, Abstract ("We report the results of a phase 2 trial
evaluating ibrutinib in recurrent FL. … Response rates were significantly higher
among patients whose disease was sensitive to rituximab (52.6%) compared with
those who were rituximab refractory (16.7%) (*P*=0.4).").

disclosing the claimed information years earlier in its patents, there is a wealth of prior art, including *Pharmacyclics' study*, confirming the obviousness of the MOT Claim.

**U.S. Patent No. 8,952,015 (the "'015 Patent"), FOF¶¶78-86**: The '015 Patent[12] discloses using a therapeutically effective amount of ibrutinib to treat MCL. FOF¶81. The '015 Patent discloses ibrutinib in, *e.g.*, Example 1b and its identification of Compound 13. FOF¶80. More generally, it discloses use of BTK inhibitors to treat B-cell proliferative disorders, like MCL.[13] FOF¶83.

The '015 Patent discloses that therapeutically effective amounts of ibrutinib can be determined through a dose escalation study with "routine experimentation." FOF¶84. It discloses that ibrutinib may be formulated for oral administration (including single daily dose), and that between 1 and 1500 mg of ibrutinib per day may be used. FOF¶¶85-86.

**'921 Publication, FOF¶¶87-88**: The '921 Publication[14] contains the same disclosure as the '015 Patent except that it has different claims. FOF¶88.

---

[12] The '015 Patent is prior art to the MOT Claim. FOF¶78.

[13] The '015 Patent discloses that ibrutinib inhibits not just BTK but also interleukin-2-inducible tyrosine kinase ("ITK"), indicating that ibrutinib is not selective for BTK. FOF¶82.

[14] The '921 Publication is prior art to the MOT Claim. FOF¶87.

**Pollyea 2009,**[15] **FOF¶¶89-93**:  Pollyea 2009 reported interim results of the Phase I dose escalation study conducted by Pharmacyclics for PCI-32765 (ibrutinib).  FOF¶¶92-93.  Pollyea 2009 reported that seven patients had been treated, reported pharmacodynamics information for ibrutinib, and reported that two of the patients had stable disease.  *Id*.  Pollyea 2009 provided results for patients with R/R MCL.  FOF¶93.

**December 2009 Press Release,**[16] **FOF¶¶94-95**: This reference discloses updated interim results from the Phase I dosage escalation study.  FOF¶95.  It discloses that 16 patients were treated, with one MCL patient responding, and that the study would likely be completed with dosing the first five dose cohorts with the highest dose at 12.5 mg/kg.  *Id*.  It also provided results for R/R MCL.  *Id*.

**Advani 2010,**[17] **FOF¶¶96-98**:  Advani 2010 provides further information on patient cohorts in the Phase I dose escalation study of ibrutinib.  FOF¶98.  It reports on 29 patients, including four R/R MCL patients and discloses an overall response rate of 42%, with two of the four R/R MCL patients responding to therapy.  *Id*.

---

[15] Pollyea 2009 is prior art to the MOT Claim.  FOF¶¶89-91.

[16] December 2009 Press Release is prior art to the MOT Claim.  FOF¶94.

[17] Advani 2010 is prior art to the MOT Claim.  FOF¶96.

### 3.    Obviousness in View of Claim 20 of the '015 Patent

Claim 20 of the '015 Patent corresponds to every element of the MOT Claim and renders it obvious.  "[A] patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention."  *Game and Tech. Co., Ltd., v. Activision Blizzard Inc.*, 926 F.3d 1370, 1381 (Fed. Cir. 2019).

There are two steps in the obviousness-type double patenting ("OTDP") inquiry.  "First, as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent, and determines the differences," and "[s]econd, the court determines whether the differences in subject matter between the two claims render the claims patentably distinct." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001). "A later claim that is not patentably distinct from, i.e., is obvious over or anticipated by, an earlier claim is invalid for obviousness-type double patenting." *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. Of Rheumatology Trust*, 764 F.3d 1366, 1374 (Fed. Cir. 2014).  Obviousness of the later patent claims is assessed "from the subject matter of the claims in the first patent, in light of the prior art." *In re Longi*, 759 F.2d 887, 893 (Fed. Cir. 1985); *see also id.* at 895-96 (relying on four prior art references in obviousness-type double patenting analysis). The specification of the earlier patent may be used for construing the claim and determining whether the later patent claim is an

obvious variation of the earlier claim.  *In re Vogel*, 422 F.2d 438, 441-42 (C.C.P.A. 1970).

Both Claim 20 of the '015 Patent and the MOT Claim disclose:

(1) a method for treating MCL (including R/R MCL, i.e., "an individual who has already received at least one prior therapy for mantle cell lymphoma" in the MOT Claim[18]);

(2) administering a drug to a subject (in the MOT Claim, an individual);

(3) an amount of ibrutinib (in the MOT Claim, "about 560 mg" of ibrutinib, and in Claim 20, a "therapeutically effective amount," (between 1 and 1500 mg ibrutinib), which includes the "about 560 mg ibrutinib" in the MOT Claim); and

(4) the structure of ibrutinib (the MOT Claim includes an inhibitor of BTK, and Claim 20 includes an inhibitor of BTK or ITK).  FOF¶¶99-103.

Plaintiffs argue that Claim 20 of the '015 Patent does not disclose "about 560 mg" ibrutinib because it recites a "therapeutically effective amount." FOF¶102.  However, the '015 Patent describes a "therapeutically effective amount" as between 1 and 1500 mg ibrutinib, which includes the "about 560 mg" ibrutinib in the MOT Claim.  *Id.*  "[W]here there is a range disclosed in the prior art, and the claimed invention falls within that range, there is a presumption of

---

[18] It was known that MCL patients inevitably relapse, and R/R MCL patients had been successfully treated with ibrutinib.  FOF¶100.

obviousness." *Tyco Healthcare Grp. v. Mutual Pharm.*, 642 F.3d. 1370, 1372 (Fed. Cir. 2011).  To rebut the presumption, "applicant must show that the particular range is critical . . ." *In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990).  Plaintiffs have not rebutted the presumption that the recited "about 560 mg" in the MOT Claim is obvious in view of the disclosed range of 1-1500 mg in the '015 Patent, and have presented no evidence that "about 560 mg" is critical.

