## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PHARMACYCLICS LLC and<br>JANSSEN BIOTECH, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 18-192 (CFC) (CJB) |
| | ) | (Consolidated) |
| v. | ) | |
| | ) | |
| CIPLA LIMITED, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| PHARMACYCLICS LLC and<br>JANSSEN BIOTECH, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-434 (CFC) (CJB) |
| | ) | |
| ALVOGEN PINE BROOK LLC and<br>NATCO PHARMA LTD., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' POST-TRIAL BRIEF WITH RESPECT TO DEFENDANTS SANDOZ INC. AND LEK PHARMACEUTICALS D.D.

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................ 1

II.   LEGAL STANDARD ..................................................................... 3

    A.    Presumption of validity ...................................................... 3

    B.    Written description .............................................................. 3

    C.    Enablement ........................................................................... 5

    D.    Inventorship ......................................................................... 6

III.  CLAIMS 18 AND 19 OF THE CRYSTALLINE FORM PATENT
      ('548 PATENT) ARE NOT INVALID ......................................... 6

    A.    The asserted claims satisfy the written description requirement ....... 14

        1.    The written description provides detailed support for the
           claimed crystalline forms ......................................... 14

        2.    The claims satisfy the written description tests for genus
           claims ........................................................................ 16

        3.    The claims satisfy the written description requirement
           even under non-genus case law.................................. 25

        4.    Upholding the asserted claims is not "contrary to the
           purpose" of the written description requirement .................... 26

    B.    The asserted claims are enabled ......................................... 30

        1.    Factor 1: The scope of the asserted claims is narrow ............. 30

        2.    Factors 4 and 5: Crystallization work cannot be predicted
           but the level of skill in the art is high ...................... 31

        3.    Factor 2: The nature of the invention is pioneering and
           the claims are narrowly drawn................................. 33

      4.     Factors 6 and 7: The written description provides ample direction and numerous working examples ............................. 33

      5.     Factor 3: The state of the art was advanced significantly by the inventors, but the prior art contained known techniques for making and characterizing crystalline forms ....................................................................................... 35

      6.     Factor 8: The amount of experimentation is not undue ........... 36

   C.    Inventorship of the '548 Patent is correct ........................................... 39

      1.     Norbert Purro is a properly named inventor ............................ 40

      2.     No one at SSCI is an inventor ................................................... 41

IV.   CLAIM 27 OF THE FORMULATION PATENT ('231 PATENT) IS NOT INVALID ......................................................................................... 46

   A.    The written description of the '231 Patent demonstrates possession of the oral pharmaceutical formulations of claim 27 ....... 46

      1.     The '231 Patent describes formulations "comprising … one or more lubricants" ............................................................. 49

      2.     The '231 Patent describes combinations of excipients falling within claim 27 ............................................................. 52

   B.    Sandoz failed to prove lack of enablement ........................................ 54

      1.     Factors 1 and 2: The nature of the invention and its narrow scope weigh in favor of enablement ............................ 55

      2.     Factors 4 and 5: A highly-skilled POSA could make and use the claimed oral formulations ........................................... 57

      3.     Factor 3: The prior art contained examples of ibrutinib oral formulations ...................................................................... 59

4.    Factors 6 and 7: The patent's teachings, including the working Imbruvica Capsule example covered by claim 27, would provide guidance to a POSA.................................. 61

5.    Factor 8: Only straightforward and routine experimentation would be required for a highly-skilled POSA to make the claimed oral formulations ........................ 64

C.    Inventorship is proper for the '231 Patent........................................... 68

1.    Dr. Smyth, Dr. Wirth, and Mr. Goldman are proper inventors.................................................................................. 69

2.    No one at Aptuit is an inventor ............................................... 71

V.    CONCLUSION.............................................................................. 73

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014) ...................................................20, 25

*Airbus DS Commc'ns, Inc. v. Microdata GIS, Inc.*,
  No. 15-1037, D.I. 28 (Fed. Cir. Mar. 18, 2015) ................................46

*Alcon Research Ltd. v. Barr Labs. Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014) ...................................................56, 61

*Allergan Sales, LLC v. Sandoz, Inc.*,
  717 F. App'x 991 (Fed. Cir. 2017) ..............................................21, 45

*Am-Pro Protective Agency, Inc. v. United States*,
  281 F.3d 1234 (Fed. Cir. 2002) ...........................................................3

*Amgen Inc. v. Sanofi*,
  872 F.3d 1367 (Fed. Cir. 2017) ...................................................10, 11

*Amgen, Inc. v. Chugai Pharm. Co.*,
  927 F.2d 1200 (Fed. Cir. 1991) ...........................................19, 20, 25

*In re Angstadt*,
  537 F.2d 498 (CCPA 1976) ........................................................6, 24, 31

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) ...................................................*passim*

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
  750 F.2d 1569 (Fed. Cir. 1984) ...................................................66, 67

*Augustine Med., Inc. v. Gaymar Indus., Inc.*,
  181 F.3d 1291 (Fed. Cir. 1999) ...........................................................28

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
  776 F.3d 837 (Fed. Cir. 2015) .............................................................70

*Bd. of Trs. of Leland Stanford Junior Univ. v. Chinese Univ. of H.K.*,
  860 F.3d 1367 (Fed. Cir. 2017) ...........................................................3

*Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*,
   642 F.3d 1031 (Fed. Cir. 2011) ............................................................8

*Bilstad v. Wakalopulos*,
   386 F.3d 1116 (Fed. Cir. 2004) .....................................................5, 53

*Boston Scientific Corp. v. Johnson & Johnson*,
   647 F.3d. 1353 (Fed. Cir. 2011) .........................................................19

*Canon Comput. Sys. v. Nu-Kote Int'l, Inc.*,
   134 F.3d 1085 (Fed. Cir. 1998) ...........................................................6

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
   541 F.3d 1115 (Fed. Cir. 2008) .........................................................25

*Cassidian Commc'ns, Inc. v. Microdata GIS, Inc.*,
   No. 2:12-CV-162-JRG, 2015 WL 1848533 (E.D. Tex. Apr. 20, 2015) ..............................................................................................46

*Cephalon, Inc. v. Watson Pharms., Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013) .............................................5, 38, 54

*CFMT, Inc. v. Yieldup Int'l Corp.*,
   349 F.3d 1333 (Fed. Cir. 2003) .........................................................29

*Chiron Corp. v. Genentech, Inc.*,
   363 F.3d 1247 (Fed. Cir. 2004) .........................................................37

*Cordis Corp. v. Medtronic AVE, Inc.*,
   339 F.3d 1352 (Fed. Cir. 2003) .............................................9, 24, 25

*Dow Chem. Co. v. Astro-Valcour, Inc.*,
   267 F.3d 1334 (Fed. Cir. 2001) .........................................................29

*Egenera, Inc. v. Cisco Sys., Inc.*,
   972 F.3d 1367 (Fed. Cir. 2020) .........................................................68

*Eiselstein v. Frank*,
   52 F.3d 1035 (Fed. Cir. 1995) ...........................................................51

*Enzo Biochem, Inc. v. Calgene, Inc.*,
   188 F.3d 1362 (Fed. Cir. 1999) .........................................................32

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
  323 F.3d 956 (Fed. Cir. 2002) ........................................................25, 32

*Ethicon, Inc. v. U.S. Surgical Corp.*,
  135 F.3d 1456 (Fed. Cir. 1998) ...............................................6, 70, 71

*Falko-Gunter v. Inglis*,
  448 F.3d 1357 (Fed. Cir. 2006) ...........................................................60

*Fina Oil & Chem. Co. v. Ewen*,
  123 F.3d 1466 (Fed. Cir. 1997) ...........................................................43

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Com'n*,
  383 F.3d 1352 (Fed. Cir. 2004) ...........................................................40

*Gentry Gallery, Inc. v. Berkline Corp.*,
  134 F.3d 1473 (Fed. Cir. 1998) ...............................................8, 26, 53

*GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*,
  No. 11-046-RGA, 2013 WL 4082232 (D. Del. Aug. 9, 2013)
  ("*GSK I*") ..................................................................................*passim*

*GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*,
  744 F.3d 725 (Fed. Cir. 2014) ("*GSK II*")......................................*passim*

*Hess v. Advanced Cardiovascular Sys., Inc.*,
  106 F.3d 976 (Fed. Cir. 1997) .......................................................39, 68

*In re Hogan*,
  559 F.2d 595 (CCPA 1977) ...........................................................*passim*

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  645 F.3d 1336 (Fed. Cir. 2011) .......................................................4, 16

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
  941 F.3d 1149 (Fed. Cir. 2019) ...........................................................19

*Inline Connection Corp. v. EarthLink, Inc.*,
  684 F. Supp. 2d 496 (D. Del. 2010)......................................................50

*Intercept Pharms. v. Fiorucci*,
  277 F. Supp. 3d 678 (D. Del. 2017)......................................................43

*Invitrogen Corp. v. Clontech Labs., Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005) ....................................................5, 53

*Johns Hopkins Univ. v. CellPro, Inc.*,
    152 F.3d 1342 (Fed. Cir. 1998) ............................................................38

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004) ............................................................5

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)..............................................................................58

*Kubota v. Shibuya*,
    999 F.2d 517 (Fed. Cir. 1993) ............................................................29

*Ex parte Liu*,
    Appeal 2009-015302, 2010 WL 3615693 (BPAI Sept. 15, 2010) .........31, 32, 37

*Maatuk v. Emerson Elec., Inc.*,
    781 F. App'x 1002 (Fed. Cir. 2019) ....................................................42

*Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*,
    C.A. No. 07-127-LPS-MPT, D.I. 505, 2017 WL 3279120 (D. Del.
    Aug. 2, 2017) ......................................................................................46

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ....................................................21, 52

*McRO v. Bandai Namco Games Am. Inc.*,
    959 F.3d 1091 (Fed. Cir. 2020) ..........................................................31

*Microsoft Corp. v. i4i Ltd. P'ship*,
    564 U.S. 91 (2011)................................................................................3

*N. Telecom, Inc. v. Datapoint Corp.*,
    908 F.2d 931 (Fed. Cir. 1990) ............................................................28

*Noelle v. Lederman*,
    355 F.3d 1343 (Fed. Cir. 1997) ..........................................................25

*Pannu v. Iolab Corp.*,
    155 F.3d 1344 (Fed Cir. 1998) ....................................................40, 41, 45, 46

*Pfizer Inc. v. Dr. Reddy's Labs. Ltd.*,
  No. 09-943-LPS, 2011 WL 767849 (D. Del. 2011) ...........................................28

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
  555 F. App'x 961 (Fed. Cir. 2014) ......................................................................24

*Pharm. Resources, Inc. v. Roxane Labs., Inc.*,
  253 F. App'x 26 (Fed. Cir. 2007) ...............................................................62, 63

*Phillips Petroleum Co. v. U.S. Steel Corp.*,
  673 F. Supp. 1278 (D. Del. 1987)......................................................11, 18, 50

*Price v. Symsek*,
  988 F.2d 1187 (Fed. Cir. 1993) ............................................................................3

*Promega Corp. v. Life Techs. Corp.*,
  773 F.3d 1338 (Fed. Cir. 2014) ..........................................................................67

*Research Found. of State Univ. of N.Y. v. Mylan Pharms. Inc.*,
  809 F. Supp. 2d 296 (D. Del. 2011)...........................................................45, 72

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) ..........................................................................24

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*,
  758 F.2d 613 (Fed. Cir. 1985) ............................................................................43

*South Corp. v. United States*,
  690 F.2d 1368 (Fed. Cir. 1982) ............................................................................9

*Stark v. Advanced Magnetics, Inc.*,
  29 F.3d 1570 (Fed. Cir. 1994) ............................................................................45

*Stern v. Trs. of Columbia Univ.*,
  434 F.3d 1375 (Fed. Cir. 2006) ............................................................................6

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
  665 F.3d 1269 (Fed. Cir. 2012) ........................................................4, 5, 47, 52

*Takeda Pharm. Co. v. Handa Pharms., LLC*,
  No. 11-840-JCS, 2013 WL 9853725 (N.D. Cal. Oct. 17, 2013) ......................36

*Tavory v. NTP, Inc.*,
   297 F. App'x 976 (Fed. Cir. 2008) ....................................................43

*Temco Elec. Motor Co. v. Apco Mfg. Co.*,
   275 U.S. 319 (1928)........................................................................29

*Trans Video Elecs., Ltd. v. Sony Elecs., Inc.*,
   822 F. Supp. 2d 1020 (N.D. Cal. 2011)............................................53

*Trovan, Ltd. v. Sokymat SA*,
   299 F.3d 1292 (Fed. Cir. 2002) .......................................................43

*Trs. of Bos. Univ. v. Everlight Elecs. Co.*,
   896 F.3d 1357 (Fed. Cir. 2018) .......................................................65

*U.S. Steel Corp. v. Phillips Petroleum Co.*,
   865 F.2d 1247 (Fed. Cir. 1989) ................................................12, 24

*Union Oil Co. v. Atl. Richfield Co.*,
   208 F.3d 989 (Fed. Cir. 2000) ...................................................47, 51

*Univ. of Pittsburgh v. Hedrick*,
   573 F.3d 1290 (Fed. Cir. 2009) ...................................................6, 40

*Utter v. Hiraga*,
   845 F.2d 993 (Fed. Cir. 1988) .........................................................29

*Vanderbilt Univ. v. ICOS Corp.*,
   601 F.3d 1297 (Fed. Cir. 2010) ...................................................6, 40

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991) .......................................................49

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) ..................................................*passim*

*Warner Lambert Co. v. Teva Pharms. USA, Inc.*,
   C.A. No. 99-922-DRD, 2007 WL 4233015 (D.N.J. Nov. 29, 2007) .................66

*Wyeth & Cordis Corp. v. Abbott Labs.*,
   720 F.3d 1380 (Fed. Cir. 2013) .......................................................67

**Statutes**

35 U.S.C. § 112 .................................................................................*passim*

35 U.S.C. § 116 ........................................................................6, 40, 70

35 U.S.C. § 256 ........................................................................41, 45, 46

## I.    INTRODUCTION

Sandoz concedes the asserted claims of the '548 and '231 Patents are novel, non-obvious, and infringed, and it has abandoned its derivation attack. Sandoz's remaining challenges to written description and enablement for the claimed inventions, and to inventorship, are contrary to the record and settled law.