Even if "about 560 mg" were not disclosed in Claim 20, the MOT Claim is obvious because the "therapeutically effective amount" could be determined (according to the '015 Patent) through "routine experimentation."  *E.I. duPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018) (where "general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.").

### 4.   Obviousness in View of '015 Patent (or '921 Publication), Pollyea 2009 and the December 2009 Press Release

Even if the '015 Patent (or claim 20) did not itself render the MOT Claim obvious, a POSA[19] would have been motivated to combine the '015 Patent (or claim 20) with other references describing the Phase I dose escalation study to

---

[19] A POSA for the '090 Patent would have a Ph.D. in chemistry, organic chemistry, or a related field and/or an M.D. and several years of experience in treating cancer. A POSA would have experience with various cancer therapies and knowledge regarding oncology clinical trials.  FOF¶¶46-47.

achieve the MOT Claim, and would have had a reasonable expectation of success in doing so.  FOF¶¶104-105.

The '015 Patent (and '921 Publication), Pollyea 2009, and the December 2009 Press Release disclose each element of the MOT Claim.[20]  FOF¶104.  A POSA would be motivated to combine these references because the '015 Patent (or '921 Publication) provides, among other things, information regarding using ibrutinib as a BTK inhibitor to treat MCL using doses that include the claimed "about 560 mg," and Pollyea 2009 and the December 2009 Press Release disclose Phase I dose escalation data showing that ibrutinib is efficacious in treating R/R MCL.  *Id*.  Advani 2010 provides additional efficacy data from the Phase I study in R/R MCL patients.  *Id*.

The evidence demonstrates a reasonable expectation of success in arriving at the MOT Claim.  FOF¶105.  The '015 Patent describes, for example, that a POSA could use a dose escalation study to arrive at the claimed daily oral dose through "routine experimentation."  FOF¶84.  Given the prior art ibrutinib clinical trial

---

[20] These references also support Alvogen's OTDP arguments.  *Amgen Inc. v. F. Hoffmann-La Roche, Ltd.*, 580 F.3d 1340, 1361 (Fed. Cir. 2009) (for OTDP "we ask whether the identified difference renders the claims of the [asserted] patents non-obvious to a person of ordinary skill in the art in light of the prior art"); *In re Longi*, 759 F.2d 887, 893, 895-96 (Fed. Cir. 1985) (relying on four prior art references in obviousness-type double patenting analysis, finding that for OTDP, obviousness of later patent is assessed "from the subject matter of the claims in the first patent, in light of the prior art").

results, a POSA would have reasonably expected to succeed in using such a daily oral dose of ibrutinib to treat R/R MCL.  FOF¶105.  These facts render the MOT Claim obvious.  *Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1374 (Fed. Cir. 2013) (reversing judgment of nonobviousness, because "prior art references set forth every limitation required by the asserted claims and provide express motivation to combine those teachings to derive the claimed [] products.")

### 5. Purported Secondary Considerations Do Not Overcome Obviousness

Where, as here, "the inventions represent no more than the predictable use of prior art elements according to their established functions," secondary considerations are "inadequate to establish nonobviousness as a matter of law." *Stone Strong,* 455 F. App'x at 971; *see also Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (secondary considerations insufficient to overcome obviousness "given the strength of the prima facie obviousness").

#### a.   Long-Felt But Unmet Need

Dr. Rule opined that prior treatments for R/R MCL allegedly did not provide safe and efficacious treatments for patients.  FOF¶¶106-112.  However, Plaintiffs produced no evidence of a "material difference" between the safety and efficacy of treating R/R MCL in the MOT Claim and in the various prior art treatment options, including treatment with ibrutinib.  *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310,

1316 (Fed. Cir. 2008) (alleged long-felt need rejected without evidence it was attributable to "only material difference" between claim and prior art).  Because the prior art methods "were effective for the purpose of the claimed invention, there is no long-felt need." *AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d 326, 387 (D.N.J. 2015), *aff'd*, 603 F. App'x 999 (Fed. Cir. 2015).

Even if there were evidence of "need," Dr. Rule failed to provide evidence that it was long-felt in view of the safe and effective prior art treatments for R/R MCL.  FOF¶108; *Perfect Web Techs., Inc. v. InfoUSA, Inc.,* 587 F.3d 1324, 1332 (Fed. Cir. 2009) (court must reject alleged long felt need without "evidence to explain how long [relevant] need was felt, . . . when the problem first arose," or how the "need [was] alleviated by the patent").

### b.    Failure of Others

Plaintiffs produced no relevant evidence of failure of others, because the prior art demonstrated *success* for treating R/R MCL resulting from the claimed features.  FOF¶¶113-116; *Ormco Corp.*, 463 F.3d at 1313 ("Failure of others" is probative only where the evidence shows that prior failure occurred because "the devices lacked the claimed features.'").  Dr. Rule's testimony has no bearing on the MOT Claim, as it addresses inhibition of other cellular pathways different from BTK.  FOF¶114.  Even when Dr. Rule addressed BTK inhibition, he identified no

failure to develop a method of treating cancer using an inhibitor bearing *any* reasonable resemblance to ibrutinib-like compounds.  FOF¶115.