The '548 crystalline form patent claims are directed to a small genus of crystalline forms (four for claim 18 and two for claim 19) sharing common structural features: unsolvated crystals of ibrutinib with specified interplanar spacings determined through XRPD. Sandoz concedes that the patent represents the first invention of crystalline ibrutinib and that it fully describes and enables all six crystalline forms of ibrutinib known at the time of the patent. Sandoz also concedes that a POSA could readily determine whether any particular crystalline form falls within the asserted claims. Sandoz's speculation that more crystalline forms may be found and that the asserted claims are limitless is incorrect and irrelevant under the law. If alleged infringers could invalidate genus claims based on speculation that additional, unknown species *may* exist, no genus patent could ever survive. But that is not the law. Ultimately, Sandoz has not met its burden to show, clearly and convincingly, that the '548 Patent fails to either describe common structural features or a representative number of species of the narrow genus claimed, or that a POSA could not practice the claimed invention without undue experimentation.

The asserted claim of the '231 formulation patent is narrowly drawn to oral dosage forms of ibrutinib with specified amounts of certain excipients. The written description sets forth a working example of the claim, additional examples with varying amounts and types of excipients, and detailed information about crystalline ibrutinib. Sandoz errs in exaggerating the scope of the claim. Plaintiffs' expert, Dr. Williams, whom this Court found credible, explained that a POSA would recognize from the written description that the inventors possessed the claimed invention and would be able, with routine testing and experimentation, to make and use the full scope of that invention. Sandoz focuses its argument on what it asserts is a broad range of up to 15% lubricant in the formulation. This is wrong on the facts and the law. As Dr. Williams explained, a POSA would know how to select and adjust the lubricant in the claimed formulation, and, in any event, the claims do not require any specific amount of lubricant. Sandoz's attempt to invalidate the claim based on unclaimed elements should be rejected.

Finally, Sandoz's attack on the named inventors of both patents runs afoul of the settled principle that an inventor is correctly named if he or she contributed to the conception of any one claim of the patent; yet, Sandoz fails to analyze inventorship for the majority of the claims. Sandoz also fails to show with clear and convincing evidence that any unidentified inventors contributed to the *conception* of the claimed

inventions, and Sandoz's inability to identify specific individuals who contributed further undermines its assertions. This is insufficient as a matter of law.

## II.    LEGAL STANDARD

### A.    Presumption of validity

Patents are presumed valid, and Sandoz has the heavy burden of overcoming that presumption by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 99-114 (2011). Under this standard, a party alleging invalidity must create "in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quotations omitted); *see Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002) (likening standard to "well-night irrefragable proof," meaning evidence that "cannot be refused or disproved; incontrovertible, incontestable, indisputable, irrefutable, undeniable") (citation omitted).

### B.    Written description

35 U.S.C. § 112 requires that "[t]he specification . . . contain a written description of the invention." Written description must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010). A written description can accomplish this in different ways, and suffices if "the essence of the original disclosure conveys the necessary information—regardless of how it conveys such information." *Bd. of Trs. of Leland Stanford Junior Univ. v.*

3

*Chinese Univ. of H.K.*, 860 F.3d 1367, 1375 (Fed. Cir. 2017) (internal quotations omitted). "[A] patentee can rely on information that is 'well-known in the art' to satisfy written description." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012) (citation omitted).

For a claim to a genus, written description may be satisfied by the disclosure of either: (i) a representative number of species falling within the scope of the genus; or (ii) structural features common to the members of the genus so that one of skill in the art can "visualize or recognize" the genus members. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1352 (Fed. Cir. 2011) (citing *Ariad*, 598 F.3d at 1350).

The Federal Circuit "has repeatedly 'explained that an adequate written description requires a precise definition, such as by *structure*, formula, chemical name, physical properties, or other properties, of species falling within the genus sufficient to distinguish the genus from other materials.'" *GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725 (Fed. Cir. 2014) ("*GSK II*") (affirming adequacy of written description for claim to all solvates of a drug) (quoting *Ariad*, 598 F.3d at 1350) (emphasis in *GSK II*).

"There is no special rule for supporting a genus by the disclosure of a species; so long as disclosure of the species is sufficient to convey to one skilled in the art that the inventor possessed the subject matter of the genus, the genus will be supported by an adequate written description." *Hynix*, 645 F.3d at 1352 (citing *Ariad*, 598 F.3d at

4

1351). A single representative embodiment, while not required, can support written description of a claimed genus. *See, e.g., Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1073 (Fed. Cir. 2005); *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124-25 (Fed. Cir. 2004).

## C.   Enablement

35 U.S.C. § 112 also requires that patent claims be enabled. The enablement requirement is met where a POSA, having read the specification, could practice the invention without "undue experimentation." *Streck*, 665 F.3d at 1288.

Enablement is a question of law based on underlying factual inquiries. *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013). Factors include: (1) the breadth of the claims; (2) the nature of the invention; (3) the state of the prior art; (4) the relative skill of those in the art; (5) the predictability or unpredictability of the art; (6) the amount of direction or guidance presented; (7) the presence or absence of working examples; and (8) the quantity of experimentation necessary. *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988).

The specification need not spell out every detail of the invention, as otherwise "patent specifications would turn into production specifications, which they were never intended to be." *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1156 (Fed. Cir. 2004) (citation omitted). And patent applicants "are not required to disclose

every species encompassed by their claims even in an unpredictable art." *In re Angstadt*, 537 F.2d 498, 503 (CCPA 1976).

### D.   Inventorship

Named inventors on a patent are presumed correct. *Canon Comput. Sys. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). The party challenging inventorship faces the heavy burden to prove misjoinder or nonjoinder by clear and convincing evidence. *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1305 (Fed. Cir. 2010). Inventorship is a question of law with underlying factual findings. *Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009).

"Conception is the touchstone of inventorship." *Stern v. Trs. of Columbia Univ.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006) (citation omitted). Contributing to the "invention of *any* of the allowed claims" satisfies inventorship. *Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009) (emphasis added); *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998); 35 U.S.C. § 116(a).

## III.   CLAIMS 18 AND 19 OF THE CRYSTALLINE FORM PATENT ('548 PATENT) ARE NOT INVALID

Sandoz has not proven by clear and convincing evidence that the asserted claims are invalid for: lack of written description; lack of enablement; or improper inventorship.

6

A number of essential facts concerning Sandoz's challenges to the '548 Patent are not in dispute.

- *First*, Sandoz does not dispute that the inventors were the first to make crystalline ibrutinib. PFOF¶55[1]; Sandoz Br. 34. Not only has Sandoz acknowledged the novelty and non-obviousness of the claims, Sandoz emphasizes how the inventors "went through many years and extensive effort" to develop crystalline ibrutinib. Sandoz Br. 6; PFOF¶¶56-57, 107-127.

- *Second*, Sandoz does not dispute that the '548 Patent provides adequate written description and enablement for all the crystalline forms of ibrutinib known at the time of the invention—Forms A through F. PFOF¶¶56-57. The '548 Patent thus indisputably sets forth full disclosure of crystalline ibrutinib as known at the filing date of the patent.

Sandoz's Section 112 challenges are based on three flawed arguments: (1) genus case law is "inapplicable" to crystalline form technology; (2) crystalline forms cannot be claimed together as a genus; and (3) a patent claim cannot validly encompass crystalline forms developed after the filing date (and hence not specifically exemplified in the patent). Sandoz's arguments ignore settled precedent and patenting practice within the industry, including by Sandoz, and should be rejected.

First, Sandoz contradicts Federal Circuit law in arguing that the "genus" test for written description is limited to "chemical compounds and genetic sequences," and cannot be applied to the asserted claims. Sandoz Br. 22-23. In *Ariad*, the Federal Circuit ruled *en banc* that the law of written description has "*always* expressly

---

[1] PFOF refers to Plaintiffs' Proposed Findings of Fact with Respect to Sandoz.

permitted the disclosure of structural features common to the members of a genus" and this standard "*has not just been applied to chemical and biological inventions*." 598 F.3d at 1352 (emphases added). Simply put, "[a] claim encompassing two or more disclosed embodiments within its scope is a genus claim." *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1037 (Fed. Cir. 2011). Thus, the "genus" test is applied to every technology under the sun, including crystalline forms. *GSK II*, 744 F.3d at 730 (applying genus test to crystalline solvates).[2]

Second, Sandoz wrongly asserts that it does not "make sense" to have a genus claim of crystalline forms because each crystalline form is unique. Sandoz Br. 22. Sandoz's assertion is contrary to its own and well-established industry practice of claiming a genus of crystalline forms, *infra* § III.A.4, and has no basis in logic or precedent. There is nothing unusual about defining a genus using shared features, as the asserted claims do, or the fact that crystalline forms are distinguishable from each other—by definition, every species of a genus is unique.

Third, Sandoz incorrectly argues that a patent claim cannot validly encompass crystalline forms developed after the filing date, as "an applicant is not required to

---

[2] Sandoz asserts that *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998) did not apply the "genus" test for written description. Sandoz Br. 23. *Gentry Gallery* not only predates the Federal Circuit's decision in *Ariad*, but also makes a single reference to the word "genus" in a parenthetical, which does not constitute a rejection of any such "genus" test. *Gentry Gallery*, 134 F.3d at 1479. Here, it is undisputed that claims 18 and 19 encompass multiple embodiments. *E.g.*, Sandoz Br. 25.

describe in the specification every conceivable and possible future embodiment of his invention." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003). Sandoz admits that only two additional forms not specifically exemplified in the patent fall within claim 18 and only one additional form falls within claim 19, but relies on its expert's speculation that additional forms *might* be discovered "in the future as crystallization technology advances" and "new crystallization methods" are developed. Steed Tr. 766:2-14. Even if this speculation came to pass, it would not render the claims invalid for lack of description or enablement.

The law is clear—written description and enablement are determined as of patent filing (including for crystalline form inventions), and later-arising advances cannot invalidate inventions that are properly described and enabled as of the filing date.

*In re Hogan*, for example, upheld a claim to solid polymeric material where the inventor had discovered how to crystallize the material and his patent application described and enabled solid material through this technique. 559 F.2d 595, 606 (CCPA 1977).[3] The PTO rejected the claim but the CCPA reversed, finding the application's full disclosure of how to make solid material *as then known* was sufficient to support the claim, notwithstanding the later discovery of additional solid material, produced by

---

[3] The Federal Circuit is the successor to the U.S. Court of Customs and Patent Appeals (CCPA) and CCPA case law is binding precedent on the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982).

new technology, that fell within the claim. *Id.* As the court explained, sufficiency of disclosure under Section 112 is judged at the time of the patent application's filing and hence is not undone by later advances—a contrary rule would undermine the premise of the patent system and incentive to invent and disclose pioneering inventions:

> The PTO has not challenged appellants' assertion that their 1953 application enabled those skilled in the art in 1953 to make and use "a solid polymer" as described in claim 13. Appellants disclosed, as the only then existing way to make such a polymer, a method of making the crystalline form. To now say that appellants should have disclosed in 1953 the amorphous form which on this record did not exist until 1962, would be to impose an impossible burden on inventors and thus on the patent system. There cannot, in an effective patent system, be such a burden placed on the right to broad claims. To restrict appellants to the crystalline form disclosed…, would be a poor way to stimulate invention, and particularly to encourage its early disclosure. To demand such restriction is merely to state a policy against broad protection for pioneer inventions, a policy both shortsighted and unsound from the standpoint of promoting progress in the useful arts.

*Id.* The court explained that "[i]f later states of the art could be employed as a basis for rejection under 35 U.S.C § 112, the opportunity for obtaining a basic patent upon early disclosure of pioneer inventions would be abolished." *Id.*

In *Amgen Inc. v. Sanofi*, a case involving functional claims, the Federal Circuit confirmed *In re Hogan*'s holding that later-arising changes in the state of the art cannot be used to support a Section 112 challenge, while clarifying that later-arising

embodiments may be germane to evaluating whether the patent discloses a representative number of species. 872 F.3d 1367, 1374 (Fed. Cir. 2017).[4]

In *Phillips Petroleum Co. v. U.S. Steel Corp.*, the court rejected a Section 112 challenge to a claim for "crystalline polypropylene" based on the subsequent discovery of crystalline forms with viscosities and molecular weights outside the disclosure of the patent specification. 673 F. Supp. 1278 (D. Del. 1987) ("*Phillips I*"). The court explained:

> Defendants have misconstrued the inquiry under section 112. They have sought to read into the '851 claim a molecular weight/intrinsic viscosity limitation which simply is not there. Nearly thirty-five years after Phillips' application was filed, they fault Phillips for not describing a polypropylene of high molecular weight/intrinsic viscosity, a property which we now know to be extremely important. A patent applicant is not required, however, to predict every possible variation, improvement or commercial embodiment of his invention.

*Id.* at 1292 (footnotes and citations omitted). The Federal Circuit affirmed, emphasizing that, as the "first to teach crystallinity" of the material, the inventors were entitled to claim crystalline material and did not have to describe later crystalline embodiments with features not known at the time of filing:

> [T]he district court correctly held defendants' evidence immaterial to the section 112, first paragraph inquiry. The central flaw in defendants' evidence, as recognized by the district court, is that it was directed solely to a later state of the art. The record evidences that until 1954, … no one thought it possible that propylene monomers could be

---

[4] Here, as discussed below, the patent discloses representative species for both claims 18 and 19. Indeed, it discloses half of the known embodiments (two of four for claim 18 and one of two for claim 19).

> polymerized into polyprop[y]lene with an intrinsic viscosity of 1.7 to
> 2.0 and an *average* molecular weight approaching 50,000…. Moreover,
> evidence of record establishes that crystallinity gives polypropylene the
> properties of tensile strength, stiffness, and hardness, and, as above
> indicated, defendants concede that Hogan and Banks were the first to
> teach crystallinity.

*U.S. Steel Corp. v. Phillips Petroleum Co.*, 865 F.2d 1247, 1252 (Fed. Cir. 1989)

("*Phillips II*"). The court further stated: "in determining sufficiency of support it is the

state of the art [at filing] and level of skill in the art at that time that is critical." *Id*.

Sandoz's theory that a claim to crystalline forms is invalid unless every

crystalline form is made and exemplified in the patent has also been rejected by this

court. In *GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, Judge Andrews rejected

written description and enablement attacks on a claim to a genus of crystalline forms—

there all "pharmaceutically acceptable solvates" of a drug substance. No. 11-046-

RGA, 2013 WL 4082232, at *8 (D. Del. Aug. 9, 2013) ("*GSK I*") (affirmed by *GSK

II*, 744 F.3d at 730). The court emphasized that the inventors were the first to make the

compound and its solvates, and concluded that the unpredictability of solvates did not

render the claim invalid under Section 112: "Although a person skilled in the art might

have trouble predicting which precise form of a dutasteride solvate would be created

through dissolution, he or she would have available routine testing methods for

identification after the fact." *Id*. The Federal Circuit affirmed, finding:

> Describing a complex of dutasteride and solvent molecules is an
> identification of structural features commonly possessed by members
> of the genus that distinguish them from others, allowing one of skill in

the art to visualize or recognize the identity of the members of the genus.