### c. Unexpected Results

Dr. Rule's opinion that the safety and efficacy of treating MCL with ibrutinib was unexpected failed to "establish that there is a difference between the results obtained and those of the closest prior art . . . ." *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014); FOF¶¶117-122.  Dr. Rule failed to explain, for example (1) how successfully treating R/R MCL with ibrutinib per the MOT Claim could be unexpected in view of the prior art's disclosure that *ibrutinib could be used to treat R/R MCL* (Sections IV(C)(i)-(ii), *supra*); or (2) how results from using the claimed dose of "about 560 mg" could be unexpected when the prior art disclosed that dose in ibrutinib treatments for R/R MCL, and that a therapeutically effective amount can be determined using routine experimentation. FOF¶118.

Moreover, Dr. Rule offered no evidence of unexpected safety and efficacy data for the full scope of the claimed method (e.g., "about 560 mg"), as opposed to a method limited to 560 mg, to satisfy the "commensurate in scope" requirement.  *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983) (narrow aspect of broad claim "insufficient to rebut" of obviousness); FOF¶119.

### d.    Skepticism

There is no evidence that "those of skill in the art were generally skeptical as to whether [the MOT Claim] was possible," because Plaintiffs failed to account for prior art showing ibrutinib was effective to treat R/R MCL. *Allergan, Inc. v. Watson Labs., Inc.-Florida*, 869 F. Supp. 2d 456, 491 (D. Del. 2012); *see also Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1352 (Fed. Cir. 2010) (skepticism evidence "weak" absent "any direct skepticism concerning the feasibility" of invention); FOF¶¶123-127.  Dr. Rule in fact contradicted the prior art in opining that an inherited condition involving a mutation in the gene for BTK shows that a POSA would have been skeptical of using a BTK inhibitor to treat R/R MCL.  FOF¶¶124-125.  There is nothing in the record to support Dr. Rule's relating the genetic condition to BTK inhibition.  FOF¶¶126-127.

### e.    Praise

There is no evidence of praise attributable to any "material difference" from the prior art, which disclosed using ibrutinib to treat R/R MCL (Sections IV(C)(i)-(ii), *supra*).  FOF¶¶128-134; *Asyst*, 544 F.3d at 1316 (absent "material difference" from prior art, praise not probative of non-obviousness).  The awards showing purported evidence of praise—"the best pharmaceutical agent," or "best drug of the year"— "results from something other than what is both claimed and novel in the claim," and has "no nexus to the merits of the claimed invention." *Novartis*, 853

F.3d at 1330; FOF¶131.   These awards admittedly are unrelated to a method of treating R/R MCL, much less a method that utilizes "about 560 mg" of ibrutinib.  *Id*. Moreover, Dr. Rule's opinion regarding the FDA's "fast tracking" of the application for ibrutinib for R/R MCL, and designation as a "breakthrough therapy," is contrary to his opinion regarding the FDA's statements in the Imbruvica label that approval may be withdrawn if there is no evidence presented of any clinical benefit from a confirmatory clinical trial.   Not even the FDA has determined that Imbruvica provides clinical benefit for the treatment of R/R MCL.  Dr. Rule did not attempt to reconcile this inconsistency.  FOF¶¶132-134.

### f.     Commercial Success

Sales of Imbruvica tablets and capsules (Plaintiffs' purported evidence) do not support nonobviousness because the claimed features were disclosed in the prior art.  *Tokai Corp. v. Easton Enters.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); FOF¶¶135-139.

The mere quantity of patentee's sales cannot support nonobviousness absent the patentee showing that "the success of the product is due to the claimed invention" and not unclaimed factors.  *Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010).  Plaintiffs did not, for example evaluate whether any success of Imbruvica was due to ibrutinib, the crystalline

form of ibrutinib, the formulation of Imbruvica, the disease treated with Imbruvica, or something else.  FOF¶137.  Plaintiffs attributed the alleged commercial success of Imbruvica to the prior art ibrutinib compound, as to which Plaintiffs maintained their exclusivities through the Compound Patents to block others from developing the MOT Claim.  FOF¶¶138-139; *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1337-38 (Fed. Cir. 2018) (where earlier patents may have "blocked" competition, "commercial success of the product was of minimal probative value.")

## V.   INVALIDITY OF THE CRYSTALLINE FORM PATENT

### A.   Claim 5 of the '455 Patent ("Crystalline Form Claim")

Claim 5 of the '455 Patent is directed to Form A of ibrutinib, and identifies six 2-Theta peaks from its X-ray powder diffraction ("XRPD") pattern.  FOF¶140.

### B.   Crystalline Forms

Crystalline forms, or polymorphs, are crystalline solids with different packings of atoms or molecules in the crystal lattice, resulting in different long range order and different properties.  FOF¶¶143-44.

Properties specific to a crystalline form include analytical characteristics such as an XRPD pattern, which serves as a fingerprint for a crystalline form and is intrinsically linked to the structure of that crystalline form.  FOF¶¶145-46.  If a sufficient number, typically ten, of the most intense 2-Theta peaks align between

two XRPD patterns, then the crystalline form samples may be considered the same form.  FOF¶147.

Thermodynamic stability is also a property inherent to a particular crystalline form; only one of the discovered crystalline forms of a compound is the most thermodynamically stable form, which will not convert to other meta-stable forms whereas meta-stable forms tend to convert to the most stable form. FOF¶148.   When the most thermodynamically stable crystalline form out of the discovered crystalline forms is used in a pharmaceutical product, there is little to no likelihood for potentially detrimental conversions to other known forms during manufacturing and storage.  *Id.*

In pharmaceutical development, crystalline form screens are used to discover and characterize the crystalline forms of a particular compound, and identify the most thermodynamically stable form out of those crystalline forms. FOF¶149.  A typical screen involves recrystallization in a relatively small number of solvents, followed by further screening in additional solvents.  *Id.*   A POSA[21] would have known of a variety of conventional solvents to use, including solvents especially relevant for pharmaceutical development.  *Id.*

---

[21] A POSA for the '455 Patent would have a Ph.D. in chemistry, organic chemistry, or a related field, with some knowledge of solid state or analytical chemistry. FOF¶¶141-42.