*GSK II*, 744 F.3d at 730 (citation and internal quotations omitted).

Here, the inventors of the '548 Patent were the first to discover crystalline ibrutinib, and they spent years advancing the art. PFOF¶¶55, 72, 107-127. Their discoveries were a significant innovation and are presented in the patent. PFOF¶55. Commensurate with these discoveries, the asserted claims are directed to a limited group of crystalline forms that share certain features. There is no dispute that these features are present in forms made by the inventors and exemplified in the patents. PFOF¶¶56-57. The written description provides a POSA with ample instruction regarding how to make such forms, as confirmed by others' use of the patent's guidance to make crystalline ibrutinib. PFOF¶¶87-88, 93-96. The claimed inventions are described and enabled.

Sandoz's claim of improper inventorship is also without merit. The listed inventors are correct. There is no misjoinder: Mr. Purro contributed to the formulations of crystalline ibrutinib claimed in the '548 Patent. *Infra* § III.C.1. There is no non-joinder: no one at contract laboratory SSCI performed any work that could be considered invention of the claims under the law. *Infra* § III.C.2.

A.      **The asserted claims satisfy the written description requirement**

1.      **The written description provides detailed support for the claimed crystalline forms**

The '548 Patent's written description provides extensive guidance about crystalline forms of ibrutinib and is commensurate with the scope of the asserted claims. PFOF¶51.

Claims 18 and 19 are each directed to a narrow genus defined by common structural features. PFOF¶¶52, 54. Claim 18 is directed to unsolvated crystalline forms of ibrutinib that have an XRPD pattern with a 2-Theta peak at about 18.9°. PFOF¶¶52-53. Claim 19 is directed to unsolvated crystalline forms of ibrutinib that have an XRPD pattern with 2-Theta peaks at about 16.1° and 18.9°. *Id*. The '548 Patent teaches not only ways to make these forms but also methods and materials for making crystalline forms of ibrutinib generally. PFOF¶¶83-86.

***Preparation of exemplary Forms A through F***. The patent describes examples of six different crystalline forms of ibrutinib, Forms A through F, and teaches methods for preparing these embodiments. PFOF¶¶57, 72, 84.

Forms A and C were the only known embodiments of claim 18 at the time of the invention. PFOF¶65. Form A was the only known embodiment of claim 19 at the time of the invention. PFOF¶68. The patent includes three different exemplary routes for making Form A, and two for making Form C. PFOF¶84. The patent also teaches

methods for preparing other exemplary forms of ibrutinib, including Forms B, D, E, and F. *Id*.

The patent further teaches examples of how to make crystals of one form using crystals of a different form, a concept called "seeding." PFOF¶85; JTX-506 at 3. In particular, the patent teaches that Form C can be converted to Form B in a methanol-water mixture. PFOF¶¶85, 94.

***Preparation of crystalline forms generally***. The written description does not limit the invention to crystalline Forms A through F, and refers to Forms A through F as "aspects" of the invention. PFOF¶71. It describes the invention as "crystalline anhydrous [that is: unsolvated]" ibrutinib. JTX-1, 2:26-28; PFOF¶71. The patent explains, under the heading "Preparation of Crystalline Forms," that the solvents, temperatures, and other reaction conditions used in the exemplary routes may be varied to make crystalline forms generally, and discusses various solvents. PFOF¶86.

Unrebutted evidence confirms that this guidance has been used by others to do exactly that—make other crystalline forms of ibrutinib. PFOF¶¶87-96. As discussed below, the Form I drug substance used in Sandoz's ANDA Product is made directly from two of the crystalline forms in the patent—Forms C and E—using a method similar to the methanol-water conversion taught in the patent. PFOF¶93; *infra* § III.B.4. Other companies have also used the patent's teachings to make crystalline

forms of ibrutinib. PFOF¶96 (Zentiva used Forms A and C to make other forms, while Perrigo used Form A to make other forms).

>    **2.    The claims satisfy the written description tests for genus claims**

Written description for these genus claims are clearly met—the claims recite common structural features that allow a POSA to "visualize or recognize" the members of the genus *and* the patent discloses a representative number of species. *Hynix*, 645 F.3d at 1352.

>    **a)    The claims recite shared structural features that allow a POSA to visualize and recognize the members of the genus**

The asserted claims satisfy the shared structural features genus test for written description.

It is undisputed that, under the asserted claims, a compound must: (i) be ibrutinib; (ii) in crystalline form; (iii) that is unsolvated; and (iv) has the claimed XRPD peak(s). *Supra* § III.A.1; PFOF¶54. Each of these requirements corresponds to a structural feature, and is found in embodiments exemplified in the patent. PFOF¶¶52-54, 65, 68, 73-74. Ibrutinib is the compound. Crystalline means the compound is arranged in a repeating structure with long range order. Myerson Tr. 1636:1-15. Unsolvated crystalline forms are those made up solely of the compound, and do not have solvent in their crystalline structure. PFOF¶53. The claimed 2-Theta peaks define a structural feature. The position of a given 2-Theta peak stems directly from the size

16

and shape of the unit cell, which is the basic repeating building block of a crystal. PFOF¶73. Specifically, 2-Theta values correspond to the "interplanar" or "d-spacings" in the crystal. *Id*. There is no dispute that these features, in combination, are unique to the claimed forms. A POSA could thus readily "visualize or recognize" the members of each claimed genus. *See GSK II*, 744 F.3d at 730 ("[d]escribing a complex of dutasteride and solvent molecules" sufficient to meet test).

There is also no dispute that a POSA could readily determine whether a crystalline form has these common features and falls within the scope of the claims. PFOF¶74; Steed Tr. 709:5-10, 826:21-827:20. Sandoz does not seriously contest that the claims set forth common structural features, but argues that it does not "make logical sense" to apply this test to crystalline forms because different embodiments, *i.e.*, different crystalline forms, are "structurally unique" from each other. Sandoz Br. 27-28. Sandoz relies on flawed logic. Different embodiments are, by definition, distinct from each other—they would not properly be referred to as embodiments otherwise. The test applies to crystalline forms, *GSK II*, 744 F.3d at 730, and the asserted claims meet it.

Sandoz also contends that the claimed features cannot define the genus of crystalline forms because each limitation, taken alone, is not "unique" to the embodiments. Sandoz Br. 27-29. But the question is not whether each claim limitation in *isolation* is unique, but whether the claim *as a whole* defines a specific genus by

identifying specific structural features. Under Sandoz's logic, no claim could properly define a genus as individual claim features invariably will be found in examples outside the scope of the claims.

Sandoz also argues that identification of just one or two 2-Theta peaks does not provide sufficient information to "identify the entire crystalline structure" and thus "cannot unite a genus." Sandoz Br. 28. The claims, however, are not directed to any crystalline compound having those peaks but are instead limited to unsolvated, crystalline ibrutinib with the claimed peaks. PFOF¶¶73, 75. It is undisputed that a POSA could easily determine whether a particular crystalline form meets the requirements of the claim. PFOF¶74. And Sandoz's expert admitted that others, including Sandoz, use only a few 2-Theta peaks to identify crystalline material. PFOF¶76. Sandoz's fingerprint analogy (Br. 21) is likewise flawed. Steed Tr. 807:10-21 (admitting analogy "does fall down at some point."). The 2-Theta peaks in an XRPD pattern define structural aspects of the crystalline forms—and, in the asserted claims, are *not* used to identify a *specific* form, but rather are shared by the limited number of forms encompassed by the asserted claim. PFOF¶73.

Moreover, Sandoz mischaracterizes the law. Claims are not required to recite all features of all embodiments. *Phillips I*, 673 F.Supp. at 1291-92 (holding that unclaimed matter does not have to be described or enabled). The purpose of claims is to delineate the boundaries of the claimed subject matter (which these claims do)—not provide a

18

comprehensive description of each and every embodiment. Further, as discussed below, claiming groups of crystalline forms using two (or fewer) 2-Theta peaks is recognized in the industry and permitted by the PTO. *See infra* § 4.

Sandoz relies on cases such as *Idenix Pharmaceuticals LLC v. Gilead Sciences Inc.*, 941 F.3d 1149 (Fed. Cir. 2019); *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d. 1353 (Fed. Cir. 2011); and *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200 (Fed. Cir. 1991)—to argue that a POSA would not be able to "visualize which undiscovered crystalline forms of ibrutinib will fall within the scope of [the] claims[.]" Sandoz Br. 28-29. But each of these cases involved written description challenges to claims with *functional* limitations, where the scope of claimed subject matter was defined by function, and not structure alone.

The claim in *Idenix* was directed to a method of treating hepatitis C with a purine or pyrimidine β-D-2'-methylribofuranosyl nucleoside or a phosphate thereof. *Idenix*, 941 F.3d at 1155. There were potentially billions (at least many thousands) of nucleosides falling within the claim and no guidance as to which would be effective at treating hepatitis C. *Id.* at 1157-59. Similarly, in *Boston Scientific*, the claims encompassed macrocyclic lactone analogs of rapamycin that possess the same pharmacologic properties as rapamycin. 647 F.3d at 1364. Although the scope of the claims was potentially limitless, the specification contained "virtually no information regarding macrocyclic lactone analogs of rapamycin." *Id.* And, in *Chugai*, the court

19

found the claimed generic DNA sequences had "manifold possibilities for change," and as such, it would be improper to claim all possible genetic sequences with EPO-like activity. 927 F.2d at 1214.

Not only were the claims in these cases expansive in scope, but claims with functional limitations "can be inherently vulnerable to invalidity challenges for lack of written description support, especially in technology fields that are highly unpredictable, where it is difficult to establish a correlation between structure and function for the whole genus or to predict what would be covered by the functionally claimed genus." *AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014).

By contrast, claims 18 and 19 do not use functional language. Nor are the claims defined by achievement of a certain result. Claims 18 and 19 are instead *structural* claims. PFOF¶73. Indeed, in affirming written description and enablement of a claim to solvates of a compound, the Federal Circuit distinguished genus claims defined by function from claims, like those here, that are defined by *structure*. *GSK II*, 744 F.3d at 730. The court explained:

> the claim term at issue, "solvate," is not functional: to be a "solvate," a compound need not produce a desired result or otherwise perform a certain function. The claim term and its corresponding description, however broad, identify certain structures produced by certain processes. We have not required more for an adequate written description that matches claim scope.

20

*Id.* at 731. Here, the structural limitations of claims 18 and 19, which are easily recognized by a POSA, limit these claims to a narrow genus, and the written description provides ample support for them.

> **b)** **The patent discloses a representative number of species of each of the claims**

The claims also satisfy the representative species test for written description. Claim 18 encompasses only four known embodiments, two of which are described in the patent. PFOF¶¶64-65. Claim 19 encompasses only two known embodiments, one of which is described in the patent. PFOF¶¶67-68.

For each of the exemplified embodiments (Forms A and C for claim 18 and Form A for claim 19), the patent includes detailed instructions for making the form and detailed characterization information that informs a POSA of its properties. PFOF¶¶57, 84-86. These embodiments are representative of crystalline forms of ibrutinib that fall within the scope of the claims. PFOF¶¶66, 69, 70; *see, e.g.*, *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1379 (Fed. Cir. 2009) (that claims encompass 22 biological species "supports an inference that there are relatively few potential species that may meet the limitations" of the claims); *Allergan Sales, LLC v. Sandoz, Inc.*, 717 F. App'x 991, 995 (Fed. Cir. 2017) (written description satisfied by disclosing sole salt embodiment of claimed genus known at the time of filing).

Sandoz has failed to show that the exemplified forms are so unlike the other few crystalline forms so as to not be representative. Undisputed evidence establishes that

21

Forms A and I are the two most stable forms to be manufactured and are suitable for use as pharmaceutical agents. PFOF¶69. In addition, one of the exemplified species (Form C) is the form used to make Form I. PFOF¶94. More generally, Forms A, C, and I all have the claimed solvation state and interplanar spacings in their crystalline structure. PFOF¶¶52-54. All are relatively stable. PFOF¶69.

In an effort to exaggerate the breadth of the asserted claims (Br. 31), Sandoz repeatedly mischaracterizes the claimed subject matter. Sandoz contends that Plaintiffs seek to "monopolize *every* crystalline form of ibrutinib"; that the claims "extend to any crystalline form"; and that there is an "unknowable" "universe" of potential additional embodiments. Sandoz Br. 18, 23, 30. Sandoz is wrong on all counts. The claims are limited to crystalline forms of ibrutinib with certain delineated features, *see supra* § III.A.1, and do not even cover all of the exemplary forms in the patent, let alone "all" crystalline forms of ibrutinib. *See* PFOF¶¶57, 65, 68.

Moreover, both sides' experts confirmed that the number of unsolvated forms for *any* compound is quite limited. PFOF¶60. In their collective decades of experience, each has only worked on drug compounds with a maximum of five unsolvated forms (PFOF¶62)—the same number of unsolvated forms of ibrutinib identified by Dr. Steed here (five).[5] Sandoz has failed to show that there are likely to be many (if any)

---

[5] Dr. Steed testified that the only compound he has worked on with more than four unsolvated forms is carbamazepine (which has five). Steed Tr. 799:19-24.

additional unsolvated crystalline forms of ibrutinib—let alone forms that meet the specific requirements of claims 18 and 19. PFOF¶¶58-60, 63.

Sandoz speculates that additional forms of crystalline ibrutinib "could be discovered" (Br. 31), relying on the fact that there are fourteen known forms of a polymorph called ROY. But, as Dr. Steed acknowledged, ROY is an exceptional compound, "extensively studied" precisely for its polymorphic properties. Steed Tr. 799:2-15; PFOF¶61. That ROY—the compound with the *most* known unsolvated crystalline forms ever reported—has only fourteen known crystalline forms illustrates the narrowness of claims 18 and 19. Sandoz offers no evidence to support that ibrutinib is more like ROY than the numerous other compounds worked on by both sides' experts.[6]

Sandoz's expert, Dr. Steed, speculates that additional forms may be discovered, for example, "if *new crystallization method[s] are invented* or [there are] new crystallization methods to try." Steed Tr. 766:6-8 (emphasis added). He further testified that although "we only know of two additional forms in addition to what the '548 Patent disclosed, there could be unlimited number of forms disclosed, discovered in the future *as crystallization technology advances*." *Id*. at 766:9-14 (emphasis added). This is contrary to law. The patent need not describe (or enable) later-

---

[6] Dr. Steed acknowledged that ROY has fourteen forms in part due to "*new* ways to produce crystalline forms." Steed Tr. 767:5-16 (emphasis added).

discovered embodiments resulting from crystallization technology advances. *In re Hogan*, 559 F.2d at 606; *Phillips II*, 865 F.2d at 1252.