Regulatory guidelines for pharmaceutical development identified screening as the first step in a multi-step process for crystalline form generation and characterization, which would have been known to a POSA.  FOF¶150.

At the time of the '455 Patent, crystalline Forms A-F of ibrutinib were known.  Form A is the most stable and easily prepared form of all known crystalline forms of ibrutinib.  FOF¶151.

### C.    The Crystalline Form Claim is Inherently Anticipated

#### 1.    Law of Inherent Anticipation

Limitations are inherently anticipated if "necessarily present, or inherent, in the single anticipating reference." *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 471 F.3d 1363, 1368 (Fed. Cir. 2006). Either a single element of the claimed subject matter or the entire claimed subject matter may be inherently disclosed.  *Schering Corp.*, 339 F.3d at 1379.

"Extrinsic evidence may be used to interpret the allegedly anticipating reference and [to] shed light on what it would have meant to" a POSA.  *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1345 (Fed. Cir. 2018); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1328 (Fed. Cir. 2001) ("recourse to extrinsic evidence is proper to determine whether a feature, while not explicitly discussed, is necessarily present in a

reference.").  Extrinsic evidence in support of inherency may be from unpublished or confidential "secret" sources. *Monsanto*, 878 F.3d at 1345.

### 2.    Scope of the Prior Art

The priority date for the Crystalline Form Claim is no earlier than June 4, 2012.  FOF¶152.  Plaintiffs' patent filing strategy resulted in the art, including Pharmacyclics' Phase I Dose escalation study for ibrutinib, that inherently anticipates the Crystalline Form Claim because *Pharmacyclics used the claimed crystalline Form A in that study*.

**Pollyea 2009**:  Pollyea 2009 discloses interim results of Pharmacyclics' Phase I dose escalation study, which examined PCI-32765 (or ibrutinib).  Section IV(C)(ii), *supra*; FOF¶¶153-54.

**Fowler 2010**[22]:  Fowler 2010 discloses updated results from the Phase I dose escalation study.  FOF¶¶156.

### 3.    Pollyea 2009 and Fowler 2010 Inherently Anticipate the Crystalline Form Claim

Both Pollyea 2009 and Fowler 2010 disclose "PCI-32765" (ibrutinib) as the solid dosage form of the drug used in the Phase I study.  FOF¶¶157-58.  The PCI-32765 in Pollyea 2009 and Fowler 2010 necessarily discloses Form A of ibrutinib,

---

[22] Fowler 2010 is prior art to the Crystalline Form Claim.  FOF¶155.

as every lot of PCI-32765 used in the Phase I study[23] (the only Phase I study performed) was crystalline Form A of ibrutinib (FOF¶¶159, 161-62).  *Abbott Labs. v. Geneva Pharms., Inc.*, 182 F.3d 1315, 1317-19 (Fed. Cir. 1999) (claim directed to "anhydrous Form IV crystalline modification" of a particular compound inherently anticipated by sale of product that, unknown to the patentee, "possesse[d] the claimed characteristics").  XRPD analysis of PCI-32765 lots used in the Phase I study compared to a reference standard lot of Form A shows that the PCI-32765 used in the study has the 2-Theta peaks of Form A, including those recited in claim 5, demonstrating that the peaks corresponding to Form A are inherent properties of the PCI-32765 used in the Phase I study.  FOF¶163.  XRPD analysis of additional lots of PCI-32765 used in the Phase I study similarly shows the 2-Theta peaks of Form A.  *Id.*

Plaintiffs' contrary arguments—that PCI-32765 *could* describe other crystalline forms, and that the Form A used was the product of a decision—are irrelevant.  Because Form A *was the compound* in the Phase I study, the references necessarily disclose it.  *SmithKline*, 403 F.3d at 1343-44 (claimed "crystalline paroxetine hydrochloride hemihydrate" was inherently anticipated, though "paroxetine hydrochloride hemihydrate" was not itself discovered by date of prior

---

[23] Pharmacyclics' clinical study report for the Phase I dose escalation study of PCI-32765 lists the lot numbers of ibrutinib used in the study.  FOF¶160.

art, because "producing PHC anhydrate according to [prior art] inevitably results in the production of at least trace amounts of anticipating PHC hemihydrate."); *Abbott Labs.* 182 F.3d at 1318-19 (sale of products inherently disclosed claimed feature despite "parties' ignorance that they were dealing with [claimed] Form IV").

### D.   Crystalline Form Claim is Obvious

#### 1.   Scope of the Prior Art

**Honigberg 2010**[24]:  Honigberg 2010 discloses the chemical structure of ibrutinib and identifies that chemical as PCI-32765.  FOF¶165.  It discloses that PCI-32765 was undergoing human clinical development and showed promising activity as a potent and selective BTK inhibitor.  FOF¶166.

**U.S. Patent No. 7,514,444 ("'444 Patent")** [25]:  The '444 Patent discloses ibrutinib, and its crystallization, recrystallization, and characterization using conventional techniques in the art.  FOF¶¶168-69.  It discloses that BTK inhibitors such as ibrutinib may be used for the treatment of various diseases, including lymphoma.  FOF¶170.

**Miller 2007**[26]:  Miller 2007 discloses a general introduction to crystal forms, crystal thermodynamics, how to crystalize molecules, and how to perform

---

[24] Honigberg 2010 is prior art to the Crystalline Form Claim.  FOF¶164.

[25] The '444 Patent is prior art to the Crystalline Form Claim.  FOF¶167.

[26] Miller 2007 is prior art to the Crystalline Form Claim.  FOF¶171.

polymorph screening.  FOF¶172.  Miller 2007 lists various solvents for polymorph screening and identifies in bold the solvents especially relevant for pharmaceutical development.  FOF¶173.