Sandoz argues there is "no way to know how many" later-discovered embodiments of the claims may exist. Sandoz Br. 23. But "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." *Cordis Corp*, 339 F.3d at 1365 (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)) (alteration in *Cordis*). Nor is an inventor required to "reduce to practice and be in physical possession of every species[.]" *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x 961, 968 (Fed. Cir. 2014); *In re Angstadt*, 537 F.2d at 502-03 (applicants "are not required to disclose every species encompassed by their claims even in an unpredictable art"). In any event, whether there are exactly four embodiments of claim 18, as opposed to, for example, five or six, does not render the claims "extraordinarily broad," as Sandoz argues. Sandoz Br. 32.

Sandoz's argument that the disclosed species are not representative because crystalline forms are unpredictable fares no better. Sandoz Br. 23-24. Although it cannot be known in advance what conditions will generate a new (previously unknown) form, the patent describes specific conditions (including multiple routes) for making the exemplified forms and a range of conditions that will cause ibrutinib to crystallize; the requisite crystallization experiments are within the capabilities of a

POSA given this instruction. PFOF¶¶47-50, 92. Further, it is routine to determine whether a crystalline form falls within the scope of the claims. PFOF¶74; Steed Tr. 709:5-10, 826:21-827:20.

Sandoz again relies on cases involving *functional* claims, such as *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956 (Fed. Cir. 2002); *Noelle v. Lederman,* 355 F.3d 1343 (Fed. Cir. 1997); *Carnegie Mellon University v. Hoffmann-La Roche Inc.*, 541 F.3d 1115 (Fed. Cir. 2008); and *Amgen*, 872 F.3d at 1374 (citing *AbbVie*, 759 F.3d 1285). As discussed above, such cases do not control here, as the claimed subject matter is indisputably defined by structure. *See AbbVie*, 759 F.3d at 1301.

### 3. The claims satisfy the written description requirement even under non-genus case law

The asserted claims satisfy the written description requirement, whether or not the genus test for written description applies. As discussed above, the disclosures in the patent provide extensive guidance about crystalline forms of ibrutinib and are commensurate with the scope of the asserted claims, which is narrow. *See supra* § III.A.1.

Sandoz appears to believe that written description can only be satisfied if an inventor provides "at a minimum, an XRPD pattern" for every single embodiment (known or unknown) of the claim. Sandoz Br. 20. That is not the law. Patentees are not required to describe "every conceivable and possible future" embodiment to satisfy written description. *Cordis*, 339 F.3d at 1365; *Ariad*, 598 F.3d at 1351-52.

25

In arguing the patent only provides written description support for Forms A through F, Sandoz relies primarily on *Gentry Gallery*—a case which does not contradict this long-standing rule, and is clearly inapplicable here. The specification in *Gentry Gallery* made "clear" that a particular embodiment in a specific configuration was an "essential element" of the invention. 134 F.3d at 1479; *see also id*. (finding disclosure described location of control means as "the only possible location," and that variations were "outside the stated purpose of the invention"). By contrast, the Abstract of the '548 Patent states that the inventions described in the patent are to "crystalline forms" of ibrutinib. PFOF¶71. And as discussed above, the patent describes the invention as "crystalline anhydrous [that is: unsolvated]" ibrutinib. *Id*. Moreover, Forms A through F are described as "aspects" of the invention, further confirming that they are not the only possible embodiments of the invention. *Id*.

Finally, Sandoz's argument that there is insufficient support to claim crystalline forms "by just two peaks" (Br. 20-22) misses the mark, as discussed above. *Supra* § III.A.2.a).

### 4. Upholding the asserted claims is not "contrary to the purpose" of the written description requirement

There is no merit in Sandoz's contention that upholding the asserted claims would be "contrary to the purpose of the written description requirement." Sandoz Br. 29-30. The relevant case law, discussed above, supports a finding that claims 18 and 19 are adequately described. Sandoz is thus wrong to state that Plaintiffs "ask this

26

Court to create new law." Sandoz Br. 29. It is Sandoz who asks the Court to depart from established case law and issue a ruling that would invalidate countless crystalline form genus patents.

Contrary to what Sandoz argues, the issue here is *not* whether being first to discover "a" crystalline form of a compound confers the right to claim "any" crystalline form. Sandoz Br. 29-30. The inventors did far more than discover "a" crystalline form of ibrutinib, and the asserted claims are much narrower than "any" crystalline form of ibrutinib.

Claiming groups of crystalline forms in the same manner as claims 18 and 19 is consistent with industry practice, which the PTO and POSAs acknowledge. PFOF¶77. Indeed, on multiple occasions, Sandoz represented to the PTO that it is proper to obtain claims on *all crystalline forms* of a compound, without further limitation. PFOF¶78. Likewise, one of Sandoz's crystalline form experts is the named inventor on a patent claiming crystalline forms defined using as few as two 2-Theta peaks. PFOF¶79. Other companies have similar genus claims to crystalline forms, including Natco (Alvogen's development partner and defendant in C.A. No. 19-434), which has a patent with claims to anhydrous crystalline forms that can be defined by one 2-Theta peak. *Id*. Sandoz provides no response to this evidence, choosing to ignore it altogether at trial and in its brief. PFOF¶80. Here, the grant of the '548 Patent by the PTO "carries with

it the presumption of validity including compliance with § 112." *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed. Cir. 1990).

Nor is there merit in Sandoz's suggestion that the asserted claims exceed "the inventor[s'] contribution to the field" (Br. 30), particularly given the written description for the narrow claims asserted. *See supra* § III.A.1. Sandoz's suggestion overlooks that, as the first to make crystalline forms of ibrutinib, the inventors' pioneering work enabled others to make additional crystalline forms of ibrutinib. *See supra* § III.A.1; *In re Hogan*, 559 F.2d at 606 ("[W]e note appellants' argument that their invention is of 'pioneer' status. . . . As pioneers, if such they be, they would deserve broad claims to the broad concept."); *Pfizer Inc. v. Dr. Reddy's Labs. Ltd.*, No. 09-943-LPS, 2011 WL 767849, at *5 (D. Del. 2011) ("The patentees were the first to discover the crystalline form of atorvastatin hydrate. … Forms I, II, and IV (along with Form III) were the only forms of crystalline atorvastatin that the patentees had discovered. …The Court agrees with [patentees] that this reality, in the circumstances presented here, did not limit the patentee to claiming only Forms I, II, and IV."); *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1301 (Fed. Cir. 1999) ("Without extensive prior art to confine and cabin their claims, pioneers acquire broader claims than non-pioneers who must craft narrow claims to evade the strictures of a crowded art field."). Later developed technology does not deprive the inventors of

their achievement and does not require exemplification in the patent. *In re Hogan*, 559 F.2d at 606.

Lastly, there is no import to Sandoz's observations that "preparing or recognizing a new crystal form is undeniably a chemical invention," or that later efforts to identify additional crystalline forms of ibrutinib have been recognized as separate inventions. Sandoz Br. 30. Whether a later species is patentable (or has been patented) is a distinct issue with no bearing on whether the inventors demonstrated sufficient written description to support their earlier claims to a genus. *See, e.g.*, *Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988), *superseded on other grounds by rule,* 37 C.F.R. § 1.637 (1992), *as recognized in Kubota v. Shibuya*, 999 F.2d 517 (Fed. Cir. 1993) (rejecting argument that written description support for generic claim was not satisfied where later species separately patented); *see also CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1340 (Fed. Cir. 2003) ("Improvement and selection inventions are ubiquitous in patent law; such developments do not alone cast doubt on enablement of the original invention."); *In re Hogan*, 559 F.2d at 606 (cautioning against use of "the patenting or publication of later existing improvements to 'reach back' and preclude or invalidate a patent on the underlying invention.").[7] Here, the inventors provided

---

[7] Moreover, well-established law recognizes that later-developed inventions can be covered by an earlier, dominant patent. *See, e.g., Temco Elec. Motor Co. v. Apco Mfg. Co.*, 275 U.S. 319, 328 (1928); *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 n.5 (Fed. Cir. 2001).

more than adequate written description for the asserted claims, and the fact that later patents have issued on later-identified species falling within those claims does not change that fact.

### B.    The asserted claims are enabled

Sandoz also failed to prove by clear and convincing evidence that claims 18 and 19 are invalid for lack of enablement. The claims are narrow, the art was well-established, the level of skill in the art was high, and the '548 Patent provides extensive guidance on how to make crystalline forms of ibrutinib. There is no evidence that undue experimentation is required to practice the claims. The claims are enabled—and Sandoz falls far short of proving otherwise. Application of the *Wands* factors confirms this. PFOF¶¶81-96.

### 1.    Factor 1: The scope of the asserted claims is narrow

As noted above, claims 18 and 19 are quite narrow. Claim 18 encompasses only four known embodiments, while claim 19 encompasses only two. *See supra* § III.A.2.b).

Sandoz again argues these claims are "exceedingly broad" because it is possible that more embodiments "could be discovered." Sandoz Br. 31. But as discussed above, there is no reason to conclude that many, if any, additional unsolvated forms of ibrutinib remain to be found. *See supra* § III.A.2.b). Regardless, it is Sandoz's burden to identify any forms that fall within the claims' scope—not the patentee's burden to

prove no such forms could exist. *See McRO v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1104 (Fed. Cir. 2020) (overturning summary judgment of non-enablement finding "it was the burden of the [alleged infringers], not [patentee], to prove that such specific content exists and that it is not enabled"). This factor weighs in favor of enablement.

### 2. Factors 4 and 5: Crystallization work cannot be predicted but the level of skill in the art is high

The parties agree that polymorphism is unpredictable. PFOF¶82. But that does not mean a POSA would have to exercise undue experimentation to practice the full scope of the asserted claims. *In re Angstadt*, 537 F.2d at 503 (that results of experimentation may not be determinable with "reasonable certainty" in advance does not render experimentation undue, as term "experimentation" itself "implies that the success of the particular activity is uncertain"); *Ex parte Liu,* Appeal 2009-015302, 2010 WL 3615693, at *4 (BPAI Sept. 15, 2010) (holding claims to a genus of compounds and their solvates enabled notwithstanding unpredictability and the possibility that the experimentation would be tedious and time-consuming).

*GSK I* is on point. There, Judge Andrews found a claim to crystalline materials—all "pharmaceutically acceptable solvates" of a drug substance—to be enabled, notwithstanding the "considerable degree of unpredictability," given that methods of creating and testing solvates had long been known. 2013 WL 4082232, at

*8-13. The same is true here, as methods of making and characterizing crystalline forms had long been known. *See infra* § III.B.5.

That a POSA would have been highly skilled further supports enablement. PFOF¶¶47-50, 82. As Sandoz's expert Dr. Steed testified, a POSA would have several years of "experience preparing, characterizing, and/or analyzing solid forms of pharmaceutical compounds and products," would be "[f]amiliar with the type of testing that accompanies the development of any drug compound including analytical testing, . . . and polymorphism." PFOF¶50. And a POSA would be "*[c]apable of preparing crystalline forms of pharmaceutical compounds*." *Id*. (emphasis added). In short, a POSA would have "know[n] how to do crystallization," as Dr. Steed acknowledged, and would have been guided by the '548 Patent in carrying out known crystallization methods. PFOF¶¶82, 92.

Sandoz's citation to *Enzo Biochem, Inc. v. Calgene, Inc.*, is inapposite. 188 F.3d 1362 (Fed. Cir. 1999). *Enzo* involved claims that were "quite broad" and claimed the application of genetic antisense technology in *all* types of cells, both eukaryotic and prokaryotic. *Id.* at 1368, 1372, 1377. In contrast, here there are specific structural features to the claimed crystalline forms, and a limited universe of embodiments.

These factors on balance support enablement. *See, e.g.*, *Wands*, 858 F.2d at 740 (laborious experimentation to practice inventions was not undue, where methods

32

involved were well known, and level of skill in the art was high); *GSK I*, 2013 WL 4082232, at *12 (high skill level supported enablement finding).

### 3.   Factor 2: The nature of the invention is pioneering and the claims are narrowly drawn

In addressing this factor, Sandoz fails to acknowledge that the asserted claims cover only a limited set of crystalline forms with specific structural features. PFOF¶¶52, 54. Sandoz also fails to account for the fact that the inventors were the first to make crystalline ibrutinib, thereby facilitating future efforts to effect crystallization. PFOF¶¶87-88. This factor thus weighs in favor of enablement.

### 4.   Factors 6 and 7: The written description provides ample direction and numerous working examples

As discussed above, the '548 Patent provides specific examples of crystalline forms encompassed by the asserted claims, and specifically describes routes for making such embodiments. *See supra* § III.A.1. There is no dispute that the written description describes and enables all known embodiments (Forms A and C) at the time of the invention. PFOF¶¶56-57.

The '548 Patent also provides significant guidance regarding crystalline forms of ibrutinib in general, and numerous working examples. *See supra* § III.A.1; PFOF¶¶83-88; Sandoz Br. 2. It describes six exemplary crystalline forms of ibrutinib, and teaches specific routes to make each one. PFOF¶¶83-84; Sandoz Br. 5. It also teaches how to make crystalline forms using other known forms; explains various

solvents that can be used; and states that the solvents, temperatures, and other reaction conditions used in the exemplary routes may be varied. PFOF¶¶84-86. Thus, contrary to what Sandoz argues, the guidance in the '548 Patent does not "relate solely to Forms A-F." Sandoz Br. 32.

The extensive guidance provided by the written description is underscored by the fact, as discussed above, the patent disclosures facilitated others in the field in making crystalline forms of ibrutinib, including forms not specifically exemplified in the patent, such as Form I.[8] PFOF¶¶87, 93-96. Although Sandoz points to later patents obtained on crystalline forms of ibrutinib not specifically exemplified in the patent (Br. 33), it fails to cite any evidence that extensive experimentation went into making these forms. PFOF¶¶93-95. That additional embodiments falling within asserted claims were discovered after the filing date of the '548 Patent does not mean the claims lack enablement. *See supra* §§ III, III.A.4.