**Bauer 2008**[27]:  Bauer 2008 discloses considerations regarding polymorphism in the context of pharmaceutical development.  FOF¶175.  Bauer 2008 discloses a decisions tree with a first step of conducting a polymorphism screen, and subsequent steps for characterizing the discovered polymorphs and studying their respective stability.  FOF¶176. Bauer 2008 discloses that crystalline solids are usually highly stable and that most drugs are used in the crystalline form for this reason.  FOF¶177.

### 2.    A POSA Would Be Motivated to Make the Crystalline Form Claim, and Would Have Had a Reasonable Expectation of Success

Based on Honigberg 2010's disclosure of ibrutinib's promising clinical activity and the knowledge in the art that oral dosage forms were preferred for patient convenience and compliance, and that stable crystalline forms were preferred for oral dosage forms, a POSA would have been motivated to make crystalline forms of ibrutinib to provide the drug in a stable oral dosage form. FOF¶178.

---

[27] Bauer 2008 is prior art to the Crystalline Form Claim.  FOF¶174.

A POSA would be motivated to make crystalline forms of ibrutinib, for example, based on the '444 Patent disclosures regarding conventional methods of crystallization, purification, and characterization, as well as the disclosure regarding treatment of diseases including lymphoma.  FOF¶179.  A POSA would have also been motivated to use conventional methods to (1) screen for different crystalline forms using conventional methods and solvents known in the art, and (2) to characterize the crystalline forms resulting from the screens (such as by XRPD).  FOF¶¶180-82.  A POSA also would have been motivated to identify the most stable crystalline form out of the known crystalline forms for pharmaceutical development to avoid potential polymorphic interconversions during the manufacturing process.  FOF¶184.

A POSA would have reasonably expected to succeed in making crystalline forms of ibrutinib, one of which would have been the most stable of those known forms, which later would have been termed "Form A."  FOF¶185.  Form A of ibrutinib was the most stable form and readily produced, which demonstrates that it would have been identified through conventional polymorph screens and pre-formulation studies.  FOF¶183.   Because crystalline Form A of ibrutinib was the most stable form out of the known crystalline forms of ibrutinib, meaning that Form A would likely not convert to another form, a POSA would have identified Form A as a suitable form for pharmaceutical formulation.   FOF¶186.  A POSA

would have characterized crystalline Form A of ibrutinib using XRPD and identified as inherent to crystalline Form A the recited 2-Theta peaks of claim 5 of the '455 Patent.  *Id.*

### 3. A POSA Would Have Been Motivated to Combine Honigberg 2010, the '444 Patent, Miller 2007, and Bauer 2008

A POSA would have been motivated to combine Honigberg 2010, the '444 Patent, Miller 2007, and Bauer 2008 to achieve the Crystalline Form Claim. FOF¶187.  Honigberg 2010 provides preclinical and pharmacologic information regarding using ibrutinib to treat B-cell malignancies by inhibiting BTK. FOF¶188.  The '444 Patent discloses ibrutinib and its crystallization and characterization using standard analytical techniques.  FOF¶189.

A POSA would have known based on Bauer 2008 that regulatory guidelines recommend performing a polymorphic screen to identify the most thermodynamically stable form and characterizing that form during the course of pharmaceutical development.  FOF¶190.  A POSA would have known how to perform a comprehensive or rationale-design polymorph screen because Miller 2007 discloses these approaches and a table of common solvents used for polymorph screens.  FOF¶191.

Given the promising information in the art regarding ibrutinib's clinical activity and the preference for stable, oral dosage forms, a POSA would have been motivated to combine these closely-related references.  FOF¶192.

### 4.    Purported Secondary Considerations Do Not Overcome Obviousness

Plaintiffs failed to meet their burden to present relevant evidence of secondary considerations, but even if credited, it cannot overcome the strong showing of obviousness of the Crystalline Form Claim.  *Supra*, § IV(C)(5) (citing cases); FOF¶¶193-95, 198.

### a.    Copying

Dr. Myerson's contention that companies copied the Crystalline Form Claim failed to explain why any copying was not driven by the need to show bioequivalence.  FOF¶196.  *Bayer*, 713 F.3d at 1377 (copying reference drug preparations "is not probative of nonobviousness because a showing of bioequivalence is required for FDA approval.").  He failed to articulate how purported copying related to the claim, rather than unclaimed features such as the stability and ease of manufacture of a crystalline form, which are features generally described as desirable in the prior art.  FOF¶197.

### b.    Unexpected Results

Dr. Myerson's opinion that the stability, reliable manufacturability, and ability to formulate in a high dose tablet were unexpected results are unclaimed

features (FOF¶¶199-200), and thus irrelevant to "unexpected results." *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997).  There is also no evidence that these results were "surprising," nor could they be since they were known in the "closest prior art" and expected by a POSA (FOF¶201) and therefore have no probative value to obviousness. *BMS*, 752 F.3d at 977.

## VI.   INVALIDITY OF THE TABLET FORMULATION CLAIMS[28]

### A.   The Tablet Claims are Obvious

#### 1.   The Asserted Claims

The priority date for Tablet Claims is no earlier than March 3, 2015.  FOF¶202.  Claim 30, depending from claim 1, is directed towards a high-load solid tablet formulation.  FOF¶203.  Claim 30 requires that the inactive excipients (everything but ibrutinib) are pharmaceutically acceptable excipients ("PAEs").  FOF¶204.  Plaintiffs concede that claimed inactive excipients are PAEs.  FOF¶¶205, 209.  Claim 37 recites an ibrutinib solid tablet formulation. FOF¶206.

---

[28] Alvogen contends that it does not infringe the '857 Patent because—as interpreted by Plaintiffs—the claims are limited to "immediate release high-load solid tablet formulations." *See, e.g.*, D.I. 289, Exhibit 16A.1 (Alvogen's Motion *in Limine* No. 1).  Although the claims Plaintiffs asserted at trial (30 and 37) are those that Plaintiffs admitted are limited to such "immediate release" formulations (*id.*), the Court determined that it would not "interpret the claim to require that there be an immediate release component to a product in order to infringe claim 30 or 37," and made an adverse determination of infringement against Alvogen of the '857 Patent. *See, e.g.*, Tr. 313:5-13, 1980:19-1981:2.  Alvogen preserves the issue for appeal.