---

[8] Sandoz argues that the use of Forms C and E is irrelevant because they are dissolved during manufacture. Sandoz Br. 27. But the patent teaches conversion of Form C to other forms, and Sandoz's manufacturing documents show that Form C is used because its high purity and lesser stability provides a good vehicle for conversion to other forms. PFOF¶¶88, 94; Myerson Tr. 1689:10-1690:6; PTX-1407 at 2. Moreover, the presence of crystalline material in manufacture greatly enhances the ability to induce further crystallization. PFOF¶88. Although amorphous material is used if the intent is to form crystals outside the influence of the existing crystalline forms, Smyth Tr. 981:6-22, that is not how Form I is made. Sandoz's supplier makes Form I by converting Form C using an ethanol-water mixture. PFOF¶94. The ethanol-water mixture is similar to the methanol-water mixture taught in the patent for converting Form C to Form B, and indeed ethanol is one of the solvents disclosed in the patent for crystallization of ibrutinib. *Id*.; Steed Tr. 821:11-822:1. There is no evidence that the way Form I was made required extensive experimentation. PFOF¶95.

Given the significant guidance and working examples in the '548 Patent, these factors support enablement.

### 5. Factor 3: The state of the art was advanced significantly by the inventors, but the prior art contained known techniques for making and characterizing crystalline forms

Sandoz correctly observes that there was no prior art that taught how to make crystalline forms of ibrutinib. Sandoz Br. 34. But its analysis focuses on the state of the art *without* benefit of the patent disclosure. *See id.* A POSA would have had the benefit of the disclosures of the '548 Patent and the knowledge that a POSA could make crystalline ibrutinib following one of many disclosed routes. PFOF¶92. When reading the methods described in the '548 Patent, a POSA would have had known and advanced techniques for identifying and characterizing crystalline forms. PFOF¶¶50, 82, 90, 92; SFOF¶29.[9]

The prior art had for decades described methods of creating and testing crystalline solids. DTX-1688 at TAB_00001113 (reference from 1990 describing methods of crystallization); Myerson Tr. 1673:9-10 ("[A]nalytical techniques for characterizing and identifying crystalline forms [were] well-known."). As one court observed, "[c]rystallization of molecules has long been known, and crystallization of pharmaceutical compounds has been a common practice in the pharmaceutical

---

[9] SFOF refers to Sandoz's Proposed Findings of Fact.

industry and in academic research laboratories for decades." *Takeda Pharm. Co. v. Handa Pharms., LLC*, No. 11-840-JCS, 2013 WL 9853725, at *6 (N.D. Cal. Oct. 17, 2013). Dr. Steed testified that crystallization methods were common and known to those in the art. Steed Tr. 704:7-10, 723:12-15, 813:20-814:18. When viewed in conjunction with the guidance in the '548 Patent, this factor supports a finding of enablement.

*GSK I* is again on point. As discussed above, the Court concluded under analogous circumstances that the prior art supported a finding of enablement because, "while there [was] a considerable degree of unpredictability of which particular form a solvate would take prior to its creation, the evidence also shows that solvation has long been known in the art, steroids are prone to solvation, and methods of creating and testing solvates have also long been known." 2013 WL 4082232, at *12; *see also Wands*, 858 F.2d at 740 (claims enabled in part because methods needed to practice invention were well known, and level of skill in the art was high).

### 6.    Factor 8: The amount of experimentation is not undue

The evidence establishes that the amount of experimentation needed for a POSA to identify all embodiments of claims 18 and 19 is not undue. PFOF¶¶81-96.

The asserted claims are narrow with a limited number of embodiments. *See supra* § III.A.2.b). Sandoz argues that one could continue to perform experiments indefinitely ("for years") to see whether other embodiments arise. Sandoz Br. 35; Steed

Tr. 789:22-790:6 (contending "potentially unlimited" amount of experimentation). But a POSA would recognize that the number of embodiments is limited and thus, as a practical matter, would understand when to stop after conducting a reasonable amount of experimentation. PFOF¶¶90-92.

Further, later advances in the art are not relevant to enablement. *See In re Hogan*, 559 F.2d at 606. Indeed, "it is well settled that the purpose of the specification is not to 'enable technology that arises after the date of application. The law does not expect an applicant to disclose knowledge invented or developed after the filing date. Such disclosure would be impossible.'" *Ex parte Liu,* 2010 WL 3615693, at *4 (quoting *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004)).

Moreover, it is undisputed that *no* experimentation would be required to practice a substantial portion of the subject matter of the claims. The '548 Patent undisputedly enables two of the four known embodiments of claim 18 (Forms A and C), and one of the two known embodiments of claim 19 (Form A). PFOF¶¶56-57, 64-68, 83-84.

Nor is there evidence, let alone clear and convincing evidence, that undue experimentation would be required to make any other embodiment, especially given the narrowness of the claims, the high level of skill, the extensive guidance in the patent, and that "once the compound has been obtained in the crystalline state," as was done with ibrutinib in the '548 Patent, "it is usually easy to effect crystallization." PFOF¶88 (quoting JTX-506 at 4). For example, Form I, an embodiment of the asserted

37

claims (and the only other embodiment of claim 19), is made directly from two of the crystalline forms in the '548 Patent—including Form C. PFOF¶¶93-94. There was no testimony that the process used to make Form I from Form C was difficult or substantially departed from the methods disclosed in the '548 Patent. PFOF¶¶93, 95. There is accordingly no evidence that undue experimentation would be required to make the known forms of the asserted claims, and no evidence that additional embodiments exist. PFOF¶89.

Moreover, even if considerable experimentation were required to make additional embodiments (it is not), such experimentation would not be undue, as even "extensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques." *Cephalon*, 707 F.3d at 1338. Here, as noted above, there were known methods for making and screening crystalline materials. *See supra* § III.B.5. That these methods were "not foolproof" and "commonly required repetition" does not render the experimentation undue. *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360 (Fed. Cir. 1998); *see also GSK I*, 2013 WL 4082232, at *9-12 (experimentation to make a pharmaceutically acceptable crystalline solvate not undue—notwithstanding need for "trial and error with many variables" work—where "routine technique known as a 'screen' allow[ed] the testing of several solvates at once.").

Sandoz thus falls far short of proving by clear and convincing evidence that undue experimentation would be required to practice the full scope of the claims.

\*       \*       \*       \*       \*

At bottom, Sandoz's appears to argue that, no matter how narrowly drawn, a genus claim to crystalline forms could never be enabled unless expressly limited to known embodiments—because even if all known forms of the genus were enabled as of the filing date (as was undisputedly the case here, PFOF¶¶56-57, 64-68), it would always be possible that some additional form could be made. Sandoz Br. 35-36. This is inconsistent with the law and PTO practice, which commonly grants crystalline form genus claims, and directly at odds with positions Sandoz has taken outside of this litigation. Sandoz's Section 112 challenges should be rejected.

## C.    Inventorship of the '548 Patent is correct

Mark Smyth, David Wirth, Erick Goldman, and Norbert Purro are the named and proper inventors of the '548 Patent. This is presumed under the law, *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997), and confirmed by the record evidence.

Sandoz argues that (1) named inventor Norbert Purro is not a proper inventor, while (2) unidentified employees of SSCI are proper inventors. Sandoz also asserts, without support, that the latter inventorship error it alleges cannot be corrected. Sandoz is wrong on all counts. It has not come close to meeting its heavy burden of proving

39

misjoinder or nonjoinder of inventors. *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1305 (Fed. Cir. 2010). But, in any event, the law affords the patentee the opportunity to correct inventorship, if it is found to be incorrect. *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed Cir. 1998).

### 1.      Norbert Purro is a properly named inventor

Sandoz asserts that Mr. Purro is not a proper inventor because he allegedly "made no contribution to the discovery of any crystalline form of ibrutinib." Sandoz Br. 36-37. This is not the law. For misjoinder, Sandoz must show that "the persons to be removed did not contribute to the invention of *any* of the allowed claims." *Pittsburgh*, 573 F.3d at 1297 (emphasis added); *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Com'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004) ("Because co-inventors need not contribute to the subject matter of every claim of the patent, inventorship is determined on a claim-by-claim basis."); 35 U.S.C § 116(a). Sandoz did not analyze Mr. Purro's contribution to each allowed claim—let alone show by clear and convincing evidence that Mr. Purro did not contribute to the conception of any claim in the '548 Patent. Sandoz's misjoinder argument fails for this reason alone.

The evidence establishes that Mr. Purro contributed to the conception of at least claims 27-30 of the '548 Patent, which are directed to pharmaceutical formulations comprising the crystalline form of ibrutinib of claim 1 and at least one pharmaceutically acceptable ingredient. PFOF¶¶129-130. Indeed, unrebutted

testimony from Mr. Purro, Mr. Goldman, and Dr. Smyth, establish that Mr. Purro, Pharmacyclics's primary ibrutinib capsule formulation scientist, worked with other named inventors to formulate crystalline forms of ibrutinib claimed in the '548 Patent. PFOF¶¶126-127, 184, 188-189. Mr. Purro's formulation work went hand-in-hand with the other inventors' work developing crystalline ibrutinib, PFOF¶188, and is reflected in claims 27-30 and the specification of the '548 Patent (a specification shared with the '231 Patent, PFOF¶132, discussed *infra* § IV.C). Tellingly, Sandoz does not question Mr. Purro's inventorship of the '231 Patent. As Sandoz does not address Mr. Purro's contribution to the conception of claims 27-30, Sandoz's misjoinder theory fails.

Even if Mr. Purro were misjoined as an inventor on the '548 Patent, Plaintiffs could and would correct inventorship pursuant to 35 U.S.C. § 256 by removing Mr. Purro from the patent. *Pannu*, 155 F.3d at 1350. Sandoz does not contend otherwise.

## 2.    No one at SSCI is an inventor

Sandoz also asserts that one or more unidentified "employees at SSCI who identified and characterized forms A and C thus contributed to the conception of claims 18 and 19." Sandoz Br. 37-38. This nonjoinder theory is not supported by law or fact. The routine contract laboratory work that SSCI did for the inventors does not come close to meeting the standard for inventorship.

The facts regarding the first isolation and characterization of Form A (embodiment of claims 18 and 19) and Form C (embodiment of claim 18) are

41

undisputed and demonstrate that no one at SSCI contributed to the conception of either claim. *Maatuk v. Emerson Elec., Inc.*, 781 F. App'x 1002, 1005-06 (Fed. Cir. 2019) ("Because conception is the touchstone of inventorship, a joint inventor must contribute to the invention's conception.") (citations omitted). Named inventor David Wirth was the first person to make Forms A and C. PFOF¶¶100, 106-18; SFOF¶175. SSCI had no role in making these forms—or any other crystalline forms of ibrutinib—for the first time. PFOF¶¶100, 106-18; SFOF¶175. Dr. Wirth had limited in-house analytical testing capabilities so, consistent with common industry practice, Drs. Wirth and Smyth (another named inventor) sent blinded samples of Forms A and C (identified only by a laboratory notebook number) to external laboratory SSCI with a request for specific, routine, non-interpretive analytical tests, XRPD, DSC, and/or TGA. PFOF¶¶104-106, 109-111, 118-120. When performing tests on these blinded samples, SSCI did not know the identity of the compounds they tested, ran only Drs. Wirth and Smyth's requested laboratory tests, and did not interpret the data. *Id.* Drs. Wirth and Smyth then analyzed the XRPD, DSC, and TGA data generated by SSCI's testing, and identified the polymorphs of ibrutinib. *Id.* Sandoz's attempt to use out-of-context deposition quotes (Br. at 37) to argue that analytical testing performed at SSCI at the inventors' direction supports inventorship by unnamed SSCI employees is without merit.

There is also no dispute that the analytical tests carried out at SSCI were routine tests requiring only ordinary skill. PFOF¶¶50, 106, 120. Thus, at most, SSCI exercised routine skill to carry out the inventors' express instructions. That does not amount to inventorship. *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("The basic exercise of the normal skill expected of one skilled in the art, without an inventive act, also does not make one a joint inventor."); *Tavory v. NTP, Inc.*, 297 F. App'x 976, 981 (Fed. Cir. 2008) ("[I]n the context of an alleged unnamed co-inventor, the requirement that his contribution be more than the exercise of ordinary skill means that he cannot prove such a contribution by only showing activities amounting to reduction to practice…."); *Intercept Pharms. v. Fiorucci*, 277 F. Supp. 3d 678, 682-84 (D. Del. 2017) (performing testing at request of inventor to determine efficacy of compounds synthesized by inventor did not contribute to conception). Indeed, "an inventor may solicit the assistance of others when perfecting the invention without 'losing' any patent rights." *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002) (citing *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985)).

Sandoz argues that because "claims 18 and 19 require the crystalline form of ibrutinib to (a) exhibit the claimed XRPD peak(s) and (b) be unsolvated … the invention of claims 18 and 19 was not fully conceived until these limitations were known." Sandoz Br. 37. This argument is a red herring. The undisputed record

43

demonstrates that no one at SSCI contributed to conception of any of these aspects of claims 18 or 19. Indeed, SSCI had no role in the first preparation of any crystalline form of ibrutinib (solvated or unsolvated); no role in deciding to perform XRPD, DSC, or TGA testing on the blinded samples of the forms Dr. Wirth prepared; and no role in interpreting the analytical results for those samples.

Sandoz also references an abbreviated polymorph screen carried out at SSCI in 2008. Sandoz Br. 37-38. However, that screen, which was carried out at the direction of the inventors (PFOF¶¶112-117), does not support inventorship. Indeed, the 2008 screen was not the first time Forms A or C were made or tested. Form A was made by Dr. Wirth, and its data was analyzed by Drs. Wirth and Smyth, several months prior to the 2008 screen—in fact, Form A was supplied by Drs. Wirth and Smyth as starting material for the screen. PFOF¶¶100, 109-120. Form C was likewise made for the *first time* by Dr. Wirth, and its data analyzed by Drs. Wirth and Smyth—in 2009, after the screen. *Id.* The screen has no bearing on inventorship, and certainly does not evidence conception by anyone at SSCI.

Sandoz's non-joinder argument is remarkable given that no employee of SSCI claims to be an inventor of the patent. PFOF¶121. Indeed, while most nonjoinder challenges are lodged by a person who claims to be an inventor, Sandoz invokes a nonjoinder argument under section 102(f) without claiming to have invented anything or pointing to any person it contends did. Plaintiffs are not aware of any case in which

44

an accused infringer has invalidated a patent by proving that an unidentified third party should have been listed as an inventor, and Sandoz has not cited one.