### 2. Solid Tablet Formulations and Classes of Excipients Were Well Known

Tablet formulations were known in the art as of the priority date, including that inactive ingredients ("excipients"), such as fillers, disintegrants, binders, glidants, lubricants, and surfactants, are used to make them.  FOF¶214.  Fillers (or diluents) permit a tablet to be compressed, and the most commonly used in tablets are microcrystalline cellulose ("MCC") and lactose.  FOF¶215.  Disintegrants help with drug dissolution, and the most commonly used is croscarmellose sodium.  FOF¶216.  Binders hold the tablets together, and the most commonly used is polyvinylpyrrolidone ("PVP").  FOF¶217.  Glidants enhance flowability of a powder when formulating a tablet, and the most commonly used is colloidal silicon dioxide ("CSD").  FOF¶218.  Lubricants facilitate the movement of a tablet through the manufacturing machine, and the most commonly used is magnesium stearate.  FOF¶219.  Surfactants are used to disperse the drug substance into the water content, and the most commonly used is sodium lauryl sulfate ("SLS").  FOF¶220.

### 3. The Prior Art

The prior art – discussed below – gave the POSA everything needed to make the Tablet Claims, including *all* of the ingredients and amounts thereof, and as a result the claims are presumptively obvious.  FOF¶213; *Tyco*, 642 F.3d. at 1372; *see also In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("In cases involving

overlapping ranges, . . . even a slight overlap in range establishes a *prima facie* case of obviousness.").

**Imbruvica 2013 Label**[29]:  In the FDA-approved label for Imbruvica 140 mg capsules, the active pharmaceutical ingredient ("API") is ibrutinib.  FOF¶¶222-23. Inactive excipients are croscarmellose sodium, magnesium stearate, MCC, and SLS.  FOF¶224.  Imbruvica 2013 Label indicates Imbruvica for treatment of R/R MCL, at a recommended dose of 560 mg (four 140 mg capsules) once daily. FOF¶225.

**The '172 Publication**[30]:  This reference describes an ibrutinib capsule formulation in Table 5 with the same API and excipients as Imbruvica Capsules, and ibrutinib tablet formulations, including high-load formulations, disclosing excipients in the Tablet Claims.  FOF¶¶227-28.  The '172 Publication discloses ibrutinib tablet formulations containing lactose in combination with MCC (FOF¶229), and ibrutinib in combination with PVP in a solid oral tablet formulation (FOF¶230).  It also identifies CSD as a "[s]uitable carrier[]" in the solid dosage forms, including ibrutinib tablets.  FOF¶231.

---

[29] The Imbruvica 2013 Label is prior art to the Tablet Claims.  FOF¶221.

[30] The '172 Publication is prior art to the Tablet Claims.  FOF¶226.

**Goldstein**[31]: Goldstein discloses high-load solid tablet formulations for ibrutinib, or formulations containing at least 50% w/w ibrutinib.  FOF¶¶208, 233. The immediate release ("IR"), high-load tablet formulations of Examples 2 and 3 of Goldstein contain 80.9 percent and 60.98 percent ibrutinib, respectively. FOF¶233.  Goldstein discloses the following claimed excipients and amounts thereof in the tablet formulations of Examples 2 and 3: MCC and/or lactose (collectively, 8.1%), magnesium stearate (0.3%), and colloidal silicon dioxide (0.2%).  FOF¶234.  Goldstein discloses ibrutinib tablet formulations containing lactose in combination with MCC (FOF¶235), and ibrutinib in combination with PVP in a solid oral tablet formulation (FOF¶236).

**Handbook of Pharmaceutical Excipients ("HPE")**[32]:  HPE is a compendium that a POSA would rely upon in selecting safe excipients for tablet formulations.  FOF¶238.  It provides descriptions of the excipients, such as physical properties and moisture content.  *Id.*  HPE discusses the claimed excipients at length, individually identifying lactose monohydrate (including in combination with MCC), MCC, PVP, croscarmellose sodium, SLS, CSD, and magnesium stearate.  FOF¶¶239-246.  HPE provides recommended amounts for

---

[31] Goldstein is prior art to the Tablet Claims.  FOF¶232.

[32] HPE is prior art to the Tablet Claims.  FOF¶237.

these excipients in tablet formulations, how they are used, and describes that each are widely used in tablet formulations.  *Id.*

### 4.   Drawbacks of Capsules Provided Motivation to Develop Ibrutinib Tablet Formulations

Disadvantages of formulating an API like ibrutinib in a capsule dosage form would have motivated a POSA[33] to pursue a tablet formulation prior to the priority date of the Tablet Claims.  FOF¶247.  For example, a recommended dosage of ibrutinib 140 mg capsule formulations is 560 mg, requiring patients prescribed Imbruvica capsules to take multiple capsules to obtain the recommended dosage.  FOF¶¶248, 250.  This is inconvenient for patients and introduces concerns regarding patient compliance.  FOF¶248.  However, it is not possible to simply increase the amount of the API in the capsule without causing other problems.  FOF¶249.  Capsules can also be less stable.  FOF¶247.

Tablets, in contrast, permit formulators to place a larger quantity of the API in a single dosage form, allowing (for ibrutinib) a complete dose to be administered in a single tablet, fostering patient compliance and creating manufacturing efficiencies.  FOF¶250.  Moreover, formulating capsule and tablet dosage forms for the same API is common in the pharmaceutical industry.

---

[33] A POSA for the '857 Patent would have a Ph.D. in chemistry, organic chemistry, pharmaceutics, or related fields, and several years of experience in drug delivery and/or drug formulation.  FOF¶¶211-212.

FOF¶¶250, 252-53.  These "need[s] or problem[s] known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."  *KSR*, 550 U.S. at 420.