Sandoz asserts that Plaintiffs cannot correct inventorship because "Plaintiffs have not put forward any evidence as to who at SSCI contributed to the claimed inventions." Sandoz Br. 38. But this argument ignores that it is *Sandoz's* burden to prove improper inventorship, and it is *Sandoz* that has "not put forward any evidence as to who at SSCI contributed to the claimed inventions." *Id.* Indeed, "[i]t is . . . notable that [Sandoz] has not identified anyone who is a missing inventor." *Research Found. of State Univ. of N.Y. v. Mylan Pharms. Inc.*, 809 F. Supp. 2d 296, 335-36 (D. Del. 2011), *vacated in part on other grounds by* 531 F. App'x 1008 (Fed. Cir. 2013). Sandoz's failure to identify any specific missing inventor speaks to its failure to meet its burden, not Plaintiffs' ability to correct inventorship.

Regardless, the only question before the Court at this point is whether Sandoz has proven by clear and convincing evidence that inventorship is incorrect. Indeed, the Federal Circuit has instructed that "a district court should first determine whether there exists clear and convincing proof" of incorrect inventorship, and "[u]pon such a finding … a patentee may invoke section 256 to save the patent." *Pannu*, 155 F.3d at 1350; 35 U.S.C. § 256(b) (inventorship error "shall not invalidate the patent … if it can be corrected."). "Section 256 does not limit the time during which inventorship can be corrected." *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1573-75 (Fed. Cir.

1994).[10] Contrary to Sandoz's argument, should the Court find inventorship to be incorrect, Plaintiffs can and will seek to correct it under Section 256. *Pannu*, 155 F.3d at 1350.

## IV.   CLAIM 27 OF THE FORMULATION PATENT ('231 PATENT) IS NOT INVALID

None of Sandoz's invalidity arguments with respect to the '231 Patent has merit. Sandoz has not met its burden to show that claim 27 lacks adequate written description or enablement, nor has Sandoz overcome the heavy presumption that inventorship of the '231 Patent is correct.

### A.   The written description of the '231 Patent demonstrates possession of the oral pharmaceutical formulations of claim 27

Claim 27 is a dependent claim directed to oral formulations of ibrutinib. Claim 1, from which claim 27 depends, requires: about 40 to about 200 mgs of ibrutinib, about 40 to about 50% of one or more diluents, about 3 to about 10% of one or more disintegrating agents, about 2 to about 7% of one or more surfactants, and one or more lubricants. Claim 27 further specifies that the ibrutinib must be about 40 to about 50%

---

[10] *See also Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, C.A. No. 07-127-LPS-MPT, D.I. 505, 2017 WL 3279120, at *3, *7-8 (D. Del. Aug. 2, 2017) (granting post-judgment motion to amend inventorship and noting "courts tend to read [§ 256] broadly, erring on the side of providing relief in correcting inventorship") (report and recommendation adopted, D.I. 506, Sept. 1, 2017); *Airbus DS Commc'ns, Inc. v. Microdata GIS, Inc.*, No. 15-1037, D.I. 28 (Fed. Cir. Mar. 18, 2015) (order granting remand); *Cassidian Commc'ns, Inc. v. Microdata GIS, Inc.*, No. 2:12-CV-162-JRG, 2015 WL 1848533, at *3 (E.D. Tex. Apr. 20, 2015) (vacating judgment of invalidity for improper inventorship).

of the formulation, and also specifies microcrystalline cellulose, croscarmellose sodium, and sodium lauryl sulfate as excipients. As Sandoz acknowledges, the written description describes oral formulations of ibrutinib with the excipients, concentrations, and amounts required by claim 27. Sandoz Br. 8-11. A POSA would recognize from the '231 Patent's detailed disclosure that the inventors "invented what is claimed," and that the written description requirement is satisfied. *See Union Oil Co. v. Atl. Richfield Co.*, 208 F.3d 989, 997 (Fed. Cir. 2000).

The written description of the '231 Patent devotes pages to describing oral formulations within the scope of claim 27 containing ibrutinib, microcrystalline cellulose, croscarmellose sodium, sodium lauryl sulfate, and a lubricant. While neither examples nor actual reduction to practice is required for sufficient written description, the '231 Patent provides both. *Streck*, 665 F.3d at 1285. It describes a pharmaceutical formulation for oral administration comprising ibrutinib in the same weight and concentration range as in claim 27 ("about 40 mg to about 200 mg" and "about 40 wt % to about 50 wt %"), the same concentration ranges of excipients as in claim 27 ("about 40 wt % to about 50 wt %" of a diluent, "about 3 wt % to about 10 wt %" of a disintegrating agent, "about 2 wt % to about 7 wt %" of a surfactant), and a lubricant. PFOF ¶142 (citing JTX-11, 7:60-8:56). The written description then provides information on specific diluents, disintegrating agents, surfactants, and

lubricants that can be used in this formulation, including the excipients recited in claim 27. PFOF¶142.

The disclosure goes on to describe a specific pharmaceutical formulation for oral administration embodying claim 27, containing 140 mgs of ibrutinib, 45.9 wt % microcrystalline cellulose, 7.0 wt % croscarmellose sodium, 4.2 wt % sodium lauryl sulfate, and 0.5 wt % magnesium stearate. PFOF¶143 (citing JTX-11, 8:57-9:7). The patent also sets forth an exemplary recipe: 140 mgs ibrutinib, 151.4 mgs microcrystalline cellulose, 23.0 mgs croscarmellose sodium, 14.0 mgs sodium lauryl sulfate, and 1.6 mgs magnesium stearate. PFOF¶143.

The patent then describes additional formulations with varying amounts of different forms of ibrutinib and excipients. JTX-11, 9:8-12:62. Again, throughout the patent, the amount and concentration of ibrutinib, the specific excipients, and the concentrations of excipients match the elements of claim 27. For example, the specific amount of ibrutinib in this section of the specification invariably falls within "about 40 mg to about 200 mg" and the specified concentration ranges are "about 40 wt % to about 50 wt %" ibrutinib, "about 40 wt % to about 50 wt %" diluent, "about 3 wt % to about 10 wt %" disintegrating agent, and "about 2 wt % to about 7 wt %" surfactant. Microcrystalline cellulose, croscarmellose sodium, and sodium lauryl sulfate (required by claim 27) are described together in the individual embodiments. PFOF¶¶142, 147, 149, 153. All oral formulations described in this

section contain "one or more lubricants" (either generally or as exemplified by magnesium stearate), and there is further description of other lubricants that one can use in these formulations. PFOF¶¶142, 153.

As admitted by Sandoz's expert, Examples 10 and 11 of the '231 Patent are working examples, and include the Imbruvica Capsule formulation (an embodiment of claim 27) in the third column of Table 5. PFOF¶¶144-145, 171. Examples 10 and 11 not only describe the specific weight percentages and amounts of each ingredient, but also provide methods for manufacturing capsules and tablets. PFOF¶144. Examples 12-14 describe the use of particular dosage forms, especially capsules. PFOF¶¶161-163. Taken together, the detailed disclosure of formulations in the '231 Patent, along with the working examples and manufacturing details, show the inventors possessed the invention of claim 27 and make clear there is adequate written description.

1.     **The '231 Patent describes formulations "comprising … one or more lubricants"**

The written description "must 'clearly allow [POSAs] to recognize that [the inventor] invented *what is claimed*.'" *Ariad*, 598 F.3d at 1351 (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)) (emphasis added) (second alteration in original). The inventors of the '231 Patent did just that. Sandoz admits that the '231 Patent describes oral formulations of ibrutinib meeting all limitations of claim 27, including the requirement of "one or more lubricants." PFOF¶133. This

49

is not surprising: the specification clearly describes oral formulations of ibrutinib containing lubricants, including specific examples using the lubricant magnesium stearate. PFOF¶¶142-145, 153.

Sandoz argues that claim 27 "*permit[s]*" oral formulations comprising up to 15% lubricant (Br. 41) (emphasis added), and that the written description of the '231 Patent provides inadequate disclosure of formulations with 15% lubricant. Sandoz Br. 40-41. But the claims do not require 15% lubricant, and what the claim *permits* is different from what the claim *requires*, *i.e.*, "what is claimed." Indeed, courts have routinely rejected written description challenges based on a purported failure to describe subject matter not expressly set forth in the claim. *See, e.g.*, *Phillips I*, 673 F. Supp. at 1290-91 (rejecting argument that claim to "crystalline polypropylene" polymers was invalid for failure to describe polymers with the particular viscosity and weight of the accused products, because claims did not "contain[ ] a limitation regarding intrinsic viscosity or molecular weight" and thus defendant's contentions were "immaterial" with respect to whether claims were adequately described); *accord Inline Connection Corp. v. EarthLink, Inc.*, 684 F. Supp. 2d 496, 528, 531-35 (D. Del. 2010) (rejecting written description challenge based on failure to describe elements not in the claim).

Moreover, both experts explained that a POSA understood the functionality of lubricant, and that too much lubricant can negatively impact desired

characteristics of the formulation, like dissolution. Williams Tr. 1867:6-1869:3; Donovan Tr. 1084:10-21; PFOF¶177. It is undisputed that a POSA would seek to minimize the amount of lubricant. As Dr. Williams explained, a POSA would have taken a holistic approach to formulation design, minimized the amount of lubricant to avoid formulation problems, and used well-known testing to determine the appropriate amount of lubricant. Williams Tr. 1867:6-1869:3; Donovan Tr. 1084:10-21; PFOF¶177.

This case is thus analogous to *Union Oil Co. v. Atl. Richfield Co.*, 208 F.3d 989 (Fed. Cir. 2000). There, the Federal Circuit held the written description requirement was satisfied for claims directed to fuel because "[a]rtisans skilled in petroleum refining … are aware of the properties of raw petroleum sources and know how to mix streams of such sources to achieve a final product with desired characteristics." *Id.* at 1000-01.

Sandoz errs in relying on *Eiselstein v. Frank*, 52 F.3d 1035 (Fed. Cir. 1995). There, the Federal Circuit found no clear error in the BPAI's finding that the disclosure of an alloy containing 45-55% nickel did not provide adequate written description for a specific, claimed range of 50-60% nickel. *Id.* at 1040. Unlike the specific, *bounded* range *required* by the claim in *Eiselstein*, claim 27 requires no particular weight percentage range of lubricant. PFOF¶177. There, the patentee attempted to argue that disclosure of *a different* range provided support for the

claimed range. Here, the '231 Patent provides amounts that are consistent with, and specifically covered by the claim. *Supra* § IV.A.

### 2.    The '231 Patent describes combinations of excipients falling within claim 27

Sandoz also argues that the written description requirement is not met because "[i]n every embodiment and example falling within the scope of claim 27 that uses [microcrystalline cellulose, croscarmellose sodium, and sodium lauryl sulfate], magnesium stearate is the lubricant." Sandoz Br. 41. But, as Plaintiffs have shown, the '231 Patent first describes the claimed invention using more general examples (with a number of potential lubricants, including the lubricant used by Sandoz, *see* JTX-11, 7:60-8:30, 9:8-45, 10:58-11:27), then provides specific examples using a particular lubricant (magnesium stearate). JTX-11, 8:31-9:7; 9:46-10:57; 11:28-12:23; 74:4-32; Williams Tr. 1775:15-1776:13; PFOF¶¶142-145, 153; *supra* § IV.A.

Not only is Sandoz incorrect regarding the '231 Patent's disclosure, it is incorrect on the law. A claim may be "broader than the specific examples disclosed." *Martek*, 579 F.3d at 1371. Indeed, a patent need not contain *any* working example. *See Streck*, 665 F.3d at 1285. And contrary to Sandoz's assertion, a single example may satisfy the written description requirement—here, the patent provides far more disclosure and guidance. The written description requirement does not require the '231 Patent to provide specific examples with every possible lubricant. *See, e.g.*,

52

*Invitrogen*, 429 F.3d at 1073 (claim was not invalid for lack of written description where patent described a single example falling within the genus claim when other species were known in the art and written description taught invention can be applied to other species); *see also Bilstad*, 386 F.3d at 1124-25 ("[O]ur predecessor court recognized that disclosure of a single species within a genus may be enough support for a claim directed to the genus.").

The cases cited by Sandoz also do not support their argument that the written description does not disclose the elements of the claimed invention in combination. In *Trans Video Electronics, Ltd. v. Sony Electronics, Inc.*, the written description neither disclosed an embodiment, nor described the appropriate connectivity of system components, for the claimed information distribution system. 822 F. Supp. 2d 1020, 1026 (N.D. Cal. 2011). Unlike the patent in *Trans Video*, the '231 Patent clearly describes the invention and provides specific embodiments combining all elements of claim 27, including a working example within the scope of the claim. PFOF¶¶142-145, 147, 153-54; Williams Tr. 1775:15-1776:13; *supra* § IV.A. And the '231 Patent, unlike the patent in *Gentry Gallery*, *supra* § III.A.3, does not identify magnesium stearate as an "essential element" of the claimed formulations. 134 F.3d at 1479. Rather, the '231 Patent explicitly provides other lubricants that can be used in the claimed invention. PFOF¶153.

The '231 Patent provides written description support for claim 27 and Sandoz failed to meet its burden of proving otherwise by clear and convincing evidence.

### B.    Sandoz failed to prove lack of enablement

Claim 27 is enabled. The evidence shows that a POSA would be able to practice its full scope using well-known, routine testing. Sandoz ignores that the enablement requirement allows some experimentation—"[t]he key word is 'undue,' not 'experimentation,'" *Wands*, 858 F.2d at 737, and "what is required is that the amount of experimentation not be 'unduly extensive.'" *Cephalon,* 707 F.3d at 1338. Indeed, it is well established that even "extensive experimentation does not necessarily render the experiments *unduly* extensive where the experiments involve repetition of known or commonly used techniques." *Id.* (emphasis added). In the pharmaceutical context, a claim does not lack enablement simply because the POSA would need to experiment with different ingredients, amounts, or common techniques to practice certain embodiments of the invention. *Id.* at 1339-40 (claim covering one- and two-compound dosage forms enabled even though patent disclosed only two-compound dosage forms).