### 5. It Would Have Been Obvious to Develop a 560 mg High-Load Solid Tablet Formulation of Ibrutinib

The Imbruvica 2013 Label would have been a POSA's natural starting point to make a high-load tablet formulation of ibrutinib given its FDA approved description of the marketed drug.  FOF¶¶250-53.  A POSA with the Imbruvica 2013 Label would use the ingredients and excipients described therein to make an ibrutinib tablet formulation because those excipients were already FDA-approved in combination with ibrutinib.  *Id.*  The evidence confirms that Imbruvica capsules were the starting point for the ibrutinib tablet formulation, and that capsule formulations are generally considered when making a tablet formulation for the same API because the capsule provides "scientific data" and "compatibility data with the excipients used in the capsule formulations."  FOF¶¶252-53.

The evidence confirms that it would have been nothing more than routine optimization to develop the Tablet Claims from the Imbruvica 2013 Label with such additional excipients that were disclosed in the literature and vary the amounts of excipients for the tablet formulation.  FOF¶¶252, 254.

A POSA would have been motivated to use each of the excipients recited in the Tablet Claims.  FOF¶¶254-262.  A POSA would rely upon the prior art (*e.g.*,

HPE, Goldstein, '172 Publication) and perform routine optimization to adjust the amounts of excipients to arrive at the claimed formulations, particularly given that the claimed amounts of the excipients were disclosed in the prior art for tablet formulations.  FOF¶¶263-64.  Products resulting from such "routine" optimization are not patentable.  *Senju Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337, 1353 (Fed. Cir. 2015) ("product of routine optimization that would have been obvious to one of skill in the art" is not patentable); *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989) ("though requiring time and care, the experimentation needed to arrive at the claimed dosages was nothing more than routine.").

A POSA would have had a reasonable expectation of success in making a high-load solid tablet formulation containing the claimed ingredients at the claimed amounts.  FOF¶265.  The prior art, for example, expressly taught ibrutinib high-load tablet formulations containing the majority of the recited inactive excipients including lactose, MCC, SLS, CSD, croscarmellose sodium, and magnesium stearate and the use of PVP in ibrutinib tablet formulations.  *Id.*

### 6.   A POSA Would Have Been Motivated to Combine the Prior Art

The motivation to combine these references is readily-apparent.  Imbruvica 2013 Label, the '172 Publication, and Goldstein all describe formulations of ibrutinib.  FOF¶266.  Having the motivation to create ibrutinib tablets starting with the Imbruvica 2013 Label, the POSA would look to the '172 Publication and

Goldstein because they describe specific ibrutinib *tablet* formulation examples.  *Id.*
A POSA would be motivated to combine HPE with the aforementioned references
because HPE is a routinely-used publication for excipient selection.  *Id.*  Plaintiffs'
expert does not contest that a POSA would be motivated to combine these
references, admitting that a POSA developing an ibrutinib tablet formulation
would have looked to Imbruvica 2013 label, and would have been able to find and
learn from Goldstein and '172 Publication.  FOF¶¶267-68.

### 7.  Purported Secondary Considerations Do Not Overcome Obvious

None of the alleged secondary considerations can overcome the
overwhelming evidence, discussed above, that the Tablet Claims are obvious.  *See*
Section IV(C)(5), *supra* (citing cases).

### a.  No Nexus

Plaintiffs have no evidence of "nexus" because Plaintiffs failed to
demonstrate that Imbruvica tablets are the commercial embodiment of the Tablet
Claims.  *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994) (evidence of
secondary considerations is not "entitled to weight" unless "it is relevant to the
claims at issue.").  Whereas the Tablet Claims recite formulations "consisting
essentially of" certain excipients (FOF¶269)[34], Plaintiffs failed to analyze the

---

[34] The '857 Patent defines "consisting essentially of" as "excluding other elements
of any essential significance to the combination for the intended use, but not

excipients in the Imbruvica tablet coating to determine whether they are of essential significance to the combination for the intended use, or materially affect the characteristic(s) of the compositions (FOF¶270). Absent this analysis, Plaintiffs cannot show that Imbruvica Tablets are a commercial embodiment of the Tablet Claims. FOF¶270.

### b. Skepticism

There is no evidence that "those of skill in the art were generally skeptical as to whether [the invention] was possible" (*Allergan,* 869 F. Supp. 2d at 491) because the prior art *taught* high-load ibrutinib tablet formulations, as conceded by Plaintiffs' expert. FOF¶¶271, 273. While Plaintiffs incorrectly argue that there was skepticism about formulating at high-load tablet containing 70% ibrutinib with lactose, the prior art disclosed ibrutinib tablet formulations in combination with lactose. FOF¶¶275, 277.[35]

Plaintiffs erroneously rely on Cai for evidence of skepticism of a high-load solid tablet formulation of ibrutinib, and that ibrutinib could be formulated with lactose. Cai admittedly *does not even discuss ibrutinib*; it also fails to discuss an

---

excluding elements that do not materially affect the characteristic(s) of the composition or methods." FOF¶207.

[35] Plaintiffs also have not shown (as confirmed by Dr. Williams) that any of their purported evidence of skepticism regarding formulating an ibrutinib tablet with lactose was publicly available before the priority date. FOF¶¶274-75.

API in the amount claimed or formulations with the claimed excipients and amounts in the Tablet Claims.  FOF¶272.  Because any skepticism in Cai is not related to the Tablet Claims, it is irrelevant.  *In re GPAC Inc*., 57 F.3d 1573, 1580 (Fed. Cir. 1995).

Plaintiffs are also incorrect that a POSA would have been skeptical of formulating an ibrutinib tablet with lactose due to potential concerns of a Maillard reaction.  Whereas the Maillard reaction requires a strong amine group to react with lactose, ibrutinib has a weak amine group, and the prior art admittedly describes ibrutinib tablet formulations with lactose.  FOF¶¶276-77.