The highly-skilled POSA, reading the '231 Patent, could readily make and use the claimed formulation without extensive—let alone *unduly* extensive—experimentation. Indeed, that is precisely how Sandoz's formulators developed their

ANDA Product.[11] Sandoz developed its formulation by looking to the Imbruvica Capsule formulation—*i.e.*, the embodiment of claim 27 disclosed in Example 10—and researching its components in publicly available literature. PFOF¶¶180-181. Then, with the input of its attorneys, Sandoz selected sodium stearyl fumarate, a lubricant specifically identified in the '231 Patent (*e.g.*, JTX-11, 8:28), as a replacement lubricant for magnesium stearate. PFOF¶¶181-182. Sandoz included sodium stearyl fumarate in its ANDA Product at a weight percentage (1.8%) within the range typically used for oral pharmaceutical formulations (0.5%-2%). PFOF¶181; Donovan Tr. 1087:2-12. By starting with the working example in the '231 Patent, Sandoz had no trouble making an oral pharmaceutical formulation of claim 27. The highly-skilled POSA would be able to do the same.

As discussed below, the *Wands* factors weigh in favor of enablement.

### 1. Factors 1 and 2: The nature of the invention and its narrow scope weigh in favor of enablement

The nature of the invention is an oral formulation of ibrutinib that comprises specific weight ranges of ibrutinib and particular excipients. PFOF¶167. Sandoz argues that claim 27 is "*undoubtedly* broad." Sandoz Br. 43 (emphasis added). But Sandoz's selective analysis of the breadth of isolated claim *limitations* is improper. It is axiomatic that the scope of a patent claim can only be determined by analyzing the

---

[11] Sandoz stipulated to infringement of claim 27. D.I. 503 at 2-3.

claim *as a whole*, not individual limitations in isolation. *Alcon Research Ltd. v. Barr Labs. Inc.*, 745 F.3d 1180, 1189 (Fed. Cir. 2014) (enablement found when reviewing claims "as a whole"). Thus, for example, contrary to Sandoz's argument, the claim does not cover "*any* oral dosage form" (Br. 43 (emphasis added))—it covers the *claimed* oral dosage form, with the recited ingredients, and specific masses and weight-percentages.

Under a proper analysis, claim 27 is narrowly drawn to a limited set of pharmaceutical formulations for oral administration with specific ranges—both in absolute mass and weight-percent—for most excipients. PFOF¶¶133, 172. Claim 27 requires that specific ingredients must be used (ibrutinib, microcrystalline cellulose, croscarmellose sodium, and sodium lauryl sulfate) and further requires that specific *types* of ingredients must be used (diluents, disintegrating agents, surfactants, and lubricants). PFOF¶¶133-134.

Sandoz's arguments to the contrary fail. For example, Sandoz argues that claim 27 is broad in part because it does not require a specific physical form of ibrutinib. Sandoz Br. 43. However, the '231 Patent provides extensive experimental data characterizing the crystalline forms of ibrutinib and describing testing methods. PFOF¶170. To the extent the physical forms of ibrutinib "broaden" claim 27, as Sandoz argues, the '231 Patent provides ample guidance to enable a POSA to practice the full scope. *Id*. Likewise, Sandoz's arguments that claim 27 would cover "all oral

dosage forms" ignores the trial testimony. As confirmed by both experts at trial, a POSA would know that the excipients recited in claim 27 are most commonly used in particular oral dosage forms, such as the capsules or tablets described in the '231 Patent. PFOF¶¶173, 176; Donovan Tr. 1099:17-1100:15; Williams Tr. 1766:11-19. Therefore, these factors weigh in favor of enablement.

### 2. Factors 4 and 5: A highly-skilled POSA could make and use the claimed oral formulations

The level of ordinary skill in the art is indisputably high. Sandoz Br. 46; PFOF¶166. Dr. Williams and Dr. Donovan agree that the highly-skilled POSA for the '231 Patent would have significant training and experience with pharmaceutical formulation development. PFOF¶166; Donovan Tr. 1035:7-17 (POSA would have "familiarity with the excipients or inactive ingredients … that could be selected[.]").

A POSA would know how to perform the "commonly … done" pre-formulation tests, Donovan Tr. 1020:16-19, including the "most common activities" of solubility testing, *id.* at 1020:20-1021:2, 1021:18-23; testing for a drug product's partition coefficient, *id.* at 1021:24-1022:3; evaluation of polymorphism, *id.* at 1022:4-8; testing for chemical stability, *id.* at 1022:9-1023:1; as well as other testing, *id.* at 1020:16-23. Indeed, the '231 Patent provides guidance for conducting, as well as results of, such testing. PFOF¶¶155-160.

The POSA would also understand how to select excipients and amounts and perform routine formulation development tests to evaluate excipient compatibility,

minimize adverse reactions, and "make the dosage form that [they] want to be able to make." Donovan Tr. 1023:22-1024:16; *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."). For example, the POSA would know that diluents "bulk up" oral dosage forms like capsules and tablets, Donovan Tr. 1026:2-3; disintegrants "help with drug dissolution" and help "break apart [*e.g.*, tablets] into much smaller pieces" to improve dissolution, *id.* at 1026:19-22, 1027:5-15; and surfactants "interact with that hydrophobic ['water-hating'] drug substance and … disperse it into the … gastrointestinal tract," *id.* at 1027:25-1028:8. Further, the POSA would know that a "lubricant is primarily a manufacturing aid," *id.* at 1028:12-16, that is added to "not jam up the production equipment" and "just to keep the process moving." *Id.* at 1028:17-1029:1; PFOF¶¶147, 149, 153. As Dr. Williams explained, the POSA would have wanted to minimize the amount of lubricant present in a formulation because "[y]ou don't want to give to people too much of any of the excipients unless you justified it." Williams Tr. 1868:2-6.

The POSA would also understand how to evaluate formulations. Thus, although formulation development can be "relatively unpredictable" in some cases, Donovan Tr. 1067:15-1068:2; PFOF¶168, contrary to Sandoz's suggestion (Br. 49), Dr. Donovan explained that disintegration, dissolution, chemical stability, and physical stability testing are all routine. Donovan Tr. 1032:15-1033:1, 1033:3-9, 1033:10-16.

As Dr. Williams confirmed, and the Court found credible, these types of tests are "routinely" performed by graduate students. Williams Tr. 1866:16-1867:5; PFOF¶¶33, 175.

Moreover, the relative unpredictability in developing a *new* formulation does not exist when working examples and experimental data and methods exist to guide the POSA's development. If a formulator wanted to develop an oral pharmaceutical formulation of ibrutinib from scratch, ibrutinib would present formulation challenges, such as low solubility and bulk density. *See, e.g.*, JTX-11, 71:48-67. These challenges, however, would not prevent or hinder a POSA from practicing the invention of claim 27. The instructions provided by the '231 Patent, including multiple examples, key physicochemical properties, and analytical methods, provide the solution to the challenges posed by ibrutinib. With a high level of skill and the patent's extensive guidance on how to formulate ibrutinib, a POSA would be able to make the claimed formulations without undue experimentation.

### 3. Factor 3: The prior art contained examples of ibrutinib oral formulations

Sandoz argues that the highly-skilled POSA would be faced with an "undeveloped" landscape with "nothing in the art" to guide them in developing the claimed inventions. Sandoz Br. 48. But prior to June 2012, two pharmaceutical formulations of ibrutinib for oral administration were known in the art. PFOF¶169. Notably, U.S. Patent No. 7,514,444—which issued over three years before the '231

Patent's priority date—disclosed two such formulations, one of which is a capsule formulation. PFOF¶169. While the '444 formulations are different from those of claim 27, the art provided general information to a POSA regarding the development of ibrutinib capsule formulations.

Sandoz also ignores the fact that the highly-skilled POSA would have had the instructions of the '231 Patent, as well as extensive knowledge and experience with using lubricants in oral formulations. For example, the POSA would have been aware of the individual lubricants appropriate for use in an oral formulation, the specific concentration ranges typically used for each lubricant; and the desire to minimize the amount of lubricant in an oral formulation; and would have experience with routine dissolution tests to determine whether the amount of lubricant in an oral formulation is excessive. PFOF¶¶177-179. The POSA would have readily drawn upon such knowledge when setting out to implement the formulations claimed by claim 27. *Falko-Gunter v. Inglis*, 448 F.3d 1357, 1365 (Fed. Cir. 2006) (a patent need not teach "what is well known in the art"). Indeed, the testing methods that would be used by the highly-skilled POSA to make and use the claimed inventions were well-known at the time of filing. *Wands*, 858 F.2d at 740.

### 4. Factors 6 and 7: The patent's teachings, including the working Imbruvica Capsule example covered by claim 27, would provide guidance to a POSA

The '231 Patent provides extensive direction and guidance to the highly-skilled POSA to make and use the claimed formulations with minimal experimentation. PFOF¶170. It is undisputed that here, the inventors provided working examples—including the Imbruvica Capsule formulation—despite there being no need to do so. PFOF¶¶145, 171; *Alcon*, 745 F.3d at 1189. Indeed, the working examples not only teach the precise ingredients and amounts of the Imbruvica formulation, but also teach the methods by which the POSA should make the formulation. PFOF¶144.

The '231 Patent is replete with examples, formulations, data, and information that would guide a POSA in making and using the formulations described in claim 27 with minimal experimentation. PFOF¶¶142-145, 155-160, 170; *supra* § IV.A. The written description provides numerous examples of the amounts and weight percentages for the claimed excipients. *See, e.g.*, PFOF¶¶142-145. The '231 Patent also provides a detailed description of the physicochemical properties of ibrutinib, as well as testing methods, that would have helped a formulator develop an oral formulation of ibrutinib. PFOF¶¶155-160, 170.

Sandoz concedes that the working example provides assistance to the POSA, Sandoz Br. 45; PFOF¶171, but argues that the '231 Patent provides "insufficient guidance" because the written description does not disclose examples with a lubricant

other than magnesium stearate. Sandoz Br. 46. But a highly-skilled POSA does not wear blinders when choosing an appropriate lubricant in an acceptable amount. As discussed above, the '231 Patent discusses the use of a number of different lubricants, including the one Sandoz selected, in connection with formulations falling within the scope of claim 27. *Supra* § IV.A.

A POSA (with knowledge of lubricants useful in oral formulations), would be able to review the '231 Patent and practice the full scope of the claims. *Supra* § IV.B.2. The patent provides specific examples of formulations that use magnesium stearate as a lubricant at concentrations of 0.25% to 2.5% w/w. PFOF¶154. Moreover, it is undisputed that a POSA would be well aware of different possible lubricants and would have known the weight percentages of each lubricant that oral formulations typically use, including from references such as the Handbook of Pharmaceutical Excipients (DTX-2261). PFOF¶¶178-179. It is also undisputed that a POSA would know to avoid too high amounts of lubricant, and would seek to minimize the amount of lubricant. PFOF¶¶177-178; Williams Tr. 1868:2-6; Donovan Tr. 1084:4-1085:10.

Sandoz relies on *Pharmaceutical Resources, Inc. v. Roxane Laboratories, Inc.*, 253 F. App'x 26 (Fed. Cir. 2007), but that case is inapposite. Sandoz Br. 44-45, 46 and 48. In that case, the asserted claim was directed to a stable flocculated suspension in water, comprising megestrol acetate; "at least two compounds selected from the group consisting of polyethylene glycol, propylene glycol, glycerol and sorbitol;" and a

surfactant. *Pharmaceutical Resources*, 253 F. App'x at 28. Unlike claim 27, the claim in *Pharmaceutical Resources* specified ***no*** absolute amount of the active ingredient, and ***no ranges*** for ***any*** of the other ingredients, such that the working examples were not sufficiently enabling. *Id.* at 28, 30. Here, in contrast, the amount of ibrutinib, diluent (microcrystalline cellulose), surfactant (sodium lauryl sulfate), and disintegrant (croscarmellose sodium) are narrowly limited to particular weight percentage ranges; and the ibrutinib is further limited to an absolute amount range.

Moreover, the specification in *Pharmaceutical Resources* highlighted the particular unpredictability of megestrol acetate suspensions, observing that the surfactant needed to be "selected carefully and be used within a critical concentration range because even minor changes can have an effect on the properties of such a stable formulation. This is *particularly true for megestrol acetate....*" 253 F.App'x at 29 (emphasis added). Here, in contrast, neither expert suggested that *ibrutinib* had a particular sensitivity to different types or amounts of lubricants; indeed, both experts testified that the motivating factor here would be to minimize the amount of lubricant as part of the holistic approach to formulation design. Williams Tr. 1867:6-1869:3; Donovan Tr. 1084:10-21; PFOF¶177. Thus, the working example of claim 27 set forth in the patent, along with the other examples that informed the POSA regarding the scope of the claims, provide ample enabling disclosure.

5. **Factor 8: Only straightforward and routine experimentation would be required for a highly-skilled POSA to make the claimed oral formulations**

Only straightforward routine experimentation would be needed for a POSA to practice the full scope of formulations covered by claim 27. The written description discloses multiple embodiments within claim 27, including a working example, as well as numerous physicochemical properties of ibrutinib. PFOF¶¶141-146, 156-160. Any additional experimentation would be minor, requiring only well-known techniques and methods, particularly in light of the POSA's high skill level. *Id.* As the Federal Circuit has repeatedly noted, "[t]he test is not merely quantitative, *since a considerable amount of experimentation is permissible*." *Wands*, 858 F.2d at 737 (emphasis added).

Sandoz alleges that formulating ibrutinib would be "particularly burdensome" because claim 27 "allow[s] for any combination of any lubricant, in any concentration up to 15%." Sandoz Br. 50. This is false. Waterproofing, *i.e.*, poor dissolution of the drug substance, is the only potential problem resulting from a high concentration of lubricant that either expert identified. PFOF¶177. This means that the dosage form becomes more hydrophobic, and as a result, "the drug doesn't dissolve as well." Donovan Tr. 1055:16-1056:13. A POSA would be aware of this concern and would have known to minimize the amount of lubricant in a formulation in order to achieve an operable formulation with the desired solubility, and would need no further

guidance to avoid formulations containing unusually high amounts of lubricant.[12] PFOF¶¶177-178; Williams Tr. 1868:2-6; Donovan Tr. 1084:4-1085:10. Moreover, if needed, a POSA would measure the extent of waterproofing by testing the oral dosage form's dissolution, and Sandoz's expert agreed that dissolution testing of oral dosage forms is routine. PFOF¶175. Thus, even if a POSA decided to make an oral formulation containing a high concentration of lubricant, a POSA would at most require routine testing to determine the effect of that lubricant concentration.