### c.      Copying

There is no relevant evidence of copying.  ██████████████

████████████████████████████████████████

██████████████████████████

### d.      Purported Skepticism and Copying is Not Commensurate in Scope

Plaintiffs' arguments regarding copying and skepticism relate to narrow aspects of the broad Tablet Claims, and therefore are not commensurate in scope with the claims.  *Therasense,* 593 F.3d at 1336 (secondary considerations relating to a narrow aspect of a broader claim not commensurate with the scope and thus not probative of nonobviousness).

Plaintiffs erroneously argue that Alvogen's ANDA Products are an exact copy of the excipients and amounts recited in the Tablet Claims and that there was skepticism related to formulations containing *70%* ibrutinib with the other claimed excipients in the claimed amounts.  FOF¶¶278, 284.  However, the Tablet Claims include amounts of API and excipients other than the amounts in Alvogen's formulations.  *Id.*  They recite ingredients with "about" certain w/w percentage.  FOF¶283.  "The term 'about' when used before a numerical value indicates that the value may vary within a reasonable range, such as within +10%, +5% or +1% of the stated value."  FOF¶210.  Dr. Bodmeier in fact applied a range of +10% with respect to the amount of ingredients.  *Id.*

Further, the purported copying and skepticism are not commensurate in scope with the Tablet Claims, because they do not recite a specific form of ibrutinib, or a specific amount for the ingredients.  FOF¶282.  According to the specification, ibrutinib can be in "various forms, including but not limited to, amorphous phase, crystalline forms, milled forms, and nano-particulate forms."  *Id.*

## e.    Commercial Success

As discussed above, Section IV(C)(5)(f), *supra*, Plaintiffs failed to meet their burden to produce evidence that commercial success supports the nonobviousness of any of the asserted claims.  FOF¶¶285-291.

Regarding the Tablet Claims, Plaintiffs' only purported evidence of success relates to unclaimed factors—for example, that they allow for once-a-day oral dosing of ibrutinib with a single tablet outside of a clinical setting. FOF¶291. Plaintiffs further have no evidence that success is due to administration of a single tablet because Plaintiffs' expert did not evaluate sales of 140 mg vs. 280 mg vs. 420 mg vs. 560 mg tablets. FOF¶291. Even if Imbruvica sales increased after Imbruvica Tablets entered the market, Plaintiffs have no evidence regarding whether the increased sales relate to the claims, or, for example, commercial spending for Imbruvica Tablets, or to discounts, rebates, and chargebacks. FOF¶¶286-87; *Geo M. Martin, Co.*, 618 F.3d at 1304.

Moreover, that Plaintiffs maintained exclusivities which blocked others negates the probative value of commercial success. FOF¶288. *Acorda*, 903 F.3d at 1337-38.

### 8. The Tablet Claims Have Inadequate Written Description

The Tablet Claims each claim an amount of ibrutinib other than 140 mg and 560 mg (FOF¶¶292-294), but a POSA would understand that the '857 Patent does not describe such formulations (FOF¶¶295-297). Claim 37 of the '857 Patent recites a formulation which includes an amount of ibrutinib from about 70 mgs to about 840 mg. FOF¶293. Claim 30 of the '857 Patent does not recite any limitation relating to a mass amount of ibrutinib, and thus covers all masses.

FOF¶294.  The specification does not describe either claimed range.  Plaintiffs argue that Figure 3 describes formulations containing an amount of ibrutinib other than 140 mg or 560 mg, but Figure 3 does not support Plaintiffs' position.

FOF¶296.  While Figure 3 is a photograph of four tablets with 140, 280, 420, or 560 mg imprinted on the tablets, there is nothing in the figure or specification that ties the imprinted language to the formulations of the Tablet Claims.  *Id.*  Put simply, the specification would not demonstrate to a POSA that the inventor possessed the solid tablet formulations containing an amount of ibrutinib other than 140 or 560 mg.  FOF¶298.  Because the '857 Patent "claims more" than what the inventor "has invented and described . . . , his patent is void.'" *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008).

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

|  |  |
|---|---|
| OF COUNSEL | Melanie K. Sharp (No. 2501) |
|  | James L. Higgins (No. 5021) |
| PROSKAUER ROSE LLP | Steven W. Lee (No. 6676) |
| Siegmund Y. Gutman | 1000 North King Street |
| David M. Hanna | Wilmington, DE  19801 |
| Christopher D. Lynch | (302) 571-6600 |
| Michelle M. Ovanesian* | msharp@ycst.com |
| 2029 Century Park East, Suite 2400 | jhiggins@ycst.com |
| Los Angeles, CA  90067-3010 | slee@ycst.com |
| (310) 557-2900 |  |

OF COUNSEL

PROSKAUER ROSE LLP
Siegmund Y. Gutman
David M. Hanna
Christopher D. Lynch
Michelle M. Ovanesian*
2029 Century Park East, Suite 2400
Los Angeles, CA  90067-3010
(310) 557-2900

Gourdin W. Sirles
Kimberly Q. Li
One International Place
Boston, MA  02110-2600
(617) 526-9600

*Admitted to Practice in Delaware
and Washington D. C. Only

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Steven W. Lee (No. 6676)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
slee@ycst.com

*Attorneys for Alvogen Pine Brook LLC and Natco Pharma Ltd.*

**CERTIFICATION OF COMPLIANCE**
**WITH TYPE, FONT, AND/ WORD LIMITATIONS**

The undersigned hereby certifies that the foregoing document complies with

the Court's Standing Order Regarding Briefing in All Cases dated November 6,

2019 and Order Dated November 5, 2020 (D.I. 302).  It has been prepared in

Times New Roman 14-point type, and contains 12,228 words, which were counted

by Microsoft Word 2016.

Dated:  November 25, 2020

*/s/ James L. Higgins*

_____

James L. Higgins (No. 5021)