Sandoz exaggerates the amount of testing required beyond routine dissolution testing. *See* Sandoz Br. 49-50; *Wands*, 858 F.2d at 737 ("The key word is 'undue,' not 'experimentation.'"). For example, a POSA would not need to identify most of the physicochemical properties of ibrutinib because the '231 Patent discloses them. *See* PFOF¶¶156-160. The examples and claim 27 also inform a POSA that particular excipients work together in oral formulations of ibrutinib, limiting the amount of compatibility and stability testing that would need to be performed. *Supra* § IV.B.2.

Sandoz further alleges that undue experimentation would be required because "the high level of permitted lubricant would result in inoperable dosage forms." Sandoz

---

[12] There is no allegation or evidence that claim 27 reads on oral pharmaceutical formulations that are physically impossible. Thus, the line of cases finding a lack of enablement for impossible limitations is inapposite here. *See, e.g.*, *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1362 (Fed. Cir. 2018) ("physically impossible" embodiment of claim would require undue experimentation to practice).

Br. 51. That again disregards the claims, disclosure, and what a POSA would have understood from both. *Supra* § IV.A. Moreover, to be enabling, a patent does not need to guarantee that all embodiments of the invention will be operative. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984) ("It is not a function of the claims to specifically exclude ... possible inoperative substances[.]") (citation omitted); *Warner Lambert Co. v. Teva Pharms. USA, Inc.*, C.A. No. 99-922-DRD, 2007 WL 4233015, at *15 (D.N.J. Nov. 29. 2007) ("A patent can support extremely broad claims even if some of the embodiments are inoperative."). The evidence shows that a POSA would require little, if any, experimentation to identify inoperable embodiments of claim 27. The highly-skilled POSA would have known the appropriate concentrations of each lubricant, known of the waterproofing concern, and known how to perform routine dissolution testing to adjust the formulation, if necessary. PFOF ¶¶ 175, 177, 179.

Indeed, the '231 Patent offers even more guidance than the patent at issue in *Atlas Powder*, in which the Federal Circuit found enablement. 750 F.2d at 1576. There, the claims were directed to "an emulsion blasting agent" consisting essentially of different ingredients. *Id.* at 1572. Similar to Sandoz, the defendants argued that the disclosure provided just a "list of candidate ingredients" and that the claim included inoperable embodiments. *Id.* at 1576. The Federal Circuit found these arguments unpersuasive, as a POSA would know which ingredients would work based on

examples in the disclosure, even where those examples were "prophetic." *Id.* at 1576-77. Here, the disclosure of the '231 Patent provides more guidance than *Atlas Powder* by including a number of embodiments within the scope of claim 27, including a working example. Indeed, as the defendant in *Atlas Powder*, "[Sandoz] had little difficulty in making satisfactory [formulations] with the [ingredients] listed in the ['231 Patent]." *Id.*; *see* PFOF¶¶180-182.

Sandoz's reliance on *Promega Corp. v. Life Techs. Corp.* (Br. 50) and *Wyeth & Cordis Corp. v. Abbott Labs.* (Br. 51) is inapposite. 773 F.3d 1338 (Fed. Cir. 2014); 720 F.3d 1380 (Fed. Cir. 2013). In both cases, the claims at issue imposed specific functional and results-based requirements that were found to require undue experimentation just for a POSA to determine if they were operating within the scope of the claim. *See Promega*, 773 F.3d at 1349 (undue experimentation required "to identify significantly more complicated sets of STR loci combinations *that would successfully co-amplify*" as claimed) (emphasis added); *Wyeth*, 720 F.3d at 1386 (ascertaining the claimed "*immunosuppressive and antirestenonic effects*" for each candidate compound was excessive, requiring complicated and lengthy series of experiments) (emphasis added). Such results-based requirements are missing from claim 27. PFOF¶133.

For these reasons, Sandoz failed to meet its burden of proving lack of enablement.

## C.  Inventorship is proper for the '231 Patent

Mark Smyth, David Wirth, Erick Goldman, and Norbert Purro are the proper inventors of the '231 Patent. Under the law, the named inventors of a patent are presumed to be correct. *Hess*, 106 F.3d at 980. Here, the inventorship of the '231 Patent is confirmed by the record evidence, including hours of inventor deposition testimony in which they discussed their contributions to the ibrutinib drug substance and formulations that became Imbruvica and are claimed in the '231 Patent. Despite this, Sandoz argues that three of the inventors made no contribution to the '231 Patent, and that "unknown" individuals should instead be credited with the achievement. Sandoz Br. 52-53. Sandoz fails to meet its "heavy" burden to prove any misjoinder or nonjoinder by clear and convincing evidence. *Hess*, 106 F.3d at 980.

As an initial matter, Sandoz has utterly failed to perform the requisite analysis for determining inventorship. "[L]ike validity, inventorship is a claim-by-claim question." *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1376 (Fed. Cir. 2020). Sandoz did not undertake any such "claim-by-claim" analysis—Sandoz's misjoinder argument fails to even *mention* claims 2-26 and 28. Nor did Sandoz offer any testimony (expert or otherwise) addressing inventorship of the specific claims and limitations of the '231 Patent. Similarly, Sandoz's nonjoinder argument fails to articulate the specific subject matter Aptuit allegedly conceived of, who at Aptuit conceived of it, and how that subject matter is encompassed by the claims. Instead,

Sandoz merely offers vague testimony and document excerpts strung together by attorney argument. This is wholly inadequate, and Sandoz's inventorship challenges fail on this basis alone.

### 1.    Dr. Smyth, Dr. Wirth, and Mr. Goldman are proper inventors

Sandoz failed to prove misjoinder. The inventors each made contributions to the conception of the ibrutinib formulations claimed by the '231 Patent. PFOF¶¶36-42, 183. Mr. Purro had primary responsibility for ibrutinib formulation development at Pharmacyclics. PFOF¶184. He selected excipients, ran experiments, and oversaw manufacturing and testing by third parties. PFOF¶184. Dr. Smyth had wide-ranging responsibilities at Pharmacyclics from lab work up through manufacturing, but he focused on developing the ibrutinib active ingredient used during formulation development. PFOF¶¶185, 189. Along with Dr. Smyth, Mr. Goldman and Dr. Wirth made distinct contributions to the development of the ibrutinib active ingredient. PFOF¶¶186-187. As Sandoz's expert testified, understanding the properties of the active ingredient is important for formulation development. Donovan Tr. 1022:4-8. And the evidence shows that development of the ibrutinib drug substance went hand-in-hand with development of ibrutinib formulations at Pharmacyclics. PFOF¶¶127, 188; JTX-334 at 17. Dr. Smyth, Mr. Goldman, and Dr. Wirth are all proper inventors.

Mr. Purro considered and experimented with the ibrutinib active ingredient developed by Messrs. Smyth, Goldman, and Wirth, and conversely, they evaluated Mr.

Purro's formulation development work during development of the active ingredient. PFOF¶¶127, 188. Together, their efforts resulted in the inventions described in the '231 and '548 Patents and the use of crystalline Form A in the Imbruvica Capsule. PFOF¶¶127, 132, 183, 188. The written descriptions of the '548 and '231 Patents are the same, reflecting the extensive and collaborative work.

Sandoz argues that Mr. Smyth, Dr. Wirth, and Mr. Goldman are not proper inventors based on the bare, one-line assertion that "[s]upplying the API is insufficient." Sandoz Br. 52. Messrs. Smyth, Goldman, and Wirth were not mere suppliers of the API—they *developed* the novel and nonobvious ibrutinib drug substance and contributed to its use in ibrutinib formulations. PFOF¶¶185-189. Sandoz has utterly failed to perform the requisite analysis for determining inventorship: Each inventor need only contribute to at least part of a claimed invention. *Ethicon*, 135 F.3d at 1460 ("[F]or the conception of a joint invention, each of the joint inventors need not 'make the same type or amount of contribution' to the invention.") (citing 35 U.S.C. § 116). Sandoz did not undertake any such analysis here, nor did Sandoz offer any testimony addressing inventorship of the specific claims and limitations of the '231 Patent. Its misjoinder case should fail on this basis alone.

Sandoz's reliance on *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 776 F.3d 837 (Fed. Cir. 2015) is misplaced. Sandoz Br. 52. Although the ibrutinib compound was in the prior art as of the priority date, Sandoz has not shown (or even

70

argued) that the contributions of Dr. Smyth, Dr. Wirth, and Mr. Goldman were known in the prior art. Indeed, they were not.

### 2.    No one at Aptuit is an inventor

Similarly, Sandoz failed to prove nonjoinder by clear and convincing evidence. According to Sandoz, excerpts from Pharmacyclics's regulatory filings suggest that Aptuit, a contract manufacturer of Imbruvica Capsules, "meaningfully contributed" to the claimed formulation.[13] Sandoz Br. 53. After years of litigation and extensive discovery, Sandoz's only support for this allegation are two regulatory documents that merely (1) mention the "Aptuit" or "Catalent" formulation, and (2) use vague language describing Pharmacyclics's manufacturing operations (*e.g.*, "*[a]t* Aptuit…the formulation *was modified*"). Sandoz Br. 53 (citing JTX-718; JTX-120) (emphases added). These statements reflect the unremarkable fact that Aptuit was the contract manufacturer for Pharmacyclics—nothing more.

The evidence is clear that the formulations of claim 27 were conceived of by the named inventors—not "unknown" individuals at Aptuit. Aptuit's only involvement was as a contract manufacturer of the inventors' ibrutinib capsule formulation.

---

[13] In *Ethicon* (Br. 53) inventorship was found improper based on a robust factual record including testimony of the improperly omitted co-inventor, corroborating evidence of conception, and analysis of each co-inventor's contributions based on the construed claims. *See* 135 F.3d at 1462. Sandoz has failed to offer any such evidence, testimony, or analysis.

PFOF¶¶198-200. It was Mr. Purro—not Aptuit—who conceived of using magnesium stearate as a lubricant in the inventors' 140 mg ibrutinib formulations. PFOF¶196. Mr. Purro made all decisions about the ingredients and amounts used in Pharmacyclics's ibrutinib capsule formulations and oversaw Aptuit's manufacturing process. PFOF¶197. No one from Aptuit has come forward claiming to have invented any claim of the '231 Patent. Indeed, there is no testimony or evidence that anyone at Aptuit conceived of anything *at all*, let alone the ibrutinib formulation of claim 27. PFOF¶¶201-202.

Contrary to Sandoz's assertion, Plaintiffs had no obligation to present evidence "related to who at Aptuit was involved." Sandoz Br. 54. Nor does such a requirement make sense—as Plaintiffs have explained, no one at Aptuit conceived of the invention in the '231 Patent. It was for Sandoz to identify the allegedly nonjoined inventor and what that inventor allegedly conceived. *See also Research Found.*, 809 F. Supp. 2d at 335-36 ("It is also notable that Mylan has not identified anyone who is a missing inventor."). Sandoz has failed to do so, and its cannot sustain its heavy burden for proving nonjoinder.

Finally, while Sandoz's inventorship theories fail, Sandoz's argument that nonjoinder of Aptuit "cannot be corrected" is legally flawed and procedurally improper. Sandoz Br. 54; *supra* § III.C.2. The only question before the Court at this

point is whether Sandoz has proven by clear and convincing evidence that inventorship

is incorrect. It has not.

## V.      CONCLUSION

For the foregoing reasons, Sandoz's invalidity arguments fail.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Christopher N. Sipes
Erica N. Andersen
Brianne Bharkhda
Chanson Chang
Nicholas L. Evoy
Justin Thomas Howell
Laura Dolbow
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC  20001-4956
(202) 662-6000

Alexa Hansen
David Denuyl
Anna Q. Han
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA  94105
(415) 591-6000

*Attorneys for Pharmacyclics LLC*

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Jennifer A. Ward (#6476)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com
jward@mnat.com

*Attorneys for Plaintiffs*

Irena Royzman
Christine Willgoos
Marcus A. Colucci
Jennifer Liu
Jonathan R. Pepin
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9100

Hannah Lee
Daniel Williams
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
(650) 752-1700

*Attorneys for Janssen Biotech, Inc.*

January 5, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations specified in Local Rule 7.1.3 and the Court's November 6, 2019 Standing Order Regarding Briefing in All Cases. According to the word processing system used to prepare this document, the brief contains 17,431 words.  This total excludes the cover page, signature block, table of contents, table of authorities, certificate of compliance, and certificate of service.

I further certify that this brief complies with the typeface requirements set forth in the Court's November 6, 2019 Standing Order Regarding Briefing in All Cases because this brief was prepared using Microsoft Word Office 365 in 14-point Times New Roman font.

*/s/ Jeremy A. Tigan*

_____

Jeremy A. Tigan (#5239)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 5, 2021, upon the following in the manner indicated:

Dominick T. Gattuso, Esquire                    *VIA ELECTRONIC MAIL*
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE  19801
*Attorneys for Defendants Sandoz Inc. and*
*Lek Pharmaceuticals d.d.*

Natalie C. Clayton, Esquire                      *VIA ELECTRONIC MAIL*
Madeline E. Byrd, Esquire
ALSTON & BIRD LLP
90 Park Avenue
New York, NY  10016
*Attorneys for Defendants Sandoz Inc. and*
*Lek Pharmaceuticals d.d.*

Shri Abhyankar, Esquire                          *VIA ELECTRONIC MAIL*
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, GA  30309-3424
*Attorneys for Defendants Sandoz Inc. and*
*Lek Pharmaceuticals d.d.*

Kirk T. Bradley, Esquire                          *VIA ELECTRONIC MAIL*
ALSTON & BIRD LLP
Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, NC  28280-4000
*Attorneys for Defendants Sandoz Inc. and*
*Lek Pharmaceuticals d.d.*

Melanie K. Sharp, Esquire                         *VIA ELECTRONIC MAIL*
James L. Higgins, Esquire
Steven W. Lee, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendants Alvogen Pine*
*Brook LLC and Natco Pharma Ltd.*

Siegmund Y. Gutman, Esquire                       *VIA ELECTRONIC MAIL*
David M. Hanna, Esquire
Michelle M. Ovanesian, Esquire
Christopher D. Lynch, Ph.D.
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA  90067-3010
*Attorneys for Defendants Alvogen Pine*
*Brook LLC and Natco Pharma Ltd.*

Kimberly Q. Li, Esquire                           *VIA ELECTRONIC MAIL*
PROSKAUER ROSE LLP
One International Place
Boston, MA  02110
*Attorneys for Defendants Alvogen Pine*
*Brook LLC and Natco Pharma Ltd.*


                                        */s/ Jeremy A. Tigan*
                                        _____
                                        Jeremy A. Tigan (#5239)


